IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
Houston Division

_____
                                              )
FIESTA MART, L.L.C.,              )
                                              )
              Plaintiff,              )
                                              )
       v.                                )         Civil Action No. 4:18-cv-04704 (EW)
                                              )
ACON INVESTMENTS, L.L.C.,  )
                                              )
              Defendant.             )
_____)


**DECLARATION OF DREW SCIELZO IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS FOR *FORUM NON CONVENIENS*
OR TRANSFER UNDER 28 U.S.C. § 1404(a)**


I, Drew Scielzo, declare under penalty of perjury the following is true and correct:

1.       I am an Operating Partner at ACON Investments, L.L.L. ("ACON"), the

Defendant in this matter. I work directly with certain portfolio companies of funds sponsored by

ACON providing advice on a range of operational issues.  I am familiar with the attached

Membership Interest Purchase Agreement ("MIPA") and the facts and circumstances stated

herein, based upon personal knowledge and conversations with Defendant's agents and

employees.  I submit this declaration in support of Defendant's motion to dismiss for *forum non*

*conveniens* or transfer under 28 U.S.C. § 1404(a).

2.       ACON is a private equity firm with investments in a diverse set of businesses.

3.       Through affiliated entities, including Fiesta Holdings Investments, L.L.C.,

formerly ACON Fiesta Holdings L.L.C. (hereinafter referred to as "Fiesta Holdings"), ACON

owned Fiesta Mart until April 30, 2018, when it was sold to Bodega Latina Corporation

("Bodega") pursuant to a Membership Interest Purchase Agreement ("MIPA"), dated March 23,
2018.  A true and accurate copy of the MIPA is attached to this Declaration (without exhibits,
appendices, and schedules).  ACON substantially participated in the negotiations leading up to
the MIPA.

     4.     ACON maintained a program of property insurance policies covering its interests
in its various portfolio companies and their businesses, including Fiesta Mart and others such as
Funko, LLC, Igloo Products Corp., IWP Holdings, LLC, Refac Holdings, Inc., ACON Suzo-
Happ, LLC.  At the primary level, ACON maintained the following seven policies (each, a
"Policy," and jointly, the "Policies"):

     (i)     Westport Insurance Corporation (Policy no.: NAP 2001214 01);

     (ii)     Aspen Specialty Insurance Company (Policy no.: PRAGK1017);

     (iii)     Arch Specialty Insurance Company (Policy no.: ESP7303053-01);

     (iv)     Lloyd's of London (Policy no.: URS 2552391.17);

     (v)     Indian Harbor Insurance Company (Policy no.: PRO0047629-01);

     (vi)     Allied World Assurance Company (Policy no.: 0310-7409-1A); and

     (vii)     HDI Global Insurance Company (Policy no.: CPD1488300).

Each Policy provided coverage for property damage and business interruption loss for the period
June 1, 2017 through June 1, 2018.

     5.     Each Policy defined the "Insured" as follows:

     NAMED INSURED - This policy does insure ACON Investments, LLC <u>and as</u>
<u>per the attached endorsement schedule</u>, any subsidiary, associated, allied or
affiliated company, corporation, firm, organization, partnership, Joint Venture,
Limited Liability Company or individual, whether wholly or partially owned or
controlled by the Insured, where the Insured maintains an interest, or where the

> Insured is required to provide insurance, as now exist or are hereafter constituted or acquired, and any other party in interest that is required by contract or other agreement to be named, all hereafter referred to as the "Insured".

(emphasis in original).  The endorsement schedule attached to each Policy designated Fiesta Holdings as the insured in connection with ACON's portfolio company, Fiesta Mart: "With respects to the entity of, Fiesta Mart, the following terms and conditions shall apply: A. Named Insured -  ACON Fiesta Holdings, LLC."  The attached endorsement schedules designated other ACON subsidiaries as the insureds with respect to other ACON portfolio companies, but it did not designate any entity other than Fiesta Holdings with respect to Fiesta Mart.

6.     ACON allocated the premium for each Policy among its portfolio companies, including Fiesta Mart.  Each portfolio company sent its allocation to ACON's insurance broker; the insurance broker then paid the premium to the insurance companies directly.

7.     The Policies stated that any loss shall be "payable to the Insured, or as directed by them."

8.     On or about August 25, 2017, Hurricane Harvey struck the Houston area, damaging multiple Fiesta Mart grocery stores and supermarkets.  As the owners of Fiesta Mart, ACON and Fiesta Holdings suffered property damage and business interruption losses resulting from Hurricane Harvey.

9.     On or about September 26, 2017, ACON and Fiesta Holdings submitted first partial proofs of loss claiming $7.5 million under the Policies.  I directed the insurance broker and Wayne Peterson, who was CFO of both Fiesta Holdings and Fiesta Mart and knowledgeable regarding the damage wrought by Hurricane Harvey, to submit the proofs of loss verifying the damage.  Each proof of loss was submitted on behalf of "ACON Investments, LLC (ACON

3

Fiesta Holdings, LLC)," as the Insureds.  I directed the insurance broker to instruct the insurers to make payment directly to Fiesta Mart, which they did in or about the fall of 2017.

10.     With the exception of two stores, the physical destruction to Fiesta Mart stores and property was repaired so that, by or about March 2018, they were in good operating condition and repair and suitable and adequate for continued use in the manner in which they were being used.  The damage from Hurricane Harvey resulted in the prolonged closing of two Fiesta Mart stores.  As of March 2018, one of the stores was expected to reopen, albeit reduced in size, in August or September 2018.  The impact of Hurricane Harvey on the other store, including whether the lease was terminated by virtue of the Hurricane and who had the financial obligation to restore the premises, was a matter of dispute with the landlord.

11.     On or about March 23, 2018, Fiesta Holdings and other ACON affiliated entities entered a Membership Interest Purchase Agreement ("MIPA") with Bodega, pursuant to which Fiesta Holdings and the ACON affiliates agreed to sell their interests in Fiesta Mart Investments, L.L.C., the 100% indirect owner of Fiesta Mart, to Bodega (the "MIPA transaction").  ACON substantially participated in the negotiations leading up to the MIPA.  The MIPA transaction closed on or about April 30, 2018.  Notably, Fiesta Holdings—the Insured specified in the Policies with respect to Fiesta Mart—was not transferred to Bodega pursuant to the MIPA transaction.  Neither the proceeds nor claims to the proceeds paid for losses resulting from Hurricane Harvey were conveyed to Bodega pursuant to the MIPA or any other agreement.

12.     In Schedules 4.7 and 7.1(a), the MIPA disclosed the damage inflicted by Hurricane Harvey on Fiesta Mart stores and business; the state of repair; the fact that two stores

4

were closed; the expectation that one, reduced in size, would reopen; and that the impact of the Hurricane on the lease of the other stores was a matter in dispute with the landlord.

13.     In August 2018, ACON submitted second partial proofs of loss on behalf of itself and Fiesta Holdings claiming $4,780,347 in property damage (after a $250,000 deductible) resulting from Hurricane Harvey under the Policies.  ACON again submitted the proofs of loss on behalf of "ACON Investments, LLC (ACON Fiesta Holdings, LLC)," as the Insureds.  Six of the seven insurance companies paid $4,302,312 to ACON in or about September and October 2018.  ACON has not yet received any monies under the Policies with respect to business interruption losses due to Hurricane

14.     By letter, dated October 4, 2018, Bodega's General Counsel requested ACON to wire Hurricane Harvey-related insurance proceeds to a Bodega bank account: "please wire $4,780,347 to Wells Fargo Bank, N.A. . . . Account title: Bodega Latina Corporation."  ACON, invoking the terms of the MIPA, refused by response letter to Bodega, dated October 10, 2018.

15.     On December 13, 2018, ACON and Fiesta Holdings filed an action against Bodega in Delaware Superior Court for breach of the MIPA's forum selection clause, breach of the MIPA's implied covenant of good faith and fair dealing, and declaratory judgment that ACON and Fiesta Holdings are entitled to retain the insurance proceeds relating to Hurricane Harvey under the Policies.

16.     This action in Texas and the action filed in Delaware is part of a larger dispute
between ACON and its affiliates and Bodega and its affiliates, all fallout from the purchase and
sale of Fiesta Mart pursuant to the MIPA.

Dated:  Washington, D.C.
      December 20, 2018

                                 Drew Scielzo

6

*Execution Version*

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

By and Among

BODEGA LATINA CORPORATION;

ACON FIESTA AGGREGATOR A, L.L.C.;

ACON FIESTA AGGREGATOR B, L.P.;

and

FIESTA HOLDINGS INVESTMENTS, L.L.C.

Dated as of March 23, 2018

## TABLE OF CONTENTS

Page

Article I DEFINITIONS AND CERTAIN INTERPRETIVE MATTERS .......................................2
1.1    *Definitions*.........................................................................2
1.2    *Certain Interpretive Matters*.............................................17

Article II PURCHASE AND SALE OF THE MEMBERSHIP INTERESTS ...........................19
2.1    *Purchase and Sale of the Membership Interests*..........19
2.2    *Consideration; Consideration Spreadsheet*.................19
2.3    *Payment of Cash Consideration.*...................................20
2.4    *Withholding Taxes*..........................................................24

Article III CLOSING AND CLOSING DELIVERIES ............................................24
3.1    *Closing Date* ...................................................................24
3.2    *Closing Deliveries*..........................................................24

Article IV REPRESENTATIONS AND WARRANTIES REGARDING THE FIESTA GROUP COMPANIES........................................................25
4.1    *Organization, Qualification and Capacity of the Fiesta Group Companies.*................25
4.2    *Authorized Equity* ...........................................................26
4.3    *Subsidiaries*.....................................................................26
4.4    *Consents and Approvals; No Violations*.......................27
4.5    *Governmental Authorizations* ........................................28
4.6    *Financial Statements; No Undisclosed Liabilities*.......28
4.7    *Absence of Changes* ........................................................29
4.8    *Real and Personal Property.* ..........................................29
4.9    *Sufficiency of Assets* .......................................................31
4.10  *Litigation, Judgments, Etc.* ............................................31
4.11  *Compliance With Laws* ...................................................31
4.12  *Intellectual Property and Intellectual Property Licenses.*.....32
4.13  *Contracts*.........................................................................34
4.14  *Environmental Laws.* .....................................................36
4.15  *Taxes* ...............................................................................37
4.16  *Employee Benefit Plans.* .................................................39
4.17  *Directors, Officers and Key Employees; Labor Matters.* ...41
4.18  *Brokerage Agreements* ...................................................43
4.19  *Suppliers* .........................................................................43
4.20  *Insurance* ........................................................................43
4.21  *Inventories* ......................................................................43
4.22  *Transactions with Affiliates.* ..........................................44
4.23  *Product Liabilities Law* ..................................................44
4.24  *Certain Payments.* ..........................................................44
4.25  *Sanctions and Export Controls* ......................................45
4.26  *No Other Representations and Warranties*....................45

i

4.27    *No Other Representations or Warranties; No Reliance* ...............................46

Article V REPRESENTATIONS AND WARRANTIES REGARDING THE SELLERS and acon blockers ...............................................................................................................46

5.1    *Representations Regarding Fiesta Holdings* ......................................46
5.2    *Representations of the ACON Aggregators* ........................................48
5.3    *Representations Regarding the ACON Blockers* ................................49

Article VI REPRESENTATIONS AND WARRANTIES OF BLC ...........................53

6.1    *Organization and Qualification of BLC* .............................................53
6.2    *Authorization of Agreement – Enforceability* ....................................53
6.3    *Consents and Approvals; No Violations* ..............................................54
6.4    *Litigation, Judgments, Etc.* ..................................................................54
6.5    *Brokerage Agreements* ...........................................................................55
6.6    *Investment Intent* ....................................................................................55
6.7    *Sufficient Funds* ......................................................................................55
6.8    *No Other Representations or Warranties; No Reliance* ....................56

Article VII CERTAIN AGREEMENTS PRIOR TO CLOSING .............................57

7.1    *Conduct of the Business of the Fiesta Group Companies and the ACON Blockers prior to the Closing Date* .......................................................57
7.2    *Further Actions* .......................................................................................60
7.3    *Competition Filings* ................................................................................61
7.4    *Access* .......................................................................................................62
7.5    *Exclusive Agreement* ...............................................................................62
7.6    *Termination of Affiliate Obligations* ...................................................63
7.7    *Cash in Stores* .........................................................................................63
7.8    *Closed Store Payments* ..........................................................................63
7.9    *BLC R&W Policy* .....................................................................................65
7.10   *Company Restructuring; Alternative Structure* .................................65
7.11   *Director and Officers Liability; Indemnification* ...............................66
7.12   *BLC's Financing Covenants* ..................................................................66
7.13   *Financing Cooperation* ..........................................................................69
7.14   *Westport Business Interruption Insurance Payments* .......................71
7.15   *Name Change* ...........................................................................................71

Article VIII CONDITIONS TO CLOSING ..............................................................71

8.1    *Conditions of BLC to Closing* ...............................................................71
8.2    *Conditions of the Sellers to Closing* ....................................................73

Article IX TAX MATTERS .........................................................................................74

9.1    *Responsibility for Straddle Period Taxes* ...........................................74
9.2    *Tax Allocation* .........................................................................................74
9.3    *Cooperation on Tax Matters* .................................................................75
9.4    *Transfer Taxes* ........................................................................................75
9.5    *Tax Returns* .............................................................................................75
9.6    *Refunds* .....................................................................................................75

9.7     *Audits* ...............................................................................................76
9.8     *Amended Returns* ..........................................................................76

Article X TERMINATION ...................................................................................76

10.1    *Termination* ...................................................................................76
10.2    *Effect of Termination* ...................................................................78
10.3    *Remedies for Breach* ....................................................................78

Article XI INDEMNIFICATION ........................................................................80

11.1    *Survival* .........................................................................................80
11.2    *Indemnification.* ............................................................................80
11.3    *Seller Indemnification – Limitations* ...........................................82
11.4    *BLC Indemnification – Limitations* ..............................................83
11.5    *Assertion of Claims* ......................................................................84
11.6    *Payment of Losses* .........................................................................86
11.7    *Exclusive Remedy; Waiver* ...........................................................86

Article XII MISCELLANEOUS ..........................................................................86

12.1    *No Third Party Beneficiaries* .......................................................86
12.2    *Notices* ...........................................................................................86
12.3    *Headings* ........................................................................................87
12.4    *Entire Agreement* ..........................................................................87
12.5    *Waiver* ............................................................................................88
12.6    *Amendment* .....................................................................................88
12.7    *Public Statements* ..........................................................................88
12.8    *Further Actions* .............................................................................88
12.9    *Assignment* .....................................................................................88
12.10   *Severability* ...................................................................................89
12.11   *Specific Performance* ....................................................................89
12.12   *Governing Law* ..............................................................................89
12.13   *Jurisdiction; Venue.* ......................................................................89
12.14   *Counterparts* .................................................................................90
12.15   *Relationship Among Sellers* ..........................................................91
12.16   *Transaction Costs* .........................................................................93
12.17   *Legal Representation* .....................................................................93
12.18   *Lender Limitations* ........................................................................95

<u>EXHIBITS</u>

| | | |
|---|---|---|
| A-1 | – | Accounting Principles: Deviations from GAAP |
| A-2 | – | Net Working Capital Line Items and Sample Calculation of Net Working Capital |
| B | – | BLC R&W Policy and Binder |
| C | – | Form of Company Restructuring Agreements |

<u>APPENDICES</u>

| | |
|---|---|
| A | Closed Store Leases |
| B | Indebtedness |
| C | Related Party Loans |
| D | Special Indemnification Matters |

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement (this "Agreement"), dated as of March 23, 2018, is by and among:

(a)      Bodega Latina Corporation, a Delaware corporation ("BLC");

(b)      ACON Fiesta Aggregator A L.L.C., a Delaware limited liability company ("ACON Aggregator A");

(c)      ACON Fiesta Aggregator B, L.P., a Delaware limited partnership ("ACON Aggregator B" and, together with ACON Aggregator A, the "ACON Aggregators");

(d)      Fiesta Holdings Investments, L.L.C. ("Fiesta Holdings" and together with ACON Aggregators, the "Sellers").

BLC and the Sellers shall be referred to herein from time to time collectively as the "Parties" and each individually a "Party."

## RECITALS

WHEREAS, as of the date of this Agreement, Fiesta Holdings collectively owns 100% of the issued and outstanding equity interests (the "Company Interests") of Fiesta Mart Investments, L.L.C., a Delaware limited liability company (the "Company");

WHEREAS, at or prior to the Closing, (a) the existing members of AEP III Fiesta Investors, L.L.C., a Delaware limited liability company ("ACON Blocker A"), will contribute 100% of the issued and outstanding equity interests (the "ACON Blocker A Interests") of ACON Blocker A to ACON Aggregator A, (b) the existing members of ACON Fiesta Investors Holdings II, L.L.C., a Delaware limited liability company ("ACON Blocker B," and together with ACON Blocker A, the "ACON Blockers"), will contribute 100% of the issued and outstanding equity interests of ACON Blocker B (the "ACON Blocker B Interests" and together with the ACON Blocker A Interests, the "ACON Blocker Interests") to ACON Aggregator B and (c) Fiesta Holdings will indirectly distribute a portion of the Company Interests to the ACON Blockers and one of its Affiliates (which Affiliate will in turn contribute such Company Interest to ACON Blocker A) (the "Company Restructuring");

WHEREAS, the Fiesta Group Companies are engaged in the Fiesta Business;

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, (a) the ACON Aggregators desire to sell, assign, transfer and convey, immediately following the consummation of the Company Restructuring, the ACON Blocker Interests to BLC and (b) Fiesta Holdings desires to sell, assign, transfer and convey the Company Interests to BLC, in each case, in exchange for each such Person's portion of the Cash Consideration, in each case, as set forth in Section 2.3; and

1

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties and covenants herein contained, as well as other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS AND CERTAIN INTERPRETIVE MATTERS

1.1    *Definitions*.  The following terms will have the following respective meanings for purposes of this Agreement:

"Accounting Firm" has the meaning set forth in Section 2.3(c)(iii).

"Accounting Principles" means GAAP, applied consistently with the past practices of the Fiesta Group Companies; provided, however, that, to the extent the Fiesta Group Companies' past practices are inconsistent with GAAP, GAAP shall control, unless such deviations are explicitly set forth on Exhibit A-1.

"ACON Aggregator A" has the meaning set forth in the Preamble.

"ACON Aggregator B" has the meaning set forth in the Preamble.

"ACON Aggregator Fundamental Representations" has the meaning set forth in Section 8.1(a)(iii).

"ACON Aggregators" has the meaning set forth in the Preamble.

"ACON Blocker A" has the meaning set forth in the Recitals.

"ACON Blocker A Interests" has the meaning set forth in the Recitals.

"ACON Blocker B" has the meaning set forth in the Recitals.

"ACON Blocker B Interests" has the meaning set forth in the Recitals.

"ACON Blocker Interests" has the meaning set forth in the Recitals.

"ACON Blockers" has the meaning set forth in the Recitals.

"ACON Blockers Acquisition" has the meaning set forth in Section 2.1(a).

"Acquired Units" means the ACON Blocker Interests and the Company Interests.

"Acquisitions" has the meaning set forth in Section 2.1(b).

"Actual Adjustment" means (a) the Adjustment Amount as finally determined pursuant to Section 2.3(c), minus (b) the Estimated Adjustment Amount.  The Actual Adjustment may be a negative number.

"Adjustment Amount" means an amount equal to (a) the amount of Cash and Cash Equivalents, plus (b) the Net Working Capital Adjustment (which may be a negative number), less (c) the aggregate outstanding Indebtedness of the Fiesta Group Companies as of immediately prior to the Closing and, with respect to each ACON Blocker acquired by BLC at Closing, the aggregate outstanding Indebtedness of such ACON Blockers as of immediately prior to the Closing, less (d) the Company Expenses, less (e) the BLC R&W Policy Premium Reimbursement Amount, less (f) the Remaining BLC R&W Policy Premium Amount, less (g) the Representative Expense Fund. The Adjustment Amount may be a negative number.

"Affiliate" means with respect to any Person, (a) a spouse or member of the immediate family or other Related Person of such Person, (b) any member, manager, director, officer or partner of such Person, (c) any corporation, partnership, business, association, limited liability company, firm or other entity of which such Person is a member, manager, director, officer or partner, and (d) any other Person that directly or indirectly controls, is controlled by or is under direct or indirect common control with such first Person.  For purposes of this definition, "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting equity interests, by contract or otherwise.

"Affiliated Group" means any affiliated group within the meaning of Code §1504(a) or any similar group defined under a similar provision of state, local, or non-U.S. Law.

"Aggregate Closed Store Lease Deduction" has the meaning set forth in Appendix B.

"Agreement" has the meaning set forth in the Preamble.

"Alternative Debt Commitment Letters" has the meaning set forth in Section 7.12(b).

"Alternative Debt Financing" has the meaning set forth in Section 7.12(b).

"Alternative Transaction" has the meaning set forth in Section 7.5.

"Audited Financial Statements" has the meaning set forth in Section 4.6(a).

"BLC" has the meaning set forth in the Preamble.

"BLC Cap" means $26,500,000.

"BLC Fundamental Representations" means the representations and warranties set forth in Sections 6.1, 6.2, 6.3(a)(i) and 6.5.

"BLC Indemnitees" has the meaning set forth in Section 11.2(a).

"BLC Liens" means any Liens created or suffered by BLC or its Affiliates or securing any financing obtained in connection with the transactions contemplated hereby.

"BLC Material Adverse Effect" means any circumstance, change or effect that, when taken individually or together with all other adverse circumstances, changes or effects, would, or with

the passage of time would be reasonably likely to, prevent or materially delay the ability of BLC to timely consummate the Acquisitions or to otherwise perform its obligations under this Agreement and the Documents.

"BLC R&W Binder" means the conditional binder to the BLC R&W Policy attached hereto as Exhibit B.

"BLC R&W Policy" means the representations and warranties insurance policy issued by the BLC R&W Provider to BLC attached hereto as Exhibit B.

"BLC R&W Policy Premium Reimbursement Amount" means an amount equal to $70,865.80.

"BLC R&W Provider" means Ambridge Partners LLC and AIG Specialty Insurance Company.

"Business Day" means any day other than (a) a Saturday or Sunday or (b) a day on which the Federal Reserve Bank of New York is closed.

"Capital Lease Obligations" means, with respect to any Person, for any applicable period, the obligations of such Person that are required to be classified and accounted for as capital lease obligations under GAAP, and the amount of such obligations at any date will be the capitalized amount of such obligations at such date determined in accordance with GAAP.

"Cash and Cash Equivalents" means, as of immediately prior to the Closing, the sum of (i) cash (including, without duplication, Cash on Hand) and cash equivalents of the Fiesta Group Companies and each ACON Blocker acquired by BLC at the Closing (net of restricted cash, advance payments, deposits received from customers, issued but uncleared checks and drafts and wire transfers initiated or in transit), calculated in accordance with GAAP plus (ii) without duplication of clause (i), the aggregate outstanding principal amount and all accrued interest thereon under all loans made by a Fiesta Group Company or ACON Blocker to any manager, officer, director, unitholder, Affiliate or employee of a Fiesta Group Company or ACON Blocker, or any Related Person of any of the foregoing that are both (x) disclosed on Appendix C and (y) terminated and fully repaid to such Fiesta Group Company or ACON Blocker at Closing.

"Cash Consideration" has the meaning set forth in Section 2.2(a).

"Cash on Hand" means any cash and coin (not to include checks or money orders) on hand in any store owned or operated by the Fiesta Group Companies immediately prior to Closing measured as of the close of business on the date immediately preceding the Closing Date.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq.

"Claim Notice" has the meaning set forth in Section 11.5(a).

"Closed Store Lease Deduction" has the meaning set forth in Appendix B.

"Closed Store Leases" means the leases set forth on Appendix A.

"Closed Store Payment" means, (i) with respect to any sublease or license for all or any portion of any Closed Store Premises, an amount equal to the product of (x) 50% multiplied by (y) the result of (A) an amount equal to the present value of the aggregate payments required to be made by the subtenant in accordance with such sublease for rent, insurance, common area maintenance (CAM) and real estate Taxes for the period of such sublease (calculated in accordance with the methodology set forth in clause 1(b) of Appendix B) minus (B) the sum of any brokerage fees or similar out-of-pocket expenses payable to third parties in order to obtain any such sublease (and to the extent payable in respect of subleases for multiple Closed Store Premises, then (without duplication) allocated among them pro rata in proportion to their respective Closed Store Lease Deductions) and (ii) with respect to any arrangement other than a sublease or license pursuant to which BLC or any Subsidiary receives any payments or Other Closed Store Value in respect of the use of all or any portion of any Closed Store Premises, an amount equal to the product of (x) 50% multiplied by (y) the result of (A) the amount of such payment (or, if such arrangement contemplates multiple payments, the aggregate amount of all such payments payable thereunder) minus (B) the sum of any brokerage fees or similar out-of-pocket expenses payable to third parties in order to obtain any such arrangement (and to the extent payable in respect of arrangements for multiple Closed Store Premises, then (without duplication) allocated among them pro rata in proportion to their respective Closed Store Lease Deductions).

"Closed Store Premises" means the premises leased under a Closed Store Lease.

"Closing" has the meaning set forth in Section 3.1.

"Closing Capitalization Certificate" has the meaning set forth in Section 3.2(a)(v).

"Closing Date" has the meaning set forth in Section 3.1.

"Closing Statement" has the meaning set forth in Section 2.3(a).

"COBRA" has the meaning set forth in Section 4.16(f).

"Code" means the Internal Revenue Code of 1986.

"Commitment Amount" means the committed amount of the Debt Financing to be funded on the Closing Date in accordance with the terms of the Debt Commitment Letter.

"Company" has the meaning set forth in the Recitals.

"Company Acquisition" has the meaning set forth in Section 2.1(b).

"Company Expenses" means, without duplication, all fees, charges, expenses and other payments incurred by any Fiesta Group Company or ACON Blocker on behalf of itself or its Affiliates prior to the Closing in connection with the negotiation, preparation and execution of this Agreement and the consummation of the transactions contemplated hereby that have not been paid immediately prior to the Closing, including (a) fees and disbursements of attorneys, accountants, investment bankers and other advisory or transaction service providers that are payable by any

Fiesta Group Company or ACON Blocker, (b) any costs and fees arising from obtaining the "tail" D&O insurance policy contemplated by <u>Section 7.11</u>, and (c) (i) severance arising solely as a result of the transactions contemplated hereby or from termination by any Fiesta Group Company or ACON Blocker or their respective Affiliates undertaken prior to Closing, and (ii) change of control, transaction or sale bonuses, or, to the extent relating to any period prior to the Closing, retention bonuses or other compensatory payments to directors, officers, employees or independent contractors of any Fiesta Group Company, ACON Blocker or any of their respective Affiliates that become due from any Fiesta Group Company or ACON Blocker as a result of the transactions contemplated by this Agreement and, in the case of each of the foregoing <u>clauses (a)</u>, <u>(b)</u>, and <u>(c)</u>, that have not been paid immediately prior to the Closing (including the employer portion of any payroll Taxes payable in connection with the payments described in <u>clause (c)</u>).  For the avoidance of doubt, the allocation by the Fiesta Representative of any portion of the Cash Consideration to any such officer, director or employee in accordance with this Agreement shall not constitute a compensatory payment or otherwise constitute a Company Expense.

"<u>Company Information</u>" has the meaning set forth in <u>Section 12.17(a)</u>.

"<u>Company Interests</u>" has the meaning set forth in the Recitals.

"<u>Company Restructuring</u>" has the meaning set forth in the Recitals.

"<u>Company Securities</u>" has the meaning set forth in <u>Section 4.2</u>.

"<u>Compliant</u>" means that the Required Information does not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the Required Information, in light of the circumstances under which the statements contained in such information are made and taken as a whole, not materially misleading.

"<u>Confidentiality Agreement</u>" means that certain Mutual Confidentiality and Non-Disclosure Agreement by and between the Company and BLC, dated as of July 5, 2017.

"<u>Consideration Spreadsheet</u>" has the meaning set forth in <u>Section 2.2(b)</u>.

"<u>Copyrights</u>" has the meaning set forth in the definition of "Intellectual Property."

"<u>D&O Indemnified Persons</u>" has the meaning set forth in <u>Section 7.11</u>.

"<u>De Minimis Amount</u>" means $25,000.

"<u>Debt Commitment Letter</u>" has the meaning set forth in <u>Section 6.7(b)</u>.

"<u>Debt Fee Letter</u>" has the meaning set forth in <u>Section 6.7(b)</u>.

"<u>Debt Financing</u>" has the meaning set forth in <u>Section 6.7(b)</u>.

"<u>Debt Financing Source</u>" means the Persons (including lenders, agents and arrangers) that have committed to provide the Debt Financing or any alternative financing (including the parties named in the Debt Commitment Letter or party to any joinder agreements, credit agreements or

other definitive agreements entered into pursuant thereto or relating thereto) in connection with the transactions contemplated by this Agreement, together with their respective Affiliates, officers, directors, employees and representatives involved in the Debt Financing or any alternative financing and their respective successors and assigns.

"Dispute" has the meaning set forth in Section 12.17(b).

"Dispute Notice" has the meaning set forth in Section 2.3(c)(ii).

"Documents" has the meaning set forth in Section 5.1(b)(i).

"Employee Plan" means any (a) "employee benefit plan," as defined in Section 3(3) of ERISA (regardless of whether subject to ERISA), (b) other employee benefit plan, policy, program, practice, arrangement or agreement, including those providing severance, salary continuation, vacation or other leave, retention, bonus, incentive, or change in control pay or benefits, loans, fringe benefits, equity or equity-based compensation, disability or death benefits, retirement, pension, profit sharing, deferred compensation or supplemental retirement benefits, or health, medical, life insurance or other welfare benefits or (c) employment, severance, retention, change in control or similar arrangement or agreement.

"Environmental Laws" means any and all Laws pertaining to the regulation or protection of the environment or natural resources or to the manufacture, processing, distribution, sale, use, handling, treatment, storage, disposal, generation, Release or transportation of or exposure to Hazardous Materials, including the Clean Air Act, 42 U.S.C. §§ 7401 et seq., CERCLA, the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq., RCRA, the Safe Drinking Water Act, 42 U.S.C. §§ 300f et seq., the Toxic Substances Control Act, 15 U.S.C. §§ 2601 et seq., the Hazardous Materials Transportation Act, 49 U.S.C. §§ 5101 et seq. and all regulations and rules issued pursuant thereto and any similar state, local or foreign Law, and any Laws pertaining to the use, maintenance and closure of underground storage tanks and fueling systems.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Person, would be considered a single employer for purposes of Section 4001 of ERISA or Section 414 of the Code.

"Estimated Adjustment Amount" means the Fiesta Representatives' good faith estimate of the Adjustment Amount, including each component of the Adjustment Amount, in accordance with Section 2.3(a).  The Estimated Adjustment Amount may be a negative number.

"Estimated Adjustment Calculation" has the meaning set forth in Section 2.3(a).

"Estimated Cash Consideration" has the meaning set forth in Section 2.3(b)(i).

"Fiesta Affiliate Contracts" has the meaning set forth in Section 4.13(c).

7

"<u>Fiesta Business</u>" means the business of (a) operating grocery stores, (b) operating, on behalf of third parties, retail stores that sell alcohol beverages and related products to consumers and (c) operating service stations.

"<u>Fiesta Cap</u>" means $1,325,000.00.

"<u>Fiesta Employee Plan</u>" means each Employee Plan (a) that is maintained or sponsored by any Fiesta Group Company, (b) to which any Fiesta Group Company is a party, contributes or is obligated to contribute or (c) with respect to which any Fiesta Group Company has or may have any liability.

"<u>Fiesta Fundamental Representations</u>" means those representations and warranties set forth in <u>Sections 4.1</u>, <u>4.2</u>, <u>4.3</u>, <u>4.4(a)(i)</u> and <u>4.18</u>.

"<u>Fiesta Group Companies</u>" means, collectively, the Company and the Fiesta Subsidiaries.

"<u>Fiesta Group Company Intellectual Property Agreements</u>" has the meaning set forth in <u>Section 4.12(a)(v)</u>.

"<u>Fiesta Holdings</u>" has the meaning set forth in the Preamble.

"<u>Fiesta Holdings Fundamental Representations</u>" has the meaning set forth in <u>Section 8.1(a)(ii)</u>.

"<u>Fiesta Improvements</u>" has the meaning set forth in <u>Section 4.8(a)(i)</u>.

"<u>Fiesta Indemnitees</u>" has the meaning set forth in <u>Section 11.2(b)</u>.

"<u>Fiesta Intellectual Property</u>" means all Intellectual Property relating to the conduct or operations of the Fiesta Business.

"<u>Fiesta Leased Real Property</u>" has the meaning set forth in <u>Section 4.8(a)(i)</u>.

"<u>Fiesta License</u>" has the meaning set forth in <u>Section 4.8(a)(i)</u>.

"<u>Fiesta Material Contract</u>" has the meaning set forth in <u>Section 4.13(p)</u>.

"<u>Fiesta Material Lease</u>" has the meaning set forth in <u>Section 4.8(a)(i)</u>.

"<u>Fiesta Owned Intellectual Property</u>" has the meaning set forth in <u>Section 4.12(a)(i)</u>.

"<u>Fiesta Personnel</u>" has the meaning set forth in <u>Section 4.12(a)(vii)</u>.

"<u>Fiesta Representative</u>" has the meaning set forth in <u>Section 12.15(a)</u>.

"<u>Fiesta Statement Date</u>" has the meaning set forth in <u>Section 4.6(a)</u>.

"<u>Fiesta Subsidiaries</u>" means Fiesta Mart Holdings, L.L.C., a Delaware limited liability company, and Fiesta Mart, L.L.C., a Texas limited liability company, together with any direct or

indirect Subsidiaries thereof.  The Fiesta Subsidiaries are sometimes referred to herein collectively as "the Subsidiaries of the Company" and/or the "Company's Subsidiaries" or individually as a "Subsidiary of the Company" or "Company Subsidiary."

"Financial Statements" has the meaning set forth in Section 4.6(a).

"Fraud" means, in the case of a Party, such Party's actual and intentional fraud with respect to the making of the representations and warranties of such Party contained in this Agreement.

"Fundamental Representations" means the Fiesta Fundamental Representations, the Fiesta Holdings Fundamental Representations, the ACON Aggregators Fundamental Representations and the BLC Fundamental Representations.

"GAAP" means the generally accepted accounting principles in the United States in effect from time to time, applied on a consistent basis.

"Governing Documents" means the legal documents by which any Person (other than an individual) establishes its legal existence or that govern its internal affairs.  For example, the "Governing Documents" of a corporation are its certificate of incorporation, bylaws and any stockholder agreements, the "Governing Documents" of a limited partnership are its limited partnership agreement and certificate of limited partnership, and the "Governing Documents" of a limited liability company are its operating agreement and certificate of formation.

"Governmental Authority" means any federal, state, local, municipal, tribal or other government; any governmental, regulatory or administrative agency, commission, body or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, regulatory or taxing authority or power, and any court or governmental tribunal, including any tribal authority having or asserting jurisdiction.

"Hazardous Materials" means all hazardous, toxic, explosive or radioactive substances, wastes, materials or other pollutants, including petroleum or petroleum distillates, asbestos, polychlorinated biphenyls, radon gas, toxic mold and all other substances, materials or wastes of any nature regulated, defined, or for which liability or standards of conduct may be imposed pursuant to any Environmental Law because of their hazardous or deleterious qualities.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"Indebtedness" means with respect to any Person, at any date, without duplication, and without duplication of any item included as a Company Expense, (a) all indebtedness of such Person for borrowed money, whether short-term or long-term, and whether secured or unsecured, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid (other than any Taxes or any trade payables incurred in the ordinary course of business to the extent reflected as a current liability in the financial records of such Person), (d) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (e) all guarantees, whether direct or indirect, by such Person of Indebtedness of others or Indebtedness of any other Person secured by any assets of such Person, (f) all Capital Lease Obligations of such Person, (g) the deferred purchase price of assets, services or securities (except

9

as otherwise reflected as a current liability in the financial records of such Person), (h) all interest rate swap, forward contract, foreign currency hedge or other hedging or similar arrangements, (i) all drawn letters of credit or similar facilities, (j) solely with respect to the Fiesta Group Companies, the aggregate amount of the items set forth on Appendix B, which shall be calculated in accordance with the methodology set forth thereon for each such item and (k) interest, premium, fees, expenses, penalties (including prepayment and early termination penalties) and other amounts owing in respect of the items in the foregoing clauses (a) through (i).

"Indemnified Party" has the meaning set forth in Section 11.5(a).

"Indemnifying Party" has the meaning set forth in Section 11.5(a).

"Intellectual Property" means the following:

(a)     All patents, including utility, utility model, plant and design patents and all issued claims therein and all patent applications, whether published or unpublished, including provisional, national, regional, and international applications, as well as original, continuation, continuation-in-part, divisional, request for continued examination, continued prosecution, reissue, and re-examination applications, including (i) the right to sue or otherwise recover for any and all past, present and future infringements and misappropriations thereof; (ii) all income, royalties, damages and other payments now or hereafter due and/or payable with respect thereto (including payments under all licenses entered into in connection therewith, and damages and payments for past, present and future infringements thereof) and (iii) all rights corresponding thereto throughout the world, and all other rights of any kind whatsoever accruing thereunder or pertaining thereto (collectively, the "Patents");

(b)     All published and unpublished works of authorship and copyrights and all rights therein; all copyrights (whether statutory or common law) of works based on, incorporated in, derived from or relating to works covered by such copyrights; all right, title and interest to make and exploit all derivative works based on or adopted from works covered by such copyrights; and all copyright registrations and copyright applications and any renewals or extensions thereof including abandoned registrations and applications for registration, and including (i) any right to print, publish and distribute any of the foregoing; (ii) any right to sue or otherwise recover for any and all past, present and future infringements and misappropriations thereof; (iii) all income, royalties, damages and other payments now or hereafter due and/or payable with respect thereto (including payments under all licenses entered into in connection therewith, and damages and payments for past, present and future infringements thereof) and (iv) all rights corresponding thereto throughout the world and all other rights of any kind whatsoever accruing thereunder or pertaining thereto (collectively, the "Copyrights");

(c)     All trademarks, service marks, trade dress, trade names, logos, slogans, designs, labels and other indicia of source or origin of a product or service, whether registered or used at common law (collectively, the "Marks"), and all registrations

10

and applications for registration therefor and including (i) any right to sue or otherwise recover for any and all past, present and future infringements and misappropriations thereof; (ii) all income, royalties, damages and other payments now or hereafter due and/or payable with respect thereto (including payments under all licenses entered into in connection therewith, and damages and payments for past, present and future infringements thereof) and (iii) all rights corresponding thereto throughout the world and all other rights of any kind whatsoever accruing thereunder or pertaining thereto, together in each case with the goodwill of the business symbolized thereby (collectively, "Trademarks");

(d)     All trade secrets, know-how, proprietary and confidential information, including all proprietary product specifications, compounds, processes, formulae, product or industrial designs, business information, technical and marketing plans and proposals, ideas, concepts, inventions, research and development, information disclosed by business manuals and drawings, technology, technical information, data, research records, customer, distributor and supplier lists and similar data and information and all other confidential or proprietary technical or business information and materials that derive value from being kept secret, and including (i) any right to sue or otherwise recover for any and all past, present and future infringements and misappropriations thereof; (ii) all income, royalties, damages and other payments now or hereafter due and/or payable with respect thereto (including payments under all licenses entered into in connection therewith, and damages and payments for past, present and future infringements thereof) and (iii) all rights corresponding thereto throughout the world and all other rights of any kind whatsoever accruing thereunder or pertaining thereto (collectively, the "Trade Secrets");

(e)     All domain names and associated goodwill, including all Internet electronic addresses, uniform resource locators and alphanumeric designations associated therewith, text, images and designs, including the "look and feel" and other content contained on any website and all registrations and applications for registration of any of the foregoing, including (i) any right to sue or otherwise recover for any and all past, present and future infringements and misappropriations thereof; (ii) all income, royalties, damages and other payments now or hereafter due and/or payable with respect thereto (including payments under all licenses entered into in connection therewith, and damages and payments for past, present and future infringements thereof) and (iii) all rights corresponding thereto throughout the world and all other rights of any kind whatsoever accruing thereunder or pertaining thereto (collectively, the "Website Materials");

(f)     Except for licenses for commercially available "off the shelf" software, all inbound and outbound licenses and license agreements in connection with any Intellectual Property whether as licensor or licensee under any such license, subject in each case to the terms of such licenses and the terms and conditions of such license agreements, including terms requiring consent to transfer rights under such license, including (i) all rights to sue or otherwise recover for any and all past, present and future infringements and misappropriations thereof and to enforce each such license

11

and license agreement; (ii) all income, royalties, damages and other payments now or hereafter due and/or payable with respect thereto (including payments under all licenses entered into in connection therewith, and damages and payments for past, present and future infringements thereof) and (iii) all rights corresponding thereto throughout the world and all other rights of any kind whatsoever accruing thereunder or pertaining thereto (collectively, the "Intellectual Property Licenses");

(g)     Except for commercially available "off the shelf" software, all computer software including all source code, object code, firmware, development tools, files, records and data, all media in which any of the foregoing is recorded, and all documentation related to any of the foregoing and including (i) any rights to sue or otherwise recover for any and all past, present and future infringements and misappropriations thereof; (ii) all income, royalties, damages and other payments now or hereafter due and/or payable with respect thereto (including payments under all licenses entered into in connection therewith, and damages and payments for past, present and future infringements thereof) and (iii) all rights corresponding thereto throughout the world and all other rights of any kind whatsoever accruing thereunder or pertaining thereto (collectively, the "Software"); and

(h)     All social media accounts, including any blogs or microblogs (e.g., Twitter accounts), social networking pages (e.g., Facebook, LinkedIn or Pinterest pages) or photo or video sharing accounts (e.g., Instagram, Flickr or YouTube accounts), and all content thereon and rights and registrations therein or thereto, including (i) any right to sue or otherwise recover for any and all past, present and future infringements and misappropriations thereof; (ii) all income, royalties, damages and other payments now or hereafter due and/or payable with respect thereto (including payments under all licenses entered into in connection therewith, and damages and payments for past, present and future infringements thereof) and (iii) all rights corresponding thereto throughout the world and all other rights of any kind whatsoever accruing thereunder or pertaining thereto (collectively, the "Social Media Accounts").

"Intellectual Property Licenses" has the meaning set forth in the definition of "Intellectual Property."

"Interim Financial Statements" has the meaning set forth in Section 4.6(a).

"Knowledge of BLC" means (i) the actual knowledge of Carlos Smith, Jack Hook and Joe Angulo and (ii) the knowledge that each such individual would have had if such individual had made reasonable due inquiry, and the terms "know," "known," "knowing" and other derivatives of "know" shall have a corresponding meaning.

"Knowledge of the Sellers" means (i) the actual knowledge of Siddharth Keswani, Wayne Peterson, Paul Sabattus, Jennie Fotovich and Chuck Dorau and (ii) the knowledge that each such individual would have had if such individual had made reasonable due inquiry, and the terms "know," "known," "knowing" and other derivatives of "know" shall have a corresponding

meaning. For the purposes of <u>Section 4.14</u> (Environmental Laws), "reasonable inquiry" does not include any environmental or subsurface sampling or testing.

"<u>Law</u>" means any United States federal, state, national, provincial, county, city, municipal or other government statute, law, rule, regulation, ordinance, Order, code or requirement (including pursuant to any settlement agreement or consent decree) and any Permit granted under any of the foregoing, or any requirement under common law.

"<u>Law Firm</u>" has the meaning set forth in <u>Section 12.17(a)</u>.

"<u>Law Firm Work Product</u>" has the meaning set forth in <u>Section 12.17(a)</u>.

"<u>Lien</u>" means any mortgage, pledge, security interest, encumbrance, lien, charge, easement, right of way, covenant or restriction.

"<u>Losses</u>" has the meaning set forth in <u>Section 11.2(a)</u>.

"<u>Marks</u>" has the meaning set forth in the definition of "Intellectual Property."

"<u>Material Adverse Effect</u>" means, with respect to the Fiesta Group Companies, any circumstance, change or effect that is, or with the passage of time would be reasonably likely to be, materially adverse to the business, operations, assets, liabilities or financial condition of the Fiesta Group Companies, taken as a whole; <u>provided</u>, <u>however</u>, that no circumstance, change or effect (by itself or taken together with any and all other circumstances, changes or effects) that results from or arises out of or is related to any of the following shall constitute or be deemed to contribute to a "Material Adverse Effect," or be taken into account in determining whether a "Material Adverse Effect" has occurred or may, would or could occur: (i) any change in general economic conditions in the industries or markets in which the Fiesta Group Companies operate; (ii) national or international political conditions, including any engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack (including any escalation or general worsening of any such conditions), or changes in general economic conditions in the United States or any other country or region in the world, or changes in condition in the global economy generally; (iii) changes in GAAP, or the interpretation thereof; (iv) changes in any applicable Law or decision of any Governmental Authority of any jurisdiction; (v) changes in conditions in the financial markets, credit markets or capital markets in the United States or any other country or region in the world; (vi) earthquakes, hurricanes, tsunamis, tornadoes, floods, mudslides, wildfires or other natural disasters, weather conditions and other force majeure events, in each case in the markets in which the Fiesta Group Companies operate, in the United States or in any other country or region in the world; (vii) compliance with the terms of, or the taking of any action required or contemplated by this Agreement, or the failure to take any action prohibited by this Agreement; (viii) any failure, in and of itself, by the Fiesta Group Companies or any one or more Fiesta Group Company to meet internal or external projections or forecasts or revenue or earnings predictions (provided that the cause or basis for such Persons failing to meet such projections or forecasts or revenue or earnings predictions may be considered in determining the existence of a Material Adverse Effect unless such cause or basis is otherwise excluded by this definition); or (ix) any matters expressly set forth in the Schedules to this Agreement, provided that in the case of <u>clauses (i)</u>, <u>(ii)</u>, <u>(iii)</u>, <u>(iv)</u>, <u>(v)</u> and

(vi), such circumstance, change or effect did not have a materially disproportionate impact on the Fiesta Group Companies as compared to other companies operating in the same industry.

"Net Working Capital" means (a) the book value of all current assets of the Fiesta Group Companies, including accounts receivable and prepaid expenses (net of reserves and write-downs), that are included in the line item categories of current assets specifically identified on Exhibit A-2, less (b) the book value of all current liabilities of the Fiesta Group Companies, including accounts payable and other amounts payable and accrued expenses, that are included in the line item categories of current liabilities specifically identified on Exhibit A-2, in each case, calculated as of immediately prior to the Closing in accordance with the Accounting Principles; provided, however, that Net Working Capital will not include (1) Cash and Cash Equivalents, (2) Indebtedness of one or more of the Fiesta Group Companies, (3) Company Expenses, (4) current or deferred Tax assets and liabilities of the Fiesta Group Companies, (5) any fees, expenses or liabilities related to any financing by BLC and its Affiliates of the transaction contemplated hereby, (6) any intercompany accounts and transactions between the Company, on the one hand, and any of its Subsidiaries on the other hand, or between any Subsidiaries of the Company, (7) any liabilities of the Company or its Subsidiaries, on the one hand, and their Affiliates, to the extent such liabilities are discharged, terminated or cancelled pursuant to Section 3.2(a)(viii), (8) accrued straight line leasing liabilities or (9) any deposit held by a lessor under a Real Property Lease.  Exhibit A-2 sets forth a sample calculation of Net Working Capital as if the Closing had occurred on January 28, 2018.

"Net Working Capital Adjustment" means (a) the amount by which Net Working Capital exceeds the Target Net Working Capital or (b) the amount by which Net Working Capital is less than the Target Net Working Capital, in each case, as applicable; provided, however, that any amount that is calculated pursuant to clause (b) above shall be deemed to be a negative number.

"Notice Period" has the meaning set forth in Section 11.5(b).

"Order" means any judgment, injunction, order, ruling, award, determination, writ or decree that is issued by a Governmental Authority.

"Other Closed Store Value" means any financial or tangible value received by BLC (or any Affiliate thereof) from or on behalf of a sublessee or landlord of Closed Store Premises (or any Affiliate thereof) in respect of the use of all or any portion of such Closed Store Premises, including forgiveness of Indebtedness and payments in kind; provided, however, that sublease payments already included in the calculation of Closed Store Payments shall not be also treated as Other Closed Store Value.

"Outside Date" means June 30, 2018.

"Party" and the correlative term "Parties" has the meaning set forth in the Preamble.

"Patents" has the meaning set forth in the definition of "Intellectual Property."

"Permits" means any licenses, permits, consents, authorizations, variances, exemptions, Orders and approvals from Governmental Authorities.

14

"Permitted Fiesta Liens" means, (a) any Lien affecting the fee or prime leasehold interest of any Fiesta Leased Real Property not created by any Fiesta Group Company or any Seller, (b) such other imperfections in title, charges, easements, restrictions and encumbrances which would not, individually or in the aggregate, be material to the Fiesta Business, (c) the Fiesta Licenses and (d) Liens described on Schedule 1.1-PFL.

"Permitted Liens" means (a) mechanic's, materialmen's, carriers', repairers' and other Liens arising or incurred in the ordinary course of business for amounts that are not yet delinquent or are being contested in good faith and for which adequate reserves have been maintained in accordance with GAAP, (b) Liens for Taxes, assessments or other governmental charges not yet due, payable or delinquent (or that may be paid without interest or penalties) or the amount or validity of which is being contested in good faith by appropriate proceedings and for which adequate reserves have been set aside in accordance with GAAP, (c) pledges, deposits or other Liens to the performance of leases or statutory obligations (including, workers' compensation, unemployment insurance or other social security legislation, but excluding Liens for Taxes), (d) zoning, entitlement and other land use and environmental regulations by any Governmental Authority that are not violated in any material respect by the current use of the real property, (e) title of a lessor under a capital or operating lease and (f) any Liens discharged or released at or in connection with Closing.

"Person" means an individual, a corporation, a partnership, a limited liability company, an association, a trust, a joint stock company, a joint venture, an unincorporated organization, any Governmental Authority or any other entity or organization.

"Pre-Closing Period" means any taxable period ending on or before the Closing Date and the portion of a Straddle Period beginning before the Closing Date and ending on the Closing Date.

"Prohibited Matters" has the meaning set forth in Section 7.12(a).

"Proposed Closing Date Calculations" has the meaning set forth in Section 2.3(c)(i).

"Qualifying Loss" means any individual item with respect to which the total Losses related thereto are greater than or equal to the De Minimis Amount.

"RCRA" means the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901 et seq.

"Related Person" means, (a) with respect to a natural Person, such Person's spouse, children (natural and adopted), grandchildren, brothers, sisters and parents and any spouse of any such Person listed above (each such Person herein a "Relative"), and (b) with respect to any other Person, any partnership, trust, corporation, limited liability company or other legal entity formed solely for the purposes of estate planning of which 100% of the beneficial ownership or interest is directly or indirectly held by such Person or any Relative of such Person.

"Relative" has the meaning set forth in the definition of "Related Person."

"Release" means any emission, spill, seepage, leak, escape, leaching, discharge, injection, pumping, pouring, emptying, dumping, disposal, migration, release or threatened release of Hazardous Materials from any source into, through or upon the indoor or outdoor environment.

"Remaining BLC R&W Policy Premium Amount" means $624,811.46, plus the Second BLC R&W Policy Premium Amount.

"Representative Expense Fund" has the meaning set forth in Section 12.15(e).

"Required Amount" has the meaning set forth in Section 6.7(a).

"Required Information" means (a) the historical financial information required by paragraph 4(b) of Annex I to the Debt Commitment Letter as in effect on the date hereof, (b) such historical financial information related to the Fiesta Group Companies as is reasonably required (and specified in writing) by BLC to enable BLC or its Affiliates to produce the pro forma financial statements identified in paragraph 4(c) of Annex I to the Debt Commitment Letter as of the date hereof and (c) such other customary financial data or other pertinent information regarding the Fiesta Group Companies customarily provided by a borrower and its Subsidiaries in preparation of a confidential information memorandum and/or other customary marketing materials with respect to the Debt Financing; provided, however, that Required Information shall not include, and no Fiesta Group Company shall have any obligation to provide, any post-Closing or pro forma cost savings, capitalization and other post-Closing adjustments (or the assumptions relating thereto) desired by BLC to be reflected in any pro forma data.

"Review Period" has the meaning set forth in Section 2.3(c)(ii).

"Second BLC R&W Policy Premium Amount" means, so long as the requirements of the last sentence of Section 12.16 are satisfied an amount equal to $12,980.77; provided, however, that if the requirements of the last sentence of Section 12.16 are not satisfied, then an amount equal to $0.

"Securities Act" means the Securities Act of 1933.

"Sellers" has the meaning set forth in the Preamble.

"Social Media Accounts" has the meaning set forth in the definition of "Intellectual Property."

"Software" has the meaning set forth in the definition of "Intellectual Property."

"Straddle Period" means any taxable period beginning on or before the Closing Date and ending after the Closing Date.

"Submission" has the meaning set forth in Section 2.3(c)(iii).

"Submission Deadline" has the meaning set forth in Section 2.3(c)(iii).

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, joint venture or other legal entity of which such Person (either alone or through or together with any other Subsidiary or Subsidiaries) directly or indirectly (a) owns 10% or more of any stock or other equity interests, the holders of which are generally entitled to vote for the election of the board of directors or other governing body of such corporation or other legal entity, or (b) serves as general partner.

"Target Net Working Capital" means $49,449,261.00.

"Tax" or "Taxes" means (a) any and all federal, state, local or foreign income, gross receipts, alternative or add-on minimum, sales, use, customs duty, property, transfer, occupation, service, license, payroll, franchise, excise, withholding, ad valorem, severance, stamp, premium, windfall profit or employment tax or other assessment or charge of any kind whatsoever, together with any interest, fine or penalty thereon, addition to tax, additional amount, deficiency, assessment or governmental charge, and (b) any liability for the payment of any amount of the types described in clause (a) immediately above (i) as a result of any agreement to indemnify any other Person, (ii) as a result of being a successor of any other Person or the transferee of assets or property of any other Person or (iii) under Treasury Regulation Section 1.1502-6 or other similar provision of any state, local or federal Law.

"Tax Allocation" has the meaning set forth in Section 9.1.

"Tax Return" means any report, statement, form, return, election, schedule or other document or information required to be supplied to a taxing authority in connection with Taxes, including any amendment or supplement thereto.

"Termination Date" has the meaning set forth in Section 11.1(c).

"Third Party Claim" has the meaning set forth in Section 11.5(a).

"Threshold Amount" means $1,325,000.00.

"Trade Secrets" has the meaning set forth in the definition of "Intellectual Property."

"Trademarks" has the meaning set forth in the definition of "Intellectual Property."

"Transfer Taxes" has the meaning set forth in Section 9.4.

"WARN Act" has the meaning set forth in Section 4.17(f).

"Website Materials" has the meaning set forth in the definition of "Intellectual Property."

1.2     *Certain Interpretive Matters*.  The definitions in Section 1.1 will apply equally to both the singular and plural forms of the terms defined.  Additionally:

(a)     all references herein to the Preamble, Recitals, Sections, Articles, Exhibits, Appendices or Schedules are to the Preamble, Recitals, Sections, Articles, Exhibits or Schedules of or to this Agreement;

(b)     each term defined in this Agreement has the meaning expressly assigned to it herein;

(c)     each accounting term not otherwise defined in this Agreement has the meaning commonly applied to it in accordance with GAAP;

(d)     words in the singular include the plural and vice versa, and the masculine, feminine or neuter gender shall be deemed to include each of the other genders, in each case, as required by the context;

(e)     the term "including" means "including, without limitation,"; the words "shall" and "will" are used interchangeably and have the same meaning; the words "this Article," "this Section," "this subsection," "this clause" and words of similar import refer only to the Article, Section, subsection and clause in this Agreement in which such words occur; the words "herein," "hereby," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Section, Article or other subdivision;

(f)     any reference in this Agreement to "the date hereof" shall refer to the date that this Agreement is executed.

(g)     with respect to any Person or group of Persons, the term "ordinary course of business" will be deemed to refer to the conduct of such Person or group in a manner consistent with the ordinary course of business of such Person or group, consistent with such Person's or group's past practice;

(h)     all references herein to "the Fiesta Group Companies" will be deemed to refer to "the Fiesta Group Companies, taken as a whole" unless expressly stated otherwise;

(i)     all references herein to $ or dollar amounts will be to lawful currency of the United States;

(j)     to the extent the term "day" or "days" is used, it means calendar days, unless Business Days are specified;

(k)     whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified;

(l)     unless the context requires otherwise, all references to any federal, state, local or foreign Law shall be deemed to (i) also refer to all rules and regulations promulgated thereunder and (ii) mean such Law, rules and regulations as from time to time amended, modified or supplemented;

(m)     all references to any agreement or instrument means such agreement or instrument as from time to time amended, modified or supplemented, including by waiver or consent;

(n)     any references to a Person are also to its successors and permitted assigns and, in the case of any Preamble, Recitals, Sections, Articles, Exhibits or Schedules, subsection,

18

clause or other subdivision, shall be construed as including a reference to any Governmental Authority succeeding to its functions and capacities;

(o)    when calculating the period of time before which, within which or following which any act is to be done or any step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded; and

(p)    no provision of this Agreement will be interpreted in favor of, or against, any of the parties by reason of the extent to which any such party or its counsel participated in the drafting thereof or by reason of the extent to which any such provision is inconsistent with any prior draft hereof or thereof.

## ARTICLE II

## PURCHASE AND SALE OF THE MEMBERSHIP INTERESTS

2.1    *Purchase and Sale of the Membership Interests*.

(a)    Purchase and Sale of the ACON Blocker Interests.  Upon the terms and subject to the conditions contained herein, at the Closing, each ACON Aggregator shall sell, assign, transfer and convey to BLC, free and clear of any and all Liens (other than BLC Liens and restrictions under the Securities Act, state securities laws and the Governing Documents of the ACON Blockers ((i) as in effect on the date hereof, with respect to their respective certificates of formation in the respective forms provided to BLC, and (ii) as in effect immediately after the Company Restructuring with respect to their respective limited liability company agreements, substantially in the respective forms included in the Company Restructuring Agreements)), 100% of the ACON Blocker Interests owned by such ACON Aggregator in exchange for such ACON Aggregator's portion of the Cash Consideration, as set forth in the Consideration Spreadsheet (the "ACON Blockers Acquisition").

(b)    Purchase and Sale of the Company Interests.  Upon the terms and subject to the conditions contained herein, at the Closing, simultaneously with the ACON Blockers Acquisition, Fiesta Holdings shall sell, assign, transfer and convey to BLC, free and clear of any and all Liens (other than BLC Liens and restrictions under the Securities Act, state securities laws and the Governing Documents of the Company ((i) as in effect on the date hereof with respect to the certificate of formation in the form provided to BLC, and (ii) as in effect immediately after the Company Restructuring with respect to the Company's limited liability company agreement, substantially in the form included in the Company Restructuring Agreements)), 100% of the Company Interests owned by Fiesta Holdings in exchange for Fiesta Holdings' portion of the Cash Consideration, as set forth in the Consideration Spreadsheet (the "Company Acquisition" and together with the ACON Blockers Acquisition, the "Acquisitions").

2.2    *Consideration; Consideration Spreadsheet*.

(a)    Consideration.  In consideration for the Acquisitions, BLC will pay or deliver (or cause to be paid or delivered) to the ACON Aggregators and Fiesta Holdings, cash in the aggregate amount of $265,000,000 (the "Cash Consideration"), subject to adjustment in accordance with Section 2.3 and paid in accordance with Section 2.3.

(b)     <u>Consideration Spreadsheet</u>.

(i)     No later than three Business Days prior to the Closing, the Fiesta Representative will deliver to BLC a spreadsheet (the "<u>Consideration Spreadsheet</u>"), which sets forth for each Seller the appropriate distribution of the Cash Consideration, as adjusted in accordance with <u>Section 2.3</u>, among such Sellers in accordance with this Agreement.

(ii)     BLC is entitled to rely upon the Consideration Spreadsheet, and no BLC Indemnitee will have any responsibility or liability to any Seller or other Fiesta Indemnitee from reliance on the allocations set forth in the Consideration Spreadsheet.

2.3     *Payment of Cash Consideration*.

(a)     <u>Estimated Adjustment Amount</u>.  Not later than three Business Days prior to the Closing Date, the Fiesta Representative shall deliver to BLC a statement setting forth (i) the Fiesta Representative's good faith estimate of the Estimated Adjustment Amount (the "<u>Estimated Adjustment Calculation</u>"), setting forth in reasonable detail each component thereof, and (ii) the applicable wire instructions necessary for BLC to make (or cause to be made) those certain Closing Date payments set forth in <u>Section 2.3(b)</u> (such statement, the "<u>Closing Statement</u>").  BLC may notify the Fiesta Representative of disagreements regarding the Estimated Adjustment Calculation set forth in the Closing Statement no later than two Business Days prior to the Closing Date, and the Fiesta Representative and BLC shall in good faith attempt to resolve any such disagreements without delaying the Closing (and to the extent they are able to resolve such disputes then they shall update and modify the Closing Statement (and any Estimated Adjustment Calculation set forth therein)).  If the Fiesta Representative and BLC are unable to reach an agreement on all disputed items prior to the Closing, then the Estimated Cash Consideration shall nevertheless be calculated based on the Estimated Adjustment Calculation derived from the calculations set forth in the Closing Statement prepared by the Fiesta Representative without adjustment.  To the extent reasonably required to complete its review of the Estimated Adjustment Calculation, BLC shall have reasonable and timely access to all supporting work papers and other documentation used in, and the personnel responsible for preparation of, the Estimated Adjustment Calculation.

(b)     <u>Closing Date Payments</u>.  On the terms and subject to the conditions set forth herein, at the Closing, BLC shall make the payments set forth in this <u>Section 2.3(b)</u>, or will cause such payments to be made, as follows:

(i)     to the Fiesta Representative, for the benefit of and for payment to the ACON Aggregators and Fiesta Holdings, an aggregate amount in cash in immediately available funds equal to the Cash Consideration <u>plus</u> the Estimated Adjustment Amount (the "<u>Estimated Cash Consideration</u>");

(ii)     to each holder of Indebtedness of any Fiesta Group Company from which BLC shall have received a payoff letter, the amount of Indebtedness to be repaid as of the Closing Date pursuant to such payoff letter (to the extent taken into account in determining the Estimated Cash Consideration);

(iii)     on the applicable Fiesta Group Company's or ACON Blocker's behalf, as the case may be, the Company Expenses to the applicable recipients thereof as set forth in the Closing Statement;

(iv)     to the BLC R&W Provider, an aggregate amount in cash in immediately available funds equal to the Remaining BLC R&W Policy Premium Amount; and

(v)     to the Fiesta Representative, a cash amount equal to the Representative Expense Fund.

The Cash Consideration, as adjusted in accordance with Section 2.3, is an aggregate payment owed by BLC to the Sellers, taken as a whole, and is not the amount individually owed to each such Person.  BLC shall have satisfied its obligations under this Agreement with respect to any individual cash payment obligation, and any such individual cash payment obligation shall be deemed delivered to the applicable Seller for purposes of this Agreement, once BLC has delivered (or caused to be delivered) such payment to the account or accounts specified by the Fiesta Representative to BLC in the Closing Statement.  The Sellers shall be responsible for the division of the payment of the Cash Consideration among the Sellers, and each Seller hereby releases the BLC Indemnitees from any liability or Loss in connection with such division.

(c)     Determination of Final Adjustment Amount.

(i)     As soon as practicable, but no later than 60 days after the Closing Date, BLC shall prepare and deliver to the Fiesta Representative BLC's good faith proposed calculation of the Adjustment Amount and the components thereof, in each case in a manner consistent with the applicable definitions contained herein.  The proposed calculations described in the previous sentence shall collectively be referred to herein from time to time as the "Proposed Closing Date Calculations."  If BLC fails to deliver such proposed calculation within such 60-day period, then in addition to any other rights the Fiesta Representative may have under this Agreement, the Fiesta Representative shall have the right to elect that the Estimated Adjustment Amount be deemed to be the final Adjustment Amount and be final and binding and used for purposes of calculating the adjustment pursuant to Section 2.3(d).

(ii)     The Fiesta Representative shall have 30 days following receipt of the Proposed Closing Date Calculations to review such calculations (the "Review Period") and may, on or prior to the last day of the Review Period, provide BLC with a written notice of dispute, setting forth its objections to BLC's calculation of the Proposed Closing Date Calculations and the Fiesta Representative's proposed calculation of the Adjustment Amount (a "Dispute Notice").  Unless the Fiesta Representative delivers a Dispute Notice to BLC on or before the last day of the Review Period, the Sellers and the other Parties agree that the Proposed Closing Date Calculations shall be deemed to set forth the final Adjustment Amount for all purposes hereunder (including for the determination of the final Adjustment Amount and the resulting final Cash Consideration).  Prior to the end of the Review Period, the Fiesta Representative may accept the Proposed Closing Date Calculations by delivering written notice to that effect to BLC, in which case the Proposed

21

Closing Date Calculations shall be deemed to set forth the final Adjustment Amount for all purposes hereunder (including for the determination of the final Adjustment Amount and the resulting final Cash Consideration).

(iii)    If the Fiesta Representative gives a Dispute Notice to BLC on or prior to the last day of the Review Period, BLC and the Fiesta Representative shall use commercially reasonable efforts to resolve the dispute set forth in the Dispute Notice in good faith during the 30-day period commencing on the date BLC receives the applicable Dispute Notice from the Fiesta Representative (and all such discussions and communications related thereto shall, unless otherwise agreed by BLC and the Fiesta Representative, be governed by Rule 408 of the Federal Rules of Evidence (and any applicable similar state rule)).  If the Fiesta Representative and BLC do not agree upon a final resolution with respect to any disputed items set forth in the Dispute Notice within such 30-day period, then the remaining items in dispute shall be submitted promptly by BLC and the Fiesta Representative to an independent accounting firm of national reputation mutually acceptable to BLC and the Fiesta Representative (the "Accounting Firm") for final determination.  BLC and the Fiesta Representative will each execute a customary engagement letter with respect to the engagement of the Accounting Firm, and, after such engagement, (x) BLC will deliver to the Accounting Firm the Proposed Closing Date Calculations, (y) the Fiesta Representative will deliver to the Accounting Firm the Dispute Notice and (z) each of BLC and the Fiesta Representative will submit a supporting brief to the Accounting Firm within ten Business Days of engaging such Accounting Firm with respect to the item or items in dispute in the Dispute Notice (the "Submission Deadline").  Subject to the immediately following sentence, each of BLC and the Fiesta Representative may make an oral presentation to the Accounting Firm (in which case BLC or the Fiesta Representative, as applicable, will provide prompt prior notice of such presentation to the other Party, which will be entitled to attend or have a representative attend such presentation (the supporting brief and any material submitted at such oral presentation being referred to as a Party's "Submission")).  Each of BLC and the Fiesta Representative shall, on or prior to the Submission Deadline, notify the Accounting Firm and the other Party as to whether or not it will make an oral presentation and, should any Party so elect, shall make such oral presentation on or before the date that is ten days after the Submission Deadline.  The Accounting Firm will be given reasonable access to all of the books and records of the Fiesta Group Companies to determine the disputed items.  The Accounting Firm shall be requested to render a written determination in reasonable detail of the applicable dispute and the resulting Adjustment Amount (acting as an expert and not as an arbitrator) within 20 days after the later of (x) the applicable Submission Deadline and (y) if either or both of BLC and the Fiesta Representative elect to make an oral presentation, the date of the last such presentation, which determination must be in writing and must set forth, in reasonable detail, whether the Proposed Closing Date Calculations in BLC's Submission or the proposed Adjustment Amount set forth in the Fiesta Representative's Submission reflects the more accurate calculation of the Adjustment Amount (i.e., the Accounting Firm may select only the Adjustment Amount proposed by BLC's Proposed Closing Date Calculations or the Adjustment Amount proposed by the Fiesta Representative in the Dispute Notice, as further described by their respective Submissions).  In making such determination, the Accounting Firm will limit its review to each Party's Submission.  Such determination of the Accounting Firm shall be conclusive

and binding upon the Parties absent actual and intentional fraud or manifest error.  The Proposed Closing Date Calculations shall be revised as appropriate to reflect the resolution of any objections thereto pursuant to this Section 2.3(c)(iii), and, as so revised, such Proposed Closing Date Calculations shall be deemed to set forth the final Adjustment Amount for all purposes hereunder (including the determination of the final Adjustment Amount and the final Cash Consideration).  The engagement fees of the Accounting Firm shall initially be borne 50% by the Sellers and 50% by BLC; provided, however, that such fees shall ultimately be borne by the Party whose Submission is not chosen by the Accounting Firm.  Except as provided in the preceding sentence, all costs and expenses incurred by the Parties in connection with resolving any dispute hereunder before the Accounting Firm shall be borne by the Party incurring such cost and expense.

(iv)    BLC shall make the Fiesta Group Companies' relevant financial records, supporting documents and work papers and personnel reasonably available to the Fiesta Representative and its accountants and other representatives at reasonable times, to the extent reasonably necessary for the Fiesta Representative to complete its review of BLC's Proposed Closing Date Calculations.

(v)    The Parties agree that the procedures set forth in this Section 2.3(c) for resolving disputes with respect to the Proposed Closing Date Calculations shall be the sole and exclusive method for resolving any such disputes; provided, however, that this provision shall not prohibit any Party from instituting litigation to either (i) compel the submission of any dispute items to the Accounting Firm in accordance with Section 2.3(c)(iii) or (ii) enforce any final determination of the Adjustment Amount by the Accounting Firm pursuant to Section 2.3(c)(iii), in each case, in any court of competent jurisdiction in accordance with Sections 12.12 and 12.13.  The substance of the Accounting Firm's determination shall not be subject to review or appeal, absent a showing of actual and intentional fraud or manifest error.  It is the intent of the Parties to have any final determination of the Adjustment Amount by the Accounting Firm proceed in an expeditious manner; provided, however, that any deadline or time period contained herein may be extended or modified by agreement of the Parties and the Parties agree that the failure of the Accounting Firm to strictly conform to any deadline or time period contained herein shall not be a basis for seeking to overturn any determination rendered by the Accounting Firm that otherwise conforms to the terms of this Section 2.3.

(d)    Adjustment to Estimated Cash Consideration.

(i)    If the Actual Adjustment is a positive amount, BLC shall pay to the Fiesta Representative an amount equal to such positive Actual Adjustment, by wire transfer of immediately available funds within three Business Days after the date on which the Adjustment Amount is finally determined pursuant to Section 2.3(c) above.

(ii)    If the Actual Adjustment is a negative amount, the Fiesta Representative shall pay (or cause to be paid) to BLC an amount equal to the absolute value of such Actual Adjustment by wire transfer of immediately available funds within three Business Days after the date on which the Adjustment Amount is finally determined pursuant to Section 2.3(c) above.

23

(iii)     If the Actual Adjustment is equal to zero, than no payment shall be made by either the Fiesta Representative or BLC pursuant to this Section 2.3(d).

(iv)     Any amounts that become payable pursuant to this Section 2.3(d) shall be treated as an adjustment to the Cash Consideration for all purposes.

2.4     *Withholding Taxes*.  BLC shall be entitled to deduct or withhold any amounts required by Law to be deducted or withheld for or on account of any Tax from the payments otherwise to be made by it hereunder, and upon payment to the appropriate Governmental Authority, any amounts so deducted or withheld shall be treated as having been paid to the Person to whom the payments from which the amounts deducted or withheld were otherwise due.

## ARTICLE III

## CLOSING AND CLOSING DELIVERIES

3.1     *Closing Date*.  The closing of the transactions contemplated by Article II (the "Closing") will take place remotely via the electronic exchange of documents and signatures on the later of (i) the date that is five Business Days following the satisfaction or waiver by the relevant Party or Parties of the conditions to Closing set forth in Article VIII (excluding conditions that, by their nature, can be satisfied only at the Closing, but subject to the fulfillment or waiver of those conditions) and (ii) April 30, 2018, unless another time, date or place is mutually agreed by the Fiesta Representative and BLC, taking into account the financial and accounting systems of the Fiesta Group Companies.  The date on and time at which the Closing is actually held is referred to herein as the "Closing Date."

3.2     *Closing Deliveries*.

(a)     Deliveries by the Sellers.  At the Closing, the Sellers shall deliver, or cause to be delivered, to BLC:

(i)     a certified copy of the resolutions of each Seller's and the Company's governing body, authorizing the execution and delivery of this Agreement and the other Documents and the consummation of the transactions contemplated hereby and thereby;

(ii)     written resignations from all director and manager positions in the Fiesta Group Companies and the ACON Blockers, in form and substance reasonably satisfactory to BLC and effective as of the Closing, of each of the directors and managers of each Fiesta Group Company and each ACON Blocker, in each case, as designated by BLC at least two Business Days prior to Closing;

(iii)     a certificate from each Seller in the form and substance as prescribed by Treasury Regulations promulgated under Code § 1445, stating that each such Seller is not a "foreign person" for purposes of such provision;

(iv)     evidence of delivery of notices to landlords of the transactions contemplated herein, to the extent required prior to the Closing under, and in accordance

with the terms and conditions of any of the Fiesta Material Leases set forth on Schedule 3.2(a)(iv);

(v)     a certificate (the "Closing Capitalization Certificate") from the Company that sets forth as of immediately prior to the Closing the record and beneficial owners of the Company Interests;

(vi)     the certificate required by Section 8.1(a)(vii), duly executed by each Seller;

(vii)     evidence of termination of the Fiesta Affiliate Contracts listed on Schedule 3.2(a)(vii);

(viii)     customary payoff letters and Lien releases documentation, reasonably satisfactory to BLC, from the Persons set forth on Schedule 3.2(a)(viii); and

(ix)     to the extent that the Company Restructuring is effectuated, the Company Restructuring Agreements, duly executed by each party thereto.

(b)     Deliveries and Payments by BLC.  At the Closing BLC shall:

(i)     make the payments set forth in Section 2.3(b);

(ii)     deliver, or cause to be delivered, to the Fiesta Representative:

(1)     a certified copy of the resolutions of BLC's board of directors, authorizing the execution and delivery of this Agreement and the other Documents and the consummation of the transactions contemplated hereby and thereby; and

(2)     the certificate required by Section 8.2(a)(iii), duly executed by BLC.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES REGARDING THE FIESTA GROUP COMPANIES

The Sellers hereby jointly and severally represent and warrant to BLC as follows:

4.1     *Organization, Qualification and Capacity of the Fiesta Group Companies.*

(a)     Each Fiesta Group Company is duly organized, validly existing and in good standing (or the equivalent thereof) under the Laws of its respective jurisdiction of incorporation or formation.  Each Fiesta Group Company has the requisite corporate power or limited liability company power, as applicable, and authority to own, lease and operate its material assets and properties and to carry on its businesses as presently conducted in all material respects.

(b)    Each Fiesta Group Company is duly qualified or licensed to transact business and is in good standing (or the equivalent thereof) in each jurisdiction in which the property owned, leased or operated by it, or the nature of the business conducted by it, makes such qualification or licensing necessary, except in such jurisdictions where the failure to be so duly qualified or licensed and in good standing could not reasonably be expected to have a Material Adverse Effect.

(c)    The Sellers have made available to BLC an accurate and complete copy of each Governing Document of each Fiesta Group Company, in each case, as in effect as of the date of this Agreement.  Each such Governing Document is in full force and effect and, to, the Knowledge of the Sellers, no Fiesta Group Company is in violation of any of the provisions of any such Governing Document.

4.2    *Authorized Equity*.  The Company Interests constitute the entirety of the authorized and outstanding equity interests of the Company.  The Company Interests are duly authorized and validly issued and are free and clear of all Liens and preemptive rights (except to the extent provided by applicable Law and the Company's Governing Documents), and have not been issued in violation of any preemptive rights, rights of first refusal or similar rights.  Except as set forth on Schedule 4.2(a), there are no authorized or outstanding (a) equity securities or other securities of the Company, (b) securities of the Company convertible into or exchangeable for equity securities or other securities of the Company or containing any profit participating features or similar rights, (c) options, warrants, put rights, call rights or other rights to acquire, redeem or repurchase from the Company (directly or indirectly), and no obligations of the Company to issue, any equity securities or securities convertible into or exchangeable for equity securities of the Company and (d) bonds, debentures, notes or other Indebtedness that entitle the holders thereof to vote (or convertible or exercisable for or exchangeable into securities that entitle the holders thereof to vote) with the equityholders of the Company on any matter (the items in clauses (a) through (d) being referred to collectively as the "Company Securities").  Except as set forth in the Governing Documents or on Schedule 4.2(b), there are no voting trusts or agreements, registration rights agreements, pledge agreements, buy-sell agreements, rights of first refusal or preemptive rights, limited liability company member agreements, operating agreements, proxies or similar agreements or arrangements or understandings relating to the Company Securities to which the Company or any Seller is a party.  Schedule 4.2(c) sets forth a complete and accurate list of each of the record and beneficial holders of the Company Securities as of the date hereof, and the Closing Capitalization Certificate sets forth a complete and accurate list of each of the record and beneficial holders of the Company Securities as of the Closing (immediately following the consummation of the Company Restructuring).

4.3    *Subsidiaries*.  Except for the companies specifically identified by name in the definition of Fiesta Subsidiaries, the Company has no Subsidiaries.  Schedule 4.3 sets forth, with respect to each Fiesta Subsidiary, (a) its name and jurisdiction of organization, (b) the number of authorized, issued and outstanding shares for each class of its capital stock or other equity interests and the holders thereof and (c) the names and titles of its officers, directors or comparable individuals.  All the issued and outstanding shares of capital stock or other equity interests of each Fiesta Subsidiary have been duly authorized and are validly issued and, if applicable, fully paid and non-assessable and have not been issued in violation of any preemptive rights, rights of first refusal or similar rights.  Except as set forth on Schedule 4.3 or in the Governing Documents of

any such Subsidiary, the Company holds of record and owns beneficially all the outstanding shares or other equity interests of each such Fiesta Subsidiary, free and clear of all Liens and restrictions on transfer, options, warrants, conversion rights, rights of first refusal or other agreements or commitments obligating any Subsidiary of the Company to issue or purchase any equity securities or any security convertible into equity securities (other than limitations expressly set forth in the applicable Governing Documents and Liens imposed by BLC or any Subsidiary of BLC or under applicable securities Laws or which will be discharged or released at or prior to Closing).  Except as set forth on Schedule 4.3 or in the Governing Documents of any such Subsidiary, no holder of securities of any Fiesta Subsidiary has entered into any agreement with respect to the voting of securities of such entity or any pledge agreements related to such securities.  Except for the Fiesta Subsidiaries specifically identified by name in the definition of Fiesta Subsidiaries, and except as set forth on Schedule 4.3, no Fiesta Group Company holds any equity, partnership, joint venture or other interest in any Person.  Except as set forth on Schedule 4.3, there are (i) no outstanding options, warrants, rights to purchase or subscribe for shares of capital stock or other ownership interests of any of the Fiesta Subsidiaries, (ii) stock appreciation rights or other securities convertible into or exercisable or exchangeable for any shares of capital stock of (or other equity interests in) such Fiesta Subsidiaries, (iii) any other commitments, contracts or agreements providing for the issuance of additional shares (or other equity interests), the sale of treasury shares, or for the repurchase or redemption of such Fiesta Subsidiaries' shares of capital stock (or other equity interests), including any such issuances after the date of this Agreement, or (iv) any agreements or contracts of any kind that may obligate any Fiesta Subsidiary to issue, purchase, register for sale, redeem or otherwise acquire any of its shares of capital stock (or other equity interests).

4.4     *Consents and Approvals; No Violations.*  Assuming the making of all notifications or filings as may be required in connection with the transactions described herein under the HSR Act or any foreign antitrust, merger control or competition Law, and the receipt of all clearances, approvals, authorizations or waiting period expirations or terminations as may be required in connection with the transactions described herein under the HSR Act or any foreign antitrust, merger control or competition Law, neither the execution or delivery of this Agreement or the other Documents nor the consummation of the transactions contemplated hereby and thereby (a) will conflict with or result in a breach, or violation of, or cause acceleration, or constitute (with or without due notice or lapse of time or both) a default, or give rise to any right to require notice or any right of termination, cancellation, modification or acceleration, under (i) any of the terms, provisions or conditions of the Governing Documents of any Fiesta Group Company or (ii) any Fiesta Material Contract or any Law to which any Fiesta Group Company is a party or to which it is subject or to which any of its properties or assets may be bound; (b) will result in the creation of any Lien on the equity interests, property or assets of any Fiesta Group Company or (c) except as disclosed on Schedule 4.4, will require any Fiesta Group Company to obtain the consent of any non-governmental third party except where the failure to obtain such consent would not be material to the Fiesta Business.  Except as expressly contemplated by the Documents, or as set forth on Schedule 4.4, no consent, action, approval or authorization of, or registration, declaration or filing with, any Governmental Authority is required to authorize, or is otherwise required in connection with, the execution and delivery of the Documents or the performance of the terms of the Documents or the validity or enforceability of the Documents other than notifications or filings as may be required in connection with the transactions described herein under the HSR Act.

27

4.5     *Governmental Authorizations.*  The Fiesta Group Companies have, and have at all times during the past three years had, in all material respects, all of the Permits as are necessary to carry on the Fiesta Business, and such Permits are in full force and effect and have been complied with by the Fiesta Group Companies in all material respects.   There are no, and since April 27, 2015, there have been no, actions, suits or proceedings (or, to the Knowledge of the Sellers, investigations) pending or, to the Knowledge of the Sellers, threatened that could reasonably be expected to result in the revocation or termination of any such Permit.  No action is pending or, to the Knowledge of the Sellers, threatened to suspend, revoke, revise, limit, restrict or terminate any Permits, or declare any Permits invalid, except in each case as could not reasonably be expected to be material to the Fiesta Business.

4.6     *Financial Statements; No Undisclosed Liabilities.*

(a)     Attached as Schedule 4.6(a) are true, complete and correct copies of the Fiesta Group Companies' (i) audited consolidated balance sheet and related audited consolidated statements of income and cash flow (collectively, the "Audited Financial Statements") as, at and for the fiscal years ended January 3, 2016 and January 1, 2017 and (ii) unaudited consolidated balance sheet and related statements of income and cash flow (collectively, the "Interim Financial Statements"), as, at and for the interim fiscal period that began January 2, 2017 and ended December 31, 2017 (the "Fiesta Statement Date") (the Audited Financial Statements, together with the Interim Financial Statements, collectively, the "Financial Statements").   The Financial Statements are consistent with the books and records of the Fiesta Group Companies, fairly present the financial position of the Fiesta Group Companies as of the dates indicated therein, and the results of operation and cash flows of the Fiesta Group Companies for the periods indicated therein, and have been prepared in accordance with GAAP, except, in the case of the Interim Financial Statements, for (x) the absence of footnotes and (y) normal and year-end adjustments, which, individually or in the aggregate, are not material to the Fiesta Business.

(b)     Except for (i) liabilities arising under this Agreement or incurred in connection with the transactions contemplated by this Agreement; (ii) liabilities listed in Schedule 4.6(b), (iii) liabilities that are repaid, terminated, forgiven, settled, cancelled or otherwise extinguished at Closing pursuant to the terms of this Agreement; and (iv) liabilities that have arisen after the Fiesta Statement Date in the ordinary course of business (except for any such liability arising from any actual or alleged breach of contract, breach of warranty, tort, infringement claim or other judicial or arbitral proceeding), no Fiesta Group Company has any liabilities of a nature required by GAAP to be reflected on a consolidated balance sheet of the Fiesta Group Companies, whether accrued, absolute, fixed, contingent, matured or unmatured or otherwise, that are not disclosed in, set forth on, or reflected or reserved against in the Interim Financial Statements.

(c)     Schedule 4.6(c) lists, as of the Fiesta Statement Date, the trade and accounts receivable and accounts payable of the Fiesta Group Companies, showing separately for each such receivable and payable, its age denominated by an appropriate aging classification.

(d)     From the Fiesta Statement Date until the date hereof, the Fiesta Group Companies have maintained cash in stores in the ordinary course of business.

4.7    *Absence of Changes*.    Except as expressly permitted or contemplated by this Agreement (including as necessary to consummate the Company Restructuring in compliance with the provisions of this Agreement) or as disclosed on <u>Schedule 4.7</u>, since January 1, 2017, (a) there have been no material adverse changes in the results of operations, business or financial condition of any Fiesta Group Company from that set forth in the Financial Statements, (b) there have been no events or conditions affecting the assets, properties, contracts with suppliers, distributors, business or operations of Fiesta Group Companies from the circumstances existing on January 1, 2017, other than, with respect to both <u>clauses (a)</u> and <u>(b)</u> hereof, changes, events or conditions, the effect of which could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect and (c) no Fiesta Group Company has engaged in any of the activities that would be prohibited by <u>Section 7.1(b)</u> or <u>subparagraph (i)</u>, <u>(ii)</u>, <u>(iii)</u>, <u>(ix)</u>, <u>(x)</u>, <u>(xi)</u>, <u>(xii)</u>, <u>(xv)</u> or (to extent related to any of the foregoing subparagraphs) <u>(xvii)</u> of <u>Section 7.1(a)</u>, in each case if such action had been taken between the date of this Agreement and the Closing.

4.8    *Real and Personal Property*.

(a)    <u>Real Property</u>.

(i)    No Fiesta Group Company owns either beneficially or of record, nor has owned either beneficially or of record, any real property.  Except as set forth on <u>Schedule 4.8(a)(i)</u>, no Fiesta Group Company is obligated or bound by any options, obligations or rights of first refusal or contractual rights to sell, lease or acquire any real property.  <u>Schedule 4.8(a)(i)</u> sets forth (A) a true and complete list of all leases, subleases, licenses and agreements (together with any amendments or modifications thereto) (each a "<u>Fiesta Material Lease</u>") concerning the use or occupancy of any real property by any Fiesta Group Company as lessee (such real property, the "<u>Fiesta Leased Real Property</u>") to which any Fiesta Group Company is a party or by which any of them is bound and (B) indicates the Fiesta Leased Real Property leased, subleased, licensed or occupied under each of the Fiesta Material Leases.  The Fiesta Leased Real Property includes all real property used or held for use in connection with the conduct of the Fiesta Business as presently conducted by the Fiesta Group Companies.  Except as indicated in <u>Schedule 4.8(a)(i)</u>, the Sellers have made available prior to the execution of this Agreement true, complete and correct copies of all Fiesta Material Leases.  Each Fiesta Material Lease is valid and binding on the Fiesta Group Company party thereto, enforceable in accordance with its terms (subject to proper authorization and execution of such Fiesta Material Lease by the other party thereto and subject to applicable bankruptcy, insolvency, reorganization, moratorium or other Laws affecting generally the enforcement of creditors' rights and subject to general principles of equity).  Each Fiesta Group Company, as applicable, has a valid leasehold interest in each of the Fiesta Material Leases and each Fiesta Group Company, as applicable, is in possession of each parcel of Fiesta Leased Real Property leased, subleased, licensed or occupied pursuant to a Material Lease, together with all buildings, structures, facilities, fixtures and other improvements thereon (collectively, "<u>Fiesta Improvements</u>"), and in each case such leasehold interest, is subject to the terms and conditions of such Fiesta Material Lease, free and clear of all Liens other than Permitted Liens and Permitted Fiesta Liens, and there are no parties in possession of any portion of the Fiesta Leased Real Property other than the Fiesta Group Companies and the other parties to the Fiesta Material Leases.  <u>Schedule 4.8(a)(i)</u> sets forth a true and complete

list of all leases, subleases, licenses and agreements (together with any amendments or modifications thereto) (each a "Fiesta License") concerning the use or occupancy of the Fiesta Leased Real Property by a third Person as lessee, sublessee, licensee or occupant. Except for the Fiesta Licenses, there are no leases, subleases, licenses, or other agreements granting to any Person the right of use or occupancy of any portion of the Fiesta Leased Real Property (except under the Fiesta Material Leases).   Except as set forth in Schedule 4.8(a)(i), the Fiesta Improvements are in all material respects: (i) in good operating condition and repair (ordinary wear and tear excepted) and (ii) suitable and adequate for continued use in the manner in which they are presently being used.  Each Fiesta Group Company, as applicable, has such rights of ingress and egress with respect to such Fiesta Leased Real Property as are required to conduct the applicable portions of the Fiesta Business in a manner consistent with past practice.  No Fiesta Group Company has assigned, transferred or pledged any interest in any of the Fiesta Material Leases.  The Sellers have made available prior to the execution of this Agreement true, complete and correct copies of any title policies, opinions or commitments (and underlying documents), surveys, appraisals, SNDAs and estoppels with respect to the Fiesta Leased Real Property in the possession of the Fiesta Group Companies or the Sellers, or their respective Affiliates or representatives.

(ii)     Except as set forth on Schedule 4.8(a)(ii), (A) there is no default on the part of any Fiesta Group Company under any of the Fiesta Material Leases, nor, to the Knowledge of the Sellers, any condition or event that, after notice or lapse of time or both, would constitute a default by any Fiesta Group Company under any of the Fiesta Material Leases, (B) no Fiesta Group Company has received notice of any such default from any other party thereunder that remains uncured, (C) to the Knowledge of the Sellers, there is no default on the part of any other party under any of the Fiesta Material Leases, nor any condition or event that, after notice or lapse of time or both, would constitute a default by the other party under any of the Fiesta Material Leases and (D) no Fiesta Group Company has delivered notice of any such default to any other party thereunder.  No security deposit or portion thereof deposited with respect to any of the Fiesta Leased Real Property has been applied in respect of a breach or default with respect to the Material Lease thereof that has not been redeposited in full.  No Fiesta Group Company owes any brokerage commissions with respect to any Fiesta Leased Real Property (other than any contingent obligation in respect of future lease extensions).

(iii)     There is no pending, or to the Knowledge of the Sellers, threatened, condemnation or similar proceeding or special assessment affecting any Fiesta Leased Real Property, or any part thereof, nor have the Sellers or the relevant tenant Fiesta Group Company of the Company received notification that any such proceeding or assessment is contemplated by any Governmental Authority.

(iv)     The use and operation of the Fiesta Leased Real Property by the Fiesta Group Companies is lawful and in compliance in all material respects with all certificates of occupancy or similar Permits, use statutes, rules, regulations, ordinances, Orders, writs, injunctions, judgments, decrees, awards and restrictions, including zoning, building and land use Laws of every Governmental Authority having jurisdiction over such

Fiesta Leased Real Property and all easements, encumbrances, covenants or rights of way applicable to the Fiesta Leased Real Property.

(v)     There are no unpaid and presently due charges, debts, liabilities, claims or obligations arising from the construction, occupancy, ownership, use or operation of the Fiesta Leased Real Property, or the business operated thereon, that could give rise to any mechanic's or materialmen's or other statutory Lien (A) against such Fiesta Leased Real Property, or any part thereof, or (B) for which any Fiesta Group Company will be responsible.  No Fiesta Group Company has entered into any agreement the performance of which could give rise to a Lien against the Fiesta Leased Real Property.

(b)     Personal Property.  Except as disclosed on Schedule 4.8(b), the Fiesta Group Companies collectively have good and valid title to or hold under valid leases all material machinery, equipment, leasehold improvements, supplies, inventory and other tangible personal property necessary for the conduct of the Fiesta Business as currently conducted, subject to no Liens except for Permitted Liens and Permitted Fiesta Liens.  No Seller or its Affiliates (other than the Fiesta Group Companies), nor any officer, director or employee of any Fiesta Group Company possesses, or has the right to use, any material tangible personal property owned or leased by the Fiesta Group Companies (other than in the case of any officer, director or employee of any Fiesta Group Company in connection with his or her services provided to any Fiesta Group Company). The material tangible personal property owned or used by the Fiesta Group Companies is, considered as a whole, sufficient for the conduct of the Fiesta Business as currently conducted, is free of latent or patent structural defects and is in good operating condition or repair, ordinary wear and tear excepted.

4.9     Sufficiency of Assets.  The assets and properties held by the Fiesta Group Companies (including the Fiesta Material Leases) are sufficient in all material respects for the conduct of the Fiesta Business as currently conducted.

4.10     Litigation, Judgments, Etc..  Except as set forth on Schedule 4.10, there are no claims, charges, audits, actions, suits, proceedings or investigations pending, or to the Knowledge of the Sellers, threatened, against any Fiesta Group Company or, to the extent relating to the Fiesta Business, any Seller, in any court or before or by any Governmental Authority or in any arbitral proceeding.  No Fiesta Group Company or, to the extent relating to the Fiesta Business, any Seller, is in default with respect to any Order applicable to them of any court or other Governmental Authority or arbitrator having jurisdiction over such Person, and all such Orders are listed in Schedule 4.10.  Notwithstanding the foregoing, for all purposes of the Agreement, the Sellers do not make any representation or warranty (pursuant to this Section 4.10 or elsewhere in the Agreement) regarding the effect of the applicable antitrust, merger control, competition or fair trade Laws on their ability to execute, deliver or perform their obligations under this Agreement or to consummate the transactions described in this Agreement as a result of the enactment, promulgation, application, or threatened or actual judicial or administrative investigation or litigation under, or enforcement of, any antitrust, merger control, competition or fair trade Law with respect to the consummation of the transactions described in this Agreement.

4.11     Compliance With Laws.  The Fiesta Group Companies are, and since April 27, 2015 have been, in material compliance with all Laws applicable to the conduct of the Fiesta Business

31

or the maintenance and operation of any Fiesta Group Company's properties and assets.  Since April 27, 2015, no Fiesta Group Company has received any written notice alleging violation in any material respect of any such Law, except as would not be reasonably be expected to be material to the Fiesta Group Companies.

      4.12    *Intellectual Property and Intellectual Property Licenses.*

      (a)    (i)    Except as set forth on Schedule 4.12(a)(i), the Fiesta Group Companies are the sole and legal owners of the entire right, title and interest in and to the Fiesta Intellectual Property (other than the Intellectual Property Licenses scheduled at Schedule 4.12(h) and commercially available "off the shelf" software), free and clear of all Liens, restrictions or claims other than rights granted to third parties pursuant to a contract ("Fiesta Owned Intellectual Property").  The Intellectual Property necessary for the conduct of the Fiesta Business as currently conducted is set forth in Schedule 4.12(b), Schedule 4.12(c), Schedule 4.12(d), Schedule 4.12(e), Schedule 4.12(f), Schedule 4.12(g), and Schedule 4.12(h), together with Copyrights owned by the Fiesta Group Companies.

      (ii)    The Fiesta Group Companies have made all necessary filings, payments of fees and Taxes, and recordations necessary to protect and maintain their respective interests in the Fiesta Intellectual Property.  Except as set forth in Schedule 4.12(a)(ii), no such filings, fees, Taxes or recordations are due in the six month period after the Closing.

      (iii)    The Fiesta Intellectual Property is subsisting and has not been adjudged invalid, unregistrable or unenforceable, in whole or in part, and all registered Intellectual Property included within the Fiesta Intellectual Property is valid and enforceable.  There are not any uses of any item of Fiesta Owned Intellectual Property or other facts that could be expected to lead to such item's becoming invalid or unenforceable, including unauthorized use by third parties.  No Fiesta Group Company has received any claim or allegation or notice of any claim, action, suit, complaint or proceeding against such Fiesta Group Company, nor, to the Knowledge of the Sellers, has a claim been alleged or is there any basis for a party to bring any action, suit, complaint or proceeding alleging that any of the Fiesta Intellectual Property is invalid or unenforceable.

      (iv)    To the Knowledge of the Sellers, the Fiesta Owned Intellectual Property and the use thereof does not infringe, violate or misappropriate the Intellectual Property or other proprietary rights of any third party.  Except as set forth on Schedule 4.12(a)(iv), no allegation, claim, action or proceeding has been brought or made, nor to the Knowledge of the Sellers, is there any good faith basis for a party to bring any action or proceeding or to claim or allege, that the past or present use by the Fiesta Group Companies or any predecessor of the Fiesta Group Companies or Affiliates of the Fiesta Group Companies of the Fiesta Intellectual Property infringes, violates or misappropriates the rights of any third party.  To the Knowledge of the Seller, except as set forth in Schedule 4.12(a)(iv), none of the Fiesta Intellectual Property is being infringed by any third party and no Affiliate of the Fiesta Group Companies has given any notice to any third party asserting infringement by such third party of any of the Fiesta Intellectual Property.

(v)     Except for the agreements set forth in <u>Schedule 4.12(a)(v)</u> (collectively, the "<u>Fiesta Group Company Intellectual Property Agreements</u>"), no Fiesta Group Company has made a previous assignment, transfer or agreement constituting a present or future assignment, transfer or encumbrance of any of the Fiesta Intellectual Property.  Except for the Fiesta Group Company Intellectual Property Agreements, no Fiesta Group Company has granted any royalty, license, release, covenant not to sue or non-assertion assurance to any Person with respect to any part of the Intellectual Property.  No Fiesta Group Company has received any claim or allegation or notice of any claim, action, suit, complaint or proceeding against such Fiesta Group Company, nor, to the Knowledge of the Sellers, has a claim been alleged or is there any basis for a party to bring any action, suit, complaint or proceeding, for asserting a breach by such Fiesta Group Company of any of the Fiesta Group Company Intellectual Property Agreements.  No Fiesta Group Company is in default under any of the Fiesta Group Company Intellectual Property Agreements, except for defaults that have not had and could not reasonably be expected to have a Material Adverse Effect.

(vi)    The Fiesta Group Companies own or have valid rights to use, pursuant to an Intellectual Property License listed on <u>Schedule 4.12(h)</u>, all of the Intellectual Property necessary to carry out the Fiesta Business free and clear of any Liens, rights of first refusal, restrictions or other encumbrances other than rights granted to third parties pursuant to contracts.  The Fiesta Intellectual Property constitutes all of the Intellectual Property necessary or used in the conduct of the Fiesta Business as currently conducted.

(vii)   Each of the employees, agents, consultants, contractors and others who have, to the Knowledge of the Sellers, contributed to or participated in the discovery, creation or development of any Fiesta Intellectual Property on behalf of the Fiesta Group Companies ("<u>Fiesta Personnel</u>") (i) has assigned to the Fiesta Group Companies, or is under a valid obligation to assign to the Fiesta Group Companies by contract or otherwise, all right, title and interest in such Intellectual Property; (ii) is a party to a valid "work for hire" agreement under which the Fiesta Group Companies is deemed to be the original owner/author of all subject matter included in such Intellectual Property; or (iii) to the extent that Fiesta Personnel do not have the ability to take any of the actions described in the foregoing <u>clause (i)</u> or <u>(ii)</u>, has granted to the Fiesta Group Companies a license or other legally enforceable right granting the Fiesta Group Companies perpetual, unrestricted and royalty-free rights to use such Intellectual Property.

(b)     <u>Patents</u>.  <u>Schedule 4.12(b)</u> contains a complete and accurate list of all Patents within the Fiesta Owned Intellectual Property.

(c)     <u>Marks</u>.  <u>Schedule 4.12(c)</u> contains a complete and accurate list of all material Marks within the Fiesta Owned Intellectual Property.

(d)     <u>Trade Secrets</u>.  All material Trade Secrets within the Fiesta Owned Intellectual Property, and all such Trade Secrets have been independently and originally created by the Fiesta Group Companies without the use of any other Person's Trade Secrets, know-how or confidential or proprietary information.  The Fiesta Group Companies have used their respective

33

commercially reasonable efforts to protect the secrecy and confidentiality of all such Trade Secrets and protect their status as Intellectual Property under applicable Law.  Except as set forth in Schedule 4.12(d), none of the Fiesta Group Companies has sold, licensed or otherwise transferred to any Person any right to use or disclose any such Trade Secret.  There has been no misappropriation of any Trade Secrets or other confidential or proprietary information owned by Fiesta Group Companies, by any Person, and no employee, independent contractor or agent of Fiesta Group Companies has misappropriated any Trade Secret of any other Person in the course of their performance as an employee, independent contractor or agent.

(e)     Website Materials.  Schedule 4.12(e) contains a complete and accurate list of Website Materials within the Fiesta Owned Intellectual Property.

(f)     Software.   Schedule 4.12(f) contains a complete and accurate list of all Software within the Fiesta Owned Intellectual Property, other than other than commercially available "off the shelf" software and Intellectual Property Licenses listed on Schedule 4.12(h).

(g)     Social Media Accounts.  Schedule 4.12(g) contains a complete and accurate list of all Social Media Accounts within the Fiesta Owned Intellectual Property.

(h)     Intellectual Property Licenses.  Schedule 4.12(h) contains a complete and accurate list of all Intellectual Property Licenses related to the Fiesta Business between the Fiesta Group Companies, on the one hand, and any third party, on the other hand.  No claim, action, suit, complaint or proceeding has been brought or alleged, nor is there any good faith basis for a party to bring any action, suit, complaint or proceeding, against any of the Fiesta Group Companies for breach of any agreement listed in Schedule 4.12(h).

4.13     *Contracts*.

(a)     Schedule 4.13(a) lists each contract of any Fiesta Group Company (other than any Fiesta Employee Plan) involving aggregate annual receipts or payments by any Fiesta Group Company (other than any Fiesta Material Leases) in excess of $100,000.

(b)     Schedule 4.13(b) sets forth all employment, bonus, change in control, severance, termination or other agreements to which a Fiesta Group Company is a party (or is otherwise bound or subject) with or pertaining to any current employee, independent contractor, consultant or other agent or representative of any Fiesta Group Company, to the extent (i) providing for annual base compensation in excess of $100,000, (ii) requiring severance or termination payments or benefits attributable in whole or in part to the termination of such individual's employment or other relationship with any Fiesta Group Company or otherwise limiting the right of any Fiesta Group Company to terminate the services or employment of any individual for any reason at any time, (iii) requiring change in control payments or other benefits attributable in whole or in part to a change of control of any Fiesta Group Company or (iv) providing for retention payments or other benefits attributable in whole or in part to an employee's continued employment until or beyond one or more specified points in time.

(c)     Schedule 4.13(c) lists all contracts between any Fiesta Group Company, on the one hand, and any Affiliate of any Fiesta Group Company, on the other hand (the "Fiesta Affiliate Contracts").

34

(d)      Schedule 4.13(d) lists each supply agreement of the Fiesta Group Companies.

(e)      Schedule 4.13(e) lists all contracts (other than invoices and scope of work agreements) relating to capital expenditures or other purchase of material, supplies, equipment or other assets or properties or services that involve amounts in excess of $100,000 in the aggregate.

(f)      Schedule 4.13(f) lists all contracts that contain minimum purchase or guaranteed or contingent sale obligations or agreements.

(g)      Schedule 4.13(g) lists all contracts (other than any Fiesta Material Leases) containing covenants limiting the freedom of any Fiesta Group Company to compete in any line of business or with any Person in any geographical area, or pursuant to their express terms limiting the freedom of any other Person to compete with any Fiesta Group Company in the Fiesta Business;

(h)      Schedule 4.13(h) lists all notes, bonds, indentures and other instruments and agreements evidencing or creating Indebtedness of any Fiesta Group Company or imposing any Lien on any of the assets of any Fiesta Group Company.

(i)      Schedule 4.13(i) lists all contracts for the acquisition of any Person or any business division thereof or the disposition of any material assets of any Fiesta Group Company (other than the sale of inventory in the ordinary course of business), other than contracts in which the applicable acquisition or disposition has been consummated and there are no obligations ongoing.

(j)      Schedule 4.13(j) lists all settlement or similar agreements, the performance of which will involve payment by any Fiesta Group Company after the Fiesta Statement Date of consideration in excess of $100,000.

(k)      Schedule 4.13(k) lists all contracts, other than the Governing Documents of any Fiesta Group Company, that grant any Person a right of first refusal, right of first offer, preemptive rights or similar right with respect to any equity securities, debt securities or tangible assets of any Fiesta Group Company.

(l)      Schedule 4.13(l) lists all contracts containing guaranty, surety or indemnification obligations of any Fiesta Group Company, other than (x) the Governing Documents of the Fiesta Group Companies and (y) indemnification obligations related to breaches of the terms thereof entered into in the ordinary course of business.

(m)      Schedule 4.8(a)(i) lists all Fiesta Material Leases.

(n)      Schedule 4.13(n) lists all joint venture, limited liability company and partnership agreements of any member of the Fiesta Group Company.

(o)      Schedule 4.13(o) lists all Fiesta Licenses involving aggregate annual payments by a Person in excess of $200,000.

(p)     The term "Fiesta Material Contract" means any contract or agreement that is listed or required to be listed on Schedules 4.13(a) through 4.13(o).  A true, complete and correct copy of each Fiesta Material Contract, including any amendments or supplements thereto, has been provided to BLC, or, if no written agreement exists, a description of the material terms of such Fiesta Material Contract and any such amendment or supplement is set forth on the applicable Schedule.  Except as set forth on Schedule 4.13(p), each unwritten Fiesta Material Contract (i) can be terminated or modified by the applicable Fiesta Group Company without penalty on less than 30 days' notice and without any other continuing obligation, (ii) does not contain any covenants limiting the freedom of any Fiesta Group Company to compete in any line of business or with any Person in any geographical area or limit in any way the use of any Intellectual Property, (iii) require performance by any Fiesta Group Company more than one year from the date hereof and (iv) does not contain any minimum purchase or guaranteed or contingent sale obligations or agreements.

(q)     Except as could not reasonably be expected to be material to the Fiesta Group Companies, taken as a whole, no Fiesta Group Company is, or, but for a requirement that notice be given or that a period of time elapse or both, would be, in default under any Fiesta Material Contract and, to the Knowledge of the Sellers, (x) no other party to any Fiesta Material Contract is in breach of or default under any Fiesta Material Contract, (y) no Fiesta Group Company or Seller has received any claim or notice of any breach, default, cancellation, termination or lapse of time that constitute a breach or default under any such Fiesta Material Contract and (z) no event has occurred that, individually or together with other events, could reasonably be expected to result in a breach, default, cancellation or termination under any such Fiesta Material Contract (in each case, with or without notice or lapse of time or both).  All of the Fiesta Material Contracts are legal, valid and binding obligations of the applicable Fiesta Group Company and, to the Knowledge of the Sellers, the other parties thereto, enforceable as of the date hereof in accordance with their respective terms (except as the enforceability thereof may be limited by any applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting creditors' rights generally and to general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law), and are in full force and effect on the date hereof.

4.14    *Environmental Laws*.

(a)     No Fiesta Group Company is, and for the past three (3) years no Fiesta Group Company has been, in material violation of any Environmental Laws or any Order or legal requirement of any court or other Governmental Authority to the extent pertaining to Environmental Laws.

(b)     No Fiesta Group Company has received any written notice, report or other written information alleging any material violation of or material liability under any Environmental Law that has not been fully resolved, nor is subject to any existing, pending or, to the Knowledge of the Sellers, threatened action, claim, suit, Order, investigation, inquiry or proceeding under any Environmental Law.

(c)     All notices or Permits, including any financial assurance, if any, required to be obtained, maintained or filed by any Fiesta Group Company under any Environmental Law based on its operations and assets as they currently exist or have existed in the last three (3) years,

including those relating to the treatment, storage, disposal or Release of a Hazardous Material into the environment, or the use, closure or remediation of any underground storage tank or fueling system, have been duly obtained, maintained or filed, and the Fiesta Group Companies are and, for the past three (3) years, have been in compliance in all material respects with the terms and conditions of all such notices and Permits.

(d)       Except as disclosed on Schedule 4.14(d), there are no underground storage tanks or fueling systems owned or operated by any Fiesta Group Company (or by any contractor, subcontractor, agent, sublessee or Fiesta Representative thereof) currently present at any property or facility owned, operated or leased by any Fiesta Group Company, any such tanks or systems present on any property owned, leased or operated by any Fiesta Group Company are and, for the past three (3) years, have been in material compliance with Environmental Laws; and there are no inactive or abandoned underground storage tanks or fueling systems previously owned or operated by any Fiesta Group Company, or to the Knowledge of the Sellers, by any other Person, present at any property or facility owned, operated or leased by any Fiesta Group Company.

(e)       No Fiesta Group Company nor any of their predecessors or Affiliates has caused, arranged for or permitted the disposal or Release of any Hazardous Material or, except as disclosed on Schedule 4.14(e), owned or operated any property or facility that is or has been contaminated by any Hazardous Material, in each case, in a manner resulting in or that would reasonably be expected to give rise to a material liability to any Fiesta Group Company (i) under any Environmental Laws or (ii) with respect to Hazardous Materials.

(f)       Except for the Fiesta Material Leases, no Fiesta Group Company has expressly by contract, or to the Knowledge of the Sellers, by operation of Law, assumed, undertaken or provided an indemnity with respect to any material liability of any other Person relating to Environmental Laws or Hazardous Materials.

(g)       The Fiesta Group Companies, taken as a whole, are not subject to any material liabilities with respect to the presence of asbestos or silica in any product or item or in or upon any property, premises or facility.

(h)       The Sellers have provided to BLC all material environmental audits, reports and other material environmental documents in the possession or under the control of the Sellers or the Fiesta Group Companies relating to the Fiesta Group Companies or the Fiesta Business, including any current or former property or facility of the Fiesta Group Companies or their predecessors.

(i)       Notwithstanding any other provision in this Agreement, except for Sections 4.4 (Consents and Approvals; No Violations), 4.6 (Financial Statements; No Undisclosed Liabilities), and 4.7 (Absence of Changes), this Section 4.14 (Environmental Matters) sets forth the sole representations and warranties of the Sellers and Fiesta Group Companies with respect to Environmental Laws, Hazardous Materials and other environmental matters.

4.15    *Taxes*.  Except as set forth on Schedule 4.15:

(a)       The Fiesta Group Companies have timely filed all Tax Returns required to be filed by them.  All such Tax Returns are true, correct and complete in all material respects.  No

Fiesta Group Company currently is the beneficiary of any extension of time within which to file any Tax Return.

(b)     The Fiesta Group Companies have timely paid in full all Taxes required to be paid by or with respect to them (whether or not shown on any Tax Return).  The Fiesta Group Companies have withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other Person.  No claim has ever been made by a Governmental Authority in a jurisdiction where a Fiesta Group Company does not file Tax Returns or pay Taxes that such Fiesta Group Company is or may be subject to taxation by that jurisdiction, nor to the Knowledge of the Sellers is there any basis on which such a claim could be asserted.

(c)     There are no Liens for Taxes outstanding against any of the assets or properties of the Fiesta Group Companies, other than Liens for Taxes not yet due or that may be paid without interest or penalty.

(d)     No Fiesta Group Company is currently under audit or examination relating to Taxes by any Governmental Authority, and no claim for unpaid Taxes is currently pending against any Fiesta Group Company.  No Fiesta Group Company has received from any Governmental Authority any (i) written notice indicating an intent to open an audit or other review (which has not yet been closed) with respect to Taxes due from any Fiesta Group Company or (ii) notice of deficiency or proposed adjustment for any amount of Tax proposed, asserted or assessed by any Governmental Authority against itself or any such Subsidiary or Affiliate that has not yet been paid or settled.  No Fiesta Group Company has waived (or has had waived on its behalf) any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(e)     No Fiesta Group Company will be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any:

(i)     change in method of accounting for a taxable period ending on or prior to the Closing Date;

(ii)     use of an improper method of accounting for a taxable period ending on or prior to the Closing Date;

(iii)     "closing agreement" as described in Code §7121 (or any corresponding or similar provision of state, local or non-U.S. income Law) executed on or prior to the Closing Date;

(iv)     intercompany transaction or excess loss account described in Treasury Regulations under Code §1502 (or any corresponding or similar provision of state, local or non-U.S. income Law);

(v)     installment sale or open transaction disposition made on or prior to the Closing Date;

38

(vi)     prepaid amount received on or prior to the Closing Date; or

(vii)    election under Code §108(i).

(f)     No Fiesta Group Company is or has been a party to any "reportable transaction," as defined in Code §6707A(c)(1) or Treasury Regulation §1.6011-4(b).  The Fiesta Group Companies have disclosed on their U.S. federal income Tax Returns all positions taken therein that could give rise to a substantial understatement of federal income Tax within the meaning of Code §6662.

(g)     None of the assets of the Fiesta Group Companies (as determined immediately after the Closing) will be subject to the "anti-churning" rules of Code §197(f)(9) or Treasury Regulation §1.197-2(h).

(h)     No Fiesta Group Company has a permanent establishment (within the meaning of an applicable Tax treaty) or otherwise has an office or fixed place of business in a country other than the country under the Law of which (or under the Law of a subdivision of which) it is organized.

(i)     The Company is and has been since its formation a limited liability company properly classified as a partnership or disregarded as an entity separate from its owner for U.S. federal, and any applicable state or local, income Tax purposes.  Each other Fiesta Group Company is presently, and has been since its formation, properly classified as a partnership or disregarded as an entity separate from its owner for U.S. federal, and any applicable state or local, income Tax purposes.

(j)     No Seller is a "foreign person" within the meaning of Code §1445.

4.16     *Employee Benefit Plans.*

(a)     <u>Schedule 4.16(a)</u> sets forth a complete and correct list of each material Fiesta Employee Plan.  The Sellers have delivered or made available to BLC true, complete, current and correct copies of the following documents with respect to each of the material Fiesta Employee Plans (as applicable):  (i) the plan document and all amendments thereto (or, in the case of an unwritten Fiesta Employee Plan, a written summary of the material terms and conditions thereof), (ii) trust documents, insurance contracts and any other funding vehicles; (iii) the most recent IRS determination or opinion letter; (iv) the most recent summary plan description and all summaries of material modifications thereto, (v) Form 5500s for the three most recently completed plan years, (vi) coverage and nondiscrimination testing for 2016, and (vii) any material correspondence from the past three years to or from any Governmental Authority.

(b)     No Fiesta Employee Plan is a "multiemployer plan" (as defined in Section 3(37) of ERISA) or is subject to Section 302 or Title IV of ERISA or Section 412 of the Code, and none of the Fiesta Group Companies or any of their respective ERISA Affiliates otherwise has any liability (including contingent liability) with respect to a multiemployer plan or under Section 302 or Title IV of ERISA or Section 412 of the Code.  None of the Fiesta Group Companies' assets is subject to any encumbrance under Section 303(k) or 4068 of ERISA,

Section 430(k) of the Code or arising out of any action filed under Section 4301(b) of ERISA. No Fiesta Employee Plan is subject to the laws of a jurisdiction outside the United States.

(c)     Except as set forth on Schedule 4.16(c), each Fiesta Employee Plan is and has at all times been maintained and operated, in all material respects, in conformity with the terms of such Fiesta Employee Plan and all applicable Laws, including ERISA and the Code. There are no pending or, to the Knowledge of the Sellers, threatened actions, claims (other than routine claims for benefits), audits, inquiries or examinations relating to any Fiesta Employee Plan. No fiduciary (within the meaning of Section 3(21) of ERISA) of any Fiesta Employee Plan subject to Part 4 of Subtitle B of Title I of ERISA has committed a breach of fiduciary duty with respect to that Fiesta Employee Plan that could subject a Fiesta Group Company or an employee of a Fiesta Group Company to any material liability (including liability on account of an indemnification obligation). No Fiesta Group Company has incurred any excise Taxes under Chapter 43 of the Code, and nothing has occurred with respect to any Fiesta Employee Plan that would be reasonably expected to subject any Fiesta Group Company to any excise Taxes under Chapter 43 of the Code.

(d)     Except as set forth on Schedule 4.16(d), (i) with respect to each Fiesta Employee Plan for which a separate fund of assets is or is required to be maintained, full and timely payment and contribution has been made of all amounts due and required under the terms of each such Fiesta Employee Plan and applicable Law, and all accrued obligations with respect to any Fiesta Employee Plan and that are not yet due have either been made or have been accrued on the Audited Financial Statements (if required to be so accrued) and (ii) all material premiums, fees and administrative expenses required to be paid under or in connection with the Fiesta Employee Plans have been paid and all such expenses accrued but not yet due have been accrued in full on the Audited Financial Statements (if required to be so accrued).

(e)     Each Fiesta Employee Plan that is intended to meet the qualification requirements of Section 401(a) of the Code is entitled to rely on either a currently effective favorable determination letter or opinion letter from the IRS with respect to such Fiesta Employee Plan's qualified status under the Code. No circumstances exist that would be reasonably expected to result in loss of such qualification under Section 401(a) of the Code.

(f)     No Fiesta Employee Plan or Fiesta Group Company provides, or has any obligation to provide, current or former employees of a Fiesta Group Company (or any dependents thereof) welfare benefits (including medical and life insurance benefits) after such Person terminates employment with a Fiesta Group Company, except for the coverage continuation requirements of Part 6 of Subtitle B of Title I of ERISA ("COBRA") or other applicable Law. No Employee Plan or Fiesta Group Company provides, or has any obligation to provide, welfare benefits to any Person who is not a current or former employee of a Fiesta Group Company (or a dependent thereof). No Fiesta Group Company has any liability (contingent or otherwise, including any contingent liability as a result of an ERISA Affiliate) on account of a violation of COBRA. No Employee Plan is, and no Fiesta Group Company has any liability with respect to, a multiple employer welfare arrangement (as defined in Section 3(40)(A) of ERISA).

(g)     No Fiesta Group Company has been required to withhold or pay any Taxes as a result of a failure to comply with Section 409A of the Code. No Fiesta Group Company has

any obligation to make a "gross-up" or similar payment in respect of any Taxes that may become payable under Section 409A of the Code.

(h)     Except as set forth on Schedule 4.16(h)-1, neither the execution of this Agreement nor the consummation of the transactions contemplated hereby (either alone or in combination with another event) will or can be reasonably expected to (i) entitle any current or former director, officer, employee or consultant of any Fiesta Group Company to any payment (including severance pay or similar compensation), any cancellation of indebtedness, or any increase in compensation; (ii) result in the acceleration of payment, funding or vesting under any Fiesta Employee Plan; or (iii) result in any increase in benefits payable under any Fiesta Employee Plan.  Except as set forth on Schedule 4.16(h)-2, no amount paid or payable (whether in cash, in property, or in the form of benefits) in connection with the transactions contemplated hereby (either alone or in combination with another event) could be characterized as an "excess parachute payment" within the meaning of Section 280G of the Code.  No Fiesta Group Company has any obligation to make a "gross-up" or similar payment in respect of any Taxes that may become payable under Section 4999 of the Code.

4.17    *Directors, Officers and Key Employees; Labor Matters.*

(a)     Schedule 4.17(a) contains a complete and accurate list, as of the date hereof, of all employees of each Fiesta Group Company, including, as applicable:  (i) the name of employee, (ii) name of employing entity, (iii) date of hire/engagement, (iv) job title (including an indication of whether such Person is an officer), (v) full or part-time status, (vi) exempt or non-exempt overtime pay classification, (vii) work location (including store number and street address), (viii) position, (ix) annual salary or hourly wages and bonus opportunity (as applicable), (x) leave status (including the type of leave any expected return to work date) and (xi) accrued vacation or other paid time off.

(b)     Schedule 4.17(b) contains a true and complete list of the name, business address and compensation, as well as the title or functional position, of each current director, officer or manager of each Fiesta Group Company.  Neither any Fiesta Group Company nor any director, officer or manager of any Fiesta Group Company has ever been convicted of (or pleaded guilty or *nolo contendere* to) a felony relating to or arising out of such director's, officer's or manager's work for such Fiesta Group Company.

(c)     Except as set forth on Schedule 4.17(c), none of the Persons listed on Schedule 4.17(a) or Schedule 4.17(b) has received any wage, salary or other compensation increase or bonus since November 1, 2017 in excess of $100,000, nor have any such increases or bonuses been adopted since November 1, 2017, other than in the ordinary course of business.

(d)     Schedule 4.17(d) contains a true and complete listing of each consultant or independent contractor who:  (i) performs services for any of the Fiesta Group Companies on a regular and ongoing basis and (ii) was paid an amount in excess of $50,000 for such services in calendar year 2016 or calendar year 2017 (prorated for any partial calendar year) by any of the Fiesta Group Companies.

41

(e)      Except as set forth on <u>Schedule 4.17(e)</u>, (i) no Fiesta Group Company is, or within the last three years prior to Closing has been, a party to or bound by any collective bargaining agreement or other agreement or understanding, work rules or practice, or arbitration award with any labor union or any other similar organization, (ii) no employees of any Fiesta Group Company are subject to or covered by any such collective bargaining agreement, other agreement or understanding, work rules or practice, or arbitration award with any labor union, or are represented by any labor organization, (iii) there is not currently and has not been at any time within the last five years prior to Closing any labor strike, work stoppage, lockout, or material labor dispute pending or, to the Knowledge of the Sellers, threatened against any Fiesta Group Company, (iv) to the Knowledge of the Sellers, there is not currently and has not been at any time within the last three years prior to Closing any actual or threatened union organization campaign, labor-related organizational effort, election activities, or request or demand for negotiations, recognition, or representation with respect to any employees of any Fiesta Group Company and (v) there is no unfair labor practice charge or complaint pending or, to the Knowledge of the Sellers, threatened, against any Fiesta Group Company.

(f)      Since December 31, 2016, no Fiesta Group Company has experienced or effected any "plant closing" or "mass layoff," as defined by the Worker Adjustment and Retraining Notification Act of 1988, 29 U.S.C. §2101 et seq. or any similar applicable Laws (the "<u>WARN Act</u>"), and during the 90-day period preceding the date hereof and preceding the Closing Date, no employee has suffered an "employment loss" as defined in the WARN Act.  No Fiesta Group Company has incurred any liability or obligation that remains unsatisfied under the WARN Act or any similar applicable Laws.

(g)      <u>Schedule 4.17(g)</u> sets forth a list of all employee of each of the Fiesta Group Companies whose employment terminated within ninety calendar days prior to the date hereof, and accurately and completely sets forth for each such former employee the following information: (i) name, (ii) title or position, (iii) whether such individual worked full-time, part-time or was a temporary employee, (iv) last work location, (v) most recent date of hire, (vi) date of employment termination and (vii) reason for termination.

(h)      Each Fiesta Group Company is and since April 27, 2015, has been in compliance in all material respects with all applicable Laws pertaining to employment and employment practices, including all Laws relating to labor relations, equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration, work authorization, wages, hours, overtime compensation, classification of employees, child labor, occupational health and safety, hiring, promotion and termination of employees, working conditions, meal and break periods, privacy, health and safety, workers' compensation, leaves of absence and unemployment insurance.  All individuals characterized and treated by any Fiesta Group Company as independent contractors or otherwise as non-employees satisfy and have satisfied all applicable requirements of Law to be so classified or treated, and the Fiesta Group Companies have fully and accurately reported their compensation of any kind on IRS Forms 1099 or as otherwise required by any requirements of Law.  There are no actions against any Fiesta Group Company pending, or to the Knowledge of the Sellers, threatened to be brought or filed, by or with any Governmental Authority or arbitrator in connection with the employment or services of any prospective, current, or former employee, director, officer, retiree, consultant or independent contractor of any Fiesta

Group Company, including any claim relating to immigration, unfair labor practices, employment discrimination, harassment, retaliation, equal pay, worker classification, wages and hours or any other employment related matter arising under applicable Laws.  The Fiesta Group Companies are not and have not been liable for any material arrears of wages, other compensation or benefits, or any Taxes or penalties for failure to comply with any of the foregoing.

4.18    *Brokerage Agreements*.  Except as set forth on <u>Schedule 4.18</u>, no Fiesta Group Company or Seller has entered into any agreement with any Person, firm or corporation requiring the payment of any commission, brokerage or "finder's fee" in connection with the transactions contemplated hereby.  Neither BLC nor any of its Affiliates (including, after the Closing, the Fiesta Group Companies) will have any liability for any commission, brokerage or "finder's fee" owing to any party set forth (or required to be set forth) on <u>Schedule 4.18</u>.

4.19    *Suppliers*.  <u>Schedule 4.19</u> sets forth the 50 most significant suppliers of the Fiesta Group Companies, taken as a whole, during the fiscal year ended January 1, 2017, and during the interim fiscal period that began January 2, 2017 and ended on the Fiesta Statement Date, as measured by dollar volume of payments.  <u>Schedule 4.19</u> includes the total dollar volume for such suppliers for each applicable period.  Except as set forth on <u>Schedule 4.19</u>, there are no minimum purchase contracts or understandings between any Fiesta Group Company and its suppliers.  Except as set forth on <u>Schedule 4.19</u>, no Fiesta Group Company or Seller has received any written notice or proposal from any such supplier set forth on <u>Schedule 4.19</u> (a) requiring or proposing material modifications in the terms on which such supplier conducts business with the Fiesta Group Companies, (b) terminating or cancelling its relationship with any Fiesta Group Company or (c) made any written threat to, or otherwise notified any Fiesta Group Company in writing that it intends to, cancel or otherwise terminate its relationship with any Fiesta Group Company or materially and adversely change the pricing or other terms on which such supplier conducts business with any Fiesta Group Company.

4.20    *Insurance*.  <u>Schedule 4.20</u> contains a complete list of all insurance policies (specifying the policy period, insured, insurer, amount of coverage, type of insurance and policy number) maintained by or on behalf of the Fiesta Group Companies.  All such policies are in full force and effect, all premiums with respect thereto covering all periods up to and including the Closing Date have been paid, and no notice of cancellation or termination has been received with respect to any such policy.  Such policies (a) are sufficient for compliance with all requirements of Law and of all agreements to which any Fiesta Group Company is a party, (b) are valid, outstanding and enforceable policies, (c) provide adequate insurance coverage for the assets and operations of the Fiesta Group Companies, (d) will remain in full force and effect through their respective dates set forth in <u>Schedule 4.20</u> without the payment of additional premiums and (e) will not in any way be affected by, or terminate or lapse by reason of, the transactions contemplated by this Agreement.  No insurance carrier has notified any Fiesta Group Company or Seller of any increases in premiums or termination or material modification of any policies currently maintained by or on behalf of the Fiesta Group Companies.

4.21    *Inventories*.  The inventory held by the Fiesta Group Companies in connection with the conduct of the Fiesta Business was acquired or produced and has been maintained in the ordinary course of business and (a) is of a quality and quantity usable or salable in the ordinary course of business and (b) there are no damaged or obsolete items or items of below standard

quality included therein, except, in each case, for any items that have been written down to estimated realizable market value, or for which adequate reserves have been provided in the Interim Financial Statements.  The value at which the inventory of the Fiesta Group Companies is carried on the Financial Statements reflects the lower of cost or market value and reflects write-offs or write downs for damaged or obsolete items, or items below the standard quality, in accordance with GAAP.  The inventory of the Fiesta Group Companies is not excessive in kind or amount in light of ordinary and normal course of conduct and reasonably anticipated needs of the Fiesta Business.  Since the Fiesta Statement Date, no Fiesta Group Company has ordered any merchandise in relation to anticipated market demand in a manner inconsistent with the ordinary course of business that could reasonably be expected to have the effect of materially increasing the level of inventory held by the Fiesta Group Companies, taken as a whole, or made any material change in the method of valuing inventory.

4.22    *Transactions with Affiliates*.

(a)    Except for the Fiesta Affiliate Contracts or as set forth on Schedule 4.22(a), no manager, officer, director, unitholder, Affiliate or employee, or any Related Person of any of the foregoing, of any Fiesta Group Company (other than another member of the Fiesta Group Company) (i) is a party to any agreement, contract, commitment or transaction with any Fiesta Group Company, (ii) has any interest in any property, tangible or intangible, that is owned, leased or used by any Fiesta Group Company, (iii) owes any amount to any Fiesta Group Company and, except for compensation to the employees of the Fiesta Group Companies, no Fiesta Group Company owes any amount to such Person or (iv) is committed to make any loan or extend or guarantee credit to or for the benefit of any such Person.

(b)    Except for any direct or indirect equity interests in Seller and any grant agreements, subscription agreements or other similar contracts or agreements related to the grant, award, purchase or sale of such equity interests, no employee of any Fiesta Group Company is a party to any agreement, contract, commitment or transaction with any Seller or Affiliate of Seller (other than a Fiesta Group Company).  Except as set forth on Schedule 4.22(b), no such equity interest or contract or agreement relating thereto imposes any post-Closing obligations on any such employee to any Seller or any Affiliate of a Seller (other than a Fiesta Group Company).

4.23    *Product Liabilities Law*.  To the Knowledge of the Sellers, the Fiesta Group Companies do not have any material liability arising out of any injury to individuals or property as a result of the ownership, possession or use of any product sold by or on behalf of the Fiesta Group Companies.  The Fiesta Group Companies have not committed any act or failed to commit any act, that would result in, and to the Knowledge of the Sellers, there has been no occurrence that would give rise to or form the basis of, any material product liability (whether covered by insurance or not) on the part of any Fiesta Group Company with respect to products sold by or on behalf of the Fiesta Group Companies.  The Fiesta Group Companies have not received written notice of any allegation that a product it sold is (i) defective or (ii) not in conformity in all material respects with an applicable product specification Law or applicable Law.

4.24    *Certain Payments*.  No Fiesta Group Company or, in connection with the Fiesta Business, any Seller, has made any unlawful payment to governmental or quasi-governmental

officials or unlawful payments to customers, distributors or suppliers for the sharing of fees or rebating of charges or reciprocal practices.

4.25 *Sanctions and Export Controls*.  No Fiesta Group Company, or any of their respective Affiliates, nor any of their respective officers, directors, employees, advisors, agents, representatives, members, consultants, or any other Person associated with or acting for or on behalf of any Fiesta Group Company (a) is a Person with whom transactions are prohibited or limited under any economic sanctions laws, including those administered by the U.S. Government (including the Office of Foreign Assets Control), the United Nations Security Council, the European Union, or Her Majesty's Treasury, or, within the last three years, (b) has violated any economic sanctions laws.  The Fiesta Group Companies are and for the past three years have been in material compliance with and in possession of any and all licenses, registrations, and Permits that may be required for the lawful conduct of their business under applicable import and export control laws, including the Export Administration Regulations.  Since April 27, 2015, no Fiesta Group Company has made any voluntary disclosures to U.S. Governmental Authorities under U.S. economic sanctions Laws or U.S. export control Laws, been the subject of any investigation by any Governmental Authority or inquiry regarding compliance with such laws, or been assessed any fine or penalty under such Laws.

4.26 *No Other Representations and Warranties*.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE IV AND IN ARTICLE V (AS MODIFIED, IN EACH CASE, BY THE SCHEDULES), NO SELLER MAKES ANY, AND HAS NOT AUTHORIZED THE ACON BLOCKERS, ANY FIESTA GROUP COMPANY OR ANY OF THEIR RESPECTIVE AFFILIATES TO MAKE ANY, OTHER PROMISE, REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, RELATING TO ANY SELLER, THE ACON BLOCKERS, THE FIESTA GROUP COMPANIES, THEMSELVES, THE FIESTA BUSINESS OR ANY OF THEIR RESPECTIVE BUSINESSES, OPERATIONS, ASSETS, LIABILITIES, CONDITIONS OR PROSPECTS OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AND SUCH SELLER DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER MADE BY SUCH SELLER, ANY AFFILIATE OF SUCH SELLER, THE COMPANY OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES, AGENTS OR REPRESENTATIVES AND IF MADE, SUCH REPRESENTATION OR WARRANTY MAY NOT BE RELIED UPON BY PURCHASER OR ANY OF ITS AFFILIATES AND REPRESENTATIVES AS HAVING BEEN AUTHORIZED BY SUCH SELLER OR ANY OF ITS AFFILIATES.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE IV AND ARTICLE V (AS MODIFIED, IN EACH CASE, BY THE SCHEDULES IN ACCORDANCE WITH THE PROVISIONS HEREOF), SUCH SELLER HEREBY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, OPINION, PROJECTION, FORECAST, STATEMENT, MEMORANDUM, PRESENTATION, ADVICE OR INFORMATION MADE, COMMUNICATED, OR FURNISHED (ORALLY OR IN WRITING) TO BLC OR ITS AFFILIATES OR REPRESENTATIVES (INCLUDING ANY OPINION, PROJECTION, FORECAST, STATEMENT, MEMORANDUM, PRESENTATION, ADVICE OR INFORMATION THAT MAY HAVE BEEN OR MAY BE PROVIDED TO BLC BY ANY DIRECTOR, OFFICER, EMPLOYEE, AGENT, CONSULTANT, OR REPRESENTATIVE OF SUCH SELLER OR ANY OF ITS AFFILIATES).

4.27    *No Other Representations or Warranties; No Reliance*.  THE SELLERS, JOINTLY AND SEVERALLY, ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE AFFILIATES AND REPRESENTATIVES, HEREBY ACKNOWLEDGE AND AGREE THAT, EXCEPT AS EXPRESSLY SET FORTH IN <u>ARTICLE VI</u>, NEITHER BLC NOR ANY AFFILIATE THEREOF, NOR ANY OF THEIR RESPECTIVE REPRESENTATIVES, MAKES ANY OTHER PROMISE, REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, RELATING TO BLC OR ANY AFFILIATE THEREOF OR ANY OF THEIR RESPECTIVE BUSINESSES, OPERATIONS, ASSETS, LIABILITIES, CONDITIONS OR PROSPECTS OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, INCLUDING WITH RESPECT TO MERCHANTABILITY, FITNESS FOR ANY PARTICULAR OR ORDINARY PURPOSE, OR AS TO THE ACCURACY OR COMPLETENESS OF ANY INFORMATION REGARDING ANY OF THE FOREGOING, OR AS TO ANY OTHER MATTER, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO ANY OF THE SELLERS OR ANY AFFILIATE OR REPRESENTATIVE THEREOF OF ANY DOCUMENTS, OPINIONS, PROJECTIONS, FORECASTS, STATEMENTS, MEMORANDUMS, PRESENTATIONS, ADVICE OR INFORMATION (WHETHER COMMUNICATED ORALLY OR IN WRITING), AND ANY SUCH OTHER PROMISES, REPRESENTATIONS OR WARRANTIES, OR LIABILITY OR RESPONSIBILITY THEREFOR, ARE HEREBY EXPRESSLY DISCLAIMED.  IN ADDITION, THE SELLERS, JOINTLY AND SEVERALLY, ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE AFFILIATES AND REPRESENTATIVES, ACKNOWLEDGE AND AGREE THAT THEY HAVE NOT EXECUTED OR AUTHORIZED THE EXECUTION OF THIS AGREEMENT IN RELIANCE UPON ANY PROMISE, REPRESENTATION OR WARRANTY NOT EXPRESSLY SET FORTH IN <u>ARTICLE VI</u>.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES REGARDING THE SELLERS AND ACON BLOCKERS

5.1    *Representations Regarding Fiesta Holdings*.  Fiesta Holdings hereby represents and warrants to BLC as follows:

(a)    <u>Organization, Existence and Good Standing of Fiesta Holdings</u>.  Fiesta Holdings is duly formed, validly existing and in good standing under the Laws of the State of Delaware.

(b)    <u>Authorization of Agreement – Enforceability; Consents and Approvals</u>.

(i)    Fiesta Holdings has all necessary power and authority to execute and deliver this Agreement and the other documents required to be delivered pursuant to this Agreement (collectively, including this Agreement, the "<u>Documents</u>"), to which Fiesta Holdings is or will be a party and the capacity and authority to make and perform the representations, warranties, covenants and agreements made by Fiesta Holdings herein and therein.  The execution and delivery of this Agreement and the other Documents by Fiesta Holdings and the consummation of the transactions contemplated hereby and thereby have been (or will be when executed and delivered) duly authorized by all necessary limited liability company action on the part of Fiesta Holdings, and except as set forth on

46

Schedule 5.1(b)(i) in order to authorize the Company Restructuring, no other limited liability company proceedings are, or at the time of their execution and delivery will be, necessary to authorize this Agreement and the other Documents to which Fiesta Holdings is a party or for Fiesta Holdings to consummate the transactions contemplated hereby and thereby.  This Agreement has been duly executed and delivered by Fiesta Holdings and constitutes, and as of the Closing, each Document to which Fiesta Holdings is a party, will constitute, when executed and delivered by Fiesta Holdings, in each case assuming the due authorization, execution and delivery by the other parties thereto, the legal, valid and binding obligation of Fiesta Holdings, enforceable against Fiesta Holdings in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting creditors' rights generally and to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(ii)     Assuming the making of all notifications or filings as may be required in connection with the transactions described herein under the HSR Act or any foreign antitrust, merger control or competition law, and the receipt of all clearances, approvals, authorizations or waiting period expirations or terminations as may be required in connection with the transactions described herein under the HSR Act or any foreign antitrust, merger control or competition law, neither the execution or delivery of this Agreement or the other Documents nor the consummation of the transactions contemplated hereby or thereby (a) will conflict with or result in a breach, or violation of, or cause acceleration, or constitute (with or without due notice or lapse of time or both) a default, or give rise to any right to require notice or any right of termination, cancellation, modification or acceleration, under (i) any of the terms, provisions or conditions of the Governing Documents of Fiesta Holdings or (ii) any agreement, document, instrument or Law to which Fiesta Holdings is a party or to which it is subject or to which any of its properties or assets may be bound or (b) will require Fiesta Holdings to obtain the consent of any private non-governmental third party.  Except as expressly contemplated by the Documents, no consent, action, approval or authorization of, or registration, declaration or filing with, any Governmental Authority is required to authorize, or is otherwise required in connection with, the execution and delivery of the Documents by Fiesta Holdings or the performance by Fiesta Holdings of the terms of the Documents or the validity or enforceability of the Documents other than notifications or filings as may be required in connection with the transactions described herein under the HSR Act.

(c)     Ownership of Company Securities.  Except for the matters set forth on Schedule 4.2, (i) as of the date hereof, Fiesta Holdings is the record and beneficial owner of and has good and valid title to the Company Securities set forth next to Fiesta Holdings' name on Schedule 4.2(c) and (ii) as of the Closing and immediately after the consummation of the Company Restructuring, Fiesta Holdings is the record and beneficial holder of and has good and valid title to the Company Securities set forth next to Fiesta Holdings' name on the Closing Capitalization Certificate, and in each case such Company Securities are (or will be at the Closing) owned free and clear of all Liens (other than limitations under the Company's Governing Documents and Liens imposed by BLC or any of its Subsidiaries or under applicable securities Laws or which will be discharged or released at or prior to Closing).  Other than Company Securities listed on Schedule 4.2, Fiesta Holdings has no beneficial ownership of any equity securities or any other

47

option, warrant, purchase right or other security of the Company or right of any kind to have any such equity security issued.  Except as set forth on <u>Schedule 5.1(c)</u> and the Company Restructuring Agreements (if executed), Fiesta Holdings is not a party to any contract (other than this Agreement) that could require Fiesta Holdings to sell or otherwise dispose of, or grant any interest in, any of Fiesta Holdings' Company Securities.

     5.2    *Representations of the ACON Aggregators*.  Each ACON Aggregator, severally and not jointly, hereby represents and warrants to BLC as follows:

     (a)    <u>Organization, Existence and Good Standing of ACON Aggregators</u>.  Such ACON Aggregator is duly formed, validly existing and in good standing under the Laws of the State of Delaware.

     (b)    <u>Authorization of Agreement – Enforceability; Consents and Approvals</u>.

     (i)    Such ACON Aggregator has all necessary power and authority to execute and deliver this Agreement and the other Documents to which such ACON Aggregator is or will be a party and the capacity and authority to make and perform the representations, warranties, covenants and agreements made by such ACON Aggregator herein and therein.  The execution and delivery of this Agreement and the other Documents by such ACON Aggregator and the consummation of the transactions contemplated hereby and thereby have been (or will be when executed and delivered) duly authorized by all necessary action on the part of such ACON Aggregator, and, except as set forth on <u>Schedule 5.2(b)(i)</u> in order to authorize the Company Restructuring, no other proceedings are necessary to authorize this Agreement and the other Documents to which such ACON Aggregator is a party or for such ACON Aggregator to consummate the transactions contemplated hereby and thereby.  This Agreement has been duly executed and delivered by such ACON Aggregator and constitutes, and as of the Closing, each Document to which such ACON Aggregator is a party, will constitute, when executed and delivered by such ACON Aggregator, in each case assuming the due authorization, execution and delivery by the other parties thereto, the legal, valid and binding obligation of such ACON Aggregator, enforceable against such ACON Aggregator in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting creditors' rights generally and to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

     (ii)    Assuming the making of all notifications or filings as may be required in connection with the transactions described herein under the HSR Act or any foreign antitrust, merger control or competition law, and the receipt of all clearances, approvals, authorizations or waiting period expirations or terminations as may be required in connection with the transactions described herein under the HSR Act or any foreign antitrust, merger control or competition law, neither the execution or delivery of this Agreement or the other Documents nor the consummation of the transactions contemplated hereby or thereby (a) will conflict with or result in a breach, or violation of, or cause acceleration, or constitute (with or without due notice or lapse of time or both) a default, or give rise to any right to require notice or any right of termination, cancellation, modification or acceleration, under (i) any of the terms, provisions or conditions of the

Governing Documents of each ACON Aggregator or (ii) any agreement, document, instrument or Law to which each ACON Aggregator is a party or to which it is subject or to which any of its properties or assets may be bound or (b) will require any ACON Aggregator to obtain the consent of any private non-governmental third party.  Except as expressly contemplated by the Documents, no consent, action, approval or authorization of, or registration, declaration or filing with, any Governmental Authority is required to authorize, or is otherwise required in connection with, the execution and delivery of the Documents by each ACON Aggregator or the performance by any such ACON Aggregator of the terms of the Documents or the validity or enforceability of the Documents other than notifications or filings as may be required in connection with the transactions described herein under the HSR Act.

5.3     *Representations Regarding the ACON Blockers*.   Each ACON Aggregator, severally, and not jointly, with respect to the ACON Blocker owned by such ACON Aggregator as of the Closing, hereby represents and warrants to BLC as follows:

(a)     Organization, Existence and Good Standing of ACON Blockers.   Such ACON Blocker is duly formed, validly existing and in good standing under the Laws of the jurisdiction of its organization, formation or incorporation, as applicable.

(b)     Consents and Approvals.   Assuming the making of all notifications or filings as may be required in connection with the transactions described herein under the HSR Act or any foreign antitrust, merger control or competition law, and the receipt of all clearances, approvals, authorizations or waiting period expirations or terminations as may be required in connection with the transactions described herein under the HSR Act or any foreign antitrust, merger control or competition law, and except as set forth on Schedule 5.3(b) to authorize the Company Restructuring, neither the execution or delivery of this Agreement or the other Documents nor the consummation of the transactions contemplated hereby or thereby (i) will conflict with or result in a breach, or violation of, or cause acceleration, or constitute (with or without due notice or lapse of time or both) a default, or give rise to any right to require notice or any right of termination, cancellation, modification or acceleration, under (A) any of the terms, provisions or conditions of the Governing Documents of such ACON Blocker or (B) any agreement, document, instrument or Law to which such ACON Blocker is a party or to which it is subject or to which any of its properties or assets may be bound or (ii) will require such ACON Blocker to obtain the consent of any private non-governmental third party.  Except as expressly contemplated by the Documents, no consent, action, approval or authorization of, or registration, declaration or filing with, any Governmental Authority is required to authorize, or is otherwise required in connection with, the execution and delivery of the Documents by the Parties hereto or the consummation of the transactions contemplated hereby, other than notifications or filings as may be required in connection with the transactions described herein under the HSR Act.

(c)     Capitalization of ACON Blocker.   Schedule 5.3(c) sets forth a complete and accurate list of each of the record and beneficial holders of the equity interests of such ACON Blocker as of the Closing (immediately following the consummation of the Company Restructuring), all of which will be, as of the Closing (immediately following the consummation of the Company Restructuring) duly authorized and validly issued and will not have been issued in violation of any preemptive rights, rights of first refusal or other similar rights.  Except as

49

described in this Section 5.3(c) or disclosed on Schedule 5.3(c), there are no authorized or outstanding (i) equity interests or other securities of such ACON Blocker, (ii) securities of such ACON Blocker convertible into, exchangeable or exercisable for equity interests or other securities of such ACON Blocker, (iii) options, warrants, purchase rights, subscription rights, exchange rights or other rights to purchase or acquire from such ACON Blocker, or obligations of such ACON Blocker to transfer, sell or issue, any equity interests or other securities, including securities convertible into or exchangeable for equity interests or other securities of such ACON Blocker, (iv) profit participation or similar rights with respect to such ACON Blocker or (v) bonds, debentures, notes, or other Indebtedness that entitles the holders to vote (or that is convertible or exercisable for or exchangeable into securities that entitle the holders to vote) with equityholders, or other securities of such ACON Blocker on any matter.  Except as disclosed on Schedule 5.3(c) or as set forth in the Governing Documents of such ACON Blocker, as of the Closing, none of the ACON Blocker Interests are subject to any voting trust agreement, option, proxy, right of first refusal or contract restricting or otherwise relating to the voting, distribution rights or disposition of such ACON Blocker Interests.

(d)     ACON Blocker Assets and Liabilities.  Except as set forth on Schedule 5.3(d) and except for the Company Securities set forth next to such ACON Blocker's name on the Closing Capitalization Certificate, as of the Closing (immediately after the consummation of the Company Restructuring), such ACON Blocker (i) does not own of record or beneficially, or have any interest in any assets (other than Cash and Cash Equivalents), (ii) is not subject to any liabilities (other than current Tax liabilities), and (iii) except as set forth on Schedule 5.3(d), is not party to any contracts.

(e)     ACON Blocker Activities.  Such ACON Blocker does not engage, and has never engaged, in any business or activity or have, or has ever had, any assets, obligations or liabilities, other than in connection with its direct or indirect ownership of the Company Securities set forth next to such ACON Blocker's name on the Closing Capitalization Certificate.  Such ACON Blocker has never been a general partner of any Person and has not taken any action as a limited partner of any Person or otherwise that could make such ACON Blocker liable for the obligations of any other Person under applicable Law.

(f)     ACON Blocker Taxes.  Except as set forth on Schedule 5.3(f):

(i)     Such ACON Blocker has timely filed all Tax Returns required to be filed by it.  All such Tax Returns are true, correct and complete in all material respects.  Such ACON Blocker is not currently the beneficiary of any extension of time within which to file any Tax Return.

(ii)     Such ACON Blocker has timely paid in full all Taxes required to be paid by or with respect to it (whether or not shown on any Tax Return).  Such ACON Blocker has withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other Person.  No claim has ever been made by a Governmental Authority in a jurisdiction where such ACON Blocker does not file Tax Returns or pay Taxes that such ACON Blocker is or may be subject to taxation by that jurisdiction, nor to the Knowledge of the Sellers is there any basis on which such a claim could be asserted.

(iii)    There are no Liens for Taxes outstanding against any of the assets or properties of such ACON Blocker, other than Liens for Taxes not yet due or that may be paid without interest or penalty.

(iv)    Such ACON Blocker is not currently under audit or examination relating to Taxes by any Governmental Authority, and no claim for unpaid Taxes is currently pending against such ACON Blocker.  Such ACON Blocker has not received from any Governmental Authority any (i) written notice indicating an intent to open an audit or other review (which has not yet been closed) with respect to Taxes due from such ACON Blocker or (ii) notice of deficiency or proposed adjustment for any amount of Tax proposed, asserted or assessed by any Governmental Authority against itself or any such Subsidiary or Affiliate that has not yet been paid or settled.  Such ACON Blocker has not waived (or has had waived on its behalf) any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(v)    Such ACON Blocker (i) has never been a member of an Affiliated Group that includes a Person other than one or more other ACON Blockers and (ii) has no liability for the Taxes of any other Person (other than another ACON Blocker) under Treasury Regulation §1.1502-6 (or any similar provision of state, local or non-U.S. Law), as a transferee or successor, by contract or otherwise.

(vi)    Such ACON Blocker will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any:

(1)    change in method of accounting for a taxable period ending on or prior to the Closing Date;

(2)    use of an improper method of accounting for a taxable period ending on or prior to the Closing Date;

(3)    "closing agreement" as described in Code §7121 (or any corresponding or similar provision of state, local or non-U.S. income Law) executed on or prior to the Closing Date;

(4)    intercompany transaction or excess loss account described in Treasury Regulations under Code §1502 (or any corresponding or similar provision of state, local or non-U.S. income Law);

(5)    installment sale or open transaction disposition made on or prior to the Closing Date;

(6)    prepaid amount received on or prior to the Closing Date; or

(7)    election under Code §108(i).

51

(vii)     Such ACON Blocker has not distributed stock of another Person, or had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Code §355 or Code §361.

(viii)    Such ACON Blocker is not and has never been a party to any "reportable transaction," as defined in Code §6707A(c)(1) or Treasury Regulation §1.6011-4(b).  Such ACON Blocker has disclosed on its U.S. federal income Tax Returns all positions taken therein that could give rise to a substantial understatement of federal income Tax within the meaning of Code §6662.

(ix)     None of the assets of such ACON Blocker (as determined immediately after the Closing) will be subject to the "anti-churning" rules of Code §197(f)(9) or Treasury Regulation §1.197-2(h).

(x)      Such ACON Blocker has no permanent establishment (within the meaning of an applicable Tax treaty) and does not otherwise have an office or fixed place of business in a country other than the country under the Law of which (or under the Law of a subdivision of which) it is organized.

(xi)     Such ACON Blocker is and has been since its formation properly classified as a corporation for U.S. federal, and any applicable state or local, income Tax purposes.

(xii)    Such ACON Blocker is not a "foreign person" within the meaning of Code §1445.

(g)     Employees.  Such ACON Blocker does not have, and has never had any employees, and does not sponsor, maintain or contribute to, and has never sponsored, maintained or contributed to, any Employee Plan.

(h)     Litigation, Judgments, Etc.  There are no, and there never have been any, actions, suits, proceedings or, to the Knowledge of the Sellers, investigations pending or, to the Knowledge of the Sellers, threatened against such ACON Blocker in any court or before any other Governmental Authority, or before any arbitrator.  Such ACON Blocker is not, and never has been, party to or subject to any Order.  Notwithstanding the foregoing, for all purposes of the Agreement, no ACON Aggregator makes any representation or warranty (pursuant to this Section 5.3(h) or elsewhere in the Agreement) regarding the effect of the applicable antitrust, merger control, competition or fair trade laws on their ability to execute, deliver or perform their obligations under this Agreement or to consummate the transactions described in this Agreement as a result of the enactment, promulgation, application or threatened or actual judicial or administrative investigation or litigation under, or enforcement of, any antitrust, merger control, competition or fair trade law with respect to the consummation of the transactions described in this Agreement.

(i)     Compliance With Laws.  Such ACON Blocker is, and has always been, in material compliance with all applicable Laws.  Such ACON Blocker has not received, nor has it ever received, any written notice of, or been charged with, the violation of any Laws or Orders.  Notwithstanding the foregoing, for all purposes of the Agreement, no ACON Aggregator makes any representation or warranty (pursuant to this Section 5.3(i) or elsewhere in the Agreement)

regarding the effect of the applicable antitrust, merger control, competition or fair trade laws on their ability to execute, deliver or perform their obligations under this Agreement or to consummate the transactions described in this Agreement as a result of the enactment, promulgation, application, or threatened or actual judicial or administrative investigation or litigation under, or enforcement of, any antitrust, merger control, competition or fair trade law with respect to the consummation of the transactions described in this Agreement.

(j)     <u>Brokerage Agreements</u>.  No Person has acted as a broker, finder or financial advisor for such ACON Blocker in connection with the transactions contemplated hereby and no Person is entitled to any commission, brokerage or "finder's fee" in connection with the transactions contemplated hereby.

(k)     <u>Certain Business Relationships with ACON Blocker</u>.  Except as set forth on <u>Schedule 5.3(k)</u>, no manager, officer, director, unitholder, Affiliate or employee, or any Related Person of any of the foregoing, of any Seller (i) is a party to any agreement, contract, commitment or transaction with such ACON Blocker, (ii) has any interest in any property, tangible or intangible, that is owned, leased or used by such ACON Blocker, (iii) owes any amount to such ACON Blocker and such ACON Blocker does not owe any amount to such Person or (iv) is committed to make any loan or extend or guarantee credit to or for the benefit of any such Person.

(l)     <u>Ownership of Company Securities</u>.  Except for the matters set forth on <u>Schedule 4.2</u>, as of the Closing and immediately after the consummation of the Company Restructuring, such ACON Blocker is the record and beneficial owner of and has good and valid title to the Company Securities set forth next to such ACON Blocker's name on the Closing Capitalization Certificate, and such Company Securities are owned free and clear of all Liens (other than limitations under the Company's Governing Documents and Liens imposed by BLC or any of its Subsidiaries or under applicable securities Laws or which will be discharged or released at or prior to Closing).

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES OF BLC

BLC hereby represents and warrants to the Sellers as follows:

6.1     *Organization and Qualification of BLC*.  BLC is duly organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation.  BLC has the requisite corporate power and authority to own, lease and operate its material assets and properties and to carry on its businesses as presently conducted.

6.2     *Authorization of Agreement – Enforceability*.  Except as disclosed on <u>Schedule 6.2</u>, BLC has full corporate power and authority to enter into, execute and deliver this Agreement and the other Documents to which it is a party, and to make the representations, warranties, covenants and agreements made by it herein and therein.  Except as disclosed on <u>Schedule 6.2</u>, the execution and delivery of each Document to which it is a party and the consummation of the transactions contemplated thereby have been duly authorized by all necessary corporate action on the part of BLC.  This Agreement and each other Document to which BLC is a party pursuant hereto

53

constitutes the legal, valid and binding obligations of BLC enforceable against BLC (assuming that each such Document has been duly and validly authorized, executed and delivered by the relevant counterparties thereto, including, as applicable, by the Sellers) in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other similar Laws affecting creditors' rights generally and to general principles of equity (regardless of whether enforceability is sought in a proceeding in equity or at law).

6.3     *Consents and Approvals; No Violations.*  Assuming the making of all notifications or filings as may be required in connection with the transactions described herein under the HSR Act or any foreign antitrust, merger control or competition law, and the receipt of all clearances, approvals, authorizations or waiting period expirations or terminations as may be required in connection with the transactions described herein under the HSR Act or any foreign antitrust, merger control or competition law, neither the execution or delivery of this Agreement or the other Documents nor the consummation of the transactions contemplated hereby or thereby (a) will conflict with or result in a breach, or violation of, or cause acceleration, or constitute (with or without due notice or lapse of time or both) a default, or give rise to any right to require notice or any right of termination, cancellation, modification or acceleration, under (i) any of the terms, provisions or conditions of the Governing Documents of BLC or any of its Subsidiaries or (ii) any material agreement, document, instrument or Law to which BLC or any of its Subsidiaries is a party or to which it is subject or to which any of its properties or assets may be bound; (b) will result in the creation of any Lien on the equity interests, property or assets of BLC or any of its Subsidiaries or (c) except as disclosed on Schedule 6.3, will require BLC or any of its Subsidiaries to obtain the consent of any non-governmental third party except where the failure to obtain such consent would not be material to the business of BLC.  Except as expressly contemplated by the Documents, or as set forth on Schedule 6.3, no consent, action, approval or authorization of, or registration, declaration or filing with, any Governmental Authority is required to authorize, or is otherwise required in connection with, the execution and delivery of the Documents or the performance of the terms of the Documents or the validity or enforceability of the Documents other than notifications or filings as may be required in connection with the transactions described herein under the HSR Act.

6.4     *Litigation, Judgments, Etc..*  (a) There are no claims, charges, audits, actions, suits, proceedings or investigations pending, or to the Knowledge of BLC, threatened, against BLC or any of its Subsidiaries, in any court or before or by any Governmental Authority or in any arbitral proceeding and (b) neither BLC nor any of its Subsidiaries is in default with respect to any Order applicable to them of any court or other Governmental Authority or arbitrator having jurisdiction over such Person that would constitute a BLC Material Adverse Effect.  Notwithstanding the foregoing, for all purposes of the Agreement, BLC does not make any representation or warranty (pursuant to this Section 6.4 or elsewhere in the Agreement) regarding the effect of the applicable antitrust, merger control, competition or fair trade laws on its ability to execute, deliver or perform their obligations under this Agreement or to consummate the transactions described in this Agreement as a result of the enactment, promulgation, application, or threatened or actual judicial or administrative investigation or litigation under, or enforcement of, any antitrust, merger control, competition or fair trade law with respect to the consummation of the transactions described in this Agreement.

6.5     *Brokerage Agreements*.  Except as set forth on <u>Schedule 6.5</u>, BLC has not, and none of its Subsidiaries or Affiliates has, entered into any agreement with any Person, firm or corporation requiring the payment of any commission, brokerage or "finder's fee" in connection with the transactions contemplated hereby.  Neither the Sellers nor any of their Affiliates will have any liability for any commission, brokerage or "finder's fee" owing to any party set forth (or required to be set forth) on <u>Schedule 6.5</u>.

6.6     *Investment Intent*.  BLC is acquiring the ACON Blocker Interests and the Company Interests for its own account for investment and not with a view to any distribution or other disposition of all or any part thereof in violation of any applicable federal or state securities Laws. BLC acknowledges that it can bear the economic risk of its investment in such securities and has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of an investment in the ACON Blocker Interests and Company Interests and the Fiesta Group Companies.  BLC is an "accredited investor" as such term is defined in Regulation D under the Securities Act.  BLC understands that neither the ACON Blocker Interests or Company Interests have been registered pursuant to the Securities Act or any applicable state securities laws, that such securities will be characterized as "restricted securities" under federal securities laws and that under such laws and applicable regulations such securities cannot be sold or otherwise disposed of without registration under the Securities Act or an exemption therefrom.

6.7     *Sufficient Funds*.

(a)     At the Closing, BLC will have sufficient, immediately available funds in cash, together with the funding of the Debt Financing in accordance with the terms of the Debt Commitment Letter, to pay the aggregate Closing Date payments contemplated by <u>Section 2.3(b)</u> (including the Cash Consideration) and any other amounts necessary to consummate the transactions contemplated by this Agreement at the Closing (the "<u>Required Amount</u>"), subject to the satisfaction of the conditions in <u>Sections 8.1</u> and <u>8.2</u>.  In no event shall the receipt by, or the availability of any funds or financing to, BLC or any of its Affiliates or any other financing be a condition to BLC's obligation to consummate the transactions contemplated by this Agreement.

(b)     BLC has delivered to the Sellers a true, correct and fully executed copy of a commitment letter (including all exhibits, annexes, schedules, term sheets and executed fee letters (which may be redacted to omit fee amounts, original issue discount, numeric "market flex" provisions, and other economic terms, in each case solely to the extent such terms could not have an impact on the availability or amount of the Debt Financing) (collectively, the "<u>Debt Fee Letters</u>") attached thereto or contemplated thereby) from Bank of America, N.A. and Merrill Lynch, Pierce, Fenner & Smith Incorporated, dated as of the date hereof (as the same may be amended or replaced from time to time in accordance with the terms of this Agreement, the "<u>Debt Commitment Letter</u>"), pursuant to which the Debt Financing Sources have committed, subject to the terms and conditions set forth therein, to provide the loans and provide commitments for loans in the amounts set forth therein (the "<u>Debt Financing</u>").

(c)     BLC has fully paid any and all commitment fees or other fees in connection with the Debt Commitment Letter (including the Debt Fee Letters) or otherwise with respect to the Financing that are due and payable on or prior to the date hereof, and BLC will pay, or cause to be paid, when due all other commitment fees and other fees arising under the Debt Commitment

Letter as and when they become due and payable thereunder.  The Debt Commitment Letter is the valid, binding and enforceable obligation of BLC, and to BLC's Knowledge, the Debt Financing Sources and each other party thereto, except in each case as such enforceability may be limited by bankruptcy, insolvency, moratorium and other similar applicable Law affecting creditors' rights generally and by general principles of equity.

(d)     As of the date hereof there are no side letters or other agreements, contracts or arrangements related to the funding of the Debt Financing other than as expressly set forth in the Debt Commitment Letter (including the Debt Fee Letters) delivered to the Sellers prior to the date hereof.  There are (i) no conditions precedent, "flex" provisions or other contingencies related to the funding of the full Commitment Amount, other than as expressly set forth in the Debt Commitment Letter (including the Debt Fee Letters) delivered to the Sellers on or prior to the date hereof and (ii) no other contingencies or rights that would permit the parties thereto to reduce the total amount of the Debt Financing contemplated by the Debt Commitment Letter, other than as set forth in the Debt Commitment Letter (including the Debt Fee Letters).  As of the date hereof, BLC does not have any reason to believe that, subject to the satisfaction of the conditions in Sections 8.1 and 8.2, any of the conditions to the funding of the Commitment Amount will not be satisfied or that the Debt Financing contemplated by the Debt Commitment Letter will not be available to BLC on the Closing Date.

(e)     As of the date of this Agreement, no event has occurred that, with or without notice, lapse of time or both, would constitute a default or breach on the part of BLC or, to the Knowledge of BLC, any of the other parties to the Debt Commitment Letter, under the Debt Commitment Letter.  The Debt Commitment Letter (including each of the Debt Fee Letters) are in full force and effect as of the date hereof and the Debt Commitment Letter (or any of the Debt Fee Letters) has not been amended or modified in any respect prior to or as of the date hereof and, as of the date hereof, (x) no such amendment or modification is contemplated (other than joinder documentation relating to the appointment of additional agents, co-agents, arrangers, bookrunners, managers or other roles in respect of the Debt Commitment Letter) and (y) the respective commitments contained in the Debt Commitment Letter have not been withdrawn, rescinded or terminated.

6.8     *No Other Representations or Warranties; No Reliance*.  BLC, ON BEHALF OF ITSELF AND IT AFFILIATES AND THEIR RESPECTIVE REPRESENTATIVES, HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY SET FORTH IN ARTICLE IV OR ARTICLE V, NONE OF THE SELLERS, THE ACON BLOCKERS NOR ANY FIESTA GROUP COMPANY MAKES ANY OTHER PROMISE, REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, RELATING TO THE ACON BLOCKERS, THE FIESTA GROUP COMPANIES, THEMSELVES, THE FIESTA BUSINESS OR ANY OF THEIR RESPECTIVE BUSINESSES, OPERATIONS, ASSETS, LIABILITIES, CONDITIONS OR PROSPECTS OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, INCLUDING WITH RESPECT TO MERCHANTABILITY, FITNESS FOR ANY PARTICULAR OR ORDINARY PURPOSE, OR AS TO THE ACCURACY OR COMPLETENESS OF ANY INFORMATION REGARDING ANY OF THE FOREGOING, OR AS TO ANY OTHER MATTER, NOTWITHSTANDING THE DELIVERY OR DISCLOSURE TO BLC OR ANY OF ITS AFFILIATES OR REPRESENTATIVES OF ANY DOCUMENTS, OPINIONS,   PROJECTIONS,   FORECASTS,   STATEMENTS,   MEMORANDUMS,

PRESENTATIONS, ADVICE OR INFORMATION (WHETHER COMMUNICATED ORALLY OR IN WRITING), AND ANY SUCH OTHER PROMISES, REPRESENTATIONS OR WARRANTIES, OR LIABILITY OR RESPONSIBILITY THEREFOR, ARE HEREBY EXPRESSLY DISCLAIMED.  IN ADDITION, BLC ACKNOWLEDGES AND AGREES THAT BLC HAS NOT EXECUTED OR AUTHORIZED THE EXECUTION OF THIS AGREEMENT IN RELIANCE UPON ANY PROMISE, REPRESENTATION OR WARRANTY NOT EXPRESSLY SET FORTH IN ARTICLE IV OR ARTICLE V.

## ARTICLE VII

## CERTAIN AGREEMENTS PRIOR TO CLOSING

7.1    *Conduct of the Business of the Fiesta Group Companies and the ACON Blockers prior to the Closing Date.*

(a)    The Sellers agree that, except as (w) required by applicable Laws, (x) expressly contemplated by this Agreement or otherwise necessary to consummate the Company Restructuring in accordance with the Company Restructuring Agreements, (y) previously approved by BLC in writing (which approval shall not be unreasonably withheld, conditioned or delayed) or (z) set forth on Schedule 7.1(a), that from the date hereof through the earlier of the Closing Date and the termination of this Agreement in accordance with its terms, the Sellers (1) will, and will cause the Fiesta Group Companies to, operate the Fiesta Business of the Fiesta Group Companies in all material respects in the ordinary course of business and consistent with such operation, the Sellers will use commercially reasonable efforts to preserve intact the relationships of the Fiesta Group Companies with material suppliers, and (2) will cause the Fiesta Group Companies not to:

(i)    redeem any equity for cash or otherwise;

(ii)    make any change to the Governing Documents of any Fiesta Group Company;

(iii)    make any change in the number or dollar amount of authorized or issued equity interests or other securities of any Fiesta Group Company, including pursuant to any split, combination, subdivision or reclassification of any such equity interest or effect any recapitalization, reclassification, stock dividend, stock split or like change in its capitalization; nor will any option, warrant, call, right, commitment, conversion right, right of first refusal, pledge, hypothecation or agreement of any character be granted or made by any Fiesta Group Company relating to the authorized or issued equity interests thereof; nor will any Seller or Fiesta Group Company issue, grant or sell any securities or obligations convertible into or redeem, purchase, assign or otherwise transfer any equity interest of any Fiesta Group Company;

(iv)    (A) incur any Indebtedness in excess of $100,000 in the aggregate, other than in the ordinary course of business, (B) assume, guarantee, endorse or otherwise become liable or responsible (whether directly, contingently or otherwise) for the obligations of any other Person, except for the endorsement of checks for collection in the

ordinary course of business or (C) make any loans, advances or capital contributions to, or investments in, any other Person, except in connection with normal relocations, travel advances or other advances in the ordinary course of business;

(v)     except as required by the terms of any Fiesta Employee Plan or as required by or to comply with applicable Law, (A) materially increase the compensation payable by such Fiesta Group Company to any officer or employee thereof, other than in the ordinary course of business, (B) except for immaterial amendments that provide *de minimis* benefits, establish, become a party to, amend, terminate, or, to the extent not consistent with past practice, provide any discretionary benefits under any Fiesta Employee Plan or arrangement that would be a Fiesta Employee Plan if in effect as of the date hereof, (C) hire or terminate (other than terminations for cause) the employment of any individual whose annual base cash compensation exceeds or is expected to exceed $100,000 or (D) enter into any collective bargaining agreement or other labor agreement covering any employee of any Fiesta Group Company;

(vi)     except in the ordinary course of business, sell, transfer, mortgage or otherwise dispose of, or encumber, or agree to sell, transfer, mortgage or otherwise dispose of or encumber, any assets of the Fiesta Group Companies or related to the Fiesta Group Companies' business, whether real, personal or mixed, tangible or intangible, that have a value, either individually or in the aggregate, in excess of $100,000;

(vii)     (A) amend, modify, transfer or terminate (excluding any expiration or renewal in the ordinary course of business) any Fiesta Material Contract or (B) except in the ordinary course of business, enter into any contract that would be considered a Fiesta Material Contract if such contract were in effect on the date hereof;

(viii)     except to the extent expressly contemplated in the 2018 fiscal year budget, make or commit to make any capital expenditure, capital addition or capital improvement in an amount exceeding $200,000;

(ix)     acquire by merger or consolidation with, or merge or consolidate with, or purchase or acquire all or substantially all of the assets of, or otherwise acquire the equity interests of, any corporation, partnership, association, joint venture or other business organization or division thereof;

(x)     settle, cancel, compromise, release or provide a waiver with respect to any claim, action or proceeding, whether administrative, civil or criminal, at law or in equity, existing on or commenced after the date hereof requiring payment in excess of (x) $100,000, with respect to any employee-related proceedings and (y) $250,000, with respect to any other proceedings, for any individual proceeding or that could reasonably be expected to result in a loss of revenue for the Company and its Subsidiaries, individually or in the aggregate, of at least $250,000, except for the settlement of any claim, action or proceeding set forth on <u>Appendix D</u> that is consistent with the final sentence of <u>Section 11.5(b)</u>;

(xi)    change or modify its credit, collection or payment policies, procedures or practices, including acceleration of collections or receivables (regardless of whether past due), or fail to timely pay or delay payment of payables or other liabilities;

(xii)    make any loan or advance to any officer, manager, shareholder, employee, consultant, representative, salesman or agent or make any other loan or advance other than in the ordinary course of business;

(xiii)    pay or commit to pay any commission or other amount to any officer, manager, employee, consultant, representative, salesman, distributor or agent, or any Relative or Affiliate of any of them, except in accordance with employment, consulting or distribution contracts or arrangements entered into in the ordinary course of business;

(xiv)    enter into, renew, modify or revise any contract, or enter into any transaction or arrangement with, any Affiliate;

(xv)    make or rescind any material income Tax election, change any annual accounting period, adopt or change any material accounting method, file any Tax Return inconsistent with past practices of the Fiesta Group Companies, as applicable (unless otherwise required by Law), file any amended Tax Return, waive or extend any limitation period for the assessment of Taxes, enter into any closing agreement with respect to Taxes, or settle any material Tax claim or assessment, in each case, to the extent such action may have an effect on any Fiesta Group Company (including the Fiesta Group Companies and the ACON Blockers following the Closing Date);

(xvi)    except for purchases of inventory in the ordinary course of business, make any purchases, payments or commitments in excess of $200,000 in the aggregate; or

(xvii)    authorize, enter into any agreement, commit to take, or otherwise become obligated to do, any of the foregoing.

(b)    The ACON Aggregators agree that, except as (w) required by applicable Laws, (x) expressly contemplated by this Agreement or otherwise necessary to consummate the Company Restructuring in accordance with the Company Restructuring Agreements, (y) previously approved by BLC in writing (which approval shall not be unreasonably withheld, conditioned or delayed) or (z) set forth on <u>Schedule 7.1(b)</u>, from the date hereof through the earlier of the Closing Date and the termination of this Agreement in accordance with its terms, the ACON Aggregators will cause the ACON Blockers not to:

(i)    make any change to the Governing Documents of any ACON Blocker;

(ii)    make any change in the number or dollar amount of authorized or issued equity interests of any ACON Blocker, including pursuant to any split, combination, subdivision or reclassification of any such equity interest or effect any recapitalization, reclassification, stock dividend, stock split or like change in its capitalization; nor will any option, warrant, call, right, commitment, conversion right, right of first refusal, pledge, hypothecation or agreement of any character be granted or made by any equityholder of

59

any ACON Blocker relating to the authorized or issued equity interests thereof nor issue, grant or sell any securities or obligations convertible into or redeem, purchase, assign or otherwise transfer any equity interest in any ACON Blocker;

        (iii)     incur any Indebtedness;

        (iv)     engage in any business or activity, enter into any contracts, acquire any assets or incur any obligations or liabilities, other than in connection with its ownership of Company Securities;

        (v)     make or rescind any material income Tax election, change any annual accounting period, adopt or change any material accounting method, file any Tax Return inconsistent with past practices (unless otherwise required by Law), file any amended Tax Return, waive or extend any limitation period for the assessment of Taxes, enter into any closing agreement with respect to Taxes, or settle any material Tax claim or assessment, in each case, to the extent such action may have an effect on the any Fiesta Group Company or any ACON Blocker;

        (vi)     enter into any transaction or arrangement with any Affiliate; or

        (vii)     authorize, enter into any agreement, commit to take, or otherwise become obligated to do, any of the foregoing.

        (c)     BLC acknowledges and agrees that: (i) nothing contained in this Agreement shall give BLC, directly or indirectly, the right to control or direct the operations of the Fiesta Business prior to the Closing, (ii) prior to the Closing, the Fiesta Group Companies shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over the Fiesta Business and (iii) notwithstanding anything to the contrary set forth in this Agreement, no consent of BLC shall be required with respect to any matter set forth in Section 7.1 or elsewhere in this Agreement to the extent that the requirement of such consent could violate any applicable Law. For the avoidance of doubt, but subject to the remaining provisions of this Agreement, the ACON Blockers and Fiesta Group Companies shall be permitted to pay cash dividends or other cash distributions prior to the Closing.

        7.2    *Further Actions*. In addition to the governmental filing requirements addressed in Section 7.3, each of the Parties will cooperate and use commercially reasonable efforts to take or cause to be taken all actions, and to make or cause to be made all filings and notifications, necessary or advisable under all other applicable Laws to consummate and make effective the transactions contemplated by this Agreement. Without limiting the generality of the foregoing, the Parties will use commercially reasonable efforts to (a) obtain all necessary waivers, consents and approvals of the parties to the Fiesta Material Contracts (including the Fiesta Material Leases) and (b) obtain all consents, approvals and authorizations that are required to be obtained under any applicable Law or by any Governmental Authority or to transfer or assign all Permits, in the case of both clauses (a) and (b), as are necessary in connection with the consummation of the transactions contemplated by this Agreement and to fulfill the conditions to the transactions contemplated by this Agreement. Each Party further covenants and agrees, except as otherwise set forth in Section 7.3, with respect to a threatened or pending Order or applicable Law that would

60

adversely affect the ability of the Parties to consummate the transactions contemplated by this Agreement, to use commercially reasonable efforts to prevent the entry, enactment or promulgation thereof, as the case may be (it being understood that such efforts shall not include any requirement of any Party to expend material sums of money or grant any material financial or other accommodation).  BLC shall not, and shall cause its Affiliates not to, acquire or agree to acquire, by merging with or into or consolidating with, or by purchasing a substantial portion of the assets of or equity in, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof, or otherwise acquire or agree to acquire any assets, if the entering into of a definitive agreement relating to, or the consummation of such acquisition, merger or consolidation would reasonably be expected to:  (i) impose any material delay in the obtaining of, or materially increase the risk of not obtaining, any consents of any Governmental Authority necessary to consummate the transactions contemplated by this Agreement or the expiration or termination of any applicable waiting period; (ii) materially increase the risk of any Governmental Authority seeking or entering an Order prohibiting the consummation of the transactions contemplated by this Agreement; (iii) materially increase the risk of not being able to remove any such Order on appeal or otherwise; or (iv) materially delay or prevent the consummation of the transactions contemplated by this Agreement.

7.3     *Competition Filings*.  Subject to the terms and conditions herein provided, each Party will (a) make, or cause its ultimate parent entity (as that term is defined in the HSR Act) to make, any filings required by such Party under any applicable antitrust or competition Laws as soon as practicable after the date hereof (but in no event later than ten Business Days after the date hereof), which filings will include a request for early termination of any applicable waiting period, (b) make, after such filings are made, any other submissions required to be made by such Party under such Laws, (c) use commercially reasonable efforts to cooperate with one another in making all such filings and timely seeking all such consents, Permits, waiting period expirations or terminations, authorizations or approvals and (d) use commercially reasonable efforts to take or cause to be taken all other actions, and do or cause to be done all other things, necessary or advisable to consummate and make effective the transactions contemplated hereby in an expeditious manner, including taking all such further action as reasonably may be necessary to resolve such objections or actions, suits, complaints, charges, proceedings, audits, investigations or Orders, if any, as the Federal Trade Commission, the Antitrust Division of the Department of Justice, state antitrust enforcement authorities or competition authorities of any other nation or other jurisdiction or any other Person may assert under relevant antitrust or competition Laws with respect to the transactions contemplated hereby; provided, however, that, notwithstanding any provision in this Agreement to the contrary, no Party shall be required to, and the Fiesta Group Companies may not (without the prior written consent of BLC), and BLC may not (without the prior written consent of the Sellers), enter into any agreement or commitment or take any other action to resolve any such objections if such agreement, commitment or other action could reasonably be expected, individually or in the aggregate, to entail (i) the commencement of any litigation against any Person in order to facilitate the consummation of the transactions contemplated hereby, (ii) the defense against any litigation brought by any Governmental Authority seeking to prevent the consummation of, or impose limitations on, any of the transactions contemplated hereby or (iii) any requirement that any Seller, any Fiesta Group Company, BLC or any of its Affiliates dispose of or hold separate all or any portion of its properties or assets or limit its future activities or place of doing business.  Subject to applicable confidentiality restrictions or restrictions required by Law, each Party will notify the other Parties

promptly upon the receipt of (i) any comments or questions from any Governmental Authority in connection with any filings made pursuant to this <u>Section 7.3</u> or the transactions contemplated by this Agreement and (ii) any request by any Governmental Authority for information or documents relating to an investigation of the transactions contemplated by this Agreement.  Without limiting the generality of the foregoing, each Party shall provide to the other Parties (or the other Parties' respective advisors), upon request, copies of all correspondence between such Party and any Governmental Authority relating to the transactions contemplated by this Agreement.  The Parties may, as they deem advisable and necessary, designate any competitively sensitive materials provided to the other under this <u>Section 7.3</u> as "outside counsel only."  Such materials and the information contained therein shall be given only to outside counsel of the recipient and will not be disclosed by such outside counsel to employees, officers or directors of the recipient without the advance written consent of the Party providing such materials.  In addition, to the extent reasonably practicable, all discussions, telephone calls and meetings with a Governmental Authority regarding the transactions contemplated by this Agreement shall include representatives of all Parties.  Subject to applicable Law, the Parties will consult and cooperate with each other in connection with any analyses, appearances, presentations, memoranda, briefs, arguments and proposals made or submitted to any Governmental Authority regarding the transactions contemplated by this Agreement by or on behalf of any Party.

7.4     *Access*.  During the period from the date of this Agreement until the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with <u>Article X</u>, BLC and its Affiliates, employees, representatives, suppliers and agents, and the Debt Financing Sources will be given access during normal business hours upon reasonable notice to the Fiesta Representative to the facilities, properties, personnel, books and records (including Tax records) of the Fiesta Group Companies as BLC may reasonably determine to be necessary to consummate the transactions contemplated by this Agreement; <u>provided</u>, <u>however</u>, that such investigation will be conducted in a manner that does not unreasonably interfere with the normal operations of the Fiesta Group Companies and none of BLC or any of its Affiliates, employees, representatives, suppliers, agents or Debt Financing Sources shall undertake any environmental testing or sampling without the prior written consent of the Fiesta Representative, which consent may be withheld in the Fiesta Representative's sole and absolute discretion.  All such properties, books, records, accounts and documents shall be deemed "Confidential Information" and shall be subject to all restrictions and limitations applicable thereto under the Confidentiality Agreement. Notwithstanding the foregoing, but without limitation to the disclosure obligations of the applicable Parties pursuant to <u>Article IV</u> and <u>Article V</u>, no Person shall be obligated to disclose any information pursuant to this <u>Section 7.4</u> to the extent such disclosure would violate applicable Law, result in a breach of any existing contractual commitment or result in the loss of legal privilege.

7.5     *Exclusive Agreement*.  Except to the extent otherwise expressly contemplated by this Agreement or as reasonably necessary to consummate the transactions contemplated by this Agreement, unless and until this Agreement is terminated in accordance with the terms hereof none of the Fiesta Group Companies, the Sellers or any Affiliate or representative of any of the foregoing will (a) directly or indirectly, encourage, solicit, initiate, support or engage in or take any other action to facilitate, discussions or any negotiations with, or provide any information to, any Person (other than BLC or Affiliates or representatives of BLC) concerning any Alternative Transaction (as defined below) or (b) directly or indirectly, do anything or enter into any agreement

or take any action that by its terms or effect could reasonably be expected to materially and adversely affect the ability of the Parties to consummate the transactions contemplated hereby on the terms and conditions set forth herein.  The Sellers will promptly notify BLC of any inquiries, proposals or offers received by any such Party or any of their respective Affiliates or representatives relating to any Alternative Transaction, including copies of any writings and summaries of the material terms of any oral inquiries, proposals or offers.  The Sellers acknowledge that they have terminated all discussions with any third parties concerning any Alternative Transaction, and, promptly following the Closing, will take all commercially reasonable actions permitted to be taken under confidentiality agreements they have with such potential counterparties to cause any confidential information regarding Fiesta Group Companies or the Fiesta Business, to be promptly destroyed (and request certification of destruction) or returned to such Party making such request.  For purposes of this Section 7.5, "Alternative Transaction" shall mean any of the following involving an ACON Blocker or any Fiesta Group Company (other than those contemplated by this Agreement amongst the Parties or any of their representatives):  (i) a merger, consolidation, share exchange or other business combination, reorganization, recapitalization or other similar transaction involving any such Party; (ii) any direct or indirect sale, lease, exchange, transfer or other similar disposition of any material portion of the assets of the ACON Blockers or any Fiesta Group Company; (iii) any proposal or offer to acquire, directly or indirectly, any equity securities of any such Party; (iv) issuance of any equity or debt securities of any such Party or (v) the announcement of an intention to do any of the foregoing or any agreement to engage in any of the foregoing; provided, however, that the Company Restructuring shall not constitute or be deemed to constitute an "Alternative Transaction."

7.6     *Termination of Affiliate Obligations*.  On or before the Closing Date, except as set forth on Schedule 7.6, and except with respect to the Governing Documents of the Fiesta Group Companies and the ACON Blockers and any Company Restructuring Agreements, all contracts, Indebtedness and other obligations between any ACON Blocker or Fiesta Group Company, on the one hand, and the Sellers and their respective Affiliates (other than the ACON Blockers or Fiesta Group Companies), on the other hand, shall be (a) settled, in the case of any Indebtedness or any intercompany accounts or (b) terminated, with respect to any contracts, without any obligation or Indebtedness on the part of any ACON Blocker or any Fiesta Group Company, from and after the Closing.  From and after the date hereof, the Sellers and their Affiliates shall conduct all transactions with the ACON Blockers and Fiesta Group Companies only in the ordinary course of business, except as is otherwise necessary to consummate the Company Restructuring in accordance with the Company Restructuring Agreements. On or before the Closing Date, any loan made by a Fiesta Group Company or ACON Blocker to any manager, officer, director, unitholder, Affiliate or employee of a Fiesta Group Company or ACON Blocker, or any Related Person of any of the foregoing, in each case disclosed on Appendix C, will be settled and terminated in full.

7.7     *Cash in Stores*.  From the date hereof until the Closing Date, the Sellers shall, and shall cause the Fiesta Group Companies to, maintain cash and coin (not to include checks or money orders) on hand in stores operated by such Persons in the ordinary course of business.

7.8     *Closed Store Payments*.

(a)     From and after the Closing, BLC shall use commercially reasonable efforts to enter into one or more third party subleases for the Closed Store Premises, to otherwise procure

63

payment in respect of the use of all or any portion of the Closed Store Premises or to otherwise terminate the payment obligations of the Fiesta Group Companies under such Closed Store Leases. BLC shall keep the Fiesta Representative reasonably informed of the progress of such efforts with reasonable frequency, and shall promptly provide the Fiesta Representative with copies of all material documents pertaining thereto, including any applicable subleases, brokerage agreements or other similar documentation entered into in connection with the foregoing.

(b)     If BLC or any of its Subsidiaries enters into one or more third party subleases or licenses for all or any portion of any Closed Store Premises or enters into any arrangement other than a sublease or license pursuant to which BLC or any Subsidiary receives any payments or otherwise recognizes Other Closed Store Value in respect of the use of all or any portion of the Closed Store Premises, then BLC shall (i) promptly notify the Fiesta Representative of such development and provide a copy of such sublease, license or other arrangement and (ii) pay the Fiesta Representative a Closed Store Payment in respect of such sublease, license or other arrangement, which payment shall be made by wire transfer of immediately available funds, within 30 days after the date on which BLC or such Subsidiary of BLC first receives payment (or first recognizes Other Closed Store Value) in respect of such sublease, license or other arrangement.

(c)     If BLC or any of its Subsidiaries enters into an agreement to terminate the obligations of the Fiesta Group Companies under any Closed Store Lease, then BLC shall (i) promptly notify the Fiesta Representative of such development and provide a copy of the documentation related thereto and (ii) pay the Fiesta Representative, within 30 days after the date on which BLC or such Subsidiary's obligation to make lease payments under such Closed Store Lease terminates, an amount equal to the product of (x) 50% multiplied by (y) the result of (A) the Closed Store Lease Deduction related to such Closed Store (as adjusted to reflect the present value calculation as of the date on which BLC or its Subsidiary's obligation to make lease payments under such Closed Store Lease terminates) minus (B) the aggregate amount, if any, paid by BLC or any of its Subsidiaries as consideration pursuant to such agreement minus (C) without duplication of clause (B), the out-of-pocket expenses payable to third parties in connection with the execution of such agreement; provided, however, that if the foregoing calculation results in a negative number, then no payment shall be owed.

(d)     In the event that BLC fails to make a Closed Store Payment or a payment required to be made pursuant to Section 7.8(c) on or prior to the date on which such payment is due pursuant to the terms of Section 7.8(b) or Section 7.8(c), as applicable, then interest shall accrue on the amount of such payment at a rate of 8% per annum, compounding annually, from the date such amount became due until the date on which such payment is received by the Fiesta Representative. The aggregate amount of Closed Store Payments and payments pursuant to Section 7.8(c) shall not exceed an amount equal to the product of (x) 50% multiplied by (y) the Aggregate Closed Store Lease Deductions; provided, however, that, for the avoidance of doubt, this sentence shall not limit the interest payments due in respect of any such amounts as set forth in the immediately preceding sentence or be considered a limit on BLC's indemnification obligations under Article XI.

(e)     Within 15 Business Days following the end of each fiscal year, BLC shall provide the Fiesta Representative with a written statement, certified by a duly appointed officer of BLC, setting forth the following information: (i) a summary of the status of each Closed Store

Premises, describing in reasonable detail whether a sublease, license or other arrangement related thereto was entered into during the prior fiscal year (or to the extent entered into during any prior fiscal year, a summary description of any material changes to such arrangements) and the financial terms of any such sublease, license or other arrangement or, if such Closed Store Premises remains unoccupied, a summary description of prospects and other opportunities in respect of such; and (ii) the aggregate Closed Store Payments and other payments pursuant to Section 7.8(c) made to the Fiesta Representative during the prior fiscal year and all other prior fiscal years.

(f)     BLC hereby covenants and agrees that it shall not, and it shall cause its Subsidiaries not to, take any action for the purpose of circumventing BLC's obligations pursuant to this Section 7.8.

(g)     For the avoidance of doubt, any payment made to the Fiesta Representative pursuant to this Section 7.8 will be deemed to have been made for the benefit of the Sellers.

7.9     *BLC R&W Policy.*  BLC shall not amend, restate, supplement, modify or alter the BLC R&W Policy in any manner that would reasonably be expected to result in any incremental liability to any Seller toward the BLC R&W Provider or any other Person without the prior written consent of the Fiesta Representative.

7.10     *Company Restructuring; Alternative Structure.*

(a)     Subject to Section 7.10(b), the Sellers will cause the Company Restructuring to be consummated prior to the Closing Date pursuant to the agreements in substantially the form attached hereto as Exhibit C (including all assignments, conveyances, bills of sale, amendments to Governing Documents, exhibits, annexes, schedules, side letters, and attachments, the "Company Restructuring Agreements").  In no event shall the Company Restructuring impose any post-Closing obligations on any Fiesta Group Company.

(b)     Notwithstanding anything to the contrary contained in this Agreement, in the event that a Seller determines, at any time on or prior to the Closing Date, that the ACON Aggregators will not sell one or both ACON Blockers to BLC, but instead have the Company Interests that would have been distributed to such ACON Blocker pursuant to the Company Restructuring be sold directly to BLC by Fiesta Holdings, then the Fiesta Representative may notify BLC in writing of such determination and this Agreement shall be deemed automatically amended without any further action of the Parties being required to (i) remove the applicable ACON Aggregator as a Party to this Agreement (and to remove references to such ACON Aggregator's applicable ACON Blocker from this Agreement), (ii) delete all representations, warranties, covenants or other agreements set forth herein with respect to such ACON Aggregator and/or its applicable ACON Blocker and (iii) delete all references to the applicable ACON Blocker's Indebtedness and Cash and Cash Equivalents in the Adjustment Amount, it being the intent of the Parties that in such instance this Agreement shall be read as if such ACON Aggregator and its applicable ACON Blocker were never contemplated herein and that the limited liability company interests that would have been owned by the applicable ACON Blocker if the Company Restructuring had been consummated are owned instead at Closing by Fiesta Holdings.  The Parties shall cooperate in good faith to execute any amendments or other similar agreements as may be reasonably necessary to effectuate the intent of the foregoing.

65

7.11    *Director and Officers Liability; Indemnification.*

(a)     The Sellers will cause to be put in place, and the Sellers shall fully prepay immediately prior to the Closing Date, "tail" insurance policies with a claims period of at least six years from the Closing Date from an insurance carrier with the same or better credit rating as the Company's current insurance carrier with respect to directors' and officers' liability insurance in an amount and scope at least as favorable as the Company's existing director and officer liability policies disclosed on Schedule 7.11 with respect to matters, acts or omissions existing or occurring at or prior to the Closing Date.

(b)     Neither BLC nor any Subsidiary thereof shall amend, repeal or otherwise modify, or permit the amendment, repeal or other modification of, any provision in the Governing Documents of any Fiesta Group Company in any manner that would affect adversely the rights thereunder of any present or former officer, manager and/or director of each Fiesta Group Company (the "D&O Indemnified Persons") to indemnification, exculpation and advancement except to the extent required by applicable Law.

(c)     In the event that BLC, any Subsidiary of BLC or any of their respective successors or assigns (i) consolidates with or merges into any other Person and is not the continuing or surviving corporation or entity of such consolidation or merger or (ii) transfers or conveys all or substantially all of its properties and other assets to any Person, then, and in each such case, BLC shall cause proper provision to be made so that the applicable successors and assigns or transferees expressly assume the obligations set forth in this Section 7.11.

7.12    *BLC's Financing Covenants.*

(a)     BLC shall use its commercially reasonable efforts to arrange, consummate and obtain the Debt Financing contemplated by the Debt Commitment Letter on the terms set forth therein (as the same may be amended, modified, supplemented or replaced as permitted hereby), including using its commercially reasonable efforts to (i) maintain in full force and effect the Debt Commitment Letter (and any definitive agreements entered into in connection therewith) in accordance with the terms thereof, (ii) negotiate and enter into definitive agreements (and provide final copies thereof to the Sellers) with respect to the Debt Financing on conditions not less favorable to BLC, taken as a whole, than the conditions contained in the Debt Commitment Letter (including the Debt Fee Letters); provided, however, that there shall be no new or additional conditions or any amendment, waiver, modification or expansion of existing conditions to receipt of the Debt Financing from those expressly set forth in Debt Commitment Letter (including the Debt Fee Letters) as of the date hereof, in any case in a manner that would reasonably be expected to (A) prevent or materially impede or delay (but in no event beyond the Outside Date) the ability of BLC to consummate the Closing, (B) make any portion of the Debt Financing in an amount equal to the Required Amount (or satisfaction of the conditions to obtaining the Debt Financing in an amount equal to the Required Amount) materially less likely to be obtained or prevent or materially impede or delay the funding of the Debt Financing or (C) materially adversely impact the ability of BLC to enforce its rights against the other parties to the Debt Commitment Letter (the matters in clauses (A) through (C), collectively, the "Prohibited Matters"), (iii) satisfy (or obtain a waiver of) on a timely basis at or prior to Closing all conditions to obtaining the Debt Financing set forth in the Debt Commitment Letter under its control and to comply with BLC's

obligations thereunder, (iv) upon satisfaction of the conditions set forth in <u>Section 8.1</u> (other than those to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions at Closing) and in <u>Section 8.2</u>, to consummate the Debt Financing at or prior to the Closing, (v) seek to cause the counterparties to the Debt Commitment Letter to fulfill their obligations under the Debt Commitment Letter in the event of a breach thereof by the Debt Financing Sources under the Financing, and (vi) assert its rights under the Debt Commitment Letter in the event of a breach thereof by the Debt Financing Sources and other lenders party thereto.  BLC shall give the Sellers and the Company prompt notice (and, in any event, within three (3) Business Days) upon (A) becoming aware of any material breach or default by any party to the Debt Commitment Letter or any definitive agreements relating to the Debt Financing or (B) receipt by it or any of its Affiliates of any written notice or other written communication from any Person with respect to (i) any failure to comply with the terms of the Debt Commitment Letter or any such definitive agreements by any party thereto, (ii) any actual or threatened termination or repudiation (whether in whole or in part) of any of the Debt Commitment Letter or any such definitive agreements by any party thereto or (iii) any material dispute or disagreement between or among any of the parties to any of the Debt Commitment Letter or any such definitive agreements solely to the extent such disagreement or dispute relates to the obligation (including with respect to the conditions, "flex" provisions or termination provisions thereto) of the parties thereto to fund their commitments thereunder or the availability of the Debt Financing (but, in each case, excluding ordinary course negotiations).  Upon the reasonable request of the Company, BLC shall inform the Sellers and the Company in reasonable detail of the status of BLC's efforts to arrange the Debt Financing and to satisfy the conditions thereof (including providing executed copies of the material definitive agreements related to the Debt Financing) and of material developments concerning the timing of the closing of the Debt Financing contemplated by the Debt Commitment Letter; provided, however, that nothing in this sentence or the immediately preceding sentence shall require BLC to disclose any information that is subject to the attorney client privilege or the disclosure of which would result in the breach of any of BLC's confidentiality obligations set forth in the Debt Commitment Letter (as in effect on the date hereof).  Without the prior written consent of each of the Sellers and the Company (which shall not be unreasonably withheld, conditioned or delayed), BLC shall not permit any amendment or modification (other than amendments or modifications contemplated by the "flex" provisions included in the related Debt Fee Letters) to be made to, or any waiver of any provision or remedy under, the Debt Commitment Letter (including the Debt Fee Letters), or release or consent to the termination of the obligations of the sources of the Financing under the Debt Commitment Letter if such amendment, modification, waiver, consent or termination or release is in respect of or relates to a Prohibited Matter; <u>provided</u>, <u>however</u>, that notwithstanding the foregoing, BLC shall be permitted to amend, restate, supplement, replace or otherwise modify the Debt Commitment Letter to add lenders, arrangers, book-runners, syndication and documentation agents or similar entities who have not executed the Debt Commitment Letter as of the date hereof or to effect such other changes, waivers or modifications that are not Prohibited Matters (and BLC shall promptly provide a copy of any such modifications to the Sellers).

(b)      If the Debt Financing contemplated by the Debt Commitment Letter becomes unavailable on the terms and conditions contemplated therein, in whole or in part, for any or no reason, BLC shall (i) promptly notify the Company and the Sellers thereof and (ii) use, and cause its Affiliates to use, commercially reasonable efforts to arrange for and obtain alternative financing from other sources (which alternative financing shall be in an amount at least equal to

the Required Amount or such unavailable portion of the Debt Financing) on terms and conditions to funding and availability that are not materially less favorable, in the aggregate, to BLC (as reasonably determined by BLC) than those in the Debt Commitment Letter in respect of the Debt Financing which has become unavailable (taking into account any "flex" provisions included in the related Debt Fee Letters) or otherwise on terms acceptable to BLC, Company and the Sellers (the "Alternative Debt Financing") to replace such unavailable Debt Financing and to obtain new debt financing commitment letters with respect to such Alternative Debt Financing (the "Alternative Debt Commitment Letters").  In the event any Alternative Debt Commitment Letters are obtained, (x) any reference in this Agreement to the "Debt Financing" shall include the debt financing contemplated by such Alternative Debt Commitment Letters and (y) any reference in this Agreement to the "Debt Commitment Letter" shall be deemed to include the Debt Commitment Letter to the extent not superseded by an Alternative Debt Commitment Letter at the time in question and any Alternative Debt Commitment Letters to the extent then in effect.

(c)     Notwithstanding anything herein to the contrary, obtaining the Debt Financing or any alternative financing by BLC is not a condition to Closing and the obligations of BLC to consummate the transactions contemplated by this Agreement are not subject to the availability of the Debt Financing or Alternative Debt Financing.

(d)     In no event shall "commercially reasonable efforts" of BLC be deemed or be construed to require BLC to, and BLC shall not be required to, (A) pay any fees in the aggregate in excess of those contemplated by the Debt Commitment Letter (including the Debt Fee Letters (taking into account any "flex" provisions included in the related Debt Fee Letters)) or (B) agree to conditionality or economic terms of any Debt Financing that are less favorable than those contemplated by the Debt Commitment Letter (including the Debt Fee Letters (taking into account any "flex" provisions included in the related Debt Fee Letters)).  Notwithstanding anything to the contrary in this Agreement, each of the Sellers and the Company expressly agrees that a breach of this Section 7.12 shall not result in a failure of a condition in Section 8.2(a)(ii) if, notwithstanding such breach, BLC is willing and able to consummate the transactions contemplated by this Agreement on the Closing Date (and, in fact, does consummate the transactions contemplated by this Agreement on the Closing Date).

(e)     BLC shall indemnify and hold harmless the Company and its Subsidiaries, the Sellers and each of their respective Affiliates, officers, directors, employees or agents from and against any and all Losses suffered or incurred by any of them in connection with any of their cooperation or assistance with respect to the Debt Financing or the provision of any information utilized in connection therewith or otherwise arising from the Debt Financing (except to the extent suffered or incurred as a result of the inaccuracy of historical financial information provided by any such Person for use in the Debt Financing or the bad faith, gross negligence or willful misconduct in connection with this Agreement by the Company, any of its Subsidiaries, the Sellers or any of their respective Affiliates, officers, directors, employees or agents, in each case as determined by a court of competent jurisdiction).  BLC shall from time to time, promptly upon request by the Company and in any event prior to the Closing, reimburse the Company and its Subsidiaries, the Sellers and each of their respective Affiliates, officers, directors, employees or agents for any and all reasonable and documented out of pocket fees, costs or expenses (including fees, costs and expenses of counsel, accountants and other advisors) incurred by any of them in connection with any of their cooperation or assistance with respect to the Debt Financing or the

68

provision of any information utilized in connection therewith or otherwise arising from the Debt Financing.

7.13    *Financing Cooperation.*  Prior to the Closing, each Fiesta Group Company agrees to use commercially reasonable efforts to, and to cause its Subsidiaries to use commercially reasonable efforts to, and to cause its and its Subsidiaries' respective agents and representatives to use commercially reasonable efforts to, at BLC's sole cost and expense, cooperate and assist with BLC in connection with the arrangement of and obtaining the Debt Financing contemplated by the Debt Commitment Letter as may be reasonably requested by BLC (provided that such requested cooperation and assistance is not in violation of any applicable Law), including:

(a)    participating in a reasonable number of meetings, presentations, road shows, due diligence sessions, sessions with prospective financing sources, including direct contact between senior management with appropriate seniority and expertise and the other agents and representatives of each Fiesta Group Company, on the one hand, and the actual and potential Debt Financing Sources, on the other hand, and otherwise reasonably cooperating with the marketing efforts of BLC and its financing sources for the Debt Financing, in each case, at reasonable times and upon reasonable notice and no more than one meeting with rating agencies;

(b)    assisting with the preparation of customary materials for bank information memoranda, lender and investor presentations, business projections, marketing materials and similar documents reasonably required in connection with the Debt Financing and identifying any portion of the information set forth in any of the foregoing that would constitute material, non-public information;

(c)    furnishing BLC and any actual or potential financing source with the Required Information to be used in connection with the Debt Financing (and any supplements thereto);

(d)    assisting in the preparation, execution and delivery of one or more credit agreements, pledge and security documents and other definitive financing documents as may be reasonably requested by BLC and the disclosure schedules and exhibits attached thereto;

(e)    facilitating the pledging of collateral for the Debt Financing (including delivery of original stock certificates and original stock powers of the Fiesta Group Company and its Subsidiaries to the extent required on the Closing Date in connection with the Debt Financing);

(f)    executing and delivering customary authorization letters with respect to bank information memoranda or other marketing material for the Debt Financing to the extent such letters are in customary form or are otherwise reasonably acceptable to the Company;

(g)    to the extent requested in writing at least nine (9) Business Days prior to Closing, furnishing within six (6) Business Days of the Closing Date all documentation and other information required by any Governmental Authority under applicable "know your customer" and anti-money laundering rules and regulations, including USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001);

(h)      subject to and conditioned on the occurrence of the Closing, taking corporate or limited liability company actions reasonably necessary to permit the consummation of the Debt Financing (provided, however, that no director or comparable manager of any Fiesta Group Company that will not continue in such role following the consummation of the Acquisitions shall be required to consent to or otherwise authorize any such corporate or limited liability company actions);

(i)      requesting from the existing lenders of any Fiesta Group Company customary payoff letters, Lien terminations, instruments of termination or discharge to be delivered at the Closing providing for the payoff, discharge and termination on the Closing Date of all Indebtedness contemplated by the Debt Commitment Letter to be paid off, discharged and terminated on the Closing Date; and

(j)      supplementing the Required Information so that the same is Compliant at all times.

Each Fiesta Group Company hereby consents to the use of its and its Subsidiaries' logos in connection with the Debt Financing, provided that such logos are used solely in a manner that is not intended to, nor reasonably likely to, harm or disparage Fiesta Holdings or any Fiesta Group Company or the reputation or goodwill of the Fiesta Group Companies.

All information provided pursuant to this Section 7.13 shall constitute "confidential information" under the Confidentiality Agreement and shall be kept confidential in accordance with the terms of the Confidentiality Agreement, except that BLC shall be permitted to disclose such information to rating agencies, the Debt Financing Sources and other lenders or potential lenders in accordance with the terms of the Debt Commitment Letters, subject to customary confidentiality undertakings by such Persons regarding such information, which undertakings are, in all material respects, the same as those in the Confidentiality Agreement; provided, however, that BLC shall be responsible for any acts or omissions of such Persons with respect to such information.

Notwithstanding anything in this Agreement to the contrary, (i) none of the Fiesta Group Companies, any of their Subsidiaries or Affiliates, or any of their respective directors, officers, employees or agents shall be required to execute or enter into any certificate, instrument, agreement or other document in connection with the Debt Financing which will be effective prior to the Closing (other than the authorization letter referred to above), (ii) nothing herein shall require cooperation or other actions or efforts on the part of the Fiesta Group Companies, any of their Subsidiaries or Affiliates, or any of their respective directors, officers, employees or agents in connection with the Debt Financing to the extent it would unreasonably interfere with the business or operations of the Fiesta Group Companies and any of its Subsidiaries or Affiliates, (iii) none of the Fiesta Group Companies, any of their Subsidiaries or Affiliates, or any of their respective directors, managers, officers, employees or agents will be required to pay any commitment or other similar fee, to incur any other liability or obligation or to enter into any agreement (other than customary authorization letters in connection with any syndication materials related to the Debt Financing) that is not contingent upon the Closing or that would be effective in connection with the Debt Financing prior to the Closing and (iv) nothing herein shall require the board of directors or similar governing body of the Fiesta Group Companies or any of their

Subsidiaries, prior to the Closing, to adopt resolutions approving or otherwise approving the agreements, documents or instruments pursuant to which the Debt Financing is made.

7.14   *Westport Business Interruption Insurance Payments*.  BLC shall, and BLC shall cause its Subsidiaries to, remit to the Fiesta Representative, within five (5) Business Days following receipt thereof, any monies received on or after the Closing Date by BLC or any of its Subsidiaries pursuant to that certain Property Insurance Policy of Westport Insurance Corporation (Policy Number: NAP 2001214 01); Aspen Specialty Ins Co (Policy Number: PRAGK1017); Arch Specialty Ins Co (Policy Number: ESP7303053-01); Lloyd's of London (Policy Number: URS 2552391.17); Indian Harbor Ins Co (Policy Number: PRO0047629-01); Allied World Assurance Co (Policy Number: 0310-7409-1A) and HDI Global Ins Co (Policy Number: CPD1488300), but, in each case, only to the extent pursuant to business interruption claims relating to any period prior to Closing.

7.15   *Name Change*.  Within thirty (30) days after the Closing Date, BLC shall amend the Governing Documents of the ACON Blockers to remove "ACON" and "AEP III," as applicable, from their respective names.

## ARTICLE VIII

## CONDITIONS TO CLOSING

8.1   *Conditions of BLC to Closing*.  The obligations of BLC to effect the transactions contemplated by this Agreement at the Closing are subject to the following conditions:

(a)   <u>Representations, Warranties and Covenants of the Sellers</u>.

(i)   (A) The Fiesta Fundamental Representations shall be true and correct in all respects (except for *de minimis* inaccuracies) at and as of the date of this Agreement and at and as of the Closing as if made at and as of the Closing, and (B) the representations and warranties of the Sellers set forth in <u>Article IV</u> (other than those that are the subject of <u>clause (A)</u>) shall be true and correct (ignoring and disregarding all materiality and Material Adverse Effect qualifications set forth therein) at and as of the date of this Agreement and at and as of the Closing as if made at and as of the Closing, except in each case where the failure of such representations and warranties to be so true and correct could not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect; <u>provided</u>, <u>however</u>, that representations and warranties that are made as of a particular date or period shall be true and correct (in the manner set forth in <u>clause (A)</u> or <u>(B)</u>, as applicable) only as of such date or period;

(ii)   (A) The representations and warranties of Fiesta Holdings set forth in <u>Sections 5.1(a)</u>, <u>5.1(b)(ii)(a)(i)</u>, and <u>5.1(c)</u> (the "<u>Fiesta Holdings Fundamental Representations</u>") shall be true and correct in all respects (except for *de minimis* inaccuracies) at and as of the date of this Agreement and at and as of the Closing as if made at and as of the Closing, and (B) the representations and warranties of the Sellers set forth in <u>Section 5.1</u> (other than those that are the subject of <u>clause (A)</u>) shall be true and correct (ignoring and disregarding all materiality and Material Adverse Effect qualifications set

forth therein) at and as of the date of this Agreement and at and as of the Closing as if made at and as of the Closing, except in each case where the failure of such representations and warranties to be so true and correct could not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect; provided, however, that representations and warranties that are made as of a particular date or period shall be true and correct (in the manner set forth in clause (A) or (B), as applicable) only as of such date or period;

(iii)     (A) The representations and warranties of the ACON Aggregators set forth in Sections 5.2(a), 5.2(b)(ii)(a)(i), 5.3(a), 5.3(b)(i)(A), 5.3(c) and 5.3(j) (the "ACON Aggregator Fundamental Representations") shall be true and correct in all respects (except for *de minimis* inaccuracies) at and as of the date of this Agreement and at and as of the Closing as if made at and as of the Closing and (B) the representations and warranties of the ACON Aggregators set forth in Section 5.2 and Section 5.3 (other than those that are the subject of clause (A)) shall be true and correct (ignoring and disregarding all materiality and Material Adverse Effect qualifications set forth therein) at and as of the date of this Agreement and at and as of the Closing as if made at and as of the Closing, except in each case where the failure of such representations and warranties to be so true and correct could not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect; provided, however, that representations and warranties that are made as of a particular date or period shall be true and correct (in the manner set forth in clause (A) or (B), as applicable) only as of such date or period;

(iv)     The Sellers shall each have performed (or caused to have been performed) or complied with in all material respects all covenants to be performed or complied with by the Sellers at or prior to the Closing under this Agreement (except for such covenants that by their nature may be performed only at the Closing);

(v)     The Company Restructuring shall have been consummated in accordance with the Company Restructuring Agreements, unless Sellers have provided notice in accordance with Section 7.10(b) of their intent not to consummate the Company Restructuring in respect of one or both of the ACON Blockers; provided, however, that if such notice relates to only one of the ACON Blockers, then this condition will remain in effect with respect to the Company Restructuring relating to the other ACON Blocker;

(vi)     Since the date of this Agreement, there shall not have occurred any event and no circumstance shall exist that constitutes or could reasonably be expected to result in a Material Adverse Effect; and

(vii)     Sellers shall have furnished BLC at the Closing with a certificate signed by an officer of each Seller, dated as of the Closing Date, certifying that the matters set forth in clauses (i) through (vi) of this Section 8.1(a) have been fulfilled (or, in the case of clause (v), not fulfilled in accordance with Sellers rights under Section 7.10(b)); provided, however, that the certifications in respect of clauses (i), (ii) and (iii) of this Section 8.1(a) shall be made on a joint and several basis.

     (b)    <u>Statutory Requirements; Litigation</u>.

        (i)    All waiting periods under the HSR Act applicable to the transactions contemplated hereby (and any extensions thereof) shall have expired or been terminated; and

        (ii)    There will not be any Order seeking to restrain, invalidate or prohibit the transactions contemplated hereby.

     (c)    <u>Closing Deliveries</u>.  The Sellers shall have executed and delivered (or caused to have been executed and delivered), as applicable, all other documents, instruments and certificates required by <u>Section 3.2(a)</u> to be delivered by any Fiesta Group Company or Seller at or prior to Closing.

    8.2    *Conditions of the Sellers to Closing*.  The obligation of the Sellers to effect the transactions contemplated by this Agreement at the Closing will be subject to the following conditions:

     (a)    <u>Representations, Warranties and Covenants of BLC</u>.

        (i)    (A) The BLC Fundamental Representations shall be true and correct in all respects (except for *de minimis* inaccuracies) at and as of the date of this Agreement and at and as of the Closing as if made at and as of the Closing, and (B) the representations and warranties of BLC set forth in <u>Article VI</u> (other than those that are the subject of <u>clause (A)</u>) shall be true and correct in all respects (ignoring and disregarding all materiality and material adverse effect qualifications set forth therein) at and as of the date of this Agreement and at and as of the Closing as if made at and as of the Closing, except in each case where the failure of such representations and warranties to be so true and correct could not constitute a BLC Material Adverse Effect; <u>provided</u>, <u>however</u>, that representations and warranties that are made as of a particular date or period shall be true and correct (in the manner set forth in <u>clause (A)</u> or <u>(B)</u>, as applicable) only as of such date or period;

        (ii)    BLC shall have performed (or caused to be performed) or complied with in all material respects all covenants required to be performed or complied with by BLC at or prior to the Closing under this Agreement (except for such covenants that by their nature may be performed only at the Closing);

        (iii)    BLC shall have furnished the Fiesta Representative at the Closing with a certificate certifying the matters set forth in <u>Section 8.2(a)(i)</u> through <u>8.2(a)(ii)</u>.

     (b)    <u>Statutory Requirements; Litigation</u>.

        (i)    All waiting periods under the HSR Act applicable to the transactions contemplated hereby (and any extensions thereof) shall have expired or been terminated; and

(ii)     There will not be any Order seeking to restrain, invalidate or prohibit the transactions contemplated hereby.

(c)     <u>Closing Deliveries</u>.  BLC shall have executed and delivered, as applicable, all other documents, instruments and certificates required by <u>Section 3.2(b)</u> to be executed and delivered by BLC at or prior to Closing.

## ARTICLE IX

## TAX MATTERS

9.1     *Responsibility for Straddle Period Taxes*.  Each Seller shall be responsible for any and all Taxes imposed on or with respect to any Fiesta Group Company or ACON Blocker for the portion of any Straddle Period ending on the Closing Date, except to the extent included in the calculation of Net Working Capital.  For purposes of allocating any Taxes related to a Straddle Period between the Pre-Closing Period and the period beginning after the Closing Date, (a) with respect to any Taxes imposed on a periodic basis and without regard to income earned or transactions occurring on a specific date, the amount of Taxes due for the portion of such period ending on the Closing Date shall be determined on a pro rata basis, based upon the number of days in the Tax period up to and including the Closing Date, as compared to the number of days after the Closing Date in such Tax period, and (b) with respect to any other Taxes, the amount of Taxes due for the portion of such period ending on the Closing Date shall be determined based upon an interim closing of the books at the end of the Closing Date (taking into account the income or operations of a subsidiary partnership or pass-through entity based upon an interim closing of the books of such subsidiary entity, and taking into account a proportionate part of any depreciation or other deductions that are determined for an entire Tax period without regard to such interim closing the books).  Notwithstanding any other provision in this Agreement (including this <u>Article IX</u>), to the extent BLC pays any Tax allocated to Seller under this <u>Section 9.1</u>, Sellers shall reimburse BLC within five (5) Business Days of receipt of notice.  For the avoidance of doubt, this <u>Section 9.1</u> applies only with respect to Taxes of a Straddle Period.

9.2     *Tax Allocation*.  Within 45 days after the Closing Date, BLC will deliver to the Fiesta Representative an allocation of the fair market value of the assets of the Fiesta Group Companies and any other items being acquired pursuant to this Agreement for the Fiesta Representative's review and reasonable comment (the "<u>Tax Allocation</u>").  BLC will incorporate any reasonable comments received from the Fiesta Representative within 45 days after delivery of the draft Tax Allocation, together with any adjustments necessitated by any subsequent adjustment to the Cash Consideration (which adjustments shall also be subject to the Fiesta Representative's reasonable comment and the foregoing provisions relating to such reasonable comment), and thereafter will deliver a revised Tax Allocation to the Fiesta Representative.  Each Party agrees (a) that it will use the Tax Allocation as the basis for reporting Fiesta Group Company asset values and other items for purposes of all federal, state and local Tax Returns, and (b) that neither they nor their Affiliates will take positions inconsistent with the Tax Allocation in notices to Governmental Authorities or in audit or other proceedings with respect to Taxes, except as otherwise required by applicable Law after consultation between BLC and the Sellers.

9.3     *Cooperation on Tax Matters.*

(i)     The Parties will cooperate in good faith with each other Party, in connection with the filing of Tax Returns and any audit, litigation or other proceeding with respect to Taxes relating to the transactions contemplated by this Agreement.  Such cooperation shall include the retention and (upon the other Party's request) the provision of records and information that are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

(ii)    BLC and the Sellers further agree, upon request, to use their commercially reasonable efforts to obtain any certificate or other document from any Governmental Authority as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed with respect to the transactions contemplated by this Agreement.

9.4     *Transfer Taxes.*  All transfer, documentary, sales, use, stamp, registration and other such Taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection the transaction contemplated by this Agreement ("Transfer Taxes") shall be borne 50% by BLC and 50% by Sellers.  Each Party will file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes, and, if required by applicable law, join in the execution of any such Tax Returns and other documentation. For the avoidance of doubt, the term "Transfer Taxes" does not include any amount incurred in connection with the Company Restructuring or any other pre-Closing restructuring or any other transfers other than the transactions specifically referenced in the previous sentence.  To the extent a Party is required to pay an amount of Transfer Taxes in excess of its share hereunder, the other Parties shall make a payment to such Party of their respective shares of the Transfer Taxes paid by such Party.

9.5     *Tax Returns.*  BLC shall prepare or cause to be prepared all Tax Returns for the Fiesta Group Companies and the ACON Blockers for all periods ending on or prior to the Closing Date that are due after the Closing Date and for all Straddle Periods.  BLC shall deliver to the Fiesta Representative copies of such Tax Returns at least thirty (30) days prior to the due date for filing any such Tax Return (taking into account all applicable extensions).  The Fiesta Representative shall have the right to review any such Tax Return prior to its filing and, within fifteen (15) days after the date of receipt by the Fiesta Representative of any such Tax Return, provide written comments to any such Tax Return, and BLC shall reflect any such comments in any such Tax Return unless otherwise required by Law or unless such comment is inconsistent with past Tax practice of the ACON Blockers or the Fiesta Group Companies, as applicable.

9.6     *Refunds.*  If, after the Closing Date, BLC or any of its Subsidiaries (including the Fiesta Group Companies and the ACON Blockers) or Affiliates receives, with respect to a Pre-Closing Period, a refund (whether received in cash or as an offset against other Taxes) of any Tax paid by any Fiesta Group Company, ACON Blocker or Seller (or any Affiliate of any Seller), BLC shall pay to the Fiesta Representative for the benefit of the Sellers, within fifteen (15) days after receipt, an amount equal to such refund or offset (including any interest or other amount received or credited thereon), except to the extent such refund or offset is included in the calculation of the amount of Net Working Capital.

9.7     *Audits*.  Following the Closing, BLC shall control all audits or administrative or judicial proceedings relating to Taxes of the Fiesta Group Companies and the ACON Blockers, except as otherwise provided in this <u>Section 9.7</u>.  In the case of an audit or administrative or judicial proceeding that relates to Pre-Closing Periods for which BLC may otherwise seek indemnification from the Sellers under this Agreement, the Fiesta Representative shall have the right, at the expense of the Sellers, to control the conduct of the portion that relates to Pre-Closing Periods, and BLC shall have the right, at its expense, to participate in such audit or proceeding.  If the Fiesta Representative chooses not to control such audit or proceeding, the Fiesta Representative shall have the right, at the expense of the Sellers, to participate in such audit or proceeding.  The Party controlling an audit or proceeding for a Pre-Closing Period shall in any event keep the other Party informed of the progress of such audit or proceeding, shall promptly provide the other Party with copies of all material documents (including material notices, protests, briefs, written rulings and determinations and correspondence) pertaining to such audit or proceeding and shall not settle such audit or proceeding for a Pre-Closing Period without the other Party's advance written consent (which consent shall not be unreasonably withheld, conditioned or delayed) unless, with respect to any settlement proposed by the Fiesta Representative, such settlement (x) does not involve any finding or admission of any wrongdoing by any Fiesta Group Company or ACON Blocker, (y) does not involve any relief other than monetary damages and (z) does not require the consent of the provider of the BLC R&W Policy.

9.8     *Amended Returns*.  None of BLC or any of its Affiliates (including, from and after the Closing Date, the Fiesta Group Companies and the ACON Blockers) shall amend, re-file, revoke or otherwise modify any Tax Return or modify any Tax election of any of the Fiesta Group Companies or ACON Blockers with respect to a Pre-Closing Period without the prior written consent of the Fiesta Representative, such consent not to be unreasonably withheld, conditioned or delayed.

## ARTICLE X

## TERMINATION

10.1     *Termination*.     This Agreement may be terminated and the transactions contemplated by this Agreement may be abandoned at any time prior to the Closing Date, as follows:

(a)     by mutual written agreement of the Fiesta Representative and BLC;

(b)     by BLC, if there has been a breach by any Seller of any covenant, representation or warranty contained in this Agreement, or if any such representation or warranty shall have become untrue, in either case that would be reasonably expected to prevent or has prevented the satisfaction of any condition to the obligations of BLC at the Closing contained in <u>Section 8.1(a)(i)</u>, <u>Section 8.1(a)(ii)</u> <u>Section 8.1(a)(iii)</u>, <u>Section 8.1(a)(iv)</u> and <u>Section 8.1(a)(v)</u> from being satisfied, and such breach has not been waived in writing by BLC or, if capable of being cured, is not cured by the applicable Seller on or prior to the date that is 30 days after written notice thereof has been provided by BLC; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this <u>Section 10.1(b)</u> shall not be available to BLC if BLC (x) is in material breach of any representation, warranty, covenant or other agreement contained in this Agreement or

(y) fails to exercise such termination right within ten (10) Business Days following the expiration of the thirty (30) day cure period described in this <u>Section 10.1(b)</u>;

   (c) by the Fiesta Representative, if there has been a breach by BLC of any covenant, representation or warranty contained in this Agreement, or if any such representation or warranty shall have become untrue, in either case that would be reasonably expected to prevent or has prevented the satisfaction of any condition to the obligations of the Sellers at the Closing contained in <u>Section 8.1(a)(i)</u> or <u>Section 8.2(a)(ii)</u> from being satisfied, and such breach has not been waived in writing by the Fiesta Representative or, if capable of being cured, is not cured by BLC, as applicable, on or prior to the date that is 30 days after written notice thereof has been provided by the Fiesta Representative; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this <u>Section 10.1(c)</u> shall not be available to the Fiesta Representative if any Seller (x) is in material breach of any representation, warranty, covenant or other agreement contained in this Agreement or (y) fails to exercise such termination right within ten (10) Business Days following the expiration of the thirty (30) day cure period described in this <u>Section 10.1(c)</u>; or

   (d) by either BLC or the Fiesta Representative upon written notice to the other, if the Closing shall not have occurred on or before the Outside Date; <u>provided</u>, <u>however</u>, that BLC may not terminate this Agreement pursuant to this <u>Section 10.1(d)</u> if such non-occurrence of the Closing prior to the Outside Date is due to the failure of BLC to perform or observe in all material respects the covenants and agreements contained herein to be performed or observed by it, and the Fiesta Representative may not terminate this Agreement pursuant to this <u>Section 10.1(d)</u> if such non-occurrence of the Closing prior to the Outside Date is due to the failure of any Seller to perform or observe in all material respects the covenants and agreements contained herein to be performed or observed by it;

   (e) by either BLC or the Fiesta Representative, if the consummation of the transactions contemplated hereby is permanently enjoined, prohibited or otherwise permanently restrained by the terms of a final, non-appealable Order or if there shall be an applicable Law making the consummation of the Closing under this Agreement illegal;

   (f) by BLC, upon the occurrence of an event after the date of this Agreement or the existence of a circumstance that constitutes a Material Adverse Effect, and such Material Adverse Effect, if capable of being cured, is not cured by the applicable Seller on or prior to the date that is 30 days after written notice thereof has been provided by BLC; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this <u>Section 10.1(f)</u> shall not be available to BLC if BLC (x) is in material breach of any representation, warranty, covenant or other agreement contained in this Agreement or (y) fails to exercise such termination right within ten (10) Business Days following the expiration of the thirty (30) day cure period described in this <u>Section 10.1(f)</u>;

   (g) by Fiesta Representative, upon the occurrence of an event after the date of this Agreement or the existence of a circumstance that constitutes a BLC Material Adverse Effect, and such BLC Material Adverse Effect, if capable of being cured, is not cured by BLC on or prior to the date that is 30 days after written notice thereof has been provided by the Fiesta Representative; <u>provided</u>, <u>however</u>, that the right to terminate this Agreement under this <u>Section 10.1(g)</u> shall not be available to the Fiesta Representative if any Seller (x) is in material

breach of any representation, warranty, covenant or other agreement contained in this Agreement or (y) fails to exercise such termination right within ten (10) Business Days following the expiration of the thirty (30) day cure period described in this Section 10.1(g); or

(h)     by Fiesta Representative if (i) all of the conditions set forth in Section 8.1 have been satisfied or waived in writing (other than those conditions that by their nature are to be satisfied by actions taken at the Closing), (ii) the Fiesta Representative has indicated to BLC in writing that Sellers are ready, willing and able to consummate the transactions contemplated by this Agreement (subject to the satisfaction or waiver of all conditions set forth in Section 8.2(a) that by their nature are to be satisfied by actions taken at the Closing) and (iii) BLC fails to consummate the Closing on the date designated for Closing pursuant to Section 3.1 (or, if the notice contemplated by the foregoing clause (ii) is delivered after such date, then five Business Days after the date on which such notice is delivered).

(i)     by BLC if (i) all of the conditions set forth in Section 8.2 have been satisfied or waived in writing (other than those conditions that by their nature are to be satisfied by actions taken at the Closing), (ii) BLC has indicated to the Fiesta Representative in writing that BLC is ready, willing and able to consummate the transactions contemplated by this Agreement (subject to the satisfaction or waiver of all conditions set forth in Section 8.1 that by their nature are to be satisfied by actions taken at the Closing) and (iii) Seller fail to consummate the Closing on the date designated for Closing pursuant to Section 3.1 (or, if the notice contemplated by the foregoing clause (ii) is delivered after such date, then five Business Days after the date on which such notice is delivered).

10.2    *Effect of Termination*.  In the event of the valid termination of this Agreement pursuant to Section 10.1, (a) written notice thereof shall be given to all other Parties by the terminating Party, (b) this Agreement shall forthwith become void and have no further effect, except for the provisions of this Article X, Section 7.12(e), Section 12.2, Section 12.7, Section 12.11, Section 12.12 and Section 12.13 and (c) there shall be no liability under this Agreement on the part of BLC or any Seller or Fiesta Group Company to any Party or any of the respective officers, directors or equityholders of any Party, and all rights and obligations of each Party shall cease (other than as provided in the remaining provisions of this Section 10.2); provided, however, that nothing herein shall relieve any party from liability for any willful breach occurring prior to such termination or for Fraud; provided further that the obligations of the parties under the Confidentiality Agreement shall continue in full force and effect in accordance with its terms.  The Parties agree not to bring any lawsuit, action or claim against any other Party inconsistent with the foregoing provisions of this Section 10.2.

10.3    *Remedies for Breach*.

(a)     If the Fiesta Representative may terminate this Agreement under Section 10.1(c) or Section 10.1(d) and BLC's breach or failure to perform its representations, warranties, covenants or agreements hereunder, individually or in the aggregate, with all other breaches and failures to perform that have not been waived in writing, are preventing or have prevented the satisfaction of any of the conditions set forth in Section 8.2, then the Fiesta Representative may seek an injunction, specific performance or other equitable relief to enforce specifically the terms and provisions of this Agreement.  For the avoidance of doubt, Sellers (or

78

the Fiesta Representative, on their behalf) shall be entitled to specific performance to cause BLC to consummate the Closing in accordance with Section 3.1 on the terms of this Agreement if (i) all of the conditions set forth in Section 8.1 have been satisfied (other than those conditions that by their nature are to be satisfied by actions taken at the Closing), and (ii) the Fiesta Representative has indicated to BLC in writing that Sellers are ready, willing and able to consummate the transactions contemplated by this Agreement (subject to the satisfaction or waiver of all conditions set forth in Section 8.2(a) that by their nature are to be satisfied by actions taken at the Closing).

(b)     If BLC may terminate this Agreement under Section 10.1(b) or Section 10.1(d) and any Seller's breach or failure to perform its representations, warranties, covenants or agreements hereunder, individually or in the aggregate, with all other breaches and failures to perform that have not been waived in writing, are preventing or have prevented the satisfaction of any of the conditions set forth in Section 8.1, then BLC may seek an injunction, specific performance or other equitable relief to enforce specifically the terms and provisions of this Agreement.  For the avoidance of doubt, BLC shall be entitled to specific performance to cause Sellers to consummate the Closing in accordance with Section 3.1 on the terms of this Agreement if (i) all of the conditions set forth in Section 8.2 have been satisfied (other than those conditions that by their nature are to be satisfied by actions taken at the Closing), and (ii) BLC has indicated to the Fiesta Representative in writing that BLC is ready, willing and able to consummate the transactions contemplated by this Agreement (subject to the satisfaction or waiver of all conditions set forth in Section 8.1(a) that by their nature are to be satisfied by actions taken at the Closing).

(c)     If this Agreement is terminated under Section 10.1, the Parties will have no obligation or liability to one another hereunder other than as set forth in this Article X and the Confidentiality Agreement.

(d)     If this Agreement is terminated under Section 10.1(b), Section 10.1(d) or Section 10.1(f) and the Fiesta Representative is not entitled to the remedies contemplated by Section 10.2 or 10.3(a) therefor, then, within fifteen (15) Business Days of such termination, the Fiesta Representative will pay BLC an amount equal to the BLC R&W Policy Premium Reimbursement Amount by wire transfer of immediately available funds to an account designated in writing by BLC to the Fiesta Representative, but only to the extent of amounts actually paid by BLC and its Affiliates to the BLC R&W Provider (net of amounts returned by the BLC R&W Provider to BLC or its Affiliates).  If this Agreement is terminated under Section 10.1(c), 10.1(d), 10.1(g) or 10.1(h) and BLC is not entitled to the remedies contemplated by Section 10.2 or Section 10.3(b) therefor, then, within fifteen (15) Business Days of such termination, BLC shall reimburse the Company and its Subsidiaries for all out of pocket costs and expenses pursuant to Section 7.12(e).

## ARTICLE XI

## INDEMNIFICATION

11.1    *Survival*.

(a)    Survival of Representations and Warranties.   The representations and warranties hereunder will survive the Closing for the following periods after the Closing Date:

(i)    the Fundamental Representations will survive until the six (6) year anniversary of the Closing Date;

(ii)    the representations and warranties in Section 4.15, Section 4.22(b), and Section 5.3(f) will survive until the date that is sixty (60) days following the expiration of the applicable statute of limitations; and

(iii)    all other representations and warranties in Article IV, Article V, and Article VI will survive until the date that is eighteen (18) months after the Closing Date.

(b)    The covenants and agreements of the Parties in this Agreement (other than the covenants and agreements set forth in Sections 7.12 and 7.13 and in Article IX) and the other Documents to be performed at or prior to the Closing Date will survive the Closing for a period of nine (9) months after the Closing Date.   The covenants and agreements in Article IX to be performed at or prior to the Closing Date shall survive until the date that is sixty (60) days following the expiration of the applicable statute of limitations.   The covenants and agreements of the Sellers and the Fiesta Group Companies set forth in Section 7.13 and the covenants and agreements of BLC and its Affiliates set forth in Section 7.12, in each case, shall terminate effective as of the Closing and shall not, for any purpose survive the Closing and, from and after the Closing, no Person shall be entitled to make any claim or demand (whether in contract, in tort or otherwise) or bring any cause of action (whether at law, in equity or otherwise) in respect of any failure of a Party to perform or comply with any covenant or agreement set forth in Sections 7.12 and 7.13 requiring performance or compliance prior to the Closing.   The covenants and agreements of the Parties in this Agreement and the other Documents to be performed after the Closing will survive the Closing until fully performed.

(c)    The date of expiration of any representation, warranty or covenant is referred to herein as the "Termination Date."   Representations, warranties and covenants under this Agreement will be of no further force or effect after the applicable Termination Date; provided, however, that the indemnification obligations set forth herein will not terminate with respect to any *bona fide* claim asserted by an Indemnified Party prior to the applicable Termination Date in accordance with the terms of Section 11.5 until such claim is finally resolved pursuant to this Article XI.

11.2    *Indemnification*.

(a)    Seller Indemnification Obligations.   Following the Closing, the Sellers agree to defend, indemnify and hold harmless each of BLC, its Subsidiaries and their respective Affiliates, successors, assigns, officers, directors and equityholders (the "BLC Indemnitees") from

and against any and all demands, claims, actions, causes of action, assessments, losses, damages, liabilities, costs and expenses, including litigation costs and all reasonable attorneys' fees and expenses ("Losses"), directly or indirectly, arising out of or resulting from:

> (i)     any breach or inaccuracy of any of the representations or warranties of any Seller set forth in this Agreement (it being agreed and acknowledged by the Parties that, for purposes of the right to indemnification pursuant to this Section 11.2(a)(i), such representations and warranties shall be deemed to have been made as of the date of this Agreement and as of the Closing Date with the same force and effect as if made on and as of the Closing Date (other than those representations and warranties that are made as of a particular date, which shall be deemed to have been made only as of such particular date));

> (ii)    any breach by any Seller of any covenant or agreement to be performed by it under this Agreement;

> (iii)   any claim made by any Seller or any Affiliate thereof relating to or arising out of the allocation of the Cash Consideration; or

> (iv)    the matters set forth on Appendix D.

Subject and without limitation to Section 11.3(b), the indemnification obligations of the Sellers under this Article XI shall be on a joint and several basis.  The BLC Indemnitees agree that, with the exception of, and subject to, the BLC Indemnitees rights to indemnification under this Agreement, with respect to any potential claim, cause of action, or other right of recovery the Company or BLC Indemnitees might have, whether in law or in equity, arising out of or relating to any of the matters set forth on Appendix D, the Sellers shall be subrogated in place of the Company or the BLC Indemnitees, as appropriate, and all such claims, causes or action, or other rights of recovery are hereby assigned to Sellers.  For the avoidance of doubt, the subrogation and/or assignment in the preceding sentence is effective with regard to each of the matters set forth on Appendix D even if the Sellers elect not to assume the defense of some or all of those matters under Section 11.5(b).

> (b)     BLC Indemnification Obligations.  Following the Closing, BLC agrees to defend, indemnify and hold harmless the Sellers and their respective Affiliates, successors, assigns, officers, directors and equityholders (the "Fiesta Indemnitees") from and against any and all Losses arising out of or resulting from:

> (i)     any breach or inaccuracy of any of the representations or warranties of BLC set forth in this Agreement (it being agreed and acknowledged by the Parties that, for purposes of the right to indemnification pursuant to this Section 11.2(b)(i), such representations and warranties shall be deemed to have been made as of the date of this Agreement and the Closing Date with the same force and effect as if made on and as of the Closing Date (other than those representations and warranties that are made as of a particular date, which shall be deemed to have been made only as of such particular date)); or

> (ii)    any breach by BLC of any covenant or agreement to be performed by it under this Agreement.

81

(c)     Notwithstanding anything to the contrary in this <u>Article XI</u>, for purposes of determining (i) whether a breach or inaccuracy of any representation or warranty set forth in this Agreement has occurred and (ii) the amount of Losses incurred or suffered with respect to such breach or inaccuracy, in each case, any reference to "materiality" or "Material Adverse Effect" or other terms of similar import of effect in the applicable representation or warranty will be disregarded.

11.3    *Seller Indemnification – Limitations.*

(a)     The Sellers will not be required to indemnify and will not have any liability to indemnify the BLC Indemnitees for any Losses under <u>Section 11.2(a)(i)</u>:

(i)     for any individual item where the total Losses relating thereto are less than the De Minimis Amount;

(ii)    unless and until the aggregate amount of Qualifying Losses exceeds the Threshold Amount, at which point the Sellers will be obligated to indemnify the BLC Indemnitees only for the total amount of such Qualifying Losses in excess of such Threshold Amount; and

(iii)   to the extent the aggregate amount of all Qualifying Losses in excess of the Threshold Amount is in excess of an amount equal to the Fiesta Cap.

(b)     Notwithstanding the foregoing, the limitations set forth in <u>Section 11.3(a)</u> shall not apply to Losses based upon, arising out of, with respect to or by reason of (A) <u>Sections 11.2(a)(ii)</u>, <u>11.2(a)(iii)</u> or <u>11.2(a)(iv)</u>, (B) any breach or inaccuracy of any Fiesta Fundamental Representation, Fiesta Holdings Fundamental Representation, ACON Aggregator Fundamental Representation, or the representations and warranties in <u>Section 4.15</u>, <u>Section 4.22(b)</u> or <u>Section 5.3(f)</u>, or (C) any claim for Fraud; <u>provided</u>, <u>however</u>, that the maximum aggregate indemnification obligations of the Sellers in respect of Losses based upon, arising out of, with respect to or by reason of the matters set forth in the foregoing <u>clauses (A)</u> and <u>(B)</u> shall not exceed an amount equal to the Cash Consideration (as adjusted pursuant to <u>Section 2.3</u>); <u>provided</u> <u>further</u> that in no event will the Sellers' indemnification obligations with respect to claims for Fraud be limited by this <u>Section 11.3(b)</u>.

(c)     No Seller will have any indemnification obligation with respect to (A) any breach or inaccuracy of a representation or warranty in <u>Article V</u> made by any other Seller or (B) the breach of any covenant to be performed by any particular Seller other than such Seller.

(d)     If there is determined to be any amount owing to a BLC Indemnitee as a result of indemnification under <u>Section 11.2(a)</u>, the recovery of Losses for such BLC Indemnitee shall be as follows:

(i)     For indemnification for Losses under <u>Section 11.2(a)(i)</u> (other than (x) due to a breach of a Fiesta Fundamental Representation, a Fiesta Holdings Fundamental Representation, an ACON Aggregator Fundamental Representation or any of the representations and warranties in <u>Section 4.15</u>, <u>Section 4.22(b)</u> or <u>Section 5.3(f)</u>, or (y) a claim for Fraud), subject to <u>Section 11.3(a)</u>, for all Qualifying Losses (A) first, the BLC

Indemnitee will incur all Qualifying Losses up to the Threshold Amount; (B) second, from Sellers for all Qualifying Losses in excess of the Threshold Amount up to, and not in excess of, an amount equal to the Fiesta Cap; and (C) thereafter, from the BLC R&W Policy.  For the avoidance of doubt, for indemnification described under this Section 11.3(d)(i), once the Sellers pay amounts to the BLC Indemnitees in accordance with clause (B) hereof, equal to an amount equal to the Fiesta Cap, BLC Indemnitee's sole recourse shall be against the BLC R&W Policy.

(ii)     For indemnification under Section 11.2(a)(i) due to a breach of a Fiesta Fundamental Representation, a Fiesta Holdings Fundamental Representation, an ACON Aggregator Fundamental Representation or the representations and warranties in Section 4.15, Section 4.22(b) or Section 5.3(f) (other than in the case of a claim for Fraud), (A) first, from Sellers for Losses up to, and not in excess of, an amount equal to the Fiesta Cap; (B) second, from the BLC R&W Policy in an amount up to the then-remaining limit of liability under the BLC R&W Policy; and (C) thereafter, from the Sellers for Losses after the limit of liability under the BLC R&W Policy is reached up to the amount of the Cash Consideration (as adjusted pursuant to Section 2.3).

(iii)    For indemnification for Losses under Section 11.2(a)(ii), Section 11.2(a)(iii), or Section 11.2(a)(iv) from the Sellers up to the amount of the Cash Consideration (as adjusted pursuant to Section 2.3).

(iv)    For claims for Fraud from the Sellers, without regard to any De Minimis Amount, Threshold or cap (including the Fiesta Cap).

(e)     BLC hereby covenants and agrees that, to the extent that it may bring a claim for indemnification pursuant to either Section 11.2(a)(i) or Section 11.2(a)(ii), that it shall bring such claim under Section 11.2(a)(i); provided, however, that to the extent that any such claim for indemnification is based on intentional breach or intentional non-fulfillment of any covenant or agreement to be performed by any Seller prior to Closing pursuant to this Agreement, then BLC may elect to bring such claim under either Section 11.2(a)(i) or Section 11.2(a)(ii).

(f)     For the avoidance of doubt,  and notwithstanding any provision of this Agreement to the contrary, Sellers shall have no obligation to indemnify the BLC Indemnitees for any Taxes imposed on or with respect to the Fiesta Group Companies or the ACON Blockers with respect to any Tax period or portion of a Tax period subsequent to the Closing Date.

11.4     *BLC Indemnification – Limitations*.

(a)     BLC will not be required to indemnify and will not have any liability to indemnify the Fiesta Indemnitees for any Losses under Section 11.2(b):

(i)      for any individual item where the total Losses relating thereto are less than the De Minimis Amount;

(ii)     unless and until the aggregate amount of Qualifying Losses exceeds the Threshold Amount, at which point BLC will be obligated to indemnify the Fiesta

Indemnitees only for the total amount of such Qualifying Losses in excess of such Threshold Amount; and

(iii)    to the extent the aggregate amount of all Qualifying Losses in excess of the Threshold Amount is in excess of an amount equal to the BLC Cap.

(b)    Notwithstanding the foregoing, the limitations set forth in Section 11.4(a) shall not apply to Losses based upon, arising out of, with respect to or by reason of (A) Section 11.2(b)(ii), (B) any breach or inaccuracy of any BLC Fundamental Representation or (C) any claim for Fraud; provided, however, that the maximum aggregate indemnification obligations of BLC in respect of Losses based upon, arising out of, with respect to or by reason of the matters set forth in the foregoing clauses (A) and (B) shall not exceed an amount equal to the Cash Consideration (as adjusted pursuant to Section 2.3); provided further that in no event will BLC's indemnification obligations with respect to claims for Fraud be limited by this Section 11.4(b).

11.5    *Assertion of Claims*.    All claims for indemnification by any of the Fiesta Indemnitees or any of the BLC Indemnitees under Section 11.2 shall be asserted and resolved as follows:

(a)    *Third Party Claims*.    Any Person claiming indemnification hereunder is hereinafter referred to as the "Indemnified Party" and any Person against whom such claims are asserted hereunder is hereinafter referred to as the "Indemnifying Party."  In the event that any Losses are asserted against or sought to be collected from an Indemnified Party by a third party (a "Third Party Claim"), such Indemnified Party shall with reasonable promptness notify the Indemnifying Party of the Losses, specifying the nature of and specific basis for such Losses and the indemnity claim and the amount or the estimated amount thereof to the extent then feasible and enclosing a copy of all papers (if any) served with respect to the claim (the "Claim Notice"). The Indemnifying Party shall not be obligated to indemnify the Indemnified Party with respect to any such Losses if the Indemnified Party fails to notify the Indemnifying Party thereof in accordance with the provisions of this Agreement in reasonably sufficient time so that the Indemnifying Party's ability to defend against the Losses is not prejudiced.

(b)    *Assumption*.    The Indemnifying Party shall have 30 days from the date the Claim Notice is received in accordance with the notice provisions hereof (the "Notice Period") to notify the Indemnified Party (i) whether it disputes the liability of the Indemnifying Party to the Indemnified Party hereunder with respect to such Losses and (ii) whether it desires, at the sole cost and expense of the Indemnifying Party, to defend the Indemnified Party against such Losses, which election to defend may be made without prejudicing the Indemnifying Party as to its liability hereunder (other than with respect to the costs of defense incurred by such Indemnifying Party). In the event that the Indemnifying Party notifies the Indemnified Party within the Notice Period that it desires to defend the Indemnified Party against such Losses and except as hereinafter provided, the Indemnifying Party shall have the right to defend by all appropriate proceedings, and with counsel of its own choosing, which proceedings shall be promptly settled or prosecuted by them to a final conclusion (unless the Indemnified Party believes in good faith that the entirety of such Third Party Claim will be covered by, or reduce the retention under, the BLC R&W Policy, in which case the Indemnified Party will have the right to defend such Third Party Claim as set

forth in Section 11.5(c)).  If the Indemnified Party desires to participate in, but not control, any such defense or settlement, it may do so at its sole cost and expense.  If requested by the Indemnifying Party, the Indemnified Party agrees to cooperate with the Indemnifying Party and its counsel in contesting any Losses that the Indemnifying Party elects to contest, or, if appropriate and related to the claim in question, in making any counterclaim against the Person asserting the third party Losses, or any cross-complaint against any Person.  If the Indemnifying Party assumes the defense of a Third Party Claim, the Indemnifying Party shall not settle such Third Party Claim without the consent of the Indemnified Party (which consent shall not be unreasonably withheld, conditioned or delayed) unless such settlement (w) does not involve any finding or admission of any wrongdoing by the Indemnified Party, (x) does not involve any relief other than monetary damages, (y) provides a customary release of the Indemnified Party in connection with such Third Party Claim and (z) does not require the consent of the provider of the BLC R&W Policy; provided, however, that this clause (z) shall not apply with respect to the settlement of any matter that gives rise to indemnification pursuant to Section 11.2(a)(ii) (to the extent BLC is not required to first assert such claims under Section 11.2(a)(i), as required by Section 11.3(e)), Section 11.2(a)(iii) or Section 11.2(a)(iv).

(c)     If the Indemnifying Party does not notify the Indemnified Party within 30 days after the receipt of a Claim Notice that it elects to undertake the defense thereof or the Indemnified Party is otherwise permitted to assume defense of any Third Party Claim pursuant to the terms of Section 11.5(b), the Indemnified Party shall have the right to defend at the expense of the Indemnifying Party the claim with counsel of its choosing reasonably satisfactory to the Indemnifying Party, subject to the right of the Indemnifying Party to assume the defense of any claim at any time prior to settlement or final determination thereof.  In the case of this clause (c), the Indemnified Party shall send a written notice to the Indemnifying Party of any proposed settlement of any claim received by the Indemnified Party and no claim may be settled or otherwise compromised without the prior written consent of the Indemnifying Party, which consent will not be unreasonably withheld, conditioned or delayed.

(d)     *Direct Claims*.  In the event any Indemnified Party has a claim against any Indemnifying Party under this Article XI that does not involve a Third Party Claim, the Indemnified Party shall deliver notice of such claim to the Indemnifying Party (setting forth in detail the facts giving rise to such claim (to the extent known by the Indemnified Party) and the amount or estimated amount (to the extent reasonably estimable) of Losses arising out of such claim) promptly after becoming aware of such claim.

(e)     *No Duplication*.  Notwithstanding anything to the contrary in this Agreement, it is intended that the provisions of this Agreement will not result in a duplicative payment of any amount required to be paid under this Agreement, and this Agreement shall be construed accordingly.  Furthermore, no Party will have any indemnification obligation hereunder with respect to any item that was taken into account in calculating the final Adjustment Amount or final adjusted Cash Consideration, or that was raised as part of the settlement of the final Adjustment Amount or final adjusted Cash Consideration as contemplated by Section 2.3.

11.6     *Payment of Losses*.

(a)     Promptly, and in any event within five Business Days following the final determination of the amount of any Losses payable to any BLC Indemnitee pursuant to this Article XI (and subject in all events to any applicable limitations set forth in this Article XI), the Fiesta Representative shall pay, on behalf of the applicable Indemnifying Party or Indemnifying Parties, to BLC the amount of such Losses, for disbursement to the applicable BLC Indemnitee(s).

(b)     Promptly, and in any event within five Business Days following the final determination of the amount of any Losses payable to a Fiesta Indemnitee pursuant to this Article XI (and subject in all events to any applicable limitations set forth in this Article XI), BLC shall pay the Fiesta Representative the amount of such Losses, for disbursement to the applicable Fiesta Indemnitees(s).

11.7     *Exclusive Remedy; Waiver*.  Except as contemplated in Section 2.3(d), Section 10.3 or Section 12.11, the indemnification provisions of this Article XI will be the sole and exclusive remedy following the Closing for any breach or alleged breach of any representation, warranty or other provision of this Agreement or the transactions contemplated hereby other than in the case of Fraud by a Party.  Except in the case of Fraud, each of the Parties, on behalf of itself and its Affiliates, agrees not to bring any actions or proceedings, at law, equity or otherwise, against any other Party or its Affiliates, in respect of any breaches or alleged breaches of any representation, warranty or other provision of this Agreement or the transactions contemplated hereby, except pursuant to the express provisions of this Article XI; provided, however, that equitable relief, including the remedies of specific performance and injunction, will be available with respect to any breach or threatened breach hereof.

## ARTICLE XII

## MISCELLANEOUS

12.1     *No Third Party Beneficiaries*.  Except to the extent expressly set forth herein, including this Section 12.1, nothing in this Agreement shall provide any benefit to any third party or entitle any third party to any claim, cause of action, remedy or right of any kind, it being the intent of the parties that this Agreement shall not be construed as a third party beneficiary contract; provided, however, that (a) the indemnification provisions in Section 11.2 shall inure to the benefit of the BLC Indemnitees and the Fiesta Indemnitees as provided therein; and (b) the provisions of Sections 12.6, 12.9, 12.13(a), 12.13(c) and 12.18 and this Section 12.1 shall be enforceable by each of the Debt Financing Sources and each is an intended third party beneficiary thereof; and (c) the provisions of Section 7.11 shall inure to the benefit of the D&O Indemnified Persons.

12.2     *Notices*.  All notices, requests, demands or other communications that are required or may be given pursuant to the terms of this Agreement shall be in writing and shall be deemed to have been duly given:  (a) on the date of delivery, if personally delivered by hand; (b) upon the fourth day after such notice is deposited in the United States mail, if mailed by registered or certified mail, postage prepaid, return receipt requested; (c) upon the date scheduled for delivery, if such notice is sent by a nationally recognized overnight express courier or (d) upon written

confirmation of receipt by the recipient of such notice (including any automatic confirmation that is received), if transmitted by electronic mail:

If to the Sellers, to:

Fiesta Holdings Investments, L.L.C.
1133 Connecticut Ave NW #700
Washington, DC 20036
Attention:  Kenneth Brotman
E-mail:  kbrotman@aconinvestments.com

with a copy to:

Hogan Lovells US LLP
7930 Jones Branch Dr., 9th Floor
McLean, VA 22102
Attention:  Adam Brown and Robert Welp
E-mail:  adam.brown@hoganlovells.com and robert.welp@hoganlovells.com

and in the case of BLC to:

Bodega Latina Corporation
14601B Lakewood Blvd.
Paramount, CA 90723
Attention:  Carlos Smith and Joe Angulo
E-mail:  Carlos.Smith@ElSuper.org and Joe.Angulo@ElSuper.org

with a copy to:

Sidley Austin LLP
1000 Louisiana St., Suite 6000
Houston, Texas 77002
Attention:  J. Mark Metts and Katy Lukaszewski
E-mail:  mmetts@sidley.com and klukaszewski@sidley.com

or at such other address or electronic mail address, as applicable, as may have been specified by like notice.

12.3    *Headings*.  The descriptive headings of the several Articles and Sections of this Agreement are inserted for convenience only and do not constitute a part of the Agreement.

12.4    *Entire Agreement*.  This Agreement and the other Documents to be executed hereunder, and the Exhibits and Appendices attached hereto constitute the entire agreement among the Parties pertaining to the subject matter hereof and supersede all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the parties pertaining to the subject matter hereof.

12.5    *Waiver*.   Any Party may (a) extend the time for the performance of any of the obligations or other acts of any other Party or (b) waive compliance with any of the agreements of any other party or with any conditions to its own obligations.  Any agreement on the part of a Party to any such extension or waiver will be valid only if set forth in an instrument in writing signed on behalf of such Party.   The consummation of the transactions contemplated hereby will not be deemed a waiver of the right any Party may have hereunder with respect to any other Party's representations, warranties, covenants or agreements contained in or related to this Agreement being incorrect, untrue or breached, except to the extent such representation, warranty, covenant or other agreement expressly terminates at the Closing pursuant to the terms of this Agreement. Notwithstanding the foregoing, any waiver executed by the Fiesta Representative shall be binding on each Seller and each Fiesta Group Company.

12.6    *Amendment*.   This Agreement may not be amended except by an instrument in writing signed by BLC and the Fiesta Representative.  No supplement, alteration or modification of this Agreement will be binding unless executed in writing by BLC and the Fiesta Representative. Notwithstanding the foregoing provisions of this Section 12.6, Sections 12.1, 12.9, 12.13(a), 12.13(c) and 12.18 and this Section 12.6 (and in each case, the definitions related thereto) may not be amended or modified in a manner that directly and specifically adversely relates to the Debt Financing Sources without the prior written consent of the Debt Financing Sources that are party to the Debt Commitment Letter.

12.7    *Public Statements*.   No Party (or any Affiliate thereof) will issue a press release or announcement concerning this Agreement and/or the transactions contemplated hereby without the prior written consent of the Fiesta Representative and BLC, except as required by applicable Law; provided, however, that, to the extent any disclosure is required by applicable Law (including, solely for purposes of this Section 12.7, non-U.S. statutes, laws, rules, regulations and securities exchange rules applicable to any Affiliate of BLC), the Party intending to make such disclosure shall use its commercially reasonable efforts consistent with applicable Law to consult with the Fiesta Representative or BLC, as applicable, with respect to the text thereof and; provided further that the Parties and their equityholders and their respective Affiliates shall be entitled to disclose such information to their respective employees, equity owners, partners, prospective partners, investors, prospective investors, professional advisors and lenders who have a need to know the information and who agree to keep such information confidential or are otherwise bound to confidentiality.  For the avoidance of doubt, disclosures resulting from the parties' efforts to obtain approval and/or early termination under the HSR Act and to make any related filing shall be deemed not to violate this Section 12.7.

12.8    *Further Actions*.   Each of the Parties, at another Party's request and without further consideration, will use all commercially reasonable efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things necessary, proper or advisable under applicable Laws, including obtaining any necessary consents or approvals from, or making any necessary filings with, any domestic or foreign regulatory agencies, and execute, acknowledge and deliver such documents and other papers, as may be required to carry out the provisions of this Agreement and consummate and make effective the transactions contemplated by this Agreement.

12.9    *Assignment*.   The provisions of this Agreement will be binding upon and inure to the benefit of the parties to this Agreement and their respective successors and assigns, but no

Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the written consent of each other Party to this Agreement; provided, however, that BLC and its Affiliates may assign their rights and interests hereunder as collateral for the purpose of securing the obligations under any financing arrangement, including those provided by any Debt Financing Source.

12.10   *Severability*.  If any term or other provision of this Agreement is illegal, invalid or unenforceable under any Law or as a matter of public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision contained herein is, to any extent, invalid or unenforceable in any respect under the Laws governing this Agreement, BLC and the Fiesta Representative shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

12.11   *Specific Performance*.  In the event of a breach or threatened breach by any Party of the provisions of this Agreement, any other Party will be entitled to specific performance, without the requirement to post a bond or any other form of security.  Nothing herein shall be construed as prohibiting any Party from pursuing any other remedies available for such breach or threatened breach, including the recovery of damages.  The Parties further agree not to assert that a remedy of specific performance is unenforceable, invalid, contrary to law or inequitable for any reason, nor to assert that a remedy of monetary damages would provide an adequate remedy.

12.12   *Governing Law*.  This Agreement and the other Documents delivered pursuant hereto and the legal relations between and among the Parties shall be governed and construed in accordance with the Laws of the State of Delaware without giving effect to its principles of conflict of Laws.

12.13   *Jurisdiction; Venue*.

(a)     Each of the Parties (i) irrevocably submits itself to the personal jurisdiction of all state and federal courts sitting in the State of Delaware, including to the jurisdiction of all courts to which an appeal may be taken from such courts, in any action, suit or proceeding arising out of or relating to this Agreement, any of the transactions contemplated by this Agreement or any facts and circumstances leading to its execution or performance, (ii) agrees that all claims in respect of any such action, suit or proceeding must be brought, heard and determined exclusively in the Court of Chancery of the State of Delaware (provided that, in the event subject matter jurisdiction is declined by or unavailable in the Court of Chancery, then such action, suit or proceeding will be heard and determined exclusively in any other state or federal court sitting in the State of Delaware), (iii) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from such courts, (iv) agrees not to bring any action, suit or proceeding against any other Party arising out of or relating to this Agreement, any of the transactions contemplated by this Agreement or any facts and circumstances leading to its execution or performance in any other court and (v) waives any defense of inconvenient forum to the maintenance of any action, suit or proceeding so brought.  The Parties agree that a final

judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.  Each of the Parties agrees to waive any bond, surety or other security that might be required of any other party with respect to any action, suit or proceeding, including any appeal thereof.  Notwithstanding the foregoing, no party hereto, nor any of its Affiliates, will bring, or support the bringing of, any claim, whether at law or in equity, whether in contract or in tort or otherwise, against any Debt Financing Source in any way relating to this Agreement or any of the transactions contemplated by this Agreement, including any dispute arising out of or relating in any way to the Debt Commitment Letter or the performance thereof, anywhere other than in (x) any New York State court sitting in the County of New York or (y) the United States District Court for the Southern District of New York.

(b)     Each of the Parties agrees that service of any process, summons, notice or document in accordance with Section 12.2 will be effective service of process for any action, suit or proceeding brought against it by the other Party in connection with Section 12.13(a); provided, however, that nothing contained herein will affect the right of any Party to serve legal process in any other manner permitted by applicable Law.  Notwithstanding the foregoing, the consents to jurisdiction set forth in this Section 12.13(b) will not constitute general consents to service of process in the State of Delaware and shall have no effect for any purpose except as provided in this Section 12.13 and will not be deemed to confer rights on any Person other than the parties.

(c)     EACH OF THE PARTIES HEREBY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREIN IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREIN OR THE FACTS OR CIRCUMSTANCES LEADING TO ITS EXECUTION OR PERFORMANCE (INCLUDING ANY DISPUTE ARISING OUT OF OR RELATING IN ANY WAY TO THE FINANCING OR THE PERFORMANCE THEREOF AGAINST ANY DEBT FINANCING SOURCE).  EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (i) NO PARTY OR REPRESENTATIVE OR AFFILIATE THEREOF HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, (iii) IT MAKES SUCH WAIVER KNOWINGLY AND VOLUNTARILY AND (iv) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED IN THIS PARAGRAPH.

12.14  *Counterparts*.  This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed an original but all of which together shall constitute one and the same instrument.  A facsimile or pdf counterpart of this Agreement shall be sufficient to bind a Party to the same extent as an original.

12.15   *Relationship Among Sellers*.

(a)   Each Seller hereby appoints Fiesta Holdings as the representative (the "Fiesta Representative") of such Seller to act as the agent and on behalf of such Seller for all purposes under this Agreement, including for the purposes of:   (i) determining whether the conditions to closing in Article VIII have been satisfied and supervising the Closing, including waiving any such condition if the Fiesta Representative, in its sole discretion, determine that such waiver is appropriate; (ii) taking any action that may be necessary or desirable, as determined by the Fiesta Representative in its sole discretion, in connection with the termination hereof in accordance with Article X; (iii) taking any and all actions that may be necessary or desirable, as determined by the Fiesta Representative in its sole discretion, in connection with the amendment hereof in accordance with Section 12.6; (iv) accepting notices on behalf of such Seller in accordance with Section 12.2; (v) executing and delivering, in the Fiesta Representative's capacity as the representative of such Seller, any and all notices, documents or certificates to be executed by the Fiesta Representative, on behalf of such Seller, in connection with this Agreement; (vi) granting any consent or approval on behalf of such Seller under this Agreement, (vii) acting on behalf of such Seller in any dispute, litigation or arbitration involving this Agreement and (viii) taking any and all other actions and doing any and all other things provided in or contemplated by this Agreement to be performed by such Seller or by the Fiesta Representative on behalf of such Seller.  As the representative of the Sellers, the Fiesta Representative will act as the agent for all Sellers and shall have authority to bind each Seller in accordance with this Agreement, and BLC may rely on such appointment and authority until the receipt of written notice of the appointment of a successor. Following the Closing, the Fiesta Representative shall have the right to resign and appoint a successor to serve as Fiesta Representative hereunder. Following such resignation, any reference to the Fiesta Representative herein shall be deemed to include such successor representative.

(b)   Each Seller (other than the Fiesta Representative) hereby appoints the Fiesta Representative as such Seller's true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, in such Seller's name, place and stead, in any and all capacities, in connection with this Agreement, granting unto said attorney-in-fact and agent full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection with the sale of the Acquired Units and the other transactions contemplated by this Agreement as fully to all intents and purposes as such Seller might or could do in person.

(c)   Without limiting the generality of this Section 12.15 and notwithstanding anything to the contrary contained in this Agreement, BLC shall be entitled to deal exclusively with the Fiesta Representative on all matters described in Section 12.15(a), and each BLC Indemnitee shall be entitled to deal exclusively with the Fiesta Representative on all matters relating to Article XI or Section 12.15(a) and each of them shall be entitled to rely conclusively (without further evidence of any kind whatsoever) on any document executed or purported to be executed on behalf of any Seller by the Fiesta Representative, and on any other action taken or purported to be taken by the Fiesta Representative on behalf of any Seller by the Fiesta Representative, as fully binding upon such Seller.

(d)   The Sellers acknowledge and agree that (i) the Fiesta Representative will allocate the Cash and Cash Equivalents of any ACON Blocker solely for the benefit of such ACON

Blocker's ACON Aggregator and (ii) with respect to any refund of any Taxes of any ACON Blocker or a credit against any Tax of any ACON Blocker attributable to a Pre-Closing Period received by the Fiesta Representative pursuant to <u>Article IX</u>, the amount of such refund or credit shall be for the benefit of such ACON Blocker's ACON Aggregator and will be distributed by the Fiesta Representative to such ACON Aggregator; <u>provided</u>, that each ACON Aggregator hereby agrees to return all or any portion of such refund within 15 days after notice from the Fiesta Representative.  In addition, the Sellers acknowledge and agree that (i) any payment in respect of any (A) Taxes which are a liability of a particular Seller with respect to the Company (or, in the case of an ACON Aggregator, with respect to its ACON Blocker) or (B) Losses attributable to the breach or inaccuracy of any representation or warranty of a Seller in <u>Article IV</u> or <u>Article V</u>, or (ii) payment by the Fiesta Representative on behalf of a particular Seller for the costs and expenses related to the preparation of the Tax Returns of the Fiesta Group Companies and any ACON Blocker, then such Seller (which shall, for the avoidance of doubt, be deemed to refer to the ACON Aggregator of any ACON Blocker that gave rise to a Tax, Loss or other payment pursuant to the foregoing clauses (i) or (ii)) shall indemnify and hold harmless each other Seller (or the Fiesta Representative, as applicable) for the amount thereof.

(e)      The Fiesta Representative shall not be entitled to any fee, commission or other compensation for the performance of its services hereunder, but shall be entitled to the payment of all its out-of-pocket expenses incurred as the Fiesta Representative. In connection with the foregoing, at the Closing, an aggregate amount of $750,000 (the "<u>Representative Expense Fund</u>") shall be transferred by or on behalf of the Company to the Fiesta Representative, to be used by the Fiesta Representative to pay expenses incurred by the Fiesta Representative in its capacity as the Fiesta Representative. Once the Fiesta Representative determines, in its sole discretion, that the Fiesta Representative will not incur any additional expenses in its capacity as the Fiesta Representative, then the Fiesta Representative will distribute the remaining unused Representative Expense Fund, if any, to the Sellers in accordance with their allocations set forth in the Consideration Spreadsheet. In connection with this Agreement and any instrument, agreement or document relating hereto, and in exercising or failing to exercise all or any of the powers conferred upon the Fiesta Representative hereunder (i) the Representative shall incur no responsibility whatsoever to any of the Sellers by reason of any error in judgment or other act or omission performed or omitted hereunder or in connection with any such other agreement, instrument or document, excepting only responsibility for any act or failure to act which represents willful misconduct, (ii) the Fiesta Representative shall not be liable to Sellers for any apportionment or distribution of payments made by the Fiesta Representative in good faith, and if any such apportionment or distribution is subsequently determined to have been made in error, the sole recourse of any Seller to whom payment was due, but not made or not made in full, shall be to recover from the other Sellers any payment in excess of the amount to which such Seller is determined to have been entitled, and (iii) the Fiesta Representative shall be entitled to rely on the advice of counsel, public accountants or other independent experts experienced in the matter at issue, and any error in judgment or other act or omission of the Fiesta Representative pursuant to such advice shall in no event subject the Fiesta Representative to liability to any of the Sellers. Each Seller shall indemnify, on a pro rata basis (based on such Seller's allocation set forth in the Consideration Spreadsheet), the Fiesta Representative against all Losses (including any and all expense whatsoever reasonably incurred in investigating, preparing or defending against any litigation, commenced or threatened or any claims whatsoever), arising out of or in connection with any claim, investigation, challenge, action or proceeding or in connection with any appeal

thereof, relating to the acts or omissions of the Fiesta Representative hereunder or otherwise in connection herewith. The foregoing indemnification shall not apply in the event of any action or proceeding which finally adjudicates the liability of the Fiesta Representative hereunder for its willful misconduct. In the event of any indemnification hereunder, upon written notice from the Fiesta Representative to the Sellers as to the existence of a deficiency toward the payment of any such indemnification amount, each Seller shall promptly deliver to the Fiesta Representative full payment of his, her or its ratable share of the amount of such deficiency (based on such Seller's allocation set forth in the Consideration Spreadsheet).

(f)     The Parties acknowledge and agree that the Fiesta Representative shall have no liability to, and shall not be liable for any Losses of, any Seller in connection with any obligations of the Fiesta Representative (in its capacity as such) under this Agreement or otherwise in respect of this Agreement or the transactions contemplated hereby, except to the extent that any act or omission by the Fiesta Representative is found by a final order of a court of competent jurisdiction to have constituted fraud or willful misconduct.

12.16   *Transaction Costs*.  The Parties will be responsible for their respective transaction costs, including any fees and expenses of any attorneys, accountants and advisors retained by them in connection with the transactions contemplated hereby (including the negotiation and documentation thereof).  BLC and the Sellers will each pay one-half of any filing or preparation fee in connection with any required antitrust or competition filing; provided, however, that the premiums for the BLC R&W Policy, with a coverage limit up to $26.5 million, shall be paid by (or, if paid by BLC, reimbursed by) the Sellers.  Furthermore, if (x) the coverage limit of the BLC R&W Policy with Ambridge Partners is less than $26.5 million and (y) BLC obtains a supplemental representation and warranty insurance policy relating to the transactions contemplated by this Agreement in an amount such that the aggregate coverage limit for the two policies is at least $26.5 million, then at the Closing the Sellers shall pay BLC an amount equal to the Second BLC R&W Policy Premium Amount.

12.17   *Legal Representation*.

(a)     The Parties acknowledge that Hogan Lovells US L.L.P. (the "Law Firm") was engaged by the Fiesta Group Companies and the ACON Blockers prior to the Closing for the purpose of serving as counsel to and advising the Fiesta Group Companies and the ACON Blockers in connection with the preparation and negotiation of this Agreement, the other Documents and the transactions contemplated hereby and thereby.  In such capacity the Law Firm has had access to confidential information of the Fiesta Group Companies and the ACON Blockers (the "Company Information") directly relating to the services that it has provided to the Fiesta Group Companies and the ACON Blockers.  In addition, the Law Firm has, in connection with the foregoing services, delivered or exchanged communications, either in writing or electronically, between or among the Sellers, and/or to or with the managers, directors, officers, accounting firm and/or employees of the Fiesta Group Companies and the ACON Blockers, as well as having developed or prepared files, attorney notes, drafts or other documents directly relating to this Agreement, the other Documents and the transactions contemplated hereby and thereby, which predate the Closing (collectively, the "Law Firm Work Product").  The Fiesta Group Companies, the ACON Blockers and BLC, on behalf of themselves and their present and future Affiliates (including after the Closing, the Fiesta Group Companies and the ACON Blockers) acknowledge

and agree that all Law Firm Work Product and any attendant attorney client privilege, attorney work product protection and expectation of client confidentiality with respect thereto or the Law Firm's engagement shall be deemed to belong solely to the Sellers and not the Fiesta Group Companies or the ACON Blockers, and shall not pass to or be claimed, held or used by the Fiesta Group Companies, the ACON Blockers or by BLC or its present and future Affiliates (including after the Closing, the Fiesta Group Companies and the ACON Blockers) upon or after the Closing, and shall not be deemed to have been waived by the Sellers even if such Law Firm Work Product is inadvertently disclosed.  Notwithstanding anything to the contrary in this Agreement, and except in the event a Third Party Claim is made against the Fiesta Group Companies or the ACON Blockers, the Sellers are not obligated to provide Law Firm Work Product.  For the avoidance of doubt, the purpose of this Section 12.17 is to ensure the ability of the Law Firm to provide counsel to the Sellers after Closing with respect to transactions contemplated hereby, to protect the confidentiality of the Law Firm Work Product (which belongs solely to Sellers), and to ensure Sellers and Law Firm retain at all times full access to and the full benefit of the Law Firm Work Product, but is not intended otherwise to have the effect of the Fiesta Group Companies or the ACON Blockers relinquishing ownership of confidential information used in the operation of the Fiesta Group Companies or the ACON Blockers.

          (b)     If any dispute arises after the Closing relating in any manner to this Agreement or any other agreement between the Sellers, on the one hand, and BLC or its present and future Affiliates (including the Fiesta Group Companies and the ACON Blockers), on the other hand, relating in any manner to this Agreement, the other Documents and the transactions contemplated hereby and thereby (a "Dispute"), BLC, on behalf of itself and its present and future Affiliates (including after the Closing, the Fiesta Group Companies and the ACON Blockers), hereby consents to the Law Firm's representation of the Sellers in such Dispute and hereby waives any conflict of interest arising therefrom.  BLC, on behalf of itself and its present and future Affiliates (including after the Closing, the Fiesta Group Companies and the ACON Blockers), acknowledges that such consent and waiver is voluntary, has been carefully considered and made after consultation with counsel.  Notwithstanding anything to the contrary in this Agreement, in any Dispute, to the extent that any Company Information is in the Law Firm's possession as of the Closing Date, such Company Information may be used on behalf of the Sellers in connection with such Dispute at the sole discretion of the Sellers.  In any Dispute, BLC, on behalf of itself and its present and future Affiliates (including after the Closing, the Fiesta Group Companies and the ACON Blockers), (i) waives the right to present any Law Firm Work Product as evidence in any action arising out of or related to any Dispute, (ii) waives any right to access any Law Firm Work Product or files of the Law Firm related to this Agreement, the other Documents and the transactions contemplated hereby and thereby, except as reasonably necessary in connection with any action that is not a Dispute and (iii) hereby consents to the disclosure and use by the Sellers and the Law Firm for the benefit of the Sellers of any information (confidential or otherwise) disclosed to them by the Fiesta Group Companies and the ACON Blockers (including its managers, directors, officers, stockholders, accounting firm and/or employees of the Company) prior to the Closing Date.

          (c)     BLC acknowledges and agrees that the services of the Law Firm in connection with the transaction contemplated by this Agreement and the process leading up to such transactions were rendered exclusively for the benefit of the Sellers and not for the pre-Closing or post-Closing benefit of the Fiesta Group Companies or the ACON Blockers.

12.18   *Lender Limitations*.   Notwithstanding anything to the contrary contained in this Agreement:

(a)      each of the Sellers and the Fiesta Group Companies hereby acknowledges and agrees that none of the Sellers, the Fiesta Group Companies and their respective Affiliates, directors, officers, employees, agents, partners, managers, members or stockholders (x) shall have any rights or claims against any Debt Financing Source or their Affiliates or representatives, in any way relating to this Agreement, the Debt Financing, any Debt Commitment Letter, or any of the Acquisitions, including any dispute arising out of or relating in any way to the Debt Commitment Letter or the performance thereof or the financings contemplated thereby, whether at law or equity, in contract, in tort or otherwise and (y) agrees not to commence any action or proceeding against any Debt Financing Source in connection with this Agreement, the Debt Financing, any Debt Commitment Letter, or any of the Acquisitions, including any dispute arising out of or relating in any way to the Debt Commitment Letter or the performance thereof or the financings contemplated thereby; and

(b)      no Debt Financing Source shall have any liability (whether in contract, in tort or otherwise) to any of the Sellers, any Fiesta Group Company and/or any of their respective Affiliates, directors, officers, employees, agents, partners, managers, members, representatives or stockholders for any obligations or liabilities of any party hereto under this Agreement or for any claim based on, in respect of, or by reason of, the Acquisitions or in respect of any oral or written representations made or alleged to have been made in connection herewith or therewith, including any dispute arising out of or relating in any way to the Debt Commitment Letter or the performance thereof or the financings contemplated thereby, whether at law or equity, in contract, in tort or otherwise.   Notwithstanding anything to the contrary contained in this Agreement, the Debt Financing Sources are intended third party beneficiaries of, and shall be entitled to the protections of this Section 12.18.

*[Remainder of Page Left Blank; Signature Pages Follow]*

IN WITNESS WHEREOF, each of the Parties has executed this Agreement as of the date first above written.

**BLC:**

**BODEGA LATINA CORPORATION**

By: _____

Carlos Smith
Chief Executive Officer

*[Signature Pages to Membership Interest Purchase Agreement]*

**FIESTA HOLDINGS**:

**FIESTA HOLDINGS INVESTMENTS, L.L.C.**

By: _____

Name: Siddharth Keswani
Title:  President, Chief Executive Officer,
        Assistant Treasurer and Assistant
        Secretary

*[Remainder of Page Left Blank; Signature Pages Continue on Next Page]*

*[Signature Pages to Membership Interest Purchase Agreement]*

**ACON AGGREGATORS**:

**ACON FIESTA AGGREGATOR A, L.L.C.**

By: _____
     Name: Kenneth Brotman
     Title:  Managing Director

**ACON FIESTA AGGREGATOR B, L.P.**

By: _____
     Name: Kenneth Brotman
     Title:  Managing Director

*[Signature Pages to Membership Interest Purchase Agreement]*