**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**Houston Division**

| | | |
|---|---|---|
| FIESTA MART, L.L.C., | § | |
| | § | |
| Plaintiff, | § | Civil Action No. 4:18-cv-04704 |
| | § | |
| v. | § | Judge Ewing Werlein, Jr. |
| | § | |
| ACON INVESTMENTS, LLC, | § | |
| | § | |
| Defendant. | § | |

**APPENDIX OF UNREPORTED CASES CITED IN**
**PLAINTIFF FIESTA MART L.L.C.'S RESPONSE TO DEFENDANT'S**
**MOTION TO DISMISS FOR *FORUM NON CONVENIENS***
**OR TRANSFER UNDER 28 U.S.C. § 1404(a)**

| Ex. | Case |
|---|---|
| 1 | *ASDC Holdings, LLC v. Richard J. Malouf 2008 All Smiles Grantor Retained Annuity Tr.*, No. CIV.A. 6562-VCP, 2011 WL 4552508 (Del. Ch. Sept. 14, 2011) |
| 2 | *Ashall Homes Ltd. v. ROK Entm't Grp. Inc.*, 992 A.2d 1239 (Del. Ch. 2010) |
| 3 | *Ball Up, LLC v. Strategic Partners Corp.*, No. 02-17-00197-CV; 02-17-00198-CV, 2018 WL 3673044 (Tex. App.—Fort Worth Aug. 2, 2018, no pet.) |
| 4 | *Bruce v. NOMAC Drilling LLC*, No. 2:10-CV-204-DF-CE, 2011 WL 749756 (E.D. Tex. Feb. 24, 2011) |
| 5 | *Carlile Bancshares, Inc. v. Armstrong*, No. 02-14-00014-CV, 2014 WL 3891658 (Tex. App.—Fort Worth Aug. 7, 2014, no pet.) |
| 6 | *Eolas Techs., Inc. v. Adobe Sys., Inc.*, No. 6:09-CV-446, 2010 WL 3835762 (E.D. Tex. Sept. 28, 2010) |
| 7 | *Jordan v. SEI Corp.*, No. 96-1616, 1996 WL 296540 (E.D. Penn. Jun. 4, 1996) |

| Ex. | Case |
|-----|------|
| 8 | *JPT Grp., LLC. v. Steven Madden Retail, Inc.*, <br> No. CV H-15-3264, 2016 WL 3523878 (S.D. Tex. June 28, 2016) |
| 9 | *Potomac Ins. Co. v. Woods*, <br> 1:95-CV-469, 1996 WL 450687 (E.D. Tex. July 22, 1996) |
| 10 | *Seidensticker v. Gasparilla Inn, Inc.*, <br> No. CIV.A. 2555-CC, 2007 WL 4054473 (Del. Ch. Nov. 8, 2007) |
| 11 | *SGIC Strategic Glo Inv. Capital, Inc. v. Burger King Eur. GMBH*, <br> No. 3:14-cv-3300-B, 2015 WL 12731761 (N.D. Tex. Aug. 26, 2015), <br> *aff'd,* 839 F.3d 422 (5th Cir. 2016) |
| 12 | *Unijax, Inc. v. Factory Ins. Ass'n*, <br> 328 So. 2d 448 (Fla. App. Ct. 1976) |
| 13 | *Weygandt v. Weco, LLC*, <br> C.A. No. 4056-CVS, 2009 WL 1351808 (Del. Ch. May 14, 2009) |

Dated: January 24, 2019                    Respectfully Submitted,

/s/ Penny P. Reid
Penny P. Reid
State Bar No. 15402570
Fed. Bar No. 23583
preid@sidley.com
Tiffanie N. Limbrick
State Bar No. 24087928
Fed. Bar No. 2799856
tlimbrick@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Ave, Suite 2000
Dallas, Texas 75201
Tel: (214) 981-3300
Fax: (214) 981-3400

Thomas D. Cunningham
(*pro hac vice* application pending)
tcunningham@sidley.com
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
Tel: (312) 853-7000
Fax: (312) 853-7036

*Counsel for Plaintiff Fiesta Mart, L.L.C.*

# EXHIBIT 1

ASDC Holdings, LLC v. Richard J. Malouf 2008 All Smiles..., Not Reported in A.3d...

Case 4:18-cv-04704   Document 9-3   Filed on 01/24/19 in TXSD   Page 5 of 131

2011 WL 4552508
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

ASDC HOLDINGS, LLC, all Smiles Dental
Center, Inc., as Property Holdings, Valor
Management Corp., Antonio Gracias, Juan
Sabatar, And Jonathan Shulkin, Plaintiffs,
v.
THE RICHARD J. MALOUF 2008 ALL
SMILES GRANTOR RETAINED ANNUITY
TRUST and Richard J. Malouf, Defendants.

C.A. No. 6562−VCP.
|
Sept. 14, 2011.

**Attorneys and Law Firms**

Kevin G. Abrams, Esq., T. Brad Davey, Esq., Matthew
F. Davis, Esq ., Abrams & Bayliss LLP, Wilmington,
Delaware; Barry Barnett, Esq., Jonathan Bridges, Esq.,
Kenneth E. Gardner, Esq., Susman Godfrey LLP, Dallas,
Texas; Attorneys for Plaintiffs.

Jon E. Abramczyk, Esq., Kevin M. Coen, Esq., Morris,
Nichols, Arsht & Tunnell LLP, Wilmington, Delaware;
J. Eric Gambrell, Esq., Akin Gump Strauss Hauer &
Feld LLP, Dallas, Texas; Attorneys for Defendants The
Richard J. Malouf 2008 All Smiles Grantor Retained
Annuity Trust and Richard J. Malouf.

**MEMORANDUM OPINION**

PARSONS, Vice Chancellor.

**\*1** This action arises from a transaction involving the sale
of equity in a Texas-based dental practice management
company to a Chicago-based private equity firm. Shortly
after consummating the deal, the purchasers soured on
their investment and initiated arbitration proceedings
against the sellers. In response to the arbitration filing, the
sellers commenced litigation in Texas state court against
the purchasers, alleging their own claims related to the

transaction. Contending that the sellers are required by
the forum selection clause governing the transaction to
bring all litigation relating to the transaction exclusively
in Delaware, the purchasers seek a preliminary injunction
to prevent the sellers from prosecuting their action in
Texas. In response, the sellers have moved to dismiss the
purchasers' claims for lack of subject matter jurisdiction
and failure to state a claim upon which relief may be
granted.

Resolution of the pending motions depends primarily
on whether the purchasers' ability to raise the forum
selection clause issue in Texas provides them with an
adequate remedy at law, undermining the basis for equity
jurisdiction, and if not, whether the terms of the forum
selection clause are broad enough to reach the Texas
claims. For the reasons stated in this Memorandum
Opinion, I conclude that the forum selection clause does
not provide purchasers an adequate remedy at law and,
therefore, this Court has subject matter jurisdiction over
their claims. I further find that the forum selection clause
here, which applies to any claims arising under or relating
to the transaction, is sufficiently broad in scope that the
purchasers are likely to succeed in showing that it provides
exclusive jurisdiction in Delaware over the claims brought
by the sellers in Texas. Accordingly, I grant the purchasers'
motion for a preliminary injunction.

**I. FACTUAL BACKGROUND**

**A. The Parties**

Plaintiff All Smiles Dental Center, Inc. ("All Smiles")
is a Texas-based dental practice management company
incorporated in Delaware. Plaintiff AS Property
Holdings, LLC ("AS Property") is a Delaware limited
liability company.

Plaintiff Valor Management Corp. ("Valor") is the
management company of a Chicago-based middle market
private equity firm, Valor Equity Partners. ASDC
Holdings, LLC ("ASDC Holdings") is a Delaware
limited liability company formed by Valor for the
purpose of investing in All Smiles. ASDC Holdings owns
approximately 8,000 shares of All Smiles preferred stock
and 61,000 shares of All Smiles common stock, giving it
about 71% of the total equity in All Smiles.

ASDC Holdings, LLC v. Richard J. Malouf 2008 All Smiles..., Not Reported in A.3d...

Case 4:18-cv-04704   Document 9-3   Filed on 01/24/19 in TXSD   Page 6 of 131

Individual plaintiff Antonio Gracias is the CEO and a director of Valor. He is also the manager of ASDC Holdings and the Chairman of All Smiles. Juan Sabater is a managing director of Valor and a director of All Smiles. Jonathan Shulkin is also a managing director of Valor, as well as an officer and director of All Smiles. The individual plaintiffs, Gracias, Sabater, and Shulkin, will be referred to collectively as the "Individuals" and all of the plaintiffs in this action will be referred to collectively as the "Plaintiffs."

**\*2** Defendant Dr. Richard J. Malouf is a Texas resident and the founder, former President, and a current director of All Smiles. Before the transaction at issue, he was All Smiles's controlling shareholder. Currently, he owns approximately 14,000 shares of All Smiles common stock. The Richard J. Malouf 2008 All–Smiles Grantor Retained Annuity Trust is a trust established and controlled by Malouf. It owns approximately 10,000 shares of All Smiles common stock. Because Malouf controls the trust, references to him herein include the Trust.

### B. Facts

On June 30, 2010, Malouf entered into an agreement with ASDC Holdings under which ASDC Holdings invested approximately $65 million in All Smiles in exchange for 71% of the company's stock (the "Transaction"). As part of the Transaction, Malouf and ASDC Holdings executed several contracts, including the five at issue here (the "Agreements").[1] AS Property, Valor, Valor Equity Partners, and the Individuals are not signatories to these Agreements. In each of the relevant contracts under the Agreements, the parties agreed to virtually identical arbitration clauses which provide, in pertinent part, that "any dispute regarding [the] Agreement[s] [would be resolved] through binding arbitration."[2] They also agreed to identical forum selection clauses that require the parties to submit "to the exclusive jurisdiction of any state court within New Castle County, Delaware or, if it can obtain jurisdiction, the United States District Court for the District of Delaware sitting in Wilmington, Delaware ... with respect to any claim or cause of action arising under or relating to th[e] Agreement[s]...."[3]

After the Transaction closed, the relationship between Malouf and ASDC Holdings quickly soured. As a result,

on February 22, 2011, ASDC Holdings and All Smiles submitted an arbitration demand against Malouf to the American Arbitration Association ("AAA"). In their demand, ASDC Holdings and All Smiles asserted various claims against Malouf, including breaches of contract, representations, warranties, and fiduciary duties, as well as fraud related to the Transaction and the Agreements. In response, Malouf filed his own claims in the arbitration against ASDC Holdings and All Smiles.

On March 22, 2011, Malouf sued All Smiles, Valor Equity Partners, AS Property, and the Individuals in Dallas County District Court in Texas (the "Texas Action"). In the Texas Action, Malouf makes various claims against Valor Equity Partners and the Individuals, including claims for fraud and fraud in the inducement, breach of fiduciary duties, negligent misrepresentation, and tortious interference with contract. In addition, Malouf also asserts claims against All Smiles for reimbursement of certain expenses he incurred before the Transaction closed.

There are three other plaintiffs besides Malouf in the Texas action: 2009 Strait Lane Family Limited Partnership ("Strait Lane"); Camelia Family Limited Partnership ("Camelia"); and Deal Time Auto Group, LLC ("Deal Time"). These entities seek declaratory judgments on the validity of various leases they executed with AS Property and All Smiles.

**\*3** All Smiles, Valor Equity Partners, AS Property, and the Individuals filed their Answer to the Texas Action on May 2, 2011, and, on May 9, filed a motion to dismiss the Texas Action on the ground that the forum selection clause conferred exclusive jurisdiction over Malouf's claims in Delaware. Although these defendants in the Texas Action did not submit a brief with their motion, Malouf and the other plaintiffs in the Texas Action filed a brief in opposition to the motion to dismiss on or about July 8, 2011.

### C. Procedural History

Plaintiffs filed their initial Complaint in this action on June 13, 2011, and on June 20, moved for a preliminary injunction enjoining Malouf from proceeding with the Texas Action. Defendants answered the Complaint on June 30 and, on July 6, moved to dismiss it for lack of

ASDC Holdings, LLC v. Richard J. Malouf 2008 All Smiles..., Not Reported in A.3d...

Case 4:18-cv-04704   Document 9-3   Filed on 01/24/19 in TXSD   Page 7 of 131

subject matter jurisdiction and failure to state a claim upon which relief can be granted. Plaintiffs filed an amended Complaint (the "Complaint") on July 18, which Defendants again moved to dismiss on the same grounds. A hearing on the motions was held on August 11, 2011.

Following that hearing, Malouf made a motion to compel discovery in the Texas Action. The Texas court set a hearing date on or about September 16, 2011 to hear arguments on both Malouf's motion to compel and the motion to stay the arbitration. This Memorandum Opinion reflects my rulings on Plaintiffs' motion for a preliminary injunction and Defendants' motion to dismiss.

### D. Parties' Contentions

In the Complaint, Plaintiffs ask for specific performance, a declaratory judgment, and a preliminary injunction in two counts. Count I seeks an order from this Court directing Defendants to honor and specifically perform their obligations under the Agreements to litigate exclusively in Delaware any claims relating to the Transaction or the Agreements, including the claims in the Texas Action. Count II seeks a declaratory judgment that Defendants must litigate exclusively in Delaware, if at all, any claims arising from the Transaction or the Agreements. Plaintiffs also sought preliminarily and permanently to enjoin Defendants from further prosecuting the Texas Action.

Defendants challenge this Court's subject matter jurisdiction over Plaintiffs' claims on the grounds that Plaintiffs have an adequate remedy at law because they can raise the forum selection clause as an affirmative defense in the Texas Action. In addition, Defendants contend that Plaintiffs have not satisfied their burden for a preliminary injunction because they have not established that they will suffer imminent and irreparable harm if the Texas court were to decide whether the forum selection clause applies to the Texas Action or shown a reasonable probability of success on the merits of the underlying claims in this action.

### II. ANALYSIS

#### A. Does This Court Have Subject Matter Jurisdiction over Plaintiffs' Claims under *El Paso*?

Malouf begins his defense by claiming this Court does not have subject matter jurisdiction over Plaintiffs' motion for a preliminary injunction and, therefore, the Complaint should be dismissed under Rule 12(b)(1). [4]

**\*4** This Court is one of limited jurisdiction. The Court of Chancery can acquire subject matter jurisdiction over a case in three ways: (1) the invocation of an equitable right; [5] (2) a request for an equitable remedy when there is no adequate remedy at law; [6] or (3) a statutory delegation of subject matter jurisdiction. [7] Moreover, where there is an adequate remedy available at law, jurisdiction will not lie with this Court. [8]

Malouf argues that Plaintiffs had the ability to raise the forum selection clause as an affirmative defense in the Texas Action and that constitutes an adequate remedy at law that deprives this Court of subject matter jurisdiction over this action. In support of this position, Malouf relies heavily on the Delaware Supreme Court's decision in *El Paso Natural Gas Co. v. TransAmerican Natural Gas Corp.* [9] In that case, the Supreme Court affirmed this Court's holding that it lacked subject matter jurisdiction to enjoin an action pending in Texas state court, even though the parties previously had agreed to a forum selection clause that conferred exclusive jurisdiction on the Delaware Court of Chancery. The Supreme Court explained that "[w]here, as here, the forum selection clause may be asserted as a defense in the Texas Action, El Paso has an adequate legal remedy. El Paso would not be forced to litigate on the merits in Texas and thus lose the benefits of the bargained-for-forum selection clause." [10]

While at first blush *El Paso* may seem quite similar to this case, a closer comparison of the facts indicates that decision is inapposite. Specifically, the Supreme Court's ruling in *El Paso* is distinguishable on two key grounds. First, the Supreme Court found the forum selection clause in *El Paso* to be unenforceable as to the claims in the Texas proceedings because the parties impermissibly had attempted to confer by agreement subject matter jurisdiction on the Court of Chancery over all claims between the parties, legal and equitable. [11] The Supreme Court held that "El Paso's specific performance claim [to enforce the forum selection clause] ... is only viable if the parties' underlying disputes are cognizable in this Court" and that the claims in the Texas action were all legal in

ASDC Holdings, LLC v. Richard J. Malouf 2008 All Smiles..., Not Reported in A.3d...

Case 4:18-cv-04704   Document 9-3   Filed on 01/24/19 in TXSD   Page 8 of 131

nature. [12] Accordingly, as to those claims, no enforceable forum selection clause existed between the parties.

The unenforceability of the forum selection clause in *El Paso* is important because it made the *Mc Wane* doctrine more critical to that decision. In this case, there is no comparable question about the enforceability of the forum selection clause between Malouf and ASDC Holdings. The clause here validly confers exclusive jurisdiction on certain Delaware state courts and the Federal District Court in Wilmington. Therefore, the clause is fully enforceable as to any claim, legal or equitable, between the parties.

A second distinction between *El Paso* and this case further undermines Malouf's position. That distinction involves the fact that the forum selection clause in *El Paso,* even if it were enforceable, was narrower than the one here. Under Delaware law, jurisdictional clauses can be narrow or broad. [13] The case law dealing with the distinctions between narrow and broad jurisdictional clauses deals primarily with arbitration clauses, as opposed to forum selection clauses, but as Defendants note, this is a distinction without a difference. [14] This Court treats forum selection clauses "in the same spirit" as arbitration clauses; thus, the same general principles apply in determining the scope and level of deference to be given either kind of clause. [15] Similarly, the United States Supreme Court has held that "[a]n agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute." [16]

**\*5** In *Parfi Hldg. AB v. Mirror Image Internet,* [17] the Supreme Court set out a two-part test for determining whether claims are subject to an arbitration clause:

> First, the court must determine whether the arbitration clause is broad or narrow in scope. Second, the court must apply the relevant scope of the provision to the asserted legal claim to determine whether the claim falls within the scope of the contractual provisions that require arbitration. If the court is evaluating a narrow arbitration clause, it will ask if the cause of action pursued in court directly relates to a right in the contract. *If the arbitration clause is broad in scope, the*

> court will defer to arbitration on any issues that touch on contract rights or contract performance. [18]

Thus, narrow forum selection clauses only cover claims dealing directly with rights embodied in the relevant contract. [19] Broad forum selection clauses, on the other hand, which expressly cover, for example, all claims between the contracting parties that "arise out of" or "relate to" a contract, apply not only to claims dealing directly with the terms of the contract itself, but also to "any issues that touch on contract rights or contract performance." [20]

Turning to the facts before me, the forum selection clauses in the Agreements Malouf has with certain of Plaintiffs provide that:

> [E]ach Party hereby (a) agrees to the exclusive jurisdiction of any state court within New Castle County, Delaware or, if it can obtain jurisdiction, the United States District Court for the District of Delaware sitting in Wilmington, Delaware (and the appropriate appellate courts) *with respect to any claim or cause of action arising under or relating to* this Agreement .... [21]

Here, the use of the phrase "arising under or relating to" in the Agreements demonstrates that this is a broad forum selection clause; therefore, any issues that "*touch on* contract rights or contract performance" should be subject to the exclusive jurisdiction agreed to under that clause. [22]

In contrast, the relevant forum selection clause in *El Paso* provided that:

> ALL ACTIONS TO ENFORCE OR SEEK DAMAGES, SPECIFIC PERFORMANCE OR OTHER REMEDY FOR THE ALLEGED BREACH OF THIS AGREEMENT OR THE

ASDC Holdings, LLC v. Richard J. Malouf 2008 All Smiles..., Not Reported in A.3d...

Case 4:18-cv-04704   Document 9-3   Filed on 01/24/19 in TXSD   Page 9 of 131

OPERATIVE AGREEMENTS SHALL BE BROUGHT IN THE CHANCERY COURT OF THE STATE OF DELAWARE. [23]

That clause was narrow in scope and, therefore, only applied to claims directly pertaining to rights based on the contract at issue. Importantly, the complaint in *El Paso* only contained claims that related indirectly, if at all, to the agreements between the parties. [24] In fact, the plaintiff there amended its complaint to drop its claims for breach of contract. Thus, based on the narrow forum selection clause and the omission of any claim for breach of contract in the Texas action, it is highly unlikely that the forum selection clause in *El Paso* could have been applied to the contested claims in that dispute.

**\*6** The forum selection clause in the Transaction between the parties in this case much more closely resembles the clause in a more recent case, *Ingres Corp. v. CA, Inc.* [25] In *Ingres,* the parties had entered into a contract with a valid forum selection clause. The clause provided that:

> Each party hereto agrees that it shall bring *any action or proceeding* in respect of *any claim* directly arising out of or *related to this Agreement,* whether in tort or contract or at law or in equity in any state or U.S. federal court sitting in The City of New York or in any state or U.S. federal court sitting in the State of Delaware.... [26]

In upholding the Court of Chancery's decision to enjoin the Appellant, Ingres, from prosecuting its claims in a California state court, the Supreme Court held that:

> [W]here contracting parties have expressly agreed upon a *legally enforceable* forum selection clause, a court should honor the parties' contract and enforce the clause, even if, absent any forum selection clause, the *McWane* principle might otherwise require a different result. The reason is that the *McWane* principle is a default rule of common law, which the parties to the

litigation are free to displace by a valid contractual agreement. [27]

The clause now before me clearly evidences the intent of the parties to the Transaction to litigate *any* dispute relating to the Agreements in Delaware, which would include, without limitation, disputes over whether the forum selection clause applies to the claims brought by Malouf in the Texas Action.

Malouf seeks to avoid this reasoning by asserting that Plaintiffs can litigate the issues regarding the forum selection and arbitration clauses in the earlier filed Texas Action and, therefore, have an adequate remedy at law. Couched as it is in terms of the *McWane* principle, I consider Malouf's argument contrary to *Ingres* and unpersuasive. *McWane* is not controlling here because the parties bargained for and agreed to a forum selection clause that explicitly committed them to litigating exclusively in Delaware. Unlike *El Paso,* this forum selection clause is valid and arguably broad enough to reach the Texas claims. In addition, there is no conflicting default presumption that otherwise would cast doubt on the parties' intent to litigate exclusively in Delaware. [28] Forum selection clauses are presumptively valid in Delaware and *Ingres* holds that such a clause displaces the traditional default presumptions under *McWane.* [29] Therefore, requiring Plaintiffs to litigate the forum selection issue in Texas, when they bargained for a contractual provision that would avoid such a result, would deprive Plaintiffs of the benefit of their bargain and cannot be an adequate remedy at law. Therefore, I find this Court has subject matter jurisdiction over this action.

### B. ASDC Has Made the Required Showing for a Preliminary Injunction

I next address whether Plaintiffs are entitled to a preliminary injunction against Malouf's further prosecution of the Texas Action. This Court has broad discretion in granting or denying a preliminary injunction. [30] "A preliminary injunction may be granted where the movants demonstrate: (1) a reasonable probability of success on the merits at a final hearing; (2) an imminent threat of irreparable injury; and (3) a balance of the equities that tips in favor of issuance of the requested relief." [31] "The moving party bears

ASDC Holdings, LLC v. Richard J. Malouf 2008 All Smiles..., Not Reported in A.3d...

Case 4:18-cv-04704 Document 9-3 Filed on 01/24/19 in TXSD Page 10 of 131

a considerable burden in establishing each of these necessary elements. Plaintiffs may not merely show that a dispute exists and that plaintiffs might be injured; rather, plaintiffs must establish clearly each element because injunctive relief will never be granted unless earned." [32] However, "there is no steadfast formula for the relative weight each deserves. Accordingly, a strong demonstration as to one element may serve to overcome a marginal demonstration of another." [33]

**\*7** Malouf argues that Plaintiffs' motion for a preliminary injunction must fail because Plaintiffs have not shown any of the three required elements. In particular, Malouf contends Plaintiffs have not demonstrated either a reasonable probability of success on the merits of their contention that the forum selection clause applies to Malouf's claims in the Texas Action or that they will suffer irreparable harm by being forced to present their defense based on the forum selection clause in the Texas Action. In addition, Malouf asserts the balance of equities weighs in his favor because allowing a Texas court to determine whether the forum selection clause applies to the claims in the Texas Action "will not harm Plaintiffs in any way," but to do otherwise will deny Malouf his choice of forum. I examine each of these arguments in turn.

### 1. Reasonable probability of success on the merits

Malouf's Texas claims can be divided into three categories. [34] The first includes claims clearly relating to the Agreements, but which are asserted against nonsignatories to the Agreements. The second category encompasses claims for breach of fiduciary duties that Malouf argues do not "arise out of" or "relate to" the Agreements. The final category consists of reimbursement claims against All Smiles that Malouf argues arose before the Transaction and therefore are not controlled by the terms of the Agreements.

### a. Can Valor Equity Partners and the Individuals enforce the forum selection clause against Malouf?

In the Texas Action, Malouf alleges eight counts against Valor Equity Partners and the Individuals, including claims for fraud and fraud in the inducement, negligent misrepresentation, and tortious interference with contract. Even assuming these counts arise directly

from the Transaction and the corresponding Agreements, Malouf argues that they are not subject to the forum selection clause because Valor Equity Partners and the Individuals were not signatories of the Agreements and, therefore, cannot enforce the obligations created thereunder.

In arguing that he can avoid the forum selection clause through artful pleading and suing nonsignatories to the Agreements, Malouf asks this Court to favor form over substance. The Supreme Court, however, considered and rejected such rigid formalism in its decision in *Ashall Homes Ltd. v. ROK Entertainment Group Inc.* [35] Addressing claims similar to those made by Malouf here, the Supreme Court held that "officers and directors ... have standing to invoke [a] Forum Selection Provision as parties *closely related* to one of the signatories such that the non-party's enforcement of the clause is foreseeable by virtue of the relationship between the signatory and the party sought to be bound." [36] Here, Valor Equity Partners is a subsidiary of Valor and the Individuals are officers and directors of both Valor and All Smiles who were intimately involved with the Transaction. Therefore, Valor Equity Partners and the Individuals are "closely related" to the signatories ASDC Holdings and All Smiles. As a result, they are entitled to invoke the forum selection clause against a party, such as Malouf, who is bound by that clause as a signatory. Thus, I find Plaintiffs have demonstrated a reasonable probability of success on the merits of their claim for preliminary injunctive relief as to Counts One, Two, Five, and Six of the Texas Action. [37]

### b. Do the breach of fiduciary duty claims "arise out of" or "relate to" the Agreements?

**\*8** Under Counts Three and Four of the Texas complaint, Malouf claims breach of fiduciary duties, and a related conspiracy, against Valor Equity Partners and the Individuals. In addition to having questioned the standing of Valor Equity Partners and the Individuals to enforce the forum selection clause, Malouf also contends that Counts Three and Four do not "arise out of" or "relate to" the Agreements and, therefore, are not subject to the forum selection clause. Malouf's argument, however, construes too narrowly the phrase "arising under or relating to this Agreement" in the forum selection clause.

As discussed at length *supra,* the forum selection clause here is broad as a matter of Delaware law, with the

ASDC Holdings, LLC v. Richard J. Malouf 2008 All Smiles..., Not Reported in A.3d...

Case 4:18-cv-04704  Document 9-3  Filed on 01/24/19 in TXSD  Page 11 of 131

operative language explicitly covering any disputes that "relate to" the Agreements.[38] While the fiduciary duties owed to Malouf may "arise out of" the common law, there is a more than colorable argument that such claims "relate to" the Agreements, and particularly the Stockholders Agreement and Stock Purchase Agreement .[39] Therefore, Plaintiffs have shown a reasonable probability of success as to the merits of their claim to enjoin prosecution of Counts Three and Four of Malouf's Texas Action.

### c. Do Malouf's reimbursement claims against All Smiles arise under or relate to the Agreements?

Counts Seven and Eight of the Texas Action are for breach of contract between Malouf and All Smiles and for unjust enrichment related to the alleged breach. In his Answering Brief, Malouf admits All Smiles signed the Agreements, but denies the applicability of the forum selection clause as to these claims because they involve a dispute that arises from an oral reimbursement agreement between him and All Smiles made prior to the closing of the Transaction. Plaintiffs counter by pointing to the integration clause in Section 14(b) of the Employment Agreement between Malouf and All Smiles and arguing that that clause extinguished any pre-existing claims Malouf may have had against All Smiles based on his prior employment relationship.

Plaintiffs have the burden of establishing a reasonable likelihood of success on the merits of their contention that these claims arise out of or relate to the Agreements.[40] Resolution of that issue will require careful consideration of the Employment Agreement and both Plaintiffs' integration clause argument and Malouf's untested allegations as to the existence of an oral agreement between himself and All Smiles. Under the forum selection clause threshold, issues of this nature should be decided by a court in Delaware or the arbitrator, because Plaintiffs have at least a colorable claim that they arise out of or relate to the Agreements.[41] Accordingly, I find that Plaintiffs have satisfied their burden on the merits as to their motion for a preliminary injunction regarding Counts Seven and Eight.

### 2. Irreparable harm

The parties negotiated and agreed to a broad forum selection clause that anticipated that any litigation arising from the Agreements would occur exclusively in Delaware. If Plaintiffs are forced to prosecute any claims falling within that clause in a different forum, they will be deprived irreparably of the benefit of that bargain, regardless of whether they later prevail on the merits of that action. This Court consistently has held that the procession of a claim in an unwarranted forum poses a threat of irreparable harm warranting a preliminary injunction.[42] To hold otherwise in the circumstances of this case would render the broad language of the forum selection clause meaningless and deprive Plaintiffs of the benefit of their bargain. Therefore, I find that ASDC has shown a sufficient threat of irreparable harm to warrant a preliminary injunction.

### 3. The Equities favor Plaintiffs

**\*9** Malouf's half-hearted contention that the equities favor him rests on the same erroneous belief that Plaintiffs will not suffer any harm by being forced to litigate the forum selection clause issues in Texas. As discussed *supra,* this argument is unpersuasive. Both parties agreed to submit all litigation arising out of or relating to the Agreements to the exclusive jurisdiction of Delaware courts. Therefore, Malouf is not entitled to any deference for his alternative choice of forum for his claims and the balance of equities weighs in favor of giving meaning to the forum selection clause bargained for and agreed upon between the parties.[43]

### III. CONCLUSION

For the reasons stated in this Memorandum Opinion, I hold that Plaintiffs have satisfied their burden of proving the elements necessary to warrant the grant of a preliminary injunction against Malouf. Accordingly, I will grant Plaintiffs' motion to preliminarily enjoin Dr. Richard J. Malouf and the Richard J. Malouf 2008 All Smiles Grantor Retained Annuity Trust from further prosecuting their claims against Plaintiffs in Texas or otherwise pursuing litigation within the scope of the forum selection clause in a forum outside of Delaware. An Order consistent with this Memorandum Opinion is being entered this date.

ASDC Holdings, LLC v. Richard J. Malouf 2008 All Smiles..., Not Reported in A.3d...

Case 4:18-cv-04704   Document 9-3   Filed on 01/24/19 in TXSD   Page 12 of 131

**All Citations**

Not Reported in A.3d, 2011 WL 4552508

Footnotes

1      The agreements at issue include the (1) Note and Stock Purchase Agreement, (2) All Smiles Dental Center, Inc.
       Stockholders' Agreement, (3) Employment Agreement between All Smiles and Malouf, (4) Director Agreement between
       All Smiles and Malouf, and (5) Restrictive Covenant Agreement between All Smiles and Malouf.

2      Compl. Ex. A at 57, B at 37, C at 13, D at 13, E at 9.

3      Compl. Ex. A at 58, B at 37–38, C at 14, D at 13, E at 9–10.

4      The Court of Chancery will dismiss an action under Rule 12(b)(1) "if it appears from the record that the Court does not
       have subject matter jurisdiction over the claim." Ct. Ch. R. 12(b)(1).

5      *See* 10 *Del. C.* § 341 ("The Court of Chancery shall have jurisdiction to hear and determine all matters and causes in
       equity."); *Christiana Town Ctr. LLC v. New Castle Cty.,* 2003 WL 21314499, at *3 (Del. Ch. June 6, 2003) ("Equitable
       rights are rights that have traditionally not been recognized at common law. The most common example of business
       rights in this court are fiduciary rights and duties that arise in the context of trusts, corporations, other forms of business
       organizations, guardianships, and the administration of estates."); *Azurix Corp. v. Synagro Techs., Inc.,* 2000 WL 193117,
       at *2 (Del. Ch. Feb. 3, 2000).

6      *Christiana Town Ctr.,* 2003 WL 21314499, at *3 ("Equitable remedies ... may be applied even where the right sued on is
       essentially legal in nature, but with respect to which the available remedy at law is not fully sufficient to protect or redress
       the resulting injury under the circumstances.") (internal quotation marks omitted).

7      *See Candlewood Timber Gp., LLC v. Pan Am. Energy, LLC,* 859 A.2d 989, 997 (Del.2004).

8      10 *Del. C.* § 342 ("The Court of Chancery shall not have jurisdiction to determine any matter wherein sufficient remedy
       may be had by common law, or statute, before any other court or jurisdiction of this State.").

9      1994 WL 248195 (Del.1994).

10     *El Paso,* 1994 WL 248195, at *3.

11     *Id.* at *2.

12     *Id.*

13     *See Aveta Inc. v. Cavallieri,* 23 A.3d 157, 166 (Del.Ch.2010) ("The Purchase Agreement contains a broad forum selection
       clause mandating that any action 'arising out of or relating to' the Purchase Agreement be brought exclusively in a
       Delaware court.").

14     Defs.' Br. at 18.

15     *See PPF Safeguard, LLC v. BCR Safeguard Hldg., LLC,* 2010 WL 2977392, at *5 (Del. Ch. July 29, 2010) ("In a similar
       spirit [as arbitration clauses], Delaware honors contractual choice of forum provisions. Thus, under Rule 12(b)(3), a court
       will grant a motion to dismiss for improper venue based upon a forum selection clause where the parties 'use express
       language clearly indicating that the forum selection clause excludes all other courts before which those parties could
       otherwise properly bring an action.' Delaware courts defer to forum selection clauses and routinely 'give effect to the
       terms of private agreements to resolve disputes in a designated judicial forum out of respect for the parties' contractual
       designation.' ").

16     *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 519 (1974).

17     817 A.2d 149 (Del.2002).

18     *Id.* at 155 (emphasis added).

19     *See id.*

20     *See supra* note 13 and accompanying text; *see also Smyrna v. Kent Cty. Levy Court,* 2004 WL 2671745, at *2 (Del.
       Ch. Nov. 9, 2004) ("[T]here is no question that the arbitration clause found in the Agreement is broad, as it covers all
       claims 'arising out of' or 'related to' the Agreement."); *Parfi,* 817 A.2d at 155 ("The parties do not dispute that Section
       20.2 of the Underwriting Agreement has a broad scope. By agreeing to submit to arbitration any dispute, controversy, or
       claim arising out of or in connection with the Underwriting Agreement, [the parties] have signaled an intent to arbitrate all
       possible claims that touch on the rights set forth in their contract.") (internal quotation marks omitted).

21     Compl. Ex. A at 58, B at 37–38, C at 14, D at 13, E at 9–10 (emphasis added).

ASDC Holdings, LLC v. Richard J. Malouf 2008 All Smiles..., Not Reported in A.3d...

Case 4:18-cv-04704   Document 9-3   Filed on 01/24/19 in TXSD   Page 13 of 131

22    *Parfi*, 817 A.2d at 155 (emphasis added); *see also Aveta Inc. v. Cavallieri*, 23 A.3d 157, 166 (Del. Ch.2010); *Smyrna*, 2004 WL 2671745, at *2.

23    *El Paso Natural Gas Co. v. TransAmerican Natural Gas Corp.*, 1994 WL 248195, at * 1 (Del.1994) (capitalization in original).

24    In its Texas complaint, the defendant in *El Paso* alleged: "(i) fraud, fraudulent inducement and fraudulent concealment in connection with the El Paso Settlement Agreement; (ii) tortious interference with existing and prospective business relationships; (iii) economic duress and coercion that allegedly caused TransAmerican to enter into the Settlement Agreement; (iv) civil conspiracy among the various defendants; and (v) violation of the Texas Anti–Trust Act." *Id.*

25    8 A.3d 1143 (Del.2010).

26    *Id.* at 1145 n. 1 (emphasis in original).

27    *Id.* at 1145–46 (emphasis added) (internal citations omitted). The *McWane* principle stems from the decision in *McWane Cast Iron Pipe Corp. v. McDowell–Wellman Eng'g Co.*, 263 A .2d 281 (Del.1970). Under that principle, the Court has broad discretion to grant a stay "when there is a prior action pending elsewhere, in a court capable of doing prompt and complete justice, involving the same parties and the same issues." *In re Bear Stearns Cos. S'holder Litig.*, 2008 WL 959992, at *5 (Del. Ch. Apr. 9, 2008) (quoting *McWane*, 263 A.2d at 283).

28    *Cf. Willy–Gary LLC v. James & Jackson*, 2006 WL 75309, at *6 (Del. Ch. Jan. 10, 2006) (holding that the presence of an arbitration clause alone does not displace the default presumption that a court should decide questions of substantive arbitrability).

29    *Ingres*, 8 A.3d at 1146 ("Forum selection [ ] clauses are presumptively valid and should be specifically enforced unless the resisting party [ ] clearly show[s] that enforcement would be unreasonable and unjust, or that the clause [is] invalid for such reasons as fraud and overreaching.").

30    *Data Gen. Corp. v. Digital Computer Controls, Inc.*, 297 A.2d 437, 439 (Del.1972) (citing *Richard Paul, Inc. v. Union Improvement Co.*, 91 A.2d 49 (Del.1952)).

31    *Nutzz.com, LLC v. Vertrue, Inc.*, 2005 WL 1653974, at *6 (Del. Ch. July 6, 2005) (internal citations omitted); *Concord Steel, Inc. v. Wilmington Steel Processing Co.*, 2008 WL 902406, at *3 (Del. Ch. Apr. 3, 2008).

32    *La. Mun. Police Empls.' Ret. Sys. v. Crawford*, 918 A.2d 1172, 1185 (Del.2007) (internal citations omitted).

33    *Alpha Builders, Inc. v. Sullivan*, 2004 WL 2694917, at *3 (Nov. 5, 2004) (citing *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 579 (Del. Ch.1998)).

34    Malouf also brought claims for attorney's fees and punitive damages in Texas. Because these counts depend on other more substantive counts, I do not consider them relevant to this analysis and, therefore, do not discuss them further.

35    992 A.2d 1239 (Del.2010).

36    *Id.* at 1249 (emphasis added); *see also id.* ("Because defendants Kendrick and Renny solicited the Ashall Plaintiffs to participate in the investment, because Kendrick and Renny managed the Cyberfund acquisition and the reincorporation of ROK Delaware, and because they are being sued by the Ashall Plaintiffs as a result of acts that the Ashall Plaintiffs themselves contend directly implicate the negotiation of and performance under the Share Sale Agreements, it was foreseeable that the defendants would invoke the Forum Selection Provision of the Share Sale Agreements, and it would be inequitable to permit the Ashall Plaintiffs to escape their contractual promise to litigate all disputes arising under the Share Sale Agreements in England."); *id.* at 1249 n. 51 (citing favorably decisions from other jurisdictions supporting the proposition that nonsignatory officers and directors can invoke forum selection clauses).

37    In challenging the rights of Valor Equity Partners and the Individuals to enforce the forum selection clause, Malouf relies heavily on *Capital Gp. Cos. v. Armour*, 2004 WL 2521295 (Del. Ch. Nov. 3, 2004). That case, however, dealt with a situation in which an allegedly "closely related" nonsignatory party had embraced the contract at issue and then tried to disclaim her obligations under the forum selection clause. The *Armour* court held that because the party previously had embraced and benefited from the contract, she was estopped from disclaiming her obligation to abide by the forum selection clause. Unlike *Armour*, this case involves an attempt by Malouf, a signatory, to disclaim the applicability of the forum selection clause after having benefitted from the Agreements.

38    *See Milton Invs., LLC v. Lockwood Bros. II, LLC*, 2010 WL 2836404, at *6 (Del. Ch. July 20, 2010) ("The 'involving or relating to' language expands the reach of each of the four enumerated categories to such an extent that it is difficult to envision any dispute arising under the LLC Agreement that would not fit within one of these broad categories. Indeed, the Agreement may even require arbitration of claims that a Member breached its fiduciary duties, claims that did not fit under the broad arbitral language in *Parfi*.").

39    *See Julian v. Julian*, 2009 WL 2937121, at *8 (Del. Ch. Sept. 9, 2009) ("[T]here is at least a colorable argument that the [defendants'] claims relate to their respective LLC agreements. To the extent there is any basis for doubt about these

findings, I conclude that, consistent with the holding in *McLaughlin,* this Court should defer to arbitration, leaving the arbitrator to determine what is or is not before her.") (internal quotation marks omitted); *see also Brown v. T–Ink, LLC,* 2007 WL 4302594, at *15 (Del. Ch. Dec. 4, 2007) (holding that a broad arbitration clause applied to certain breach of fiduciary claims because those claims arose "at least in part, by virtue of specific obligations created by the terms of the LLC Agreement rather than arising by virtue of any statutory, common law, or other requirement that imposes fiduciary duties upon Plaintiff as a consequence of the formation of [the company] without regard to the specific terms of the LLC Agreement.").

40   *La. Mun. Police Empls.' Ret. Sys. v. Crawford,* 918 A.2d 1172, 1185 (Del. Ch.2007) (internal citations omitted).

41   *See Brown,* 2007 WL 4302594, at * 11 ("Because this Court, and not the arbitrator, should hear questions of substantive arbitrability, this Court has subject matter jurisdiction over the questions of substantive arbitrability raised by Brown's complaint and her renewed motion for a preliminary injunction.").

42   *See Lefkowitz v. HWF Hldgs., LLC,* 2009 WL 3806299, at *2 n. 5 (Del. Ch. Nov. 13, 2009) (citing *Brown,* 2007 WL 4302594, at * 13; *HDS Inv. Hldg., Inc. v. Home Depot, Inc.,* 2008 WL 4604262, at *9 (Del. Ch. Oct. 17, 2008); *Parfi Hldg. AB v. Mirror Image Internet, Inc.,* 842 A.2d 1245, 1259 (Del. Ch.2004)).

43   *Ingres Corp. v. CA, Inc.,* 8 A.3d 1143, 1146 (Del.2010) ( "Forum selection [ ] clauses are presumptively valid and should be specifically enforced unless the resisting party [ ] clearly show[s] that enforcement would be unreasonable and unjust, or that the clause [is] invalid for such reasons as fraud and overreaching. Courts should assess the reasonableness of a forum selection clause on a case-by-case basis.") (internal quotation marks omitted).

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 2

992 A.2d 1239
Court of Chancery of Delaware.

ASHALL HOMES LIMITED, Arthur
Simon Davies, Scott Alexander Ashall,
David William Ashall, Anthony Mark
Ashall and Thames Limited, Plaintiffs,
v.
ROK ENTERTAINMENT GROUP INC., a
Delaware corporation, Jonathan Kendrick,
Laurence Alexander and Alex Renny, Defendants.

C.A. No. 4643-VCS.
|
Submitted: Jan. 26, 2010.
|
Decided: April 23, 2010.

**Synopsis**
**Background:** Shareholders brought action against
corporation, alleging breach of stock purchase agreement
in corporation's failure to issue to shareholders registered,
unrestricted, and freely-tradable stock in a successor
company. Corporation filed motion to dismiss, citing
forum selection clauses within documents governing the
stock purchase agreement.

**Holdings:** The Chancery Court, Strine, Vice Chancellor,
held that:

[1] forum selection provisions in both subscription
agreement and share sale agreement precluded Chancery
Court from exercising jurisdiction;

[2] resolution of issue as to whether shareholders waived
right to allege termination of share sale agreement as to
render forum selection clause inoperable was reserved for
English courts;

[3] corporation had standing to enforce forum selection
clauses even though corporation was not a signatory on
the documents;

[4] language of forum selection provision in subscription
agreements was mandatory rather than permissive;

[5] subscription agreement and share sale agreement were
contemporaneous documents such that forum selection
provision in one was applicable to claims arising from
both;

[6] policy concerns precluded bifurcation of claims arising
from the separate documents; and

[7] shareholders' non-contract claims grew out of the
parties' contractual relationship and depended upon the
same set of facts as shareholders' contract claims such that
the non-contract claims were within scope of and subject
to forum selection clauses.

Motion to dismiss granted.

West Headnotes (13)

[1]    **Contracts**
       👉 Legal remedies and proceedings
       Forum selection provisions in the parties'
       subscription agreement and their share sale
       agreement, which clearly chose English law
       to exclusively govern the parties' relationship,
       precluded Chancery Court from exercising
       jurisdiction over action in which shareholders
       alleged that corporation breached parties'
       stock purchase agreement by failing to issue
       them registered, unrestricted, and freely-
       tradable stock in a successor company.

       1 Cases that cite this headnote

[2]    **Contracts**
       👉 Agreement as to place of bringing suit;
       forum selection clauses
       Courts defer to forum selection clauses and
       routinely give effect to the terms of private
       agreements to resolve disputes in a designated
       judicial forum out of respect for the parties'
       contractual designation.

       8 Cases that cite this headnote

[3]    **Contracts**

👉 Legal remedies and proceedings

Forum selection clauses within a contract can be applied not only to contract-based claims but also tort claims arising out of, or depending upon, the contractual relationship in question.

4 Cases that cite this headnote

[4] **Contracts**
👉 Legal remedies and proceedings

When a contract contains a forum selection clause, the court will interpret the forum selection clause in accordance with the law chosen to govern the contract.

27 Cases that cite this headnote

[5] **Contracts**
👉 Legal remedies and proceedings

Resolution of issue as to whether shareholders waived right to allege termination of share sale agreement by failing to object to belated delivery of stock certificates while reaping benefits of contract, though necessary for purposes of determining validity of forum selection clause within the share sale agreement, was nevertheless reserved for English courts that had been designated within forum selection clause to govern the parties' relationship, and thus, Chancery Court elected not to address the matter on the merits, in action in which shareholders sought to enforce stock purchase agreement.

9 Cases that cite this headnote

[6] **Contracts**
👉 Waiver

A waiver of a contractual right is found where a party had actual or constructive notice of a known right, and that the party voluntarily and intentionally relinquished that known right; the policy underlying the rule is that a party cannot both accept the benefits which accrue under a contract on the one hand and shirk its disadvantages on the other.

Cases that cite this headnote

[7] **Contracts**
👉 Legal remedies and proceedings

Corporation against whom shareholders brought action for alleged breach of stock purchase agreement had standing to enforce forum selection clause within share sale agreement that designated English courts to govern parties' relationship, even though corporation was not a signatory to the agreement, where corporation was a legal successor by merger to the original signatory company, and share sale agreement expressly permitted corporation, as the signatory's successor, to invoke the forum selection provision.

7 Cases that cite this headnote

[8] **Contracts**
👉 Legal remedies and proceedings

Language of forum selection provision in subscription agreement, providing, in relevant part, "English courts shall have jurisdiction over any disputes arising hereunder," was mandatory, rather than permissive, such that Chancery Court could not exercise jurisdiction over shareholders' action against corporation, in which shareholders alleged a breach of stock purchase agreement.

2 Cases that cite this headnote

[9] **Contracts**
👉 Construing instruments together

**Contracts**
👉 Legal remedies and proceedings

Even if parties' subscription agreement, unlike the parties' share sale agreement, did not clearly indicate that English courts were to have exclusive jurisdiction as to any legal disputes arising between the parties, the two documents were executed contemporaneously such that they were to be read together in manner as to mandate jurisdiction in the English courts and preclude bifurcation

of claims arising from either document, in action in which shareholders alleged that corporation breached stock purchase agreement.

8 Cases that cite this headnote

[10]   Contracts
        👉 Legal remedies and proceedings

Even if parties' subscription agreement, unlike the parties' share sale agreement, did not clearly indicate that English courts were to have exclusive jurisdiction as to any legal disputes arising between the parties, policy concerns precluded bifurcation of claims arising from the separate documents, in action against corporation in which shareholders alleged breach of stock purchase agreement; claim splitting would have run counter to res judicata principles, encouraged forum shopping, and availed the possibility of conflicting verdicts.

2 Cases that cite this headnote

[11]   Judgment
        👉 Nature and requisites of former recovery as bar in general
       Judgment
        👉 Nature and elements of bar or estoppel by former adjudication

Res judicata minimizes inefficiency and inequity by making a judgment binding as to all claims that could and therefore should have been brought in the initial litigation.

1 Cases that cite this headnote

[12]   Contracts
        👉 Legal remedies and proceedings

Shareholders' non-contract claims against corporation grew out of the parties' contractual relationship and depended upon the same set of facts as shareholders' contract claims, such that the non-contract claims were within scope of and subject to forum selection clauses within share sale agreement and subscription agreement, which designated

English courts as forum to resolve any legal disputes between the parties, thus precluding Chancery Court from exercising jurisdiction in action against corporation in which shareholders alleged breach of stock purchase agreement.

1 Cases that cite this headnote

[13]   Contracts
        👉 Legal remedies and proceedings

A forum selection clause should not be defeated by artful pleading of claims not based on the contract containing the clause if those claims grow out of the contractual relationship.

9 Cases that cite this headnote

## Attorneys and Law Firms

*1241 Charles J. Brown, III, Esquire, Archer & Greiner, Wilmington, Delaware; Mitchell D. Cohen, Esquire, Vedder Price P.C., New York, New York, Attorneys for Plaintiffs Ashall Homes Limited, Arthur Simon Davies, Scott Alexander Ashall, David William Ashall, Anthony Mark Ashall, and Thames Limited.

Daniel B. Rath, Esquire and Rebecca L. Butcher, Esquire, Landis, Rath & Cobb, LLP, Wilmington, Delaware; Kirk L. Brett, Esquire, Duval & Stachenfeld, LLP, New York, New York, Attorneys for Defendants ROK Entertainment Group Inc., Jonathan Kendrick, and Alex Renny.

## OPINION

STRINE, Vice Chancellor.

### I. Introduction

This dispute is between a corporation and its stockholders over whether the stockholders were tricked into making their investments in the company. The stockholders allege that the corporation's officers promised that, in return for investing in the company, the investors would

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.    3

ultimately receive shares of stock in a successor U.S. company that would be SEC-registered, unrestricted, and freely-tradable. That promise was allegedly broken when the stockholders were issued unregistered and restricted shares after executing the necessary investment agreements. Although the corporation and its officers dispute the merits of the stockholders' claims, they primarily point to forum selection provisions in the investment agreements, which choose the courts of England to adjudicate disputes between the parties, and argue that this court is precluded from exercising jurisdiction over the stockholders' claims. That is, the defendants raise the threshold question of whether this court is the proper venue to adjudicate this dispute.

After analyzing the agreements, my conclusion is that this court cannot exercise jurisdiction over the stockholders' claims without dishonoring the parties' contracts. Both of the investment agreements contain unequivocal language mandating exclusive jurisdiction in the courts of England. Under well-settled precedent, this court must honor such clear contractual expressions of intent to select a particular forum. [1]  **\*1242**  Therefore, I conclude that this matter should be dismissed pursuant to Rule 12(b)(3).

## II.  *Factual Background*

These are the facts as drawn from the complaint and the documents it incorporates.

### A.  *The Parties And The Structure Of The Investment*

In October 2007, defendants Jonathan Kendrick and Laurence Alexander, [2] officers and directors of a United Kingdom entity called ROK Entertainment Group Ltd. ("ROK U.K. Group"), solicited plaintiffs Ashall Homes Limited, Arthur Davies, Scott Ashall, David Ashall, Anthony Ashall, and Thames Limited (collectively, the "Ashall Plaintiffs") to invest in ROK U.K. Group. [3]  The proposed investment in ROK U.K. Group would be the first step in a three-part deal, where ROK U.K. Group would become a wholly-owned subsidiary of Cyberfund, Inc. ("Cyberfund"), an Oklahoma corporation, through a stock-for-stock exchange, and then Cyberfund would reincorporate in Delaware as ROK Entertainment Group, Inc. ("ROK Delaware"). [4]  That is, the Ashall Plaintiffs

allege that Kendrick and Alexander told them that, if they invested in ROK U.K. Group, their ROK U.K. Group shares would be converted to Cyberfund shares and ultimately to ROK Delaware shares. [5]  Kendrick and Alexander also allegedly told the Ashall Plaintiffs that "in exchange for their investment, within fourteen days of receipt of the investment funds, they would receive 'unrestricted,' 'free-to-trade' share certificates in Cyberfund that could be immediately traded." [6]  In particular, on October 16, 2007, Kendrick allegedly confirmed to the Ashall Plaintiffs that, if they invested in ROK U.K. Group, Cyberfund would issue a registration statement for their Cyberfund shares that would make the shares unrestricted after the stock-for-stock exchange was accomplished. [7]  Later that same month, Alexander allegedly told Thames Limited that it would receive unrestricted shares in exchange for its investment in ROK U.K. Group. [8]

Based on these representations, Ashall Homes Limited, Arthur Davies, Scott Ashall, David Ashall, and Anthony Ashall signed identical subscription agreements (the "Subscription Agreements") and collectively invested approximately $500,000 in ROK U.K. Group on November 8, 2007. [9]  On the same day, Thames Limited invested $1,000,000 in ROK U.K. Group. [10]  At the same time, each Ashall Plaintiff except Thames Limited executed identical share sale agreements (the "Share Sale Agreements") agreeing to swap their shares in ROK U.K. Group for shares in Cyberfund.  **\*1243**  [11] Thames Limited executed a Share Sale Agreement in February 2008. [12]

When the reincorporation of Cyberfund as the Delaware entity ROK Delaware was accomplished, Kendrick became ROK Delaware's Chairman, Alexander was named President and CEO, and Alex Renny was named Chief Financial Officer, Secretary, and Treasurer (as well as a director). [13]

### B.  *The Subscription Agreements And The Share Sale Agreements*

Two sets of agreements were required to effect the transformation of ROK U.K. Group shares into ROK Delaware shares. Under the Subscription Agreements,

Case 4:18-cv-04704  Document 9-3  Filed on 01/24/19 in TXSD  Page 20 of 131

the Ashall Plaintiffs agreed to purchase shares in ROK U.K. Group. Then, under the Share Sale Agreements, the Ashall Plaintiffs agreed to sell and transfer their shares in ROK U.K. Group to Cyberfund. Therefore, these two agreements accomplished the first and second steps in the three-step transformation of ROK U.K. Group into ROK Delaware. The agreements were executed simultaneously. [14]

Both the Subscription Agreements and the Share Sale Agreements contain forum selection provisions (the "Forum Selection Provisions") that vest jurisdiction in the English courts and choice of law clauses that require the agreements to be governed by and interpreted under English law. The relevant provision in the Subscription Agreements provides: "This Agreement shall be construed and interpreted in accordance with the laws of England and the English courts shall have jurisdiction over any disputes arising hereunder." [15] And, the Share Sale Agreements provide: "This Agreement shall be governed and interpreted in accordance with English law and the parties submit to the exclusive jurisdiction of the English courts." [16]

In relevant part, the Share Sale Agreements also plainly provide that Cyberfund would issue shares to the Ashall Plaintiffs that were both restricted and unregistered: "The Shareholder acknowledges and agrees that the Cyberfund Shares issued to the Shareholder on Closing shall be subject to restrictions on their sale or transfer in accordance with United States law and that such Cyberfund Shares shall, unless otherwise agreed, be issued on an unregistered basis." [17] Notably, that language expressly contradicts the alleged earlier oral promises from Kendrick and Alexander that the shares would be registered and unrestricted. The Share Sale Agreements also state that "[i]f Closing has not taken place by 31 December 2007, then this Agreement shall be of no further force and effect and shall be automatically terminated." [18] "Closing" is defined in the Share Sale Agreements as "when the Company shall validly allot and issue to the Shareholder the ... Cyberfund Shares." [19] Also, the Share Sale Agreements did not include an integration clause, although the Subscription Agreements contained such a provision, stating that "[t]his Agreement sets forth the entire **1244** Agreement and understanding between the Parties and *supersedes all oral and written understandings, representations and discussions between them respecting its*

*subject matter.*" [20] Finally, the Share Sale Agreements provide that "[n]o term of this Agreement is enforceable under the Contracts (Rights of Third Parties) Act of 1999 by a person who is not a party to this Agreement." [21]

### C. *The Stock Certificates*

As planned, after the Ashall Plaintiffs invested in ROK U.K. Group, they received stock certificates for their respective shares. [22] And, following the stock-for-stock exchange, the Ashall Plaintiff's ROK U.K. Group shares were converted to Cyberfund shares in turn. [23] But, because of the impending reincorporation of Cyberfund as ROK Delaware, Cyberfund gave the Ashall Plaintiffs written notice on December 19, 2007 (the "December Notice") that it would not issue stock certificates to the Ashall Plaintiffs until that reincorporation was accomplished. [24] The letter indicated that the brief delay-reincorporation was "scheduled to occur at the end of December 2007"-was simply to avoid issuing stock certificates in Cyberfund's name and then having to re-issue certificates in ROK Delaware's name shortly thereafter. [25] In February 2008, after that reincorporation was completed, ROK Delaware issued the Ashall Plaintiffs stock certificates that reflected the shares issued to them in exchange for their ROK U.K. Group shares in the exchange with Cyberfund. [26] The ROK Delaware stock certificates stated that the Ashall Plaintiffs' shares were restricted. [27]

Upon receiving the ROK Delaware shares, the Ashall Plaintiffs returned them because they were restricted and repeatedly requested that ROK Delaware issue unrestricted shares. [28] Allegedly, ROK Delaware repeatedly assured the Ashall Plaintiffs through April and May 2008 that unrestricted shares would eventually be issued. [29] On June 6, 2009, the Ashall Plaintiffs filed their complaint alleging that the defendants fraudulently induced the Ashall Plaintiffs to invest in ROK U.K. Group (Counts I and II); that ROK Delaware, as the legal successor to ROK U.K. Group and Cyberfund, breached its contract with the Ashall Plaintiffs to sell unrestricted stock (Counts III and IX); that the defendants committed deceit, negligently misrepresented, or tortiously interfered with business relations by making false statements to the Ashall Plaintiffs (Counts IV through VIII); that

ROK Delaware wrongfully converted the money the Ashall Plaintiffs invested in ROK U.K. **\*1245** Group (Count X); and that the Ashall Plaintiffs are entitled to rescission of the Subscription Agreements (Count XI). The central theme to the Ashall Plaintiffs' arguments on all of these counts is that the defendants' oral promises to issue unrestricted, registered shares overrode the express language in the Share Sale Agreements indicating that the shares to be issued would be restricted and unregistered. [30]

### III. *Analysis*

**[1]**   The defendants move to dismiss the Ashall Plaintiffs' complaint under both Rule 12(b)(3) and Rule 12(b)(6). Because dismissal is mandated under Rule 12(b)(3), I do not reach the Rule 12(b)(6) argument.

#### A. *Legal Standard*

**[2]   [3]**   The courts of Delaware defer to forum selection clauses and routinely "give effect to the terms of private agreements to resolve disputes in a designated judicial forum out of respect for the parties' contractual designation." [31]   Under Court of Chancery Rule 12(b)(3), a court will grant a motion to dismiss based upon a forum selection clause where the parties "use express language clearly indicating that the forum selection clause excludes all other courts before which those parties could otherwise properly bring an action." [32]   Forum selection clauses can be applied not only to contract-based claims but also tort claims arising out of, or depending upon, the contractual relationship in question. [33]

**[4]**   When a contract contains a forum selection clause, this court will interpret the forum selection clause in accordance with the law chosen to govern the contract. [34]   Here, the agreements clearly chose English law to govern the parties' relationship, [35]   and it appears that most of the relevant conduct occurred in England, and that none of the conduct on which the **\*1246** Ashall Plaintiffs' claims turn occurred in Delaware. It is telling, however, that neither party has cited to English law-the law for which they bargained-in its briefing on this motion to any material degree. That illustrates a basic problem with

adjudicating this dispute in Delaware: this court does not have-and cannot pretend to have-the same knowledge of English law or even access to English sources as the courts of England. In deference to the English courts, for which this court has great respect, and because the parties have not cited to English law to an appreciable extent, [36]   the analysis will proceed exclusively under Delaware law.

#### B. *The Parties Agreed To Submit This Dispute To The Exclusive Jurisdiction Of The English Courts*

The issue is whether the Forum Selection Provisions in the Subscription Agreements and the Share Sale Agreements preclude this court from exercising jurisdiction over the Ashall Plaintiffs' claims. The defendants argue that those Forum Selection Provisions clearly require the Ashall Plaintiffs to bring their claims in the courts of England. In response, the Ashall Plaintiffs make four arguments for why the Forum Selection Provisions are inoperative: first, they argue that the Share Sale Agreements terminated on December 31, 2007 because closing had not yet occurred; second, they argue that the defendants do not have standing to enforce the provisions of the Share Sale Agreements; third, they argue that the Forum Selection Provision in the Subscription Agreements does not exclusively choose English courts; and fourth, they argue that, even if the Subscription Agreements' Forum Selection Provisions do exclusively choose the courts of England, the Forum Selection Provisions do not encompass their claims.

I analyze these arguments below. Because some of the Ashall Plaintiffs' arguments apply to one agreement but not the other, I consider the enforceability of each agreement's Forum Selection Provision separately. But, the conclusion as to both agreements is the same: each agreement mandates exclusive jurisdiction in the English courts.

##### 1. *The Share Sale Agreements Mandate Exclusive Jurisdiction In The English Courts*

**[5]**   The language of the Share Sale Agreements clearly provides for the courts of England to have exclusive jurisdiction. The Share Sale Agreements' Forum Selection Provision reads as follows: "This Agreement shall be governed and interpreted in accordance with English law

and the parties submit to the *exclusive* jurisdiction **\*1247** of the English courts." [37] It is hard to imagine a clearer indication that the English courts are to have exclusive jurisdiction over disputes arising from the agreement.

Nevertheless, the Ashall Plaintiffs make a number of arguments, why the Forum Selection Provision in the Share Sale Agreements does not apply. First, the Ashall Plaintiffs argue that the Forum Selection Provision in the Share Sale Agreements cannot be enforced because the Share Sale Agreements terminated on December 31, 2007. As noted above, the Share Sale Agreements provided that the Agreements would terminate on December 31, 2007 unless the stockholders were allotted and issued the Cyberfund shares. [38] Because the Cyberfund shares were not issued until February 2008, the Ashall Plaintiffs argue that the Share Sale Agreements terminated by their terms, and therefore the Forum Selection Provision is unenforceable. In response, the defendants argue that the Ashall Plaintiffs waived their right to enforce the Share Sale Agreements' termination provision, and therefore the Forum Selection Provision in those agreements still has force.

[6]    The Ashall Plaintiffs' argument must be rejected because interpretation of the Share Sale Agreements' termination provision and application of the doctrine of contractual waiver are issues for the court identified in the Forum Selection Provisions to decide. Given the evidence in the record, it is easy to see how an English court might decide that the Ashall Plaintiffs waived their rights to enforce the termination provision. For example, under Delaware law, a waiver is found where a party had actual or constructive notice of a known right, [39] and that the party "voluntarily and intentionally relinquished [that] known right." [40] The policy underlying the rule is that a "party cannot both accept the benefits which accrue under a contract on the one hand and shirk its disadvantages on the other." [41] Before the termination date, the Ashall Plaintiffs received the December Notice indicating that, for simple efficiency reasons, the stock certificates would not be delivered until after Cyberfund reincorporated as ROK Delaware, which was scheduled to occur shortly thereafter. [42] Therefore, the Ashall Plaintiffs had express notice that Cyberfund intended to postpone the issuance of the stock certificates past the contractual termination **\*1248** deadline. But, upon receiving the December Notice, the Ashall Plaintiffs apparently never protested

the delayed delivery of the stock certificates. Indeed, when they received the certificates in February 2008, they returned them to ROK Delaware because they were restricted shares, not because they came a month late. [43] And, the Ashall Plaintiffs repeatedly contacted ROK Delaware over the next several months requesting reissued shares, indicating that they still sought the benefits of the contract. [44] Furthermore, Thames Limited executed a Share Sale Agreement in February 2008, [45] over a month *after* the Share Sale Agreements purportedly terminated. Therefore, based on this evidence, the court selected by the parties to adjudicate disputes under the Share Sale Agreements might reasonably conclude that, because the Ashall Plaintiffs received explicit notice of the delay and therefore knew that the certificates would only be delivered after the reincorporation occurred, their (1) failure to object to the timing of delivery of the certificates, and (2) repeated attempts to reap the benefits of the contract constituted a voluntary and intentional waiver of any right to allege the termination of the Share Sale Agreements. [46]

But, at this stage in the analysis-where this court is to decide whether it can exercise jurisdiction over a dispute, and not to decide the outcome of the dispute itself-coming to a conclusion as to whether the Share Sale Agreements' termination provision was waived would be inappropriate. To do so might allow a party to circumvent duties for which the other party bargained. Deciding, for example, that the Ashall Plaintiffs did not waive their rights, and that the termination provision therefore applies, would allow the Ashall Plaintiffs to make an end-run around an otherwise enforceable Forum Selection Provision through an argument about the enforceability of other terms in the contract. Such an end-run has been denied in the analogous situation of enforcement of arbitration provisions, where courts have held that a claim that a contract was fraudulently induced is for the arbitrator, not a court, to decide. [47] Here, I cannot decide whether the termination provision applies without usurping the role of the English courts, which were expressly charged with adjudicating disputes over the Share Sale Agreements.

[7]    The Ashall Plaintiffs' second argument for why the Forum Selection Provision in the Share Sale Agreements does not apply is that the defendants do not have standing to enforce the terms of the Share Sale Agreements. As

noted above, the Share Sale Agreements provide that "[n]o term of this Agreement is enforceable ... by a person who is not a party to **\*1249** this Agreement." [48] The Ashall Plaintiffs argue that that provision precludes the defendants from enforcing the Share Sale Agreements because they were not signatories to the Agreements, which were executed by Cyberfund. But, the Ashall Plaintiffs' reliance on that provision overlooks their own allegation that "ROK is the *legal successor* by merger to Cyberfund." [49] Indeed, the Share Sale Agreements provide that they "shall be binding on and shall survive for the benefit of the successors in title and permitted assigns of the Parties." [50] Therefore, the Share Sale Agreements expressly permit defendant ROK Delaware, as Cyberfund's successor, to invoke the Forum Selection Provision. Furthermore, defendants Kendrick and Renny, officers and directors of ROK U.K. Group, Cyberfund, and ROK Delaware, have standing to invoke the Forum Selection Provision as parties "closely related to one of the signatories such that the non-party's enforcement of the clause is foreseeable by virtue of the relationship between the signatory and the party sought to be bound." [51] Because Kendrick and Renny solicited the Ashall Plaintiffs to participate in the investment, because Kendrick and Renny managed the Cyberfund acquisition and the reincorporation of ROK Delaware, and because they are being sued by the Ashall Plaintiffs as a result of acts that the Ashall Plaintiffs themselves contend directly implicate the negotiation of and performance under the Share Sale Agreements, it was foreseeable that the defendants would invoke the Forum Selection Provision of the Share Sale Agreements, and it would be inequitable to permit the Ashall Plaintiffs to escape their contractual promise to litigate all disputes arising under the Share Sale Agreements in England.

### 2. *The Subscription Agreements Also Mandate Exclusive Jurisdiction In The English Courts*

**[8]**   **[9]**   **[10]**   The language of the Forum Selection Provision in the Subscription **\*1250** Agreements is different from that of the Share Sale Agreements. The Forum Selection Provision in the Subscription Agreements provides in relevant part: "English courts shall have jurisdiction over any disputes arising hereunder." [52] The Ashall Plaintiffs argue that this language is simply permissive and does not expressly require that disputes under the Subscription Agreements can only be brought in English courts.

But, that argument overlooks precedent that reads a provision stating that a court *shall* have jurisdiction over *any* dispute as a mandatory, rather than permissive, grant of jurisdiction. For example, in *Prestancia Mgmt. Group Inc. v. Va. Heritage Found., II LLC,* this court interpreted an almost identical forum selection clause and concluded that it was mandatory. [53] The forum selection clause in *Prestancia* provided: "The jurisdiction for any controversy arising [under the Security Agreement] shall be in the courts of competent jurisdiction of Loudoun County, Virginia." [54] The court focused on the use of the word "any" and reasoned that "use of the word 'any' ... connotes all-encompassing inclusion." [55]

Furthermore, even if the Subscription Agreements' language did not clearly indicate exclusivity-which it does-the rule that related contemporaneous documents should be read together [56] requires the Subscription Agreements' Forum Selection Provision to be read as mandating jurisdiction in the English courts as the Share Sale Agreements' Forum Selection Provision **\*1251** does. Not only were the Share Sale Agreements and the Subscription Agreements executed contemporaneously, but they also effectuated separate steps of a single integrated scheme for changing ROK U.K. Group shares ultimately into ROK Delaware shares.

**[11]**   Finally, there is an important policy reason for adjudicating all of the disputes relating to these two agreements in one court. Because the two agreements are intertwined, the wisdom of the rule that related agreements are to be read together is apparent: bifurcating this dispute-so as to send claims arising from the Share Sale Agreements to the English courts, but to keep claims arising from the Subscription Agreements here in this court-would result in obvious inefficiencies and confusion. Those inefficiencies and the potential for injustice are serious enough that long-standing doctrines, such as res judicata and the Delaware Supreme Court's *McWane* doctrine, [57] have been developed to minimize claims splitting. Res judicata minimizes inefficiency and inequity by making a judgment binding as to all claims that could and therefore should have been brought in the initial litigation. [58] And, *McWane,* which generally confines

Case 4:18-cv-04704 Document 9-3 Filed on 01/24/19 in TXSD Page 24 of 131

litigation to one forum,[59] serves the public's interest in the orderly administration of justice by discouraging forum shopping and by reducing the risk of conflicting verdicts.[60]

Here, where it is clear that the contract claims *must* be brought in England, it makes little sense to allow the Ashall Plaintiffs' claims to be split. Under *McWane* and other analogous doctrines, the Ashall Plaintiffs ought to be bound for fairness and efficiency's sake to litigate in one place, and not force the defendants to unnecessarily expend resources on what would essentially be the same defense in multiple venues. That is especially so when all the Ashall Plaintiffs claims are governed by English law, all the key parties to this case reside in the United Kingdom,[61] and all the key events took place in the United Kingdom. Because this is not an internal affairs case, the fact that ROK U.K. Group was eventually to be a Delaware entity has no important relation to the underlying claims or events. That is, the presence of a Delaware corporation in a dispute is most relevant when Delaware's **\*1252** corporate law is at issue, or when Delaware entities use Delaware contract law to govern their relationship,[62] neither of which is the case here. Therefore, disputes relating to both the Share Sale Agreements and the Subscription Agreements should be heard together.

[12] [13] The Ashall Plaintiffs also argue that their claims fall outside the scope of the Forum Selection Provision in the Subscription Agreements because that provision is limited to claims "arising hereunder."[63] The Ashall Plaintiffs' contract-based claims, which allege breach of both the Subscription Agreements and the Share Sale Agreements,[64] are obviously within the scope of Subscription Agreements' Forum Selection Provision.[65] Therefore, the question is whether the Ashall Plaintiffs' non-contract claims are within the scope of the Forum Selection Provision. Courts in Delaware and other jurisdictions have found that "[a] forum selection clause should not be defeated by artful pleading of claims not based on the contract containing the clause if those claims grow out of the contractual relationship."[66] That rule not only prevents parties **\*1253** from escaping their contractual commitments to adjudicate their disputes in a particular forum but also allows the court to police the important boundary between the application of contract and tort doctrines. Tort claims related to a contractual relationship frequently require a determination of the contract's scope and of how the rights and duties created by that contract interact with the parties' general tort duties-questions that are typically freighted with public policy concerns.[67]

Here, the Ashall Plaintiffs' non-contract claims depend upon the same set of facts as their contract claims. That is, all of the claims involve the Ashall Plaintiffs' initial decision to invest, their execution of the Subscription Agreements and the Share Sale Agreements, and the parties' performance of their obligations under those agreements.[68] Resolution of these claims will require an analysis of the Subscription Agreements and the Share Sale Agreements.

Furthermore, because they allege that the defendants' fraudulent and tortious behavior has overridden the promises made in the agreements, the Ashall Plaintiff's non-contract claims necessarily raise the question of how the boundary between contract and tort is to be drawn in this case. That is, the Ashall Plaintiffs' central argument to give weight to the defendants' oral representations over the written contract terms requires the court to determine the extent to which the plain terms of the agreements preclude the Ashall Plaintiffs from arguing they were duped into investing in the defendants' scheme. Because the Share Sale Agreements provide that the Ashall Plaintiffs were to receive restricted, unregistered shares and the contemporaneously-entered Subscription Agreements contain an integration clause that plainly states that those agreements supersede all prior written or oral understandings,[69] striking the appropriate balance between the competing values served by tort and contract may well require an intricate consideration of the public policies of the jurisdiction whose law controls the parties' relationship-that is, England. **\*1254** [70] How far can a contract go to exculpate fraud?[71] Does the integration clause of the Subscription Agreements encompass the Share Sale Agreements too? Weighing the various English public policies implicated by these questions is best accomplished by an English court that is expert in English law.

IV. *Conclusion*

Because all of the Ashall Plaintiffs' claims fall under the forum selection provisions of the Share Sale Agreements and the Subscription Agreements, and because those provisions clearly mandate that the English courts have exclusive jurisdiction over any disputes arising from the contracts, the defendants' motion to dismiss must be GRANTED under Rule 12(b)(3). IT IS SO ORDERED.

**All Citations**

992 A.2d 1239

## Footnotes

1   *Troy Corp. v. Schoon,* 2007 WL 949441, at *2 (Del.Ch. Mar.26, 2007); *see also Prestancia,* 2005 WL 1364616, at *7 (Del.Ch. May 27, 2005) (quoting DONALD J. WOLFE, JR. MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY 5-4[a], at 5-53 to 5-54 (2005)).

2   Recently, all claims against Alexander were voluntarily dismissed. *See* Stipulation of Dismissal Without Prejudice (Jan. 19, 2010).

3   Compl. ¶ 22.

4   Therefore, all of the parties, with the exception of Cyberfund, ROK Delaware, and Thames Limited, which is incorporated and has a business address in Mauritius, reside in the United Kingdom. *Id.* at ¶¶ 3-14.

5   *Id.* at ¶¶ 22-25.

6   *Id.* at ¶ 23.

7   *Id.*

8   *Id.*

9   *Id.* at ¶ 26.

10   *Id.* at ¶ 29.

11   *Id.* at ¶ 28.

12   *Id.* at ¶ 31; Def.'s Reply Br. 8.

13   Compl. ¶ 37.

14   *Compare* Def.'s Op. Br. Ex. A (Share Sale Agreement (Nov. 9, 2007)) (the "Share Sale Agreements") *with* Def.'s Op. Br. Ex. B. (Subscription Agreement (Nov. 8, 2007)) (the "Subscription Agreements").

15   Subscription Agreements § 4(c).

16   Share Sale Agreements § 8.

17   *Id.* at § 6.2.

18   *Id.* at § 4.2.

19   *Id.* at § 4.1.

20   Subscription Agreements § 4(b) (emphasis added).

21   Share Sale Agreements § 7.

22   Compl. ¶ 27.

23   *Id.* at ¶ 33.

24   In a letter dated December 19, 2007, the stockholders were informed that no Cyberfund shares would be issued because those shares "would need to be returned and then re-issued when the company becomes ROK Entertainment Group Inc. At that stage, any documentation bearing the Cyberfund name would become invalid. It would mean the return of the Cyberfund share certificates and issuing of the new ROK Entertainment Group Inc. share certificates. Consequently, we think it is prudent and efficient that issuance occurs on completion of the name change." Compl. Ex. D (the "December 19 Notice").

25   *Id.*

26   *Id.* at ¶ 39.

27   *Id.*

28   *Id.* at ¶¶ 40, 42, 46.

29   *Id.* at ¶¶ 42, 45-48.

30   Pl.'s Ans. Br. 13-18.

31    *Troy,* 2007 WL 949441, at *2; *see also Prestancia,* 2005 WL 1364616, at *7 (quoting WOLFE PITTENGER 5-4[a], at 5-53 to 5-54).

32    *Eisenbud v. Omnitech Corp. Solutions, Inc.,* 1996 WL 162245, at *1 (Del.Ch. Mar. 21, 1996).

33    *See Hugel v. Corp. of Lloyd's,* 999 F.2d 206, 209 (7th Cir.1993) (Regardless of the duty sought to be enforced in a particular cause of action, if the duty arises from the contract, the forum selection clause governs the action.); *Lambert v. Kysar,* 983 F.2d 1110, 1121 (1st Cir.1993) (rejecting the argument that a forum selection clause did not apply to tort claims and stating that [w]e cannot accept the invitation to reward attempts to evade enforcement of forum selection agreements through artful pleading of [tort] claims' in the context of a contract dispute); *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.,* 709 F.2d 190, 203 (3d Cir.1983) ("We agree with those courts have held that where the relationship between the parties is contractual, the pleading of alternative non-contractual theories of liability should not prevent enforcement of such a bargain." (citations omitted)), *overruled on other grounds* 490 U.S. 495, 109 S.Ct. 1976, 104 L.Ed.2d 548 (1989); *Simon v. Navellier Series Fund,* 2000 WL 1597890, at *5 n. 18 (Del.Ch. Oct. 19, 2000) (citing cases holding that a forum selection clause will not be defeated by recasting contract claims as tort claims for the proposition that "artful pleading" designed to circumvent enforcement of the parties' contractual choice of forum is inappropriate); *Loveman v. Nusmile, Inc.,* 2009 WL 847655, at *4 (Del.Super. Mar. 31, 2009) ("Authority from this and other jurisdictions provides that 'where the relationship between the parties is contractual, the pleading of alternative non-contractual theories of liability should not prevent enforcement of such a bargain.' " (citations omitted)).

34    *See Del Pharm., Inc. v. Access Pharm., Inc.,* 2004 WL 1631355, at *1 (Del.Ch. Jul. 16, 2004); *see also Fitzgerald v. Cantor,* 1998 WL 842304, at *1-2 (Del.Ch. Nov. 5, 1998).

35    *See supra* page 1243.

36    On the question of whether the Forum Selection Provisions preclude this court from exercising jurisdiction over the dispute, the Ashall Plaintiffs' briefing cited only one English case, and the defendants' briefs relied entirely on the U.S. Supreme Court's recitation of English law in its decades-old decision in *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). *See* Pl.'s Ans. Br. 4-13; Def.'s Op. Br. 6-9; Def.'s Rep. Br. 3-18. Apparently, the parties are in agreement that there is no material difference between English and Delaware law in regard to the enforceability of forum selection clauses. *See* Pl.'s Ans. Br. 5 n. 1 ("With regard to the ROK Defendants' argument regarding the applicability of the forum selection clauses in the Subscription Agreements and the Share Sale Agreements, the ROK Defendants admit that there is no substantial difference between Delaware law and English law. Therefore, a choice of law analysis is unnecessary, and Plaintiffs will hereafter cite to both Delaware and English case law where appropriate.") (citation omitted). Candidly, I am not sure that the parties' lawyers know enough about English law on the subject to know whether that is indeed the case. But I assume that they are correct.

37    Share Sale Agreement § 8 (emphasis added).

38    *See supra* page 1243.

39    *See Realty Growth Investors v. Council of Unit Owners,* 453 A.2d 450, 456 (Del.1982) ("Waiver is the voluntary and intentional relinquishment of a known right. It implies knowledge of all material facts, and intent to waive.") (internal citations omitted); *Julian v. E. States Constr. Serv.,* 2009 WL 1211642, at *8 (Del.Ch. May 5, 2009) ("To establish waiver, one must show that the other 'party voluntarily and intentionally relinquished a known right.' The asserting party must prove that the waiving party had actual or constructive notice of this known right.") (internal citations omitted); *Pers. Decisions, Inc. v. Bus. Planning Sys., Inc.,* 2008 WL 1932404, at *7 n. 40 (Del.Ch. May 5, 2008) (citing 13 WILLISTON ON CONTRACTS § 39:34 (4th ed.2000)) (noting that constructive knowledge is sufficient to effect a waiver).

40    *Danvir Corp. v. City of Wilmington,* 2008 WL 4560903, at *7 (Del.Ch. Oct. 6, 2008).

41    *Cianci v. JEM Enter., Inc.,* 2000 WL 1234647, at * 12 (Del.Ch. Aug. 22, 2000).

42    *See* Compl. Ex. D. (explaining that, if certificates were issued under the Cyberfund name, that documentation would be invalid after Cyberfund changed its name to ROK Delaware; therefore, as a matter of practicality, certificates would be delivered after the reincorporation and name change was completed).

43    The Ashall Plaintiffs returned the certificates on February 18, 2008, but their complaint only states that they returned the certificates because the shares were restricted. *See* Compl. ¶¶ 40, 42. There is no mention in their complaint or their briefing that the Ashall Plaintiffs objected to the certificates because the delayed issuance terminated the Share Sale Agreements.

44    *See supra* page 1244.

45    *See supra* page 1243.

46    *See Julian,* 2009 WL 1211642, at *10 (determining that defendant waived his right to challenge application of an amendment to a stockholder agreement because the defendant had knowledge of the amendment and failed to object to its application at the time).

47    *See, e.g., Karish v. SI Intern., Inc.,* 2002 WL 1402303, at *4 (Del.Ch. June 24, 2002) (A claim of fraud in the inducement of the contract generally as opposed to the arbitration clause itself is for the arbitrators and not for the courts. (quoting *Prima Paint Corp. v. Flood Conklin Mfg. Co.,* 388 U.S. 395, 400, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967))).

48    *See supra* page 1244.

49    Compl. ¶ 10 (emphasis added).

50    Share Sale Agreements § 6.3.

51    *BNY AIS Nominees Ltd. v. Quan,* 609 F.Supp.2d 269, 275 (D.Conn.2009) (quoting *Morag v. Quark Expeditions, Inc.,* 2008 WL 3166066, at *5 (D.Conn. Aug. 5, 2008); *see also Holland Am. Line Inc. v. Wärtsilä N. Am., Inc.,* 485 F.3d 450, 456 (9th Cir.2007) (where the alleged conduct of the nonparties is closely related to the contractual relationship, a range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses. (citation omitted)); *Grigson v. Creative Artists Agency L.L.C.,* 210 F.3d 524, 528 (5th Cir.2000) ( [A] signatory ... cannot have it both ways: it cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitrations applicability because the defendant is a non-signatory. (citation omitted)); *Hugel,* 999 F.2d at 209 (7th Cir.1993) (In order to bind a nonparty to a forum selection clause, the party must be closely related to the dispute such that it becomes foreseeable that it will be bound. (citations omitted)); *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.,* 10 F.3d 753, 757 (11th Cir.1993) (requiring a signatory to arbitrate with a non-signatory at the non-signatory's insistence because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the non-signatory's obligations and duties in the contract ... and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations.); *Cfirstclass Corp. v. Silverjet PLC,* 560 F.Supp.2d 324, 328 (S.D.N.Y.2008)) (finding that non-signatory manager and director had standing to enforce forum selection clause within contract related to the purchase of shares); *Ishimaru v. Fung,* 2005 WL 2899680, at *17-18 (Del.Ch. Oct. 26, 2005) (holding that a non-signatory subsidiary could enforce the arbitration provision in an agreement executed by its parent company).

52    Subscription Agreements § 4(c).

53    2005 WL 1364616, at *7.

54    *Id.* (alteration in original).

55    *Id.* The Ashall Plaintiffs argue that the Forum Selection Provision in the Subscription Agreements is "materially identical" to the forum selection clause at issue in *Eisenbud v. Omnitech Corp. Solutions, Inc.* 1996 WL 162245. The forum selection provision in *Eisenbud* provided that "the parties further agree the Court having *competent jurisdiction* over all legal and equitable matters shall be the Superior Court of the State of New Jersey in Bergen County, New Jersey." *Id.* at *1 (emphasis added). In interpreting that provision, this court found that this language permitted but did not mandate jurisdiction in the New Jersey Court. *Id.* at *2. But, this language is distinguishable: in *Eisenbud,* the provision simply identified a "competent jurisdiction;" here, as in *Prestancia,* the forum selection clause requires that "any" disputes "shall" be submitted to a particular jurisdiction.

56    *See Crown Books Corp. v. Bookstop Inc.,* 1990 WL 26166, at *1 (Del.Ch. Feb. 28, 1990) ("[I]n construing the legal obligations created by [a] document, it is appropriate for the court to consider not only the language of that document but also the language of contracts among the same parties executed or amended as of the same date that deal with related matters."); *see also* 17A C.J.S. Contracts § 315, at 337 (1999) ("In the absence of anything to indicate a contrary intention, writings executed at the same time and relating to the same transaction are construed together as a single contract, as though they were as much one in form as they are in substance, in order to determine the intent, rights, and interests of the parties."); 11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 30:26, at 239-42 (4th ed. 1999) ("Apart from the explicit incorporation by reference of one document into another, the principle that all writings which are part of the same transaction are interpreted together also finds application in the situation where incorporation by reference of another document may be inferred from the context in which the documents in question were executed. Thus, in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction will be considered and construed together as one contract or instrument, even though they do not in terms refer to each other."); RESTATEMENT (SECOND) OF CONTRACTS § 202(2) (1981) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.").

57    *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.,* 263 A.2d 281 (Del.1970).

**58** *See Betts v. Townsends,* 765 A.2d 531, 534 (Del.2000) (stating that the doctrine of res judicata forecloses a party from "bringing a second suit based on the same cause of action after a judgment has been entered in a prior suit involving the same parties"). The United States Supreme Court gave the classic formulation over a century ago:

> [T]he judgment, if rendered upon the merits, constitutes an absolute bay to a subsequent action. It is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.

*Cromwell v. County of Sac,* 94 U.S. 351, 352, 24 L.Ed. 195 (1876). The Delaware Supreme Court has described the doctrine's purpose as follows: "The fundamental basis of the doctrine of res judicata, and of its subsidiary rule, collateral estoppel, is that in the public interest a litigant may have one day in court but not two." *Malone Freight Lines, Inc. v. Johnson Motor Lines, Inc.,* 148 A.2d 770, 775 (Del.1959).

**59** *McWane,* 263 A.2d at 283 (deferring to plaintiff's initial choice of forum where the Delaware action is not the first filed).

**60** *Lisa, S.A. v. Mayorga,* 993 A.2d 1042, 1047, 2010 WL 1553768, at *4 (Del. Apr. 20, 2010).

**61** *See supra* note 4.

**62** *See Edgar v. MITE Corp.,* 457 U.S. 624, 645, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982) ("[O]nly one state should have authority to regulate a corporation's internal affairs-matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders."); *McDermott, Inc. v. Lewis,* 531 A.2d 206, 216 (Del.1987) (reasoning that application of a single state's law to govern the internal affairs of a corporation "serves the vital need for a single, constant and equal law to avoid the fragmentation of continuing, interdependent internal relationships" and that, "[w]ith the existence of multistate and multinational organizations, directors and officers have a significant right ... to know what law will be applied to their actions"); *Hynson v. Drummond Coal Co.,* 601 A.2d 570, 576 (Del.Ch.1991) ("[T]he internal affairs of a corporation ... are governed by the law of the corporation's domicile.").

**63** *See supra* page 1243.

**64** *See* Compl. ¶ 73 ("Plaintiffs have suffered damages as a direct and proximate result of ROK's breach of the *contracts* between the parties for the purchase of unrestricted stock.") (emphasis added).

**65** In their answering brief, the Ashall Plaintiffs nevertheless make the argument that, because the dispute is over ROK Delaware shares, the Subscription Agreements, which addressed the issuance of ROK U.K. Group shares, are not implicated at all, and therefore none of their claims-contract or otherwise-arise under the Subscription Agreements. Pl.'s Ans. Br. 9. But this argument must be rejected because-as the Ashall Plaintiffs' own complaint alleges-the Subscription Agreements and the Share Sale Agreements are part of a single, integrated investment scheme. *See* Compl. ¶¶ 54-55, 116-18, 125, 129, 130. The Ashall Plaintiffs cannot on one hand argue that the Subscription Agreements should be rescinded because they are part of a single scheme, and on the other hand argue that the Subscription Agreements are not implicated at all when they want to avoid the agreements' Forum Selection Provision. *See id.* at ¶ 125.

**66** *Simon,* 2000 WL 1597890, at *3; *see also supra* note 33. An opinion from the United States District Court for the Southern District of New York deciding the scope of a forum selection clause aptly summarizes the logic behind this rule:

> A forum selection clause should not be defeated by artful pleading of claims not based on the contract containing the clause if those claims grow out of the contractual relationship, or if 'the gist' of those claims is a breach of that relationship.... Thus, the circuit courts have held that a contractually-based forum selection clause will also encompass tort claims if the tort claims ultimately depend on the existence of a contractual relationship between the parties ... or if resolution of the claims relates to interpretation of the contract, ... or if the tort claims involve the same operative facts as a parallel claim for breach of contract.... [The] common thread running through these various formulations [of the rule] is the inquiry whether the plaintiff's claims depend on rights and duties that must be analyzed by reference to the contractual relationship.

*Direct Mail Prod. Serv. Ltd. v. MBNA Corp.,* 2000 WL 1277597, at *6 (S.D.N.Y. September 7, 2000) (internal citations omitted).

**67** The balancing of the public's interest in truthfulness with its interest in the predictability afforded by consistent enforcement of contractual promises that occurs when courts examine the extent to which contractual provisions, such as integration clauses, can exculpate fraud claims is an example of the policy issues that arise at the intersection of contract and tort. *See Abry Partners V, L.P. v. F & W Acquisition LLC,* 891 A.2d 1032, 1055-65 (Del.Ch.2006) (discussing the public policies implicated in the enforcement of integration clauses where fraud is alleged); *see also* Allen Blair, *A Matter of Trust: Should No-Reliance Clauses Bar Claims for Fraudulent Inducement of Contract?,* 92 MARQ. L.REV.. 423 (2009) (discussing the moral theories and public policies informing the case law, and arguing that no-reliance clauses can-and do-serve valuable contract functions); Kevin Davis, *Licensing Lies: Merger Clauses, the Parol Evidence Rule and Pre-Contractual*

*Misrepresentations,* 33 VAL. U.L.REV. . 485 (1999) (discussing the tension between the policies behind rules supporting contractual freedom and rules that relax the enforcement of contracts in certain circumstances, such as fraud).

68  Cf. *U.S. Fid. & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobras,* 2001 WL 300735 (S.D.N.Y. Mar.27, 2001) (finding that a forum selection clause providing that "any question arising from the performance of this Contract" encompassed claims for fraud, negligent misrepresentation, tortious interference with contract, and unjust enrichment).

69  *See supra* page 1243-44.

70  The choice of law clauses in the Subscription Agreements and Share Sale Agreements, which choose English law to govern the agreements, are also applicable to the non-contract claims because the claims arise from the parties' contractual relationship. *See Abry,* 891 A.2d at 1047-48.

71  In its *Abry* decision, this court explored many of the difficult issues raised by fraud claims that arguably involve representations of fact contrary to or disclaimed by an integrated contract, or which seek a remedy for a misrepresentation of fact incorporated in the contract that is barred by the contract's limitations on remedies. *Id.* at 1055-65. For example, in that case, the court acknowledged the Restatement's rule that "[a] term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy." *Id.* at 1059 (quoting RESTATEMENT (SECOND) OF CONTRACTS S 195 (1981)). But, the court eschewed the broad recklessness standard in the Restatement as Delaware common law and embraced a more contractarian rule based upon Delaware public policy that a contractual remedy limitation is effective to bar a rescission claim based on reckless misstatements, and will be overridden as a matter of public policy only if the plaintiff proves that the defendant intentionally lied about a representation of fact. *Id.* at 1064.

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2019 Thomson Reuters. No claim to original U.S. Government Works.   14

# EXHIBIT 3

Case 4:18-cv-04704 Document 9-3 Filed on 01/24/19 in TXSD Page 31 of 131

Ball Up, LLC v. Strategic Partners Corp., Not Reported in S.W. Rptr. (2018)

2018 WL 3673044
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

Court of Appeals of Texas, Fort Worth.

BALL UP, LLC, Appellant
v.
STRATEGIC PARTNERS CORP.; PG-
ACP Holdings, L.P.; PG-ACP Holdings
GP, LLC; and Mike Singer, Appellees
and
Strategic Partners Acquisition Corp. f/
k/a PG-ACP Acquisition Corp. Appellant
v.
Ball Up, LLC, Appellee

NO. 02-17-00197-CV, NO. 02-17-00198-CV
|
DELIVERED: August 2, 2018

FROM THE 17TH DISTRICT COURT OF TARRANT
COUNTY, TRIAL COURT NO. 017-283538-16, HON.
MELODY WILKINSON, JUDGE

**Attorneys and Law Firms**

ATTORNEY FOR APPELLANT: ANDREW D.
KEETCH, SCOTT A. FREDRICKS, DEREK
CARSON, CANTEY HANGER LLP, FORT WORTH,
TX.

ATTORNEY FOR APPELLEE: STACEY L.
ZILL, JESSE J. CONTRERAS, MICHLEMAN &
ROBINSON, LLP, LOS ANGELES, CA, JODY
SANDERS, MALLORY A. SCHUIT, KELLY HART
& HALLMAN LLP, FORT WORTH, TX.

PANEL: WALKER, MEIER, and BIRDWELL, JJ.


**MEMORANDUM OPINION** [1]

SUE WALKER, JUSTICE

**I. INTRODUCTION**

*1 These two related interlocutory appeals arise
from the trial court's orders sustaining and denying
special appearances. Because the facts concerning these
appeals are intertwined, we dispose of them in a single
memorandum opinion.

Appellant Ball Up, LLC filed suit in Tarrant County,
Texas, alleging causes of action for fraud/intentional
misrepresentation, conspiracy, and alternatively negligent
misrepresentation. Ball Up named as defendants: Mike
Singer individually; Strategic Partners, Inc.; Strategic
Distribution, LP; and Strategic General Partners, LLC—
these three entity defendants made general appearances
and are not parties to these appeals. Ball Up's Tarrant
County suit also named as defendants Strategic Partners
Corp.; PG-ACP Holdings, L.P.; PG-ACP Holdings
GP, LLC; and Strategic Partners Acquisition Corp.
(individually, SPAC). [2]

After a hearing, the trial court signed orders and amended
orders sustaining special appearances filed by Singer
individually and the Appellee Entities—Strategic Partners
Corp.; PG-ACP Holdings, L.P.; and PG-ACP Holdings
GP, LLC. The trial court denied the special appearance
filed by SPAC. The trial court did not issue findings of fact
and conclusions of law.

Ball Up perfected an interlocutory appeal from the
trial court's orders sustaining the special appearances of
Singer and the Appellee Entities. Ball Up raises three
issues. Ball Up's first issue claims that although Ball
Up is a nonsignatory, nonparty to Singer's unsigned
personal investment contracts with two entities named
One Holdings, LLC and Midland Entertainment, LLC, [3]
Ball Up may nonetheless enforce the forum-selection
clauses contained in those investment contracts to obtain
personal jurisdiction over Singer in Texas. Ball Up's
second and third issues claim that the trial court erred
by sustaining Singer's and the Appellee Entities' special
appearances because Ball Up pleaded and proved that
"their work on an apparel and footwear project [was]
centered in Texas with a Texas company and because they
directed a tort at Texas, to cause harm in Texas to a Texas
company."

SPAC also perfected an interlocutory appeal from the trial
court's order denying its special appearance and raises a
single issue asserting that Ball Up failed to plead or prove
facts establishing general or specific jurisdiction over

Ball Up, LLC v. Strategic Partners Corp., Not Reported in S.W. Rptr. (2018)

Case 4:18-cv-04704   Document 9-3   Filed on 01/24/19 in TXSD   Page 32 of 131

SPAC exists in Texas and that SPAC offered jurisdictional evidence establishing that it is a nonresident that lacks any contacts with Texas.

For the reasons set forth below, we hold that Ball Up cannot enforce the forum-selection clauses contained in Singer's personal investment contracts with One Holdings and Midland Entertainment because Ball Up is neither a party nor a signatory to the investment contracts. We also hold that Ball Up did not plead facts establishing personal jurisdiction exists in Texas over Singer, over each of the Appellee Entities, or over SPAC or prove facts establishing a jurisdictional alter-ego/veil-piercing theory whereby the acts or contacts of the generally-appearing defendants, the Appellee Entities, or SPAC could be attributed to another of them for jurisdictional purposes. Accordingly, we will affirm the trial court's orders granting the special appearances of Singer and the Appellee Entities, reverse the trial court's order denying SPAC's special appearance, render judgment dismissing SPAC from the suit filed by Ball Up, and remand this case to the trial court for further proceedings consistent with this opinion.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Ball Up Negotiates with Singer Concerning the Manufacture of Shoes and Apparel as Part of Ball Up's "Million Dollar Summer Challenge"

**\*2**  Ball Up is a Texas limited liability company and, according to its pleadings, is an internationally recognized "street" basketball entertainment company.[4] Ball Up contends that it invested significant funds into the 2015 "Million Dollar Summer Challenge"—a nationwide street basketball tournament featuring teams and players from cities across the country. The Million Dollar Summer Challenge included over $1 million in prizes, and the championship game aired on ESPN 2. Ball Up utilized the Million Dollar Summer Challenge to launch and promote Ball Up's new line of footwear and apparel; Ball Up planned for participants in the Million Dollar Summer Challenge to return to their respective cities across the country—New York, Chicago, etc.—wearing Ball Up apparel and footwear, thereby generating a market for Ball Up products.

In 2014, Singer and Ball Up entered into negotiations to create a joint venture between Ball Up and some of the defendant companies to create, market, sell, and distribute Ball Up's new line of apparel and footwear (the Ball Up Apparel Project). Singer and the Appellee Entities claim that the proposed joint-venture negotiations occurred between Ball Up and Singer, as CEO of the generally-appearing defendant Strategic Distribution, LP, and occurred in California or by phone or e-mail; that Singer never traveled to Texas as a part of the negotiations; and that no joint venture agreement was ever actually consummated.

Ball Up, however, in its pleadings and on appeal identifies the generally-appearing defendants, the Appellee Entities, and SPAC all together in its jurisdictional contentions as "SP";[5] for ease of reading, we likewise refer to the generally-appearing defendants, the Appellee Entities, and SPAC collectively as the "SP Companies." Ball Up contends that Singer arranged for representatives of the SP Companies to take Ball Up's representatives on two separate tours of a Texas distribution center—which the Appellee Entities, SPAC, and Singer claim is owned and operated by generally-appearing Strategic Distribution, LP. Ball Up alleges that this Texas distribution center was emphasized during the joint-venture negotiations due to its impressiveness and location and was "critical" to and a "key reason" for Ball Up's decision to do business with the SP Companies. Ball Up contends that a third meeting also occurred between Ball Up's and the SP Companies' representatives at the Texas distribution center.

### B. Singer Personally Invests in One Holdings, LLC and Midland Entertainment, LLC—Entities Purportedly Sharing Leadership With Ball Up

**\*3**  Around the same time that Ball Up engaged in joint-venture negotiations regarding the Ball Up Apparel Project, Singer decided to make personal investments totaling $3.1 million dollars[6] in two Texas limited liability companies—One Holdings, LLC and Midland Entertainment, LLC—both of which are operated by the same men who operate Ball Up: Bob Keetch and Demetrius Spencer. Ball Up argues that One Holdings and Ball Up have a "symbiotic" relationship, with One Holdings essentially providing production and media support for Ball Up.

During the negotiations between attorneys for Singer and One Holdings, regarding Singer's investment in One Holdings and Midland Entertainment, the parties exchanged several drafts of investment contracts, but none of the contracts were ever signed. Both the "Fourth Amended and Restated Company Agreement of One Holdings, LLC" (Company Agreement) and the "One Holdings, LLC Subscription Agreement" (Subscription Agreement) [7] provided to Singer and his attorneys contain forum-selection clauses, which Ball Up alleges apply in this case to bind Singer and to subject him to personal jurisdiction in Texas for Ball Up's lawsuit relating to the Ball Up Apparel Project. [8]

The relevant portion of the Company Agreement provides as follows:

> **11.11.** <u>Venue.</u> THE PARTIES HERETO CONSENT THAT VENUE OF ANY ACTION BROUGHT UNDER THIS AGREEMENT SHALL BE IN TARRANT COUNTY, TEXAS, <u>PROVIDED</u>, <u>HOWEVER</u>, THAT VENUE OF SUCH ACTION IS LEGALLY PROPER IN TARRANT COUNTY, TEXAS. [9]

The related Subscription Agreement provided to Singer and his attorneys for his investments with One Holdings also states, in part, as follows:

> 4. <u>Governing Law</u>. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE GOVERNED, CONSTRUED[,] AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS. THE PARTIES AGREE THAT <u>ANY LITIGATION DIRECTLY OR INDIRECTLY RELATING TO THIS AGREEMENT</u> MUST

BE BROUGHT BEFORE AND DETERMINED BY A COURT OF COMPETENT JURISDICTION WITHIN THE STATE OF TEXAS, AND THE PARTIES HEREBY AGREE TO WAIVE ANY RIGHTS TO OBJECT, AND HEREBY AGREE TO SUBMIT TO THE JURISDICTION OF SUCH COURTS. [Emphasis added.]

At the special appearance hearing, Ball Up produced evidence that during Singer's negotiations concerning his investment with One Holdings and after Singer had wired the first $1 million of his investment, Singer's attorney suggested changing the forum-selection clause in the Company Agreement from Texas to California. One Holdings's attorney declined to make the change, and just a few days later, Singer wired another $1 million of the agreed investment to One Holdings. Singer requested that all documents be finalized before he sent the final $500,000 of his One Holdings investment. However, Singer ultimately transferred the funds without signing the One Holdings Contracts.

### C. Negotiations Breakdown, and the Ball Up Apparel Project Never Materializes

**\*4** Ball Up contends that it needed more money to fund the Million Dollar Summer Challenge, so it approached Singer about a $1 million loan. Ball Up believed that Singer would be interested in seeing the Million Dollar Summer Challenge succeed because he and the SP Companies had already invested approximately $1.2 million in the related Ball Up Apparel Project and because their investment returns would be affected by the success of the Million Dollar Summer Challenge.

Ball Up alleges that by this time, Singer had already become disgruntled with his investments in One Holdings and Midland Entertainment, so instead of loaning additional money to Ball Up to fund the Million Dollar Summer Challenge, Singer allegedly threatened to terminate the SP Companies' alleged involvement in the Ball Up Apparel Project unless One Holdings and Midland Entertainment refunded his personal

Ball Up, LLC v. Strategic Partners Corp., Not Reported in S.W. Rptr. (2018)

Case 4:18-cv-04704 Document 9-3 Filed on 01/24/19 in TXSD Page 34 of 131

investments. Ball Up claims that One Holdings and Midland Entertainment made the concessions that Singer requested but alleges that Singer still terminated the Ball Up Apparel Project.

### D. Ball Up Sues Singer and the SP Companies in Tarrant County, Texas

Although Ball Up asserts that the Million Dollar Summer Challenge was ultimately a success, Ball Up claims that it lost the opportunity to capitalize on this success due to the failure of the Ball Up Apparel Project, which was caused by Singer and the SP Companies. Thus, Ball Up filed suit in the 17th District Court of Tarrant County, Texas, alleging claims for fraud/intentional misrepresentation, conspiracy, and alternatively negligent misrepresentation against Singer and against the SP Companies.

### III. BALL UP'S FIRST ISSUE—THE FORUM-SELECTION CLAUSES

#### A. The Parties' Positions

In its first issue, Ball Up contends that the trial court erred by sustaining Singer's special appearance because Singer consented to litigate Ball Up's fraud/intentional misrepresentation, conspiracy, and alternatively negligent misrepresentation claims against him in Texas state court based on the forum-selection clauses contained in Singer's personal investment contracts—the One Holdings Contracts. [10] Ball Up points out that One Holdings and Midland Entertainment are "operated under the leadership of the same men who operated in Ball Up's leadership—Demetrius Spencer and Bob Keetch" and contends that Singer leveraged the Ball Up Apparel Project to convince Spencer and Keetch to refund Singer's investment in One Holdings and Midland Entertainment. This alleged conduct by Singer, according to Ball Up, ties Ball Up's fraud/intentional misrepresentation, conspiracy, and alternatively negligent misrepresentation claims against Singer in connection with the Ball Up Apparel Project "directly or indirectly" to the One Holdings Contracts so that Ball Up's claims against Singer fall within the One Holdings Contracts' forum-selection clauses.

**\*5** Ball Up further argues that the forum-selection clauses are binding on Singer and enforceable against him despite the fact that he did not sign the One Holdings Contracts and argues that Ball Up's claims against Singer are directly or indirectly related to Singer's personal investments via the One Holdings Contracts because "Ball Up Alleges that Singer's Investment Dispute was the Basis for His Tortious Conduct, and Singer Cannot Disprove It." [11]

Singer counters, however, that even assuming the correctness of all of these contentions by Ball Up—that the forum-selection clauses contained in the One Holdings Contracts are binding on and enforceable against him and that his subjective reason for allegedly committing the torts Ball Up has pleaded was in some way tied to his investments in One Holdings and Midland Entertainment —nonetheless, Ball Up is a nonparty, nonsignatory, and total stranger to the personal investment transaction Singer entered into with One Holdings and Midland Entertainment via the unsigned One Holdings Contracts, and as such, Ball Up cannot enforce the forum-selection clauses contained in the One Holdings Contracts. [12]

In its reply brief, Ball Up explains its position that "Ball Up need not enforce Singer's jurisdiction agreement":

> Appellees cite to an arbitration case for the premise that Ball Up had an obligation to establish its right to enforce the forum selection clauses in the investment agreements, but this argument misses the mark. Singer agreed that "any litigation directly or indirectly relating to" his investments "must be brought before and determined by a court of competent jurisdiction within the State of Texas," and he waived jurisdictional objections to Texas. [Record citation omitted.] It's not a question of enforcement. It's a question of whether or not Singer agreed to jurisdiction in Texas for claims even indirectly relating to his investments. Ball Up alleged he did, and Singer could not disprove this.

#### B. Procedural Burdens of Proof Concerning Forum-Selection Clauses

A party to an agreement seeking to enforce the agreement's forum-selection clause bears the initial burden of proving that (1) the parties entered into an agreement to litigate in an exclusive forum and (2) the

Case 4:18-cv-04704 Document 9-3 Filed on 01/24/19 in TXSD Page 35 of 131

Ball Up, LLC v. Strategic Partners Corp., Not Reported in S.W. Rptr. (2018)

agreement applies to the claims involved. *See Lujan v. Alorica*, 445 S.W.3d 443, 448 (Tex. App.—El Paso 2014, no pet.); *Young v. Valt.X Holdings, Inc.*, 336 S.W.3d 258, 262 (Tex. App.—Austin 2010, pet. dism'd). The burden of establishing the existence of a valid and enforceable forum-selection clause includes proving that the party seeking to compel litigation in the contracted-for forum was a party to the agreement or had the right to enforce it. *See Pinto Tech. Ventures, L.P. v. Sheldon*, 526 S.W.3d 428, 443–47 (Tex. 2017); *see also In re Merrill Lynch Trust Co. FSB*, 123 S.W.3d 549, 554–55 (Tex. App.—San Antonio 2003, orig. proceeding) (so holding in the arbitration context), *mand. granted*, 235 S.W.3d 217 (Tex. 2007). That is, when a litigant seeks to compel litigation in a particular forum pursuant to a contract's forum-selection clause but that litigant was a nonparty, nonsignatory to the contract containing the forum-selection clause, the litigant seeking enforcement of the forum-selection clause bears the burden of establishing why and under what theory the litigant as a nonparty to a contract is nonetheless entitled to enforce the contract's forum-selection clause. [13]

### C. Substantive Law Concerning Who May Enforce Forum-Selection Clauses

**\*6** A forum-selection clause, like an arbitration clause, [14] is generally enforceable only "by and against" a party to the agreement containing the forum-selection clause. *Pinto Tech. Ventures, L.P.*, 526 S.W.3d at 443; *see also Black v. Diamond Offshore Drilling, Inc.*, No. 14-17-00011-CV, 2018 WL 2208205, at \*4 (Tex. App.—Houston [14th Dist.] May 15, 2018, no pet.) ("As a general rule, an arbitration clause or forum[-]selection clause cannot be invoked by a nonparty to the contract." (citing *G.T. Leach Builders, LLC v. Sapphire V.P., L.P.*, 458 S.W.3d 502, 524 (Tex. 2015) ) ). Because forum-selection clauses are creatures of contract, the circumstances in which nonsignatories or nonparties to a contract may enforce that contract's forum-selection clause are rare. *See Pinto Tech. Ventures, L.P.*, 526 S.W.3d at 432 (holding nonsignatories Owens and Burke could not enforce forum-selection clause against signatories Sheldon and Konya).

Legal theories do exist, however, by which nonsignatories to a contract may nonetheless enforce a contract's arbitration provision or forum-selection clause against signatories. *See id.* (setting forth the following

nonsignatory theories: (1) the transaction-participant theory; (2) the substantially interdependent and concerted misconduct doctrine; and (3) the mandatory-venue provisions in sections 15.004 and 15.020 of the Texas Civil Practice and Remedies Code). [15]

Ultimately, we determine the intent of the parties as expressed in the terms of the agreement—by applying ordinary principles of state contract law—to ascertain whether, based on the language of the forum-selection clause, a nonsignatory may enforce it. *Black*, 2018 WL 2208205, at \*4 (citing *G.T. Leach Builders, LLC*, 458 S.W.3d at 524, and *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 739 (Tex. 2005) (orig. proceeding). The deliberate inclusion of language in contracts may extend forum-selection-clause enforcement rights to nonsignatories. *See Pinto Tech. Ventures, L.P.*, 526 S.W.3d at 445 (citing *In re Rubiola*, 334 S.W.3d 220, 224–25 (Tex. 2011) (orig. proceeding), for the proposition that "parties to an arbitration agreement may grant nonsignatories the right to compel arbitration"). For example, because the agreement in *Rubiola* defined the term "parties" to include "Rubiola Mortgage Company and each and all persons and entities signing this agreement or any other agreement between or among any of the parties as part of this transaction" as well as "individual partners, affiliates, officers, directors, employees, agents, and/or representatives of any party to such documents[,]" the Texas Supreme Court held that Rubiola Mortgage Company's President and Vice President were, by express agreement, parties to the contract entitled to enforce the agreement's arbitration provision. *See id.* (quoting and explaining *Rubiola*, 334 S.W.3d at 222–23).

### D. Ball Up Does Not Allege Any Theory, and the Forum-Selection Clauses and Contracts Do Not Express Any Intent, for Enforcement by a Nonsignatory

**\*7** The Company Agreement and the Subscription Agreement both contain forum-selection clauses; however, using common principles of contract law and the parties' chosen language as the "fulcrum of our inquiry," neither the Company Agreement nor the Subscription Agreement nor their respective forum-selection clauses contain language expressing any intent to extend enforcement rights to nonsignatories other than those listed. *Cf. Rubiola*, 334 S.W.3d at 224–25 (holding

Case 4:18-cv-04704 Document 9-3 Filed on 01/24/19 in TXSD Page 36 of 131

Ball Up, LLC v. Strategic Partners Corp., Not Reported in S.W. Rptr. (2018)

arbitration clause enforceable by nonsignatory based on broad definition of "parties" contained in the agreement). For example, the Company Agreement and its forum-selection clause are contractually limited to enforcement by and against the parties to it and the parties' respective heirs, legal representatives, successors, and assigns. [16] The Subscription Agreement and its forum-selection clause are likewise contractually limited to enforcement by and against the parties to it together with the parties' respective executors, administrators, successors, personal representatives, heirs, and assigns. [17] Compare *Pinto Tech. Ventures, L.P.*, 526 S.W.3d at 444–45 (analyzing plain language of shareholder agreement to conclude agreement precluded nonsignatories from enforcing the agreement's forum-selection clause), *with Rubiola*, 334 S.W.3d at 222–23 (reaching opposite conclusion when contract broadly defined parties to include "Rubiola Mortgage Company, and each and all persons and entities signing this agreement or any other agreements between or among any of the parties as part of this transaction" as well as "individual partners, affiliates, officers, directors, employees, agents, and/or representatives of any party to such documents"). Here, Ball Up does not assert that it is an executor, administrator, successor, legal or personal representative, heir, or assignee of a party to the One Holdings Contracts, and Ball Up does not point to any language in the One Holdings Contracts permitting Ball Up—a nonsignatory and nonparty to Singer's personal investment contracts with One Holdings and Midland Entertainment—to enforce the forum-selection clauses in those contracts. *See Black*, 2018 WL 2208205, at \*4 (construing similar forum-selection clause and holding nonsignatories could not enforce it because they "do not argue they are 'successors or assigns, dependants [sic], executors[,] or administrators' of the parties").

Ball Up simply argues that by virtue of the unsigned One Holdings Contracts, Singer consented to Texas's personal jurisdiction over him, and Singer "cannot disprove it." But it is not Singer's burden to disprove his alleged consent to be bound by the forum-selection clauses in the One Holdings Contracts. It is Ball Up's burden to prove how Ball Up is authorized to enforce a forum-selection clause in Singer's One Holdings Contracts when Ball Up is a nonparty and nonsignatory to the One Holdings Contracts. *See Pinto Tech. Ventures, L.P.*, 526 S.W.3d at 443, 447 (explaining that nonsignatories contended they could enforce the forum-selection clause in the shareholder's agreement

under (1) the transaction-participant theory, (2) the substantially interdependent and concerted misconduct doctrine, and (3) the mandatory-venue provisions and concluding that because the nonsignatories "could not enforce the forum-selection clause ... under the legal theories presented, the trial court erred in granting their motion to dismiss").

Nor does Ball Up's factual allegation—that Ball Up, One Holdings, and Midland Entertainment share the same ownership or leadership—advance Ball Up's argument that it may enforce against Singer the forum-selection clauses in the One Holdings Contracts. *See id.* at 443 (holding that because Owens signed forum-selection-containing contract as company's CEO "but not in his individual capacity," when Owens in his individual capacity sought to enforce the forum-selection-containing contract he had signed as CEO, he was required to establish an exception to general rule of contracts that nonsignatory may not enforce contract); *see also In re Merrill Lynch Tr. Co. FSB*, 235 S.W.3d 185, 191 (Tex. 2007) (orig. proceeding) (explaining in the arbitration context that "[a] corporate relationship is generally not enough to bind a nonsignatory to an arbitration agreement"). Even if Keetch and Spencer had signed the One Holdings Contracts in their management or ownership capacity with those companies (which Ball Up does not allege or argue), Ball Up still would be unable to enforce the forum-selection clauses in those contracts against Singer based solely on this fact. *See Pinto Tech. Ventures, L.P.*, 526 S.W.3d at 443. And even if Ball Up was a corporate affiliate of One Holdings or Midland Entertainment (which Ball Up does not allege or argue), Ball Up still would be unable to enforce the forum-selection clauses in the One Holdings Contracts against Singer based solely on this fact. [18] *See Merrill Lynch Tr. Co. FSB*, 235 S.W.3d at 191 (explaining that "corporate affiliates are generally created to separate the businesses, liabilities, and contracts of each. Thus, a contract with one corporation—including a contract to arbitrate disputes —is generally not a contract with any other corporate affiliates").

**\*8** Because Ball Up has neither pleaded nor offered jurisdictional evidence that it is an executor, administrator, successor, legal or personal representative, heir, or assign of any party to the One Holdings Contracts or Singer and has not pleaded or offered jurisdictional evidence of any other facts or legal theory articulating

Case 4:18-cv-04704 Document 9-3 Filed on 01/24/19 in TXSD Page 37 of 131

Ball Up, LLC v. Strategic Partners Corp., Not Reported in S.W. Rptr. (2018)

how Ball Up possesses authority to enforce the One Holdings Contracts' forum-selection clauses when Ball Up is a nonsignatory, nonparty, and stranger to the One Holdings Contracts, we hold that Ball Up may not enforce the One Holdings Contracts' forum-selection clauses against Singer to attain personal jurisdiction over him in Texas in Ball Up's suit for fraud/intentional misrepresentation, civil conspiracy, and alternatively negligent misrepresentation. We overrule Ball Up's first issue. [19]

## IV. BALL UP'S SECOND AND THIRD ISSUES AND SPAC'S SOLE ISSUE— PERSONAL JURISDICTION OVER SINGER, THE APPELLEE ENTITIES, AND SPAC

In its second and third issues, respectively, Ball Up contends that the trial court possesses personal jurisdiction over Singer and the Appellee Entities because they worked on a project centered in Texas with a Texas company and because Ball Up provided evidence showing Singer's and Appellee Entities' intent and efforts directed at Texas to cause harm in Texas to a Texas Company.

In SPAC's sole issue in its appeal from the trial court order denying its amended special appearance, SPAC contends that the trial court erred by denying its special appearance because SPAC lacks the required minimum contacts with Texas.

We address these three issues together.

### A. Special Appearance Standard of Review and Burdens of Proof

Texas special-appearance law dictates that the plaintiff and the defendant bear shifting burdens of proof in a personal jurisdiction challenge. *M & F Worldwide Corp. v. Pepsi–Cola Metro. Bottling Co.*, 512 S.W.3d 878, 887 (Tex. 2017); *see also* Tex. R. Civ. P. 120a. The plaintiff bears the initial burden to plead sufficient allegations to invoke jurisdiction under the Texas long-arm statute. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007). A plaintiff may carry its initial pleading burden in its petition or its response to the defendant's special appearance. *Stull v. LaPlant*, 411 S.W.3d 129, 134 (Tex. App.—Dallas 2013, no pet.). However, if the plaintiff

fails to plead facts bringing the defendant within reach of the Texas long-arm statute, the defendant need only prove that it does not live in Texas to negate jurisdiction. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658–59 (Tex. 2010). (citing *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 438 (Tex. 1982) ). If the plaintiff does plead facts bringing the defendant within reach of the Texas long-arm statute, a defendant who contests the trial court's exercise of personal jurisdiction bears the burden of negating all bases of jurisdiction alleged by the plaintiff. *Moki Mac River Expeditions*, 221 S.W.3d at 574; *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 807 (Tex. 2002), *cert. denied*, 537 U.S. 1191 (2003).

**\*9** Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading. *Kelly*, 301 S.W.3d at 658–59. A defendant can negate jurisdiction on either a factual basis or a legal basis. *Id.* A defendant negates jurisdiction on a factual basis by presenting evidence to disprove the plaintiff's jurisdictional allegations. *Id.* Alternatively, a defendant negates jurisdiction on a legal basis by showing that even if the plaintiff's jurisdictional allegations are true, the allegations are legally insufficient to establish personal jurisdiction. *Id.*

In determining whether a defendant has negated all potential bases for jurisdiction, the trial court frequently must resolve questions of fact. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). When a trial court does not issue findings of fact or conclusions of law to support its special-appearance determination, we presume that all factual disputes were resolved in favor of the trial court's ruling. *Spir Star AG v. Kimich*, 310 S.W.3d 868, 871 (Tex. 2010). The conclusion that personal jurisdiction exists over a defendant is a conclusion of law that we review de novo. *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009).

### B. Ball Up's Pleadings

As partially set forth above, Ball Up's third amended original petition pleads that each of the defendants are separate foreign entities with principal places of business in California. Ball Up pleaded that "the entity defendants failed to maintain separate and distinct corporate entities such that the presence and/or contacts of one in Texas may

Ball Up, LLC v. Strategic Partners Corp., Not Reported in S.W. Rptr. (2018)

Case 4:18-cv-04704 Document 9-3 Filed on 01/24/19 in TXSD Page 38 of 131

be attributed to the others." In paragraphs 55 through 83, titled "SP's Acts on Ball Up Project," Ball Up sets forth acts it attributes globally to the SP Companies. In the remainder of its pleading, Ball Up sets forth its causes of action, again pleading claims "against Singer and SP for fraud/intentional misrepresentation" and "against Singer and SP for civil conspiracy" and asserting an "alternative claim against Singer and SP for negligent misrepresentation." Thus, Ball Up's third amended original petition does not plead specific facts or acts attributable to any individual defendant; instead, Ball Up pleads acts or facts attributable to the SP Companies.

The Appellee Entities and SPAC—in addition to pointing out that Ball Up does not plead acts relating to any individual Appellee Entity or to SPAC—also point out that Ball Up's third amended original petition does not plead any "facts establishing that a tort was committed" in whole or in part in Texas. Although Ball Up's claims plead that "Singer and SP represented to Ball Up that they would fund, staff[,] and execute the design, creation, marketing[,] and sales of apparel and footwear carrying the Ball Up Brand," that "[t]hese were a [sic] material representations that turned out to be false," and that "SP and Singer combined to accomplish an unlawful purpose," Ball Up does not plead that any part of the alleged torts occurred in Texas.

### C. The Special Appearances and Evidence of the Appellee Entities, SPAC, and Singer

Each of the Appellee Entities—Strategic Partners Corp; PG-ACP Holdings, L.P.; and PG-ACP Holdings GP, LLC—and SPAC attached to their respective special appearances a separate affidavit of Robert Pierpoint as the Executive Vice President of Strategic Partners Corp; as the Vice President of PG-ACP Holdings, L.P.; as the Vice President of PG-ACP Holdings GP, LLC.; and as the Executive Vice President of SPAC. According to Pierpoint's affidavits concerning Strategic Partners Corp; PG-ACP Holdings, L.P.; and PG-ACP Holdings GP, LLC, these entities are, respectively, a Delaware corporation, a Delaware limited partnership, and a Delaware limited partnership—all with their principal place of business in California. According to Pierpoint's affidavit concerning SPAC, it is a Delaware corporation with its principal place of business in California.

*10 Pierpoint's affidavits explain that PG-ACP Holdings, L.P. and PG-ACP Holdings GP, LLC are holding companies with no employees, offices, or business contacts. All four of Pierpoint's affidavits state that each of these entities does not do business in Texas, does not solicit customers in Texas, does not own real property in Texas, does not maintain an office or have employees in Texas, does not have a registered agent for service of process in Texas, has not entered into any contracts performable in whole or part in Texas, has not committed any statutory violations or torts in Texas, has no relation to the allegations in Ball Up's third amended original petition, has never authorized any representative to make any representations on its behalf to Ball Up with respect to any proposed joint venture with Ball Up, and has neither incurred expenses nor engaged in actions relating to any proposed joint venture with Ball Up.

Singer attached his own affidavit to his special appearance. Singer's detailed, forty-seven paragraph, five-page, single-spaced affidavit explains that Ball Up's allegation—"that I generally conduct business and/or tortious activities in Texas"—"is false." Singer explains that he was born in California, lives in California, and has never lived in Texas. He states that he does not regularly conduct business in Texas. As the CEO of generally-appearing Strategic Distribution, L.P. (which Singer refers to as Strategic Distribution throughout his affidavit), Singer states that he has "made telephone calls on an average of two to three times per year with Strategic Distribution's warehouse manager in Dallas, Texas," and has "had telephonic contact with Michael Penn at Williamson Dickie two to three times per year on matters unrelated to this suit." Singer explained that in his role as President of Strategic Distribution, he has "traveled to Texas on business for a tradeshow on one occasion," and that constitutes the totality of his contacts with Texas since January 2014. Singer states that he, individually, has never owned personal property or real estate in Texas; has never had a checking or savings account in Texas; has not committed a statutory violation, breach of contract, or tort, in whole or in part, in Texas; has never filed or defended a lawsuit in Texas; and has conducted no business activities in Texas with respect to Ball Up.

Singer explained that any work he performed regarding the proposed joint venture with Ball Up was for and on behalf of Strategic Distribution and was based out of

Ball Up, LLC v. Strategic Partners Corp., Not Reported in S.W. Rptr. (2018)

Case 4:18-cv-04704   Document 9-3   Filed on 01/24/19 in TXSD   Page 39 of 131

Strategic Distribution's office in Chatsworth, California, except for one meeting in Oregon and when he was traveling to places other than Texas and possibly sent emails or made phone calls relating to the proposed Ball Up joint venture. Singer explained that in his corporate capacity, the Strategic Distribution employees he supervised with respect to the proposed Ball Up Apparel Project worked out of Strategic Distribution's office in Chatsworth, California.

Singer denies that the Ball Up Apparel Project was centered in Texas; he alleges that "[a]ll management and control of the proposed Ball Up project was centered in California where Ball Up and Strategic Distribution are headquartered and conduct operations" and that "there were hundreds of meetings [his] staff participated in with and without Robert Keetch ("Keetch") and Demetrius Spencer ("Spencer") of Ball Up, all of which took place in California." Singer alleged that "Ball Up maintains its headquarters in Valley Village, California," and that as a representative of Strategic Distributions, his in-person communications with Ball Up representatives took place in Los Angeles County, California. Singer's affidavit expressly denied Ball Up's allegation that "SP has many employees and a very large business facility in Texas, and those resources were involved in the business effort at issue in this lawsuit." Singer pointed out,

> **\*11** [w]hile Strategic Distribution (which has appeared in this matter) operates a distribution center in Dallas, Texas, that facility and the employees who work there had only incidental involvement with the proposed Ball Up project. The project never reached a stage where there was even a single order from a retailer[,] so the manufacturing and distribution stage (outside of some samples and give-a-ways) was never realized and therefore never required significant involvement from Strategic Distribution's employees based in Dallas who handle distribution of manufactured apparel and footwear.

Likewise, Singer denied being present for or participating in any tour of the distribution center by any representative, investor, or potential investor of Ball Up.

Singer explained that in his capacity as Strategic Distribution's CEO, he was introduced to Spencer by a mutual acquaintance, Lavetta Willis, who knew Ball Up was looking for a company with the ability to design and manufacture Ball Up shoes and apparel. Singer said that he and Spencer engaged in exploratory conversations regarding a potential joint venture and that these conversations took place in person in California, not in Texas. Singer pointed out that his only involvement with Ball Up was in his capacity as CEO of generally-appearing Strategic Distribution and stated that there were "never any negotiations where I would participate in my individual capacity in the proposed Ball Up joint venture."

Finally, Singer specifically denied Ball Up's allegations that he owns or operates all of the other entities Ball Up has sued:

> 36. Plaintiff alleges that I acted as the general partner of Defendant PG-ACP Holdings, L.P. with respect to the Ball Up project. [Record reference omitted.] I am not and have never been the general partner of PG-ACP Holdings, L.P., nor did I act in any such capacity. This entity's general partner is PG-ACP Holdings GP, LLC. I am the President and CEO of PG-ACP Holdings GP, LLC. Any actions I have taken on behalf of PG-ACP Holdings, LP were in my role as President and CEO of its general partner.

> 37. I am not an owner of Defendant Strategic Distribution.

> 38. I am not a shareholder of Defendant Strategic Partners, Inc.

> 39. I am not a shareholder of Defendant Strategic Partners Corp.

> 40. I am not a shareholder of Defendant Strategic Partners Acquisition Corp.

> 41. I am not a member of Defendant Strategic Partners Midco, LLC.

Case 4:18-cv-04704 Document 9-3 Filed on 01/24/19 in TXSD Page 40 of 131

Ball Up, LLC v. Strategic Partners Corp., Not Reported in S.W. Rptr. (2018)

42. Individually, I do not own any voting units of defendant PG-ACP Holdings, L.P. My family collectively has indirect interests in PG-ACP Holdings, L.P., through various trusts, as holders of economic units. Those collective units constitute approximately twenty percent of the outstanding units. In any event, the economic unit holders of the limited partnership did not control or direct PG-ACP Holdings, L.P.

43. I am not a member of Defendant PG-ACP Holdings GP, LLC.

44. I am not a shareholder of Defendant PG-ACP Acquisition Corp.

45. I am not a member of Defendant Strategic General Partners, LLC.

46. My personal deposit and investment accounts are separate from the deposit and investment accounts owned and controlled by the other Defendants named in this suit. These funds have never been comingled.

47. I do not use personal funds to purchase assets for any Defendant or to pay any defendant's expenses. No corporate assets of any Defendant are used or have been used to purchase assets owned by me or to pay any of my personal expenses. As an officer of the various defendant entities, in the event I advance funds to cover expenses, I am reimbursed for those expenses by the company on whose behalf I acted.

### D. Ball Up's Special-Appearance Response

**\*12**  Ball Up filed a single, combined special-appearance response addressing the Appellee Entities' and SPAC's special appearances together as "SP." Ball Up's jurisdictional allegations in its response do not attribute any act to any individual Appellee Entity or to SPAC but instead allege that "[t]he SP entities were so interconnected that they ceased to operate as separate entities and instead should be regarded as one entity for purposes of jurisdiction."

### E. Law on Personal Jurisdiction [20]

A Texas court may assert personal jurisdiction over a nonresident defendant only if the requirements of the Texas long-arm statute and of due process under the Fourteenth Amendment are satisfied. U.S. Const. amend. XIV, § 1; Tex. Civ. Prac. & Rem. Code Ann. §§ 17.041–.045 (West 2015); *Bristol–Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct. 1773, 1779 (2017); *TV Azteca v. Ruiz*, 490 S.W.3d 29, 36 (Tex. 2016), cert. denied, 137 S. Ct. 2290 (2017); *Moki Mac River Expeditions*, 221 S.W.3d at 574. The Texas long-arm statute permits Texas courts to exercise jurisdiction over a nonresident defendant who "does business" in Texas, which includes committing a tort in whole or in part in the state. Tex. Civ. Prac. & Rem. Code Ann. § 17.042; *TV Azteca*, 490 S.W.3d at 36. The long-arm statute's doing-business language allows the statute to reach as far as the federal constitutional requirements of due process will allow. Thus, the requirements of the long-arm statute are satisfied if an assertion of jurisdiction accords with federal due process limitations. *Moki Mac River Expeditions*, 221 S.W.3d at 575. Due process is satisfied when (1) the defendant has established minimum contacts with the forum state and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017); *TV Azteca*, 490 S.W.3d at 36.

The United States Supreme Court has distinguished two types of jurisdiction, depending on the types of contacts: general (all-purpose) jurisdiction and specific (case-linked) jurisdiction. *BNSF Ry.*, 137 S. Ct. at 1558; see also *TV Azteca*, 490 S.W.3d at 37. A trial court may assert general jurisdiction over a nonresident defendant when that defendant's contacts with the forum are so continuous and systematic that they render the defendant "at home" in the forum state. *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014); *TV Azteca*, 490 S.W.3d at 37. The paradigm for exercising general jurisdiction over an individual is the person's domicile; for a corporation, it is an equivalent place in which the company is fairly regarded as at home, such as its domicile, place of incorporation, or principal place of business. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924, 131 S. Ct. 2846, 2853–54 (2011). Only a particular type of affiliation with a forum will render a defendant amenable to general jurisdiction in a state. *Bristol–Myers Squibb*, 137 S. Ct. at 1780.

Ball Up, LLC v. Strategic Partners Corp., Not Reported in S.W. Rptr. (2018)

Case 4:18-cv-04704   Document 9-3   Filed on 01/24/19 in TXSD   Page 41 of 131

In contrast, a trial court may exercise specific jurisdiction over a defendant only if the suit arises out of or relates to the defendant's forum contacts. *Id.* In other words, specific jurisdiction depends on the existence of activity or an occurrence that takes place in the forum state and is therefore subject to its regulation. *Goodyear Dunlop Tires Operations, S.A.*, 564 U.S. at 919, 131 S. Ct. at 2851.

**\*13** Concerning allegations of personal jurisdiction over a defendant based on the alter-ego theory, personal jurisdiction may exist over a nonresident defendant if the relationship between the foreign corporation and its parent corporation that does business in Texas is one that would allow the court to impute the parent corporation's "doing business" to the subsidiary. *BMC Software Belg., N.V.*, 83 S.W.3d at 798–99. The rationale for exercising alter-ego personal jurisdiction is that "the parent corporation exerts such domination and control over its subsidiary 'that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction.'" *Id.* (quoting *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983) ). The party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities must prove this allegation because Texas law presumes that two separate corporations are indeed distinct entities. *Id.*

To "fuse" the parent company and its subsidiary for jurisdictional purposes, the plaintiffs must prove the parent controls the internal business operations and affairs of the subsidiary and that the degree of control the parent exercises is greater than that normally associated with common ownership and directorship; the evidence must show that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice. *See PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 172 (Tex. 2007) (citing *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 335–37, 45 S. Ct. 250, 251 (1925) ). The proof required of a party seeking to fuse a parent company and a subsidiary company for jurisdictional veil-piercing purposes is different and more strenuous than the proof required of a party seeking to fuse a parent and a subsidiary company for substantive veil-piercing purposes. *Id.* at 175.

## F. Analysis

### 1. No Specific Jurisdiction or General Jurisdiction Exists Over the Appellee Entities, SPAC, or Singer

#### a. Requisites for Specific Jurisdiction Under the Texas Long-Arm Statute Not Satisfied

To establish specific jurisdiction over the Appellee Entities, SPAC, and Singer in Texas, Ball Up was required to allege (1) what acts each of the Appellee Entities, SPAC, and Singer individually (2) committed in Texas related to Ball Up's claims against them for fraud/intentional misrepresentation, conspiracy, and alternatively negligent misrepresentation. *See Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005) (explaining that only the defendant's own actions may constitute purposeful availment; a defendant may not be haled into a jurisdiction based solely on the unilateral activities of a third party); *see also Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 157 (Tex. 2013) (holding nonresident defendant not subject to personal jurisdiction for alleged tortious interference claim because alleged acts of interference occurred outside Texas); *Kelly*, 301 S.W.3d at 659–60 ("GIC failed to plead facts within the reach of the long-arm statute because it did not allege that the Officers committed any tortious acts in Texas."). But Ball Up did not allege in its third amended original petition or in its response to the special appearances that any act by any of the Appellee Entities, by SPAC, or by Singer individually occurred in Texas. *See Patel v. Pate*, No. 02-16-00313-CV, 2017 WL 2871684, at \*5 (Tex. App.—Fort Worth July 6, 2017, no pet.) (mem. op.) (finding sufficient for minimum contacts allegations that "nonresident who, *while physically present in the State of Texas*," made statements alleged to be fraudulent) (emphasis added); *Petrie v. Widby*, 194 S.W.3d 168, 175 (Tex. App.—Dallas 2006, no pet.) ("[A] nonresident *who travels to Texas and* makes statements alleged to be fraudulent is subject to specific jurisdiction in Texas[.]") (emphasis added).

**\*14** Although Ball Up's pleading alleges that the Appellee Entities, SPAC, and Singer improperly refused to continue funding or providing information to Ball Up in connection with the Ball Up Apparel Project and acted in concert to unlawfully harm Ball Up—arguably

Ball Up, LLC v. Strategic Partners Corp., Not Reported in S.W. Rptr. (2018)

Case 4:18-cv-04704   Document 9-3   Filed on 01/24/19 in TXSD   Page 42 of 131

directing tortious conduct at a Texas business and with effects to be felt in Texas—there is no allegation that these alleged acts of wrongdoing *occurred in Texas. See Vinmar Overseas Sing. PTE Ltd. v. PTT Int'l Trading PTE Ltd.*, 538 S.W.3d 126, 133 (Tex. App.—Houston [14th Dist.] 2017, pet. denied)* ("When the plaintiff fails to allege an act by the defendant occurring in Texas, the plaintiff has not met its initial burden of pleading acts sufficient to invoke jurisdiction over the nonresident defendant."); *see also Patel*, 2017 WL 2871684, at *5; *Petrie*, 194 S.W.3d at 175.

Because neither Ball Up's jurisdictional allegations nor Ball Up's special-appearance evidence alleges or establishes that the Appellee Entities, SPAC, or Singer individually performed any act in Texas related to the torts asserted against them or had any contacts with Texas, these defendants could meet their burden of factually negating all potential bases of personal jurisdiction over them by simply presenting evidence that they are nonresidents. *See Siskind*, 642 S.W.2d at 438 (holding that in view of the plaintiff's failure to allege any act by these individuals in Texas, the defendants sustained their burden by proving nonresident status); *Vinmar Overseas Sing. PTE Ltd.*, 538 S.W.3d at 133 (same); *George v. Deardorff*, 360 S.W.3d 683, 687 (Tex. App.—Fort Worth 2012, no pet.) (same); *Hotel Partners v. KPMG Peat Marwick*, 847 S.W.2d 630, 634 (Tex. App.—Dallas 1993, writ denied) (same).

### b. The Appellee Entities, SPAC, and Singer Negated Specific and General Jurisdiction

The Appellee Entities, SPAC, and Singer presented evidence establishing that they are nonresidents and had no contacts with Texas. Thus, because Ball Up failed to allege acts performed *in Texas* by the Appellee Entities, SPAC, and Singer and because the Appellee Entities, SPAC, and Singer presented evidence establishing that they are nonresidents and had no contacts with Texas, we hold that the trial court did not err by sustaining the special appearances of the Appellee Entities and Singer but did err by denying SPAC's special appearance. *See, e.g., Kelly*, 301 S.W.3d at 658 (holding that a defendant can factually negate plaintiff's alleged basis for personal jurisdiction by presenting evidence "that it has no contacts with Texas"); *see also Oryx Capital Int'l, Inc. v. Sage*

*Apartments, L.L.C.*, 167 S.W.3d 432, 441–43 (Tex. App.—San Antonio 2005, no pet).

### 2. The Special-Appearance Evidence Does Not Support the Alter-Ego/Veil-Piercing Theory as a Basis for Specific Jurisdiction or General Jurisdiction Over the Appellee Entities, SPAC, or Singer [21]

Alternatively, assuming Ball Up did sufficiently allege in its pleading and special-appearance response acts *in Texas* performed in furtherance of the torts it alleged, we would nonetheless reach the same disposition because Ball Up did not allege or prove any acts or contacts attributable to each of the individual Appellee Entities, to SPAC, or to Singer and did not prove an alter-ego/veil-piercing theory. Instead, Ball Up's appellate arguments, like its trial court pleadings and special-appearance response, focus on the acts or contacts of the SP Companies.

**\*15** Because Texas law presumes that two separate corporations are distinct entities, Ball Up, as the party seeking to ascribe the actions of some of the SP Companies to other of the SP Companies for jurisdictional purposes by piercing the corporate veil, bore the burden of proving an alter-ego relationship. *See BMC Software Belg., N.V.*, 83 S.W.3d at 798. Absent proof by Ball Up establishing a factual basis for some legal theory, such as alter-ego or single-business enterprise, to attain corporate veil piercing that will support the aggregation of acts or contacts by separate legal entities, they will not be aggregated. *See PHC-Minden*, 235 S.W.3d at 172 (explaining that to fuse entities for jurisdictional purposes, a plaintiff must prove that one entity controls the internal business operations and affairs of the other entity to an extent greater than that normally associated with a parent/subsidiary relationship to the extent that the two entities in fact cease to be separate); *Morris v. Kohls–York*, 164 S.W.3d 686, 693 (Tex. App.—Austin 2005, pet. dism'd) (recognizing that defendants' contact cannot be aggregated because personal jurisdiction is grounded on each individual defendant's actions and choices to enter Texas and do business in Texas). That is, Ball Up's pleadings and briefing relating to acts performed by and contacts with the SP Companies (assuming the facts pleaded such contacts and acts occurred in Texas) is nonetheless not sufficient to establish general-jurisdiction minimum contacts or specific committed-a-tort-in-whole-or-in-part-in-Texas jurisdiction unless the

Case 4:18-cv-04704 Document 9-3 Filed on 01/24/19 in TXSD Page 43 of 131

Ball Up, LLC v. Strategic Partners Corp., Not Reported in S.W. Rptr. (2018)

acts and contacts Ball Up has attributed to the SP Companies are attributable to one or more of the Appellee Entities, to SPAC, or to Singer under an alter-ego/veil-piercing theory. *See Kelly*, 301 S.W.3d at 658 (holding trial court correctly sustained foreign defendants' special appearance when plaintiff failed to plead that defendants lived in Texas or perpetrated any fraudulent acts in Texas).

On appeal, Ball Up does not focus on the purported alter-ego relationship existing between any particular SP Companies or Singer. Instead, Ball Up argues that personal jurisdiction exists under the alter-ego/veil-piercing theory because the SP Companies "cannot prove which company(ies) made the decisions on the Ball Up project, they cannot prove which company(ies) did not make the decisions on the Ball Up Project" and that, therefore, "none of these entities can negate Ball Up's allegations that they were involved in the project." But Ball Up—not the Appellee Entities, SPAC, or Singer— had the burden of pleading and proving an alter-ego/veil-piercing theory in order to attribute contacts with the forum by one defendant to another defendant or to attribute jurisdictional acts by one defendant to another defendant.

Ball Up had the burden to overcome the presumption that two separate business entities are distinct by proving its alter-ego/veil-piercing allegation. *See BMC Software Belg., N.V.*, 83 S.W.3d at 798 (explaining that "[t]he party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities must prove this allegation"). To fuse all of the SP Companies for jurisdictional purposes—that is, to make the acts or contacts of the generally-appearing defendants Strategic Partners, Inc.; Strategic Distribution, LP; and Strategic General Partners, LLC or of other specially-appearing defendants constitute acts or contacts by the Appellee Entities, SPAC, or Singer—Ball Up was required to establish that the Appellee Entities, SPAC, or Singer exercised a degree of control over Strategic Partners, Inc.; Strategic Distribution, LP; and Strategic General Partners, LLC that is "greater than that normally associated with common ownership and directorship"; the evidence must show that the Appellee Entities, SPAC, Singer, and the generally-appearing defendants or some combination of these ceased to be separate. *See id.* at 799.

The following factors have been identified as important to determining whether a subsidiary is separate and distinct

from its parent corporation for personal jurisdiction purposes: (1) the amount of the subsidiary's stock owned by the parent corporation, (2) the existence of separate headquarters, (3) the observance of corporate formalities, and (4) the degree of the parent's control over the general policy and administration of the subsidiary. *See PHC–Minden*, 235 S.W.3d at 175. The types of evidence a court will consider as proof of alter ego—when a person is alleged to be the alter ego of a corporation but also applicable in allegations of entity-to-entity alter ego—include: (1) the payment of alleged corporate debt with personal checks or other commingling of funds; (2) representations that the individual will financially back the corporation; (3) the diversion of company profits to the individual for his personal use; (4) inadequate capitalization; and (5) other failure to keep corporate and personal assets separate. *See Guarino v. 11327 Reeder Rd., Inc.*, No. 05-12-01573-CV, 2013 WL 4478202, at *4 (Tex. App.—Dallas Aug. 20, 2013, no pet.) (mem. op.) (holding alter-ego jurisdictional evidence insufficient to establish nonresident individual was alter ego of entity); *see also Booth v. Kontomitras*, 485 S.W.3d 461, 483 (Tex. App.— Beaumont 2016, no pet.) (listing types of evidence a court may consider in determining alter-ego relationship).

**\*16** Ball Up did not offer evidence of financial commingling of funds between any combination of the SP Companies and Singer, the payment of one of the SP Companies' debt by another or by Singer, the diversion of profits from one SP Company to another or to Singer, the failure to keep separate accounting records or corporate books, a lack of separate legal formation, or other evidence that would establish that the Appellee Entities, SPAC, or Singer exercised a degree of control over Strategic Partners, Inc.; Strategic Distribution, LP; and Strategic General Partners, LLC that is greater than that normally associated with common ownership and directorship so that the Appellee Entities, SPAC, and the generally-appearing defendants ceased to be separate entities. *See BMC Software Belg., N.V.*, 83 S.W.3d at 799; *cf. Cappuccitti v. Gulf Indus. Prods., Inc.*, 222 S.W.3d 468, 485 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (holding evidence sufficient to support trial court's alter-ego/veil-piercing finding based on facts not present here).

The evidence Ball Up did produce with regard to SPAC consisted of two spreadsheets containing SPAC's name that were provided to Ball Up and that detailed the Ball Up Apparel Project's expenses. Ball Up argues that

Ball Up, LLC v. Strategic Partners Corp., Not Reported in S.W. Rptr. (2018)

Case 4:18-cv-04704 Document 9-3 Filed on 01/24/19 in TXSD Page 44 of 131

these spreadsheets coupled with the alleged failure of the SP Companies to maintain separate and distinct corporate identities is sufficient to support the trial court's denial of SPAC's special appearance. We cannot agree. Even if SPAC created the spreadsheet for the project's current expenses, the two spreadsheets simply represent a calculation of expenses and do not establish any amounts billed by SPAC or work performed by SPAC. Thus, the spreadsheets are insufficient to support a showing that SPAC has the minimum contacts necessary to demonstrate that the trial court has personal jurisdiction over SPAC. *See BMC Software Belg., N.V.*, 83 S.W.3d at 799 (holding parent's and subsidiary's common financial reports and interchangeable letterhead were not sufficient to support alter-ego theory of personal jurisdiction).

The evidence Ball Up did produce with regard to the Appellee Entities consisted of excerpts from Pierpoint's deposition establishing that the composition of the board of directors of each of the SP Companies was the same or substantially the same; that Padraic McConville worked for Partners Group; that Partners Group was a private equity partner that sat on the board of directors for PG-ACP Holdings, GP; and that McConville put Ball Up proposal numbers together for the PG-ACP Holdings, GP's board of directors. Ball Up's evidence and contentions, however, do not rise to the required level of control and domination by one or more of the SP Companies over one or more of the other SP Companies necessary to meet Ball Up's burden of proving that the SP Companies ceased to be separate entities and are one and the same for jurisdictional purposes.[22] *See PHC-Minden*, 235 S.W.3d at 172; *see also Gentry v. Credit Plan Corp. of Houston*, 528 S.W.2d 571, 573 (Tex. 1975) ("A subsidiary corporation will not be regarded as the alter ego of its parent merely because of stock ownership, a duplication of some or all of the directors or officers, or an exercise of the control that stock ownership gives to stockholders."); *N. Frac Proppants, II, LLC v. 2011 NF Holdings, LLC*, No. 05-16-00319-CV, 2017 WL 3275896, at *6 (Tex. App.—Dallas July 27, 2017, no pet.) (mem. op.) (recognizing that "an entity's owner may monitor the entity's performance, supervise its financial and capital budget decisions, and articulate general policies without becoming fused to the entity for jurisdictional purposes").

**\*17** Ball Up's alter-ego/veil-piercing jurisdictional evidence at most shows some common ownership between

the SP Companies and some common and overlapping boards of directors; this type of evidence does not establish alter ego for jurisdictional purposes.[23] *See TMX Fin. Holdings, Inc. v. Wellshire Fin. Servs., LLC*, 515 S.W.3d 1, 8–9 (Tex. App.—Houston [1st Dist.] 2016, pet. filed) (recognizing that "common ownership, even when combined with common corporate officers, does not demonstrate that a parent and subsidiary are alter egos"); *PT Intermediate Holding, Inc. v. LMS Consulting, LLC*, No. 04-14-00827-CV, 2015 WL 5438964, at *4 (Tex. App.—San Antonio Sept. 16, 2015, pet. denied) (mem. op.) ("The type of parental control that confers jurisdiction [via an alter-ego theory] is evidenced by a 'plus' factor: 'something beyond the subsidiary's mere presence within the bosom of the corporate family.' "); *see also N. Frac Proppants, II, LLC*, 2017 WL 3275896, at *6 ("Alter ego cannot be based on mere stock ownership, duplication of some or all of directors or officers, or exercise of the control that stock ownership gives to stockholders.").

Because Ball Up failed to assert or to offer proof of acts by the Appellee Entities, SPAC, and Singer in furtherance of Ball Up's tort claims against them and also failed to meet its burden of proving its alter-ego/veil-piercing jurisdictional theory concerning the Appellee Entities, SPAC, and Singer, the trial court properly sustained the Appellee Entities' and Singer's[24] special appearances and erred by denying SPAC's special appearance. *See Moki Mac River Expeditions*, 221 S.W.3d at 574; *Vinmar*, 538 S.W.3d at 133. We sustain SPAC's sole issue in its appeal, and we overrule Ball Up's second and third issues in its appeal.

### V. CONCLUSION

Having overruled Ball Up's three issues and having sustained SPAC's sole issue, we affirm the trial court's orders granting Singer's and the Appellee Entities' special appearances, we reverse the trial court's denial of SPAC's special appearance, we render judgment dismissing SPAC from the suit filed by Ball Up, and we remand this case for further proceedings.

**All Citations**

Not Reported in S.W. Rptr., 2018 WL 3673044

Ball Up, LLC v. Strategic Partners Corp., Not Reported in S.W. Rptr. (2018)

Case 4:18-cv-04704   Document 9-3   Filed on 01/24/19 in TXSD   Page 45 of 131

## Footnotes

1   *See* Tex. R. App. P. 47.4.

2   Ball Up also sued Strategic Partners Midco, LLC but subsequently dismissed that defendant, so Strategic Partners Midco, LLC is not a party to this appeal.

3   The record reflects that Singer loaned funds to Worldwide One Media in return for membership interests in Midland Entertainment. Because this distinction is not pertinent to the issues in this appeal, we hereinafter refer to this transaction simply as Singer's investment in Midland Entertainment.

4   Ball Up pleaded and asserts that it is a Texas limited liability company with its principal place of business in Tarrant County, Texas. Appellees assert, however, that Ball Up is headquartered in California.

5   Ball Up's live pleading—its third amended original petition—stated:

   13. At all times relevant herein, ["SP"] and Mike Singer conducted business and/or tortious activities in the State of Texas in general, and specifically in relation to the business effort, acts[,] and omissions described below....

   14. SP has many employees and a very large business facility in Texas[.] ...

   ....

   25. Each of the defendants were involved in the Ball Up project.... SP emphasized its Texas distribution center.... SP conducted Ball Up representatives on two separate tours of the Texas distribution center, and on a third occasion, SP also conducted a project meeting with Ball Up at the Texas distribution center.

   26. ... All of the actions of [the] project were integrated amongst the defendants. The Ball Up project and SP's decision to enter into the fraudulent scheme to terminate it[ ] was the result of the activities of the defendants amongst themselves....

   Likewise, Ball Up's brief states that

   Singer and the SP entities were each involved in the Ball Up project[.] ... Singer and the SP Entities emphasized the impressiveness and utility of their Dallas, Texas[,] distribution center[.]

   ....

   The SP Entities failed to maintain separate and distinct corporate identities such that the presence or contacts of one in Texas may be attributed to the others.

6   Of the $3.1 million dollars total, Ball Up alleges $2.5 million dollars went to purchase a 5% ownership interest in One Holdings.

7   We refer to the Company Agreement and the Subscription Agreement collectively as the One Holdings Contracts.

8   Ball Up also relies on the language of the "Amended and Restated Company Agreement of Midland Entertainment, LLC" and its corresponding Loan Agreement to argue that Singer has consented to jurisdiction in Texas. Those agreements, however, contain Texas choice-of-law provisions, not forum-selection clauses, and more importantly, Ball Up is not a party to or a signatory to those agreements either.

9   All the parties to this appeal treat this provision as a forum-selection clause, so for purposes of this opinion, and because doing so does not alter our analysis or holding in this appeal, we do so as well. *But see* In re Rigney Constr. & Dev., LLC, No. 12-17-00370-CV, 2018 WL 719515, at *4 (Tex. App.—Tyler Feb. 6, 2018, orig. proceeding) (mem. op.) (recognizing a "critical distinction" between forum-selection clauses and venue-selection clauses because "venue selection cannot be the subject of a private contract unless otherwise provided by statute").

10  Six months after Ball Up filed the underlying lawsuit, Singer filed suit against, among other parties, One Holdings, LLC; Worldwide One Media, LLC; Midland Entertainment, LLC; Ball Up, LLC; and Keetch in Los Angeles Superior Court in California. Ball Up asserts that Singer's California lawsuit is evidence that Singer considers his investments in One Holdings and Midland Entertainment to be related—at least indirectly if not directly—to the Ball Up Apparel Project. We cannot agree because although Singer's lawsuit is referenced in a few places in the record before us, the record does not establish the facts or causes of action asserted by Singer in that case.

11  Ball Up's brief explains:

   <u>2. Singer Cannot Disprove the Allegations He Agreed to Jurisdiction</u>

   Singer, in order to defeat Texas jurisdiction, must *prove* he did not agree to the Texas law, jurisdiction[,] and venue provisions in the [One Holdings Contracts]. Singer's only evidence against these allegations is his statement by affidavit that he never consented to the investment documents, despite wiring $3.1 million to Texas and numerous acts indicating his agreement. Singer's affidavit—at most—raises a fact issue. It *proves* nothing. Singer failed to meet the required burden of proof.

12  Because we ultimately agree with Singer that Ball Up cannot enforce the forum-selection clauses contained in the One Holdings Contracts against Singer in Ball Up's underlying lawsuit against Singer, we need not address Ball Up's

Ball Up, LLC v. Strategic Partners Corp., Not Reported in S.W. Rptr. (2018)

Case 4:18-cv-04704   Document 9-3   Filed on 01/24/19 in TXSD   Page 46 of 131

arguments that Singer is bound by the forum-selection clause because he allegedly ratified the unsigned One Holdings Contract by conduct. *See* Tex. R. App. P. 47.1 (providing that appellate court must address only issues necessary for disposition of appeal).

13    Texas cases addressing the enforcement of forum-selection clauses by or against nonsignatories to the underlying contract that contains the forum-selection clause obviously pivot on whether the nonsignatory is the plaintiff or the defendant and whether the nonsignatory is asserting or resisting application of the forum-selection clause. With the exception of footnote 15, we limit our discussion and analysis here to facts involving nonsignatory plaintiffs like Ball Up that seek to enforce a forum-selection clause against an alleged signatory defendant, like Singer.

14    Reference to cases addressing the applicability of arbitration clauses is appropriate when examining whether particular claims or parties fall within a forum-selection clause's reach. *Smith v. Kenda Capital, LLC*, 451 S.W.3d 453, 457 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *In re Lisa Laser USA, Inc.*, 310 S.W.3d 880, 884 (Tex. 2010) (orig. proceeding) ).

15    Other theories exist permitting a nonsignatory defendant to enforce a forum-selection clause against a signatory plaintiff —as opposed to here where Ball Up as the nonsignatory plaintiff is seeking to enforce the forum-selection clause against the defendant Singer. *See Carlile Bancshares, Inc. v. Armstrong*, No. 02-14-00014-CV, 2014 WL 3891658, at *8 (Tex. App.—Fort Worth Aug. 7, 2014, no pet.) (mem. op.) (recognizing "direct-benefits estoppel" has been applied to allow a defendant signatory to enforce a forum-selection clause against a nonsignatory plaintiff who is suing based on the contract that contains the forum-selection clause); *see also Meyer v. WMCO-GP, LLC*, 211 S.W.3d 302, 305–06 (Tex. 2006) (recognizing two equitable circumstances when a signatory plaintiff may enforce an arbitration clause against a nonsignatory: (1) when the signatory plaintiff must rely on the contract's terms to assert its claims against the nonsignatory and (2) when the signatory plaintiff raises an allegation of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories).

16    The Company Agreement states, in pertinent part: "**THE PARTIES HERETO CONSENT**...." The Company Agreement also provides:

> **11.07.** **Binding Effect.** Subject to the restrictions on Dispositions set forth in this Agreement, this Agreement [is] binding on and inure[s] to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns.

17    The Subscription Agreement states, in pertinent part: "THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE GOVERNED, ... AND THE PARTIES HEREBY *AGREE* TO WAIVE ANY RIGHTS TO OBJECT, AND HEREBY AGREE." [Emphasis added.] The Subscription Agreement also provides that "[t]his Agreement shall be binding upon the parties hereto, together with their respective executors, administrators, successors, personal representatives, heirs[,] and assigns."

18    The pleadings, the record, and the briefing before us does not explain the legal relationship, if any, that exists between One Holdings, Midland Entertainment, and Ball Up or how they are allegedly related, even assuming some common ownership or management exists and that One Holdings and Ball up work on the same projects.

19    Because Ball Up cannot enforce the One Holdings Contracts' forum-selection clauses in its suit against Singer, we need not address Ball Up's contention that the substance of its tort claims against Singer fall within those forum-selection clauses. *See Pinto Tech.*, 526 S.W.3d at 440; *In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 677 (Tex. 2009) (orig. proceeding). And because Ball Up cannot enforce the One Holdings Contracts' forum-selection clauses against Singer, we need not address Ball Up's contention that Singer's subsequent suit filed in June 2016 in California against, among others, One Holdings, LLC; Worldwide One Media, LLC; Midland Entertainment, LLC; Ball Up, LLC; and Keetch is evidence that his investments are "directly or indirectly" related to the causes of action pleaded by Ball Up.

20    We recently set forth general personal-jurisdiction law in *OZO Capital, Inc. v. Syphers*, No. 02-17-00131-CV, 2018 WL 1531444, at *4 (Tex. App.—Fort Worth Mar. 29, 2018, no pet. h.) (mem. op.). We recite that standard here.

21    Ball Up does not raise an issue challenging the trial court's implied negative finding on Ball Up's alter-ego/veil-piercing jurisdictional theory but does argue in its brief that "the Court can also find jurisdiction by finding that the defendants acted as alter egos of entities and persons to which jurisdiction attaches."

22    Ball Up does not specifically identify which of the generally-appearing defendants, the Appellee Entities, or SPAC are purportedly fused for jurisdictional purposes; Ball Up alleges all of them were intertwined and acted jointly.

23    If Ball Up had met its burden of proving alter ego, no evidence exists that piercing the corporate veil of any particular entity or entities for purposes of personal jurisdiction is necessary to prevent fraud or injustice. *See Booth*, 485 S.W.3d at 483 (explaining that in the absence of allegations or evidence demonstrating fraud or injustice, court would not find alter ego for jurisdictional purposes).

**Ball Up, LLC v. Strategic Partners Corp., Not Reported in S.W. Rptr. (2018)**

Case 4:18-cv-04704  Document 9-3  Filed on 01/24/19 in TXSD  Page 47 of 131

24    In addition to factually negating personal jurisdiction, Singer's affidavit and special-appearance evidence legally negated personal jurisdiction; Singer established that at all times in any dealings with Ball Up he was acting in his corporate capacity on behalf of generally-appearing Strategic Distribution. Thus, even if Singer had contacts with Texas or performed acts in Texas—which he directly denied in his affidavit—personal jurisdiction over him could not be predicated on jurisdiction over Strategic Distribution unless Strategic Distribution is the alter ego of Singer. *See, e.g.*, *J & J Marine, Inc. v. Le*, 982 S.W.2d 918, 927 (Tex. App.—Corpus Christi 1998, no pet.); *Garner v. Furmanite Austl. Pty., Ltd.*, 966 S.W.2d 798, 803 (Tex. App.—Houston [1st Dist.] 1998, pet. denied); *Clark v. Noyes*, 871 S.W.2d 508, 518 (Tex. App.—Dallas 1994, no writ) (citing *Stuart v. Spademan*, 772 F.2d 1185, 1197 (5th Cir. 1985) ).

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 4

2011 WL 749756
Only the Westlaw citation is currently available.
United States District Court,
E.D. Texas,
Marshall Division.

George Steven BRUCE and Sheila Bruce
v.
NOMAC DRILLING LLC and
Chesapeake Energy Corporation.

No. 2:10–CV–204–DF–CE.
|
Feb. 24, 2011.

**Attorneys and Law Firms**

William Kenneth Dippel, Dippel & Davis, Dallas, TX, for
George Steven Bruce and Sheila Bruce.

Keith William Starr, Mayo Mendolia & Starr, Tyler, TX.

***MEMORANDUM OPINION AND ORDER***

CHARLES EVERINGHAM IV, United States
Magistrate Judge.

**I. Background**

*\*1** In May of 2010, Plaintiffs filed suit in state court to
recover damages for injuries sustained by Steve Bruce [1]
while working at a well operated by Defendants in the
Northern District of Texas. In June of 2010, Defendants
removed the action to federal court alleging diversity
jurisdiction. Plaintiffs have not challenged the removal.
In August of 2010, Defendants filed the present motion
to transfer venue to the Northern District of Texas.
(Dkt. No. 11). Plaintiffs responded in November of 2010.
Defendants have not replied. For the reasons below,
Defendants' motion to transfer is DENIED.

The parties agree that the events underlying Plaintiff's
complaint occurred in the Northern District of Texas on a
rig owned by Nomac Drilling, LLC ("Nomac"). However,
at the time of his injury, the rig was being disassembled
for transport to Louisiana. After the rig was disassembled
and transported, the associated employees of Nomac,
Chesapeake Energy Corporation ("Chesapeake"), and
MultiShot were to follow the rig to Louisiana. When

not working, many of these potential witnesses live in
the Eastern District of Texas, Louisiana, and Mississippi.
Plaintiffs and Mr. Bruce's treating physicians are located
in Louisiana.

**II. Legal Standard**

"For the convenience of parties, in the interest of justice,
a district court may transfer any civil action to any other
district or division where it might have been brought." 28
U.S.C. § 1404(a). The district court has "broad discretion
in deciding whether to order a transfer." *Balawajder
v. Scott,* 160 F.3d 1066, 1067 (5th Cir.1998) (quoting
*Caldwell v. Palmetto State Sav. Bank,* 811 F.2d 916, 919
(5th Cir.1987)). The Fifth Circuit has recently clarified
the standard that district courts in this circuit should
apply when deciding motions to transfer venue. *In re
Volkswagen of America, Inc.,* 545 F.3d 304 (5th Cir.2008)
(en banc) ("*Volkswagen II* "). The Fifth Circuit ruled that
" § 1404(a) venue transfers may be granted upon a lesser
showing of inconvenience than forum non conveniens
dismissals," and that "the burden that a moving party
must meet to justify a venue transfer is less demanding
than that a moving party must meet to warrant a forum
non conveniens dismissal." *Id.* at 314 (citing *Norwood v.
Kirkpatrick,* 349 U.S. 29, 32, 75 S.Ct. 544, 99 L.Ed. 789
(1955)). The Court held that the party seeking a transfer
must show good cause why a court should not defer
to the plaintiff's choice of forum. *Id.* at 315. Under the
good cause standard, "when the transferee venue is not
clearly more convenient, the plaintiff's choice should be
respected." *Id.*

The Court reiterated that the relevant factors to be
considered for a § 1404(a) motion are the same as those
used for forum non conveniens dismissals, which include
both public and private interest factors. *Id.* at 315 (citing
*Humble Oil & Ref. Co. v. Bell Marine Serv.,* Inc., 321
F.2d 53, 56 (5th Cir.1963)). The private interest factors
are: (1) the relative ease of access to sources of proof;
(2) the availability of compulsory process to secure the
attendance of witnesses; (3) the cost of attendance for
willing witnesses; and (4) all other practical problems that
make trial of a case easy, expeditious and inexpensive.
*Id.* (citing *In re Volkswagen AG,* 371 F.3d 201, 203
(5th Cir.2004) ("*Volkswagen I* ")). The public interest
factors are: (1) the administrative difficulties flowing from
court congestion; (2) the local interest in having localized
controversies decided at home; (3) the familiarity of the
forum with the law that will govern the case; and (4) the

avoidance of unnecessary problems of conflict of laws or in the application of foreign law. *Volkswagen II,* 545 F.3d at 315. These factors are not necessarily exhaustive or exclusive, and none can be said to be of dispositive weight. *Id.* (citing *Action Indus., Inc. v. U.S. Fid. & Guar. Corp.,* 358 F.3d 337, 340 (5th Cir.2004)).

## III. Discussion

**\*2** Defendants have failed to establish that the Northern District of Texas would be clearly more convenient under *Volkswagen II.* Although the incident underlying Plaintiffs' claim occurred in the Northern District of Texas, neither the work site nor any substantial number of witnesses remain there. Accordingly, Defendants' motion is DENIED.

### A. Threshold Requirement

As a threshold requirement, the party moving for transfer must establish that jurisdiction would have been proper in the proposed transferee venue before the relative convenience of the Plaintiff's chosen venue and the proposed transferee venue can be considered. *Volkswagen I,* 371 F.3d at 203. Plaintiffs do not dispute that jurisdiction would have been proper in the Northern District of Texas, and the agreed underlying facts support at least specific jurisdiction. Accordingly, Defendants meet their threshold burden for transfer under 28 U.S.C. § 1404(a).

### B. § 1404(a) Analysis

For the reasons below, Defendants have failed to show that the Northern District of Texas would be clearly more convenient than the Eastern District of Texas.

#### 1. Private Interest Factors

##### a. Convenience for the Parties and Witnesses and the Cost of Attendance for Witnesses

The Court first considers the convenience of the witnesses and parties. In *Volkswagen I,* the Fifth Circuit established the "100–mile" rule, which states that "[w]hen the distance between an existing venue for trial of a matter and a proposed venue under § 1404(a) is more than 100 miles, the factor of the convenience to witness increases in direct relationship to the additional distance to be traveled." 371 F.3d at 204–5.

Defendants have not identified a single witness who would be closer to the Dallas Division of the Northern District of Texas than to the Marshall Division of the Eastern District of Texas. Defendants contend that some witnesses may be in Conroe, Texas, where MultiShot is located, which Defendants concede is approximately equidistant from Dallas and Marshall. Defendants also reason that some witnesses may be near Godley, Texas, in the Northern District where the incident occurred. Given the transient nature of Mr. Bruce's profession, and the undisputed fact that the workers at the site were disassembling the rig and moving it to Louisiana, there is little reason to believe that any workers at the site remain nearby. Plaintiffs and Mr. Bruce's treating physicians are located in Louisiana, significantly closer to Marshall than Dallas. The present venue is significantly more convenient for the parties and their identified witnesses. Accordingly, this factor weighs against transfer.

##### b. The Availability and Location of Sources of Proof

"That access to some sources of proof presents a lesser inconvenience now than it might have absent recent developments does not render this factor superfluous." *Volkswagen II,* 545 F.3d at 316. Even in the age of electronic discovery, considerations of physical evidence remain meaningful in § 1404(a) analysis. *See id.*

**\*3** The rig where the incident occurred, while in the Northern District of Texas at the time of the accident, has subsequently been moved to Louisiana. Plaintiffs, Mr. Bruce's treating physicians, and all associated documents are in Louisiana. Defendant Nomac has a large facility in Marshall, Texas where relevant evidence may be stored. MultiShot, Mr. Bruce's employer at the time of the incident, is headquartered in Conroe and likely maintains relevant evidence there. Defendants have not identified any sources of proof closer to Dallas than to Marshall. Accordingly, the Court concludes that this factor weighs against transfer.

##### c. The Availability of Compulsory Process to Secure the Attendance of Witnesses

Federal Rule of Civil Procedure 45(b)(2) allows a federal district court to compel a witness' attendance at a trial or hearing by subpoena. However, a court's subpoena power is subject to Rule 45(c)(3)(A)(ii), which protects nonparty witnesses who work or reside more than 100 miles from the courthouse. *See Volkswagen II,* 545 F.3d at 316. Neither

party has identified a potentially unwilling third party witness with information relevant to facts at issue in this case.

Because neither party has identified a potentially unwilling witness, and neither party has identified any witnesses who live within 100 miles of the Dallas courthouse, this factor cannot weigh in favor of transfer. Plaintiffs have not identified any witnesses within 100 miles of the Marshall courthouse either. Accordingly, the Court concludes that this factor is neutral.

### d. The Possibility of Delay and Prejudice if Transfer is Granted

The Fifth Circuit has suggested that this factor may be relevant in a transfer analysis "only in rare and special circumstances and when such circumstances are established by clear and convincing evidence." *Shoemake v. Union Pacific R.R. Co.,* 233 F.Supp.2d 828, 834 (citing *In re Horseshoe Entm't,* 305 F.3d 354, 358 (5th Cir.2002)). This is not a rare and exceptional case; therefore, this factor is neutral.

### 2. Public Interest Factors

### a. The Administrative Difficulties Caused by Court Congestion

To the extent that court congestion is relevant, the speed with which a case can come to trial and be resolved is a factor. Of the factors weighed to determine whether transfer would be proper, court congestion is the most speculative. Neither party argues this factor. Accordingly, the Court concludes that this factor is neutral.

### b. The Local Interest in Adjudicating Local Disputes and the Unfairness of Burdening Citizens in an Unrelated Forum with Jury Duty

Transfer may be appropriate where none of the operative facts occurred in the division and where the division has no particular local interest in the outcome of the case. *See In re Volkswagen,* 545 F.3d at 318. Here, none of the operative facts occurred in the Eastern District. However, Nomac has a large facility and extensive operations in the Eastern District. The practices that led to the incident underlying Plaintiffs' claim are likely to be an issue affecting citizens of the Eastern District of Texas. Because both the Northern and Eastern Districts of Texas have a local interest in this action, the Court concludes that this factor is neutral.

### c. The Familiarity of the Forum with the Law that will Govern the Case

**\*4** Both Plaintiff and Defendants concede that this factor is neutral.

### d. The Avoidance of Unnecessary Problems in Conflict of Laws

Both Plaintiff and Defendants agree that this factor is inapplicable to this case.

### e. Judicial Economy

Neither Plaintiff nor Defendants raised an argument concerning judicial economy. Accordingly, the Court finds this factor is neutral.

## V. Conclusion

For the reasons stated above, Defendants have satisfied their burden of showing that venue would be proper in the Northern District of Texas, but have not shown that a transfer would be clearly more convenient in this case. The Court concludes that the competing factors weigh against transfer. Accordingly, the Court DENIES Defendants' motion.

## All Citations

Not Reported in F.Supp.2d, 2011 WL 749756

### Footnotes

1     Steve Bruce was employed by MultiShot. MultiShot is not named as a defendant.

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 5

2014 WL 3891658
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
Fort Worth.

CARLILE BANCSHARES, INC. and
Washington Investment Company, Appellants
v.
William L. ARMSTRONG, III, Rod Bryant,
Shane Loeffler, and Jack Villines, Appellees
and
Patrick Lynch and Dennis Meier, Appellants
v.
Carlile Bancshares, Inc. and Washington
Investment Company, Appellees.

Nos. 02–14–00014–CV, 02–14–00018–CV.
|
Aug. 7, 2014.

**Synopsis**
**Background:** Purchaser of bank stock brought action
against former bank directors, who resided in Colorado,
for common-law fraud, securities fraud, fraud in a
stock transaction, negligent misrepresentation, and unjust
enrichment. The 342nd District Court, Tarrant County,
J. Wade Birdwell, J., denied directors' motion to dismiss.
Directors appealed.

**Holdings:** The Court of Appeals, Lee Gabriel, J., held that:

[1] former bank directors, who were nonsignatories
to merger agreements involving bank purchase, were
not bound by forum-selection clauses contained in
agreements, and

[2] former directors had sufficient contact with Texas to
give trial court personal jurisdiction over them pursuant
to long-arm statute.

Affirmed.

West Headnotes (5)

[1]  **Estoppel**
     **Contracts**
     Former bank directors, who were
     nonsignatories to merger agreements
     involving bank purchase, were not bound
     by forum-selection clauses contained in
     agreements under the doctrine of direct-
     benefits estoppel; receipt of the proceeds
     from the merger was not a sufficient
     substantial benefit for the purposes of direct-
     benefits estoppel, and indemnity provision
     and the availability of tail insurance were
     also insufficient benefits in the absence of
     any evidence that directors were actually
     indemnified by purchaser or claimed coverage
     under the tail insurance.

     3 Cases that cite this headnote

[2]  **Contracts**
     **Legal Remedies and Proceedings**
     Former bank directors, who were
     nonsignatories to merger agreements
     involving sale of bank, were not bound
     by forum selection clauses in agreements
     based on their participation in the merger
     transaction.

     5 Cases that cite this headnote

[3]  **Courts**
     **Allegations, Pleadings, and Affidavits**
     Purchaser of bank stock sufficiently pleaded
     allegations to bring former bank directors,
     who resided in Colorado, within the
     provisions of the Texas long-arm statute;
     purchaser pleaded that directors committed
     torts in whole or in part in Texas and asserted
     that they contracted by mail or otherwise
     with a Texas resident and were to perform
     the contracts in whole or in part in Texas.
     V.T.C.A., Civil Practice & Remedies Code §
     17.042(1–2).

2 Cases that cite this headnote

**[4]**    **Courts**

👉 Tortious or Intentional Conduct;Fraud and Breach of Fiduciary Duties

Former bank directors, who resided in Colorado, had sufficient contact with Texas to give trial court personal jurisdiction over them pursuant to long-arm statute in suit brought against them by Texas purchaser of bank stock alleging fraud in regards to bank merger; directors purposefully availed themselves of the privilege of conducting business in Texas by seeking out Texas company to purchase bank and being directly involved in compiling information for the ensuing due diligence, which they knew would be produced in Texas as part of merger negotiations, and, thus, directors could reasonably foresee being haled into a Texas court based on their purposeful actions directed to Texas. V.T.C.A., Civil Practice & Remedies Code § 17.042(1–2).

4 Cases that cite this headnote

**[5]**    **Constitutional Law**

👉 Representatives of Organizations; Officers, Agents, and Employees

**Courts**

👉 Tortious or Intentional Conduct;Fraud and Breach of Fiduciary Duties

Trial court's exercise of personal jurisdiction over former bank directors, who resided in Colorado, in action by Texas purchaser of bank stock alleging fraud in bank merger transaction did not offend traditional notions of fair play and substantial justice; Texas had a manifest interest in providing its residents with a convenient forum for redressing injuries inflicted by nonresidents, and directors did not demonstrate that the interests of Colorado or the shared interests of all the states outweighed Texas's substantial interest in providing relief to its residents. V.T.C.A., Civil Practice & Remedies Code § 17.042(1–2).

1 Cases that cite this headnote

From the 342nd District Court of Tarrant County, Trial Court No. 342–264322–13. J. Wade Birdwell, Judge.

**Attorneys and Law Firms**

James W. Bowen, Kyle A. Owens, Hunton & Williams LLP, Dallas, TX, for Appellants.

Jay L. Krystinik, Bradley J. Purcell, Bryan Cave LLP, Dallas, TX, John R. Bielema, Michael P. Carey, Bryan Cave LLP, Atlanta, GA, for Appellees.

PANEL: WALKER, MEIER, and GABRIEL, JJ.

# MEMORANDUM OPINION [1]

LEE GABRIEL, Justice.

**\*1** In these interlocutory appeals, we are asked to decide whether forum-selection clauses contained in corporate merger documents are enforceable against nonsignatories to the merger documents and, if not, whether the trial court could exercise personal jurisdiction over the nonsignatories. We conclude, under the specific facts of this case, that the forum-selection clauses are not enforceable against the nonsignatories. However, we conclude that two of the nonsignatories had sufficient minimum contacts with Texas that exercising jurisdiction over them does not offend traditional notions of fair play and substantial justice. Accordingly, we affirm the trial court's special-appearance orders.

# I. BACKGROUND

## A. PROPOSED MERGER AND DUE DILIGENCE

Washington Investment Company (WIC) was a Colorado bank-holding company that owned all of the outstanding shares of Colorado Community Bank (the Bank). Jerry Bryant (J. Bryant) was the chairman and chief executive officer of WIC and the Bank. Patrick Lynch was the president of the Bank and was a member of WIC's and the Bank's boards of directors. Dennis Meier was the

executive vice president of the Bank and was a member of the boards of directors of WIC and the Bank. William L. Armstrong, III, Jack Villines, Rod Bryant, and Shane Leoffler (collectively, the remaining directors) were the remaining members of WIC's and the Bank's boards of directors.

In 2009, WIC's net income began to decrease significantly based on the decline in the values of the bank's real-estate holdings, which secured its commercial loans. Believing the Bank's recovery would be a slow process, WIC's board of directors hired St. Charles Capital, LLC (St.Charles)—a Colorado investment banking firm—to find a buyer for WIC and, thus, the Bank. On February 21, 2011, Wesley A. Brown, the managing director of St. Charles, acting at the behest of WIC's board of directors, contacted Tom C. Nichols who was Carlile Bancshares, Inc.'s chief executive officer and chairman of its board of directors. Carlile is a Texas corporation that buys or invests in community banks located in the southwestern United States. Carlile had not considered buying WIC or the Bank before Brown called.

Shortly thereafter, Carlile and WIC signed a nondisclosure agreement. Nichols signed the agreement on behalf of Carlile. [2] Carlile and WIC began preliminary due diligence, with "limited information" being exchanged. During this due-diligence period, J. Bryant, Lynch, and Meier compiled extensive financial information about WIC and the Bank, which Carlile requested, and forwarded it to Carlile in Texas. Further, multiple emails and phone calls were exchanged between Carlile representatives, J. Bryant, Lynch, and Meier. On May 16, 2011, Carlile issued a nonbinding letter of interest to WIC, which outlined the basic parameters under which Carlile would acquire all outstanding shares of WIC. Nichols signed the letter as chairman of the board and chief executive officer of Carlile, and J. Bryant signed and accepted the letter as president of WIC. In June or July 2011, Lynch and J. Bryant met with Nichols in Texas to discuss the possible merger of Carlile and WIC. [3] On September 26, 2011, Nichols met with J. Bryant at Carlile's office in Tarrant County, Texas, to discuss "the terms of the definitive agreement and other issues related to Carlile's acquisition of WIC."

## B. WIC APPROVAL, FORMAL AGREEMENTS, AND DIRECTOR RELEASES

**\*2** On February 23, 2012, WIC's board of directors approved (1) a merger between WIC and Carlile, (2) J. Bryant to act as the representative of the shareholders of WIC, and (3) J. Bryant to finalize the transaction with Carlile. In spring 2012, Nichols met with J. Bryant and Lynch at Carlile's office in Tarrant County, Texas, "to discuss and negotiate" J. Bryant's noncompete agreement and Lynch's future employment agreement with Carlile. [4] On March 6, 2012, Carlile, WIC, and J. Bryant (as the representative of WIC's shareholders) signed an acquisition and reorganization agreement (the agreement), memorializing their intent to merge Carlile and WIC into a new entity—Newco, a subsidiary of Carlile. The agreement contained a choice-of-law and forum-selection clause: **"*GOVERNING LAW.* THIS AGREEMENT IS TO BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD FOR THE PROVISIONS THEREOF REGARDING CHOICE OF LAW. VENUE FOR ANY CAUSE OF ACTION ARISING FROM THIS AGREEMENT WILL LIE IN TARRANT COUNTY, TEXAS."** The agreement also contained an indemnification clause that required Carlile to "indemnify, defend, and hold harmless each person entitled to indemnification from WIC or any WIC Subsidiary against all liabilities arising out of actions or omissions" arising from the agreement. J. Bryant signed the agreement on behalf of WIC and WIC's shareholders. The agreement was subject to shareholder approval.

WIC and Carlile then exchanged more "information relating to representations and warranties pertaining to WIC and its subsidiaries." This information led Carlile and WIC to sign an amended acquisition and reorganization agreement (amended agreement) on April 20, 2012, which itself was amended on November 16, 2012 (second amended agreement). [5] The amended agreement contained the same choice-of-law and forum-selection clause that was included in the agreement. The second amended agreement did not contain the clause but provided that any provision in the amended agreement that was not specifically amended or deleted by the second amended agreement remained "in full force and effect." The second amended agreement did

not mention any alteration or deletion of the clause. The amended agreement contained several covenants, obligations, representations, and warranties by WIC to Carlile. Further, the amended agreement required Carlile to indemnify J. Bryant, Meier, Lynch, and the remaining directors from "all liabilities arising out of actions or omissions" relating to the merger. The second amended agreement did not modify the indemnity provision or the covenants, obligations, representations, and warranties. Indeed, all remained in effect after the merger closed. Nichols on behalf of Carlile, and J. Bryant on behalf of WIC and its shareholders, signed the amended and second amended agreements.

The amended agreement required each member of WIC's board of directors to sign a release that released "WIC and the WIC Subsidiaries from any and all claims of such directors." It also provided for every officer and director to receive "a tail coverage policy" for one year after the merger was closed. [6] The second amended agreement did not modify the release requirement or the provision of tail coverage. Each release contained a choice-of-law and forum-selection clause: "THIS AGREEMENT IS TO BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF TEXAS. VENUE FOR ANY CAUSE OF ACTION ARISING FROM THIS AGREEMENT WILL LIE IN TARRANT COUNTY, TEXAS." Lynch, Meier, J. Bryant, and the remaining directors each signed a release.

### C. VOTING AGREEMENTS AND MERGER AGREEMENT

**\*3** Because the merger was subject to shareholder approval, Lynch, Meier, J. Bryant, and the remaining directors signed a voting agreement shortly after the amended agreement was signed and voted their shares in favor of the merger. [7] The voting agreement contained a choice-of-law and forum-selection provision: **"THIS AGREEMENT IS TO BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF COLORADO. VENUE FOR ANY CAUSE OF ACTION ARISING FROM THIS AGREEMENT WILL LIE IN YUMA COUNTY, COLORADO."** J. Bryant, Meier, Lynch, and the remaining directors also signed support agreements as directors of WIC, in which they agreed "to refrain from harming the goodwill of WIC ... or Carlile, and their

respective customer and client relationships." As did the voting agreement, the support agreement fixed Colorado as the governing law and the appropriate venue for "any cause of action arising from this agreement."

On December 27, 2012, the agreement and plan of merger (merger agreement) was finalized, which required Carlile—through Newco—to buy WIC's outstanding shares, Newco to merge into WIC, and WIC to become a subsidiary of Carlile. The merger agreement contained a choice-of-law and forum-selection clause: "*Governing Law.* **THIS MERGER AGREEMENT IS TO BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF TEXAS. VENUE FOR ANY CAUSE OF ACTION ARISING FROM THIS MERGER AGREEMENT WILL LIE IN TARRANT COUNTY, TEXAS."** The merger agreement was signed by Nichols on behalf of Carlile and J. Bryant on behalf of WIC. The next day, J. Bryant, as authorized by WIC, signed and delivered to Carlile an "Officer's Certificate," certifying the accuracy of WIC's representations and warranties regarding the merger and the full performance of WIC's obligations, as set forth in the agreement, the amended agreement, and the second amended agreement. Nichols asserted that "[i]f not for the execution and delivery of the Officer's Certificate to Carlile in Texas, Carlile would not have purchased the outstanding WIC shares." Shortly after the merger was final, Lynch signed the previously-negotiated employment agreement with Carlile to serve as president of the Bank, which was then a subsidiary of Carlile. Lynch's employment agreement contained a choice-of-law clause, mandating Colorado law as the law governing the employment agreement.

### D. PROCEDURAL FACTS

After the merger closed, Carlile believed that key pieces of information had been concealed during the due-diligence process, causing Carlile to overpay for the WIC stock. Carlile and WIC filed suit against J. Bryant, Lynch, Meier, and the remaining directors for common-law fraud, securities fraud, fraud in a stock transaction, negligent misrepresentation, and unjust enrichment. Along with money damages, Carlile and WIC pleaded for rescission and imposition of a constructive trust. In their petition, they contended two separate bases for the exercise of personal jurisdiction over Lynch, Meier, and the

remaining directors: (1) Lynch, Meier, and the remaining directors consented to jurisdiction in Texas by virtue of the forum-selection clauses and (2) Lynch's, Meier's, and the remaining directors' minimum contacts with Texas conferred specific jurisdiction without offending the traditional notions of fair play or substantial justice. Shortly after Carlile and WIC filed suit, the remaining directors demanded that Carlile indemnify them against Carlile's claims based on the indemnification clause contained in the agreement.

**\*4** J. Bryant, Meier, Lynch, and the remaining directors answered subject to their special appearances, in which they asserted that the trial court did not have personal jurisdiction over them based on a lack of minimum contacts with Texas. *See* Tex.R. Civ. P. 120a(1). The remaining directors submitted affidavits in support of their special appearances in which they stated they did not live or conduct business in Texas; did not own or lease property or maintain bank accounts in Texas; did not sign contracts in Texas; did not sign the agreement, amended agreement, the second amended agreement, or the merger agreement; and did not pay taxes in Texas. Meier also submitted an affidavit in which he averred that he is not a resident of Texas; has never conducted any business in Texas; has no ongoing contact or relationship with any person or business in Texas; has no regular or systematic contact with any person or business in Texas; and has not traveled to Texas in the last ten years. Lynch made similar averments in his affidavit but admitted he "traveled to ... Texas twice in the last ten ... years. Once in 2005 to attend a sporting event and between late 2010 to mid–2011 to attend a gathering at the offices of Tom Nichols and Don Cosby," the president of Carlile.

In response to the special appearances, Nichols submitted an affidavit stating that Lynch traveled to Texas in May 2011 to discuss with Nichols and Cosby the Bank's business, the Bank's financial condition, Carlile's preliminary due-diligence findings, and the specifics of the proposed merger. During the drafting of the merger agreement, several conference calls occurred with Lynch and Meier calling Carlile in Texas. Several other calls regarding the acquisition were initiated by J. Bryant to Carlile in Texas, with Lynch and Meier participating. Further, Nichols averred that Lynch traveled to Texas to finalize his employment agreement with Carlile before the merger closed. Nichols also detailed specific information that was not disclosed (either due to the concealment

of information or the production of false information) during the due-diligence period.

Carlile and WIC also attached excerpts from Lynch's and Meier's depositions to their special-appearance response. Meier admitted to sending multiple emails to Cosby, Nichols, and other Carlile employees in Texas that relayed information relevant to the due-diligence process. Meier personally prepared some of the compiled documents that he forwarded to Cosby and Nichols in Texas by email. Lynch also participated in compiling the due-diligence information that he knew was forwarded to Carlile in Texas. Both Meier and Lynch stated that they compiled and provided the information either at J. Bryant's request or with his approval. Nichols stated that Carlile relied on much of this information in making its decision about the advisability of a merger. Lynch again admitted to meeting with Carlile representatives in 2011 at Carlile's offices in Texas to discuss "different regions of our company where maybe improvements could [be] made and those kinds of things." Lynch also talked with Cosby by phone and email, while Cosby was located in Texas, presumably about Lynch's future employment agreement with Carlile. Both Lynch and Meier were aware that Carlile was located in Texas.

**\*5** The trial court overruled J. Bryant's, Lynch's, and Meier's objections to the exercise of personal jurisdiction but sustained the remaining directors' objections. *See* Tex.R. Civ. P. 120a(4). The trial court did not make findings of fact or conclusions of law and none were requested. *See* Tex.R. Civ. P. 296. Meier, Lynch, Carlile, and WIC appeal the trial court's interlocutory rulings. [8] *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(7) (West Supp.2014); Tex.R.App. P. 28.1(a). Lynch and Meier assert in three issues that the trial court erred in overruling their special appearance because the Texas long-arm statute was not satisfied, they did not have minimum contacts with Texas, and the exercise of jurisdiction over them would offend notions of fair play and substantial justice. Carlile and WIC assert in a sole issue that the trial court erred in sustaining the remaining directors' special appearance because the forum-selection clauses contained in the agreement, the amended agreement, the releases, and the merger agreement operated as the remaining directors' consent to the trial court's jurisdiction. In their reply brief, Lynch and Meier assert that they, like the remaining directors, are not subject to the forum-selection clauses, which further supports their special appearance.

## II. FORUM–SELECTION CLAUSES

We first address whether the contractual clauses setting venue and the applicable law for any disputes apply to Carlile and WIC's claims against Lynch, Meier, and the remaining directors such that Lynch, Meier, and the remaining directors consented to jurisdiction in Texas. We do so because the presence of a valid and enforceable forum-selection clause circumvents the need to conduct a due-process and minimum-contacts analysis because such a clause acts as consent to jurisdiction in the contracted-for forum. *Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 589–90, 111 S.Ct. 1522, 1525, 113 L.Ed.2d 622 (1991); *Baker Hughes Inc. v. Brooks,* 405 S.W.3d 246, 249 (Tex.App.-Houston [14th Dist.] 2013, pet. denied); *RSR Corp. v. Siegmund,* 309 S.W.3d 686, 704 (Tex.App.-Dallas 2010, no pet.); *see also Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 n. 14, 105 S.Ct. 2174, 2182 n. 14, 85 L.Ed.2d 528 (1985) (recognizing personal jurisdiction is a waivable right and party may give express or implied consent to jurisdiction under "variety of legal arrangements"). In short, if a party contractually consents to jurisdiction in a particular forum, the trial court's exercise of jurisdiction over that party will not offend due process even in the absence of minimum contacts with Texas. *Dos Santos v. Bell Helicopter Textron, Inc.,* 651 F.Supp.2d 550, 554 (N.D.Tex.2009); *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 792 (Tex.2005); *RSR Corp.,* 309 S.W.3d at 704; *Tri–State Bldg. Specialties, Inc. v. NCI Bldg. Sys., L.P.,* 184 S.W.3d 242, 248 (Tex.App.-Houston [1st Dist.] 2005, no pet.).

### A. STANDARD OF REVIEW

**\*6** Because the trial court did not issue findings of fact and conclusions of law, we infer that the trial court made all fact findings that have support in the record and that are necessary to uphold the ruling.[9] *CNOOC Se. Asia Ltd. v. Paladin Res. (SUNDA) Ltd.,* 222 S.W.3d 889, 894 (Tex.App.-Dallas 2007, pets. denied) (op. on reh'g); *see also Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 574 (Tex.2007); *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 794–95 (Tex.2002). We review the trial court's decision whether to enforce forum-selection clauses for an abuse of discretion. *Brown v. Mesa Distribs., Inc.,* 414 S.W.3d 279, 284 (Tex.App.-

Houston [1st Dist.] 2013, no pet.). "Under an abuse of discretion standard, we defer to the trial court's factual determinations if they are supported by the evidence, but we review the trial court's legal determinations de novo." *In re Labatt Food Serv., L.P.,* 279 S.W.3d 640, 643 (Tex.2009) (orig.proceeding). Therefore, to the extent our review involves contractual interpretation of a forum-selection clause, we employ a de novo standard of review. *Phoenix Network Techs. v. Neon Sys.,* 177 S.W.3d 605, 610 (Tex.App.-Houston [1st Dist.] 2005, no pet.).

When we are asked to enforce a forum-selection provision, we first determine whether the contract in fact contains such a clause by using ordinary principles of contract interpretation. *RSR Corp. ..,* 309 S.W.3d at 700. If such a clause is found, we then determine whether there is any reason to deem it unenforceable, recognizing that the presumption is that the clause is indeed enforceable. *In re Int'l Profit Assocs.,* 274 S.W.3d 672, 675 (Tex.2009) (orig.proceeding); *RSR Corp.,* 309 S.W.3d at 700. Assuming the clause is enforceable, we finally decide whether the clause applies to the particular claims or issues being litigated. *In re Lisa Laser, Inc.,* 310 S.W.3d 880, 884–86 (Tex.2010) (orig.proceeding).

### B. FORUM OR VENUE

It is uncontroverted that some of the written agreements entered into at various times during the parties' negotiations contained clauses that contractually set venue for any litigation arising out of the agreements in the courts of Tarrant County, Texas. Carlile, WIC, and the remaining directors refer to the operative clauses as forum-selection clauses, but Lynch and Meier assert the clauses are venue-selection clauses that do not confer jurisdiction as forum-selection clauses do.

A forum-selection clause is a contractual provision that selects the adjudicative body in which jurisdiction is properly invoked, while a venue-selection clause selects the geographic place of trial. *In re Great Lakes Dredge & Dock Co.,* 251 S.W.3d 68, 73–74 (Tex.App.-Corpus Christi 2008, orig. proceeding). In some instances, the difference between the two clauses is key. *Id.;* Jeremy Jones, Comment, *Forum and Venue Selection Clauses in Seamen's Employment Contracts: Can Contractual Stipulations be Used to Defeat a Seaman's Choice of Forum or Venue in a Jones Act Claim?,* 85 Tul. L.Rev. 519,

523–24 (2010). However, Texas and federal courts have referred to contractual-venue provisions that are similar to the provisions at issue in this case as forum-selection clauses, which equate to a consent to personal jurisdiction. *Carnival Cruise Lines,* 499 U.S. at 587–88, 595, 111 S.Ct. at 1524, 1528; *Alliance Health Group, LLC v. Bridging Health Options, LLC,* 553 F.3d 397, 399 (5th Cir.2008); *Michiana,* 168 S.W.3d at 792; *Lindsey v. RGK Consultants, LLC,* No. 14–09–00855–CV, 2010 WL 1189440, at *1–2 (Tex.App.-Houston [14th Dist.] Mar. 30, 2010, no pet.) (mem.op.); *cf. In re Fisher,* No. 12–0163, 2014 WL 801160, at *1, 8–9 (Tex. May 2, 2014) (orig.proceeding) (corrected op. on reh'g) (referring to contractual clause, which mandated that any legal action arising out of the agreement would be brought only in a Texas court, as venue-selection clause but recognizing that clause was a consent to personal jurisdiction and venue).

**\*7** Contrary to Lynch, Meier, and the remaining directors' argument, there is no requirement that a contractual venue clause specifically contain the words "forum," "jurisdiction," or "consent" to be considered a consent to jurisdiction. *See Kevlin Servs., Inc. v. Lexington State Bank,* 46 F.3d 13, 14–15 (5th Cir.1995); *Lindsey,* 2010 WL 1189440, at *2–3. Indeed, a forum-selection clause is, by definition, a clause specifying a particular venue, i.e., place, for suit. *Mendoza v. Microsoft, Inc.,* No. 5:13–CV–378–DAE, 2014 WL 842929, at *9 (W.D.Tex. Mar.5, 2014). Thus, we conclude that, to the extent there is a case-affecting difference between forum-selection and venue-selection clauses under the facts of this case, the operative clauses are forum-selection clauses. *E.g., Lindsey,* 2010 WL 1189440, at *2. Because the clauses at issue are forum-selection clauses, they are presumptively valid. *Laibe,* 307 S.W.3d at 316.

## C. ENFORCEMENT AGAINST NONSIGNATORIES

Lynch, Meier, and the remaining directors assert that the presumptively-valid forum-selection clauses are not enforceable against them so as to confer personal jurisdiction because they were not signatories to the agreement, the amended agreement, the second amended agreement, or the merger agreement. Indeed, a forum-selection clause in an agreement can be enforced as to a nonsignatory only if the nonsignatory is bound by that agreement under recognized contract or agency principles. *Hellenic Inv. Fund, Inc. v. Det Norske Veritas,* 464 F.3d

514, 517 (5th Cir.2006); *In re Kellogg Brown & Root, Inc.,* 166 S.W.3d 732, 739 (Tex.2005) (orig.proceeding).

Carlile and WIC bore the burden to identify and prove a theory under which the nonsignatories could be bound by the forum-selection clauses. *See CNOOC,* 222 S.W.3d at 894–95. Carlile and WIC do not argue that Lynch, Meier, or the remaining directors personally signed any of these three documents; instead, they assert that Lynch, Meier, and the remaining directors are bound by the forum-selection clauses under the doctrine of direct-benefits estoppel and as transaction participants. *See Quality Custom Rail & Metal, LLC v. Travelers Cas. & Sur. Co. of Am.,* No. 3:13–CV–3587–D, 2014 WL 840046, at *3 (N.D.Tex. Mar.4, 2014); *Tex. Source Group, Inc. v. CCH, Inc.,* 967 F.Supp. 234, 237 (S.D.Tex.1997); *Kellogg,* 166 S.W.3d at 739; *Deep Water Slender Wells, Ltd. v. Shell Int'l Exploration & Prod.,* 234 S.W.3d 679, 693 & n. 8 (Tex.App.-Houston [14th Dist.] 2007, pet. denied).

### 1. Direct–Benefits Estoppel

**[1]** Direct-benefits estoppel, which was initially developed in the context of arbitration clauses, [10] applies when a nonsignatory "knowingly exploits the agreement containing the arbitration clause ." *Bridas S.A.P.I.C. v. Gov't of Turkm.,* 345 F.3d 347, 361–62 (5th Cir.2003) (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.,* 269 F.3d 187, 199 (3d Cir.2001)). The doctrine is invoked if "non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract." Hellenic, 464 F.3d 517–18; *see also Carr v. Main Carr Dev., LLC,* 337 S.W.3d 489, 497 (Tex.App.-Dallas 2011, pet. denied).

**\*8** Direct-benefits estoppel has been applied to enforce forum-selection clauses against nonsignatories seeking to sue on the contract containing the forum-selection clause. *See, e.g., Hellenic,* 464 F.3d at 520. But as the United States Court of Appeals for the Fifth Circuit has pointed out, direct-benefits estoppel is "seriously consider[ed]" only when "the nonsignatory had brought suit against a signatory premised in part upon the agreement." *Bridas,* 345 F.3d at 362. *See generally MaxEn Capital, LLC v. Sutherland,* No. H–08–3590, 2009 WL 936895, at *5 (S.D.Tex. Apr.3, 2009) (collecting cases

enforcing forum-selection and arbitration clauses against nonsignatories based on estoppel). In other words, the party position of the nonsignatory in the lawsuit— plaintiff or defendant—is an important distinction in deciding whether estoppel can bind a nonsignatory to a contract's terms. *See Bridas,* 345 F.3d at 361 ("[T]he [nonsignatory defendant] ... did not sign a contract containing an arbitration provision and never sued [plaintiff] on the agreement. The distinction is *not* one without a difference."). Here, Lynch, Meier, and the remaining directors did not sue Carlile or WIC under the agreement, the amended agreement, the second amended agreement, or the merger agreement. Thus, they did not "exploit" the agreements containing the Tarrant County forum-selection clauses to the degree required for direct-benefits estoppel. *See id.* at 362. Indeed, estoppel is a defensive theory, not a theory by which a signatory plaintiff may hold a nonsignatory defendant to the terms of a contract the nonsignatory defendant is not seeking to enforce. *See Perry Homes v. Cull,* 258 S.W.3d 580, 593 (Tex.2008), *cert. denied,* 855 U.S. 1103 (2009); *see also Grigson v. Creative Artists Agency, L.L.C.,* 210 F.3d 524, 526–28 (5th Cir.2000) (estopping a signatory plaintiff from relying on defendants' status as nonsignatories to prevent *defendants* from compelling arbitration under contractual provision), *cert. denied,* 531 U.S. 103 (2000).

However, "a nonparty may seek or obtain direct benefits from a contract by means other than a lawsuit." *In re Weekley Homes, L.P.,* 180 S.W.3d 127, 132 (Tex.2005) (orig.proceeding). Indeed, a nonsignatory also can exploit a contract by knowingly seeking and obtaining direct and substantial benefits from that contract. *Noble Drilling Servs., Inc. v. Certex USA, Inc.,* 620 F.3d 469, 473 (5th Cir.2010); *Fleetwood Enters., Inc. v. Gaskamp,* 280 F.3d 1069, 1074 (5th Cir.2002); *Weekley Homes,* 180 S.W.3d at 131–33. Carlile and WIC assert that the remaining directors' invocation of the indemnity provision and their receipt of the proceeds from the merger were direct and substantial benefits justifying a conclusion that direct-benefits estoppel applies. Carlile and WIC also argue that Lynch additionally received "the benefit of employment with Carlile" and that Lynch and Meier, along with the benefits received by the remaining directors, received tail insurance.

**\*9** Lynch's employment agreement did not include a Tarrant County forum-selection clause and was a separate agreement from the merger agreements; thus, Lynch's

employment cannot be considered a benefit derived from the merger agreements implicating direct-benefits estoppel. The receipt of the proceeds from the merger also is not a sufficient substantial benefit for the purposes of direct-benefits estoppel. *See St. Clair,* 2007 WL 1095554, at \*7 (holding wife's receipt of sale proceeds as part of community estate where she did not negotiate or participate in sale was not a benefit sufficient to invoke estoppel). The indemnity provision and the availability of tail insurance, likewise, are insufficient to show a substantial benefit because there is no evidence that Carlile and WIC actually indemnified Lynch, Meier, or the remaining directors or that Lynch and Meier claimed coverage under the tail insurance. Carlile and WIC failed to meet their burden to prove direct-benefits estoppel such that the nonsignatory defendants could be bound by the forum-selection clauses.

Finally, we note that estoppel is an equitable theory that may or may not be applied at the trial court's discretion. *See Weekley Homes,* 180 S.W.3d at 134–35; *VSR Fin. Servs., Inc. v. McLendon,* 409 S.W.3d 817, 830 (Tex.App.-Dallas 2013, no pet.). On the record before us, we cannot conclude that the trial court clearly abused that discretion in declining to enforce the forum-selection clauses against nonsignatories Lynch, Meier, and the remaining directors under direct-benefits estoppel.

### 2. Transaction Participants

**[2]** Carlile and WIC next assert that the forum-selection clauses may be enforced against Lynch, Meier, and the remaining directors because they participated in and were closely related to the merger:

> [The remaining directors] made the decision initially to sell WIC. They approved the retention of St. Charles to find a buyer. They directed St. Charles to solicit Carlile in Texas. They approved the sale of the WIC stock to Carlile. They approved and authorized Jerry Bryant to execute the agreements containing the choice of forum clauses. They approved and directed the distribution of a Proxy

Statement to WIC's shareholders. They recommended that the WIC shareholders vote in favor of the transaction.... They signed Support Agreements promising to support the merger.... Last, but certainly not least, [they] personally received approximately $4 million of Carlile's money in the transaction.

Regarding Lynch and Meier, Carlile and WIC raise the same actions quoted above but add that Lynch and Meier "were actively involved in the pre-closing activities leading to the transaction, including providing due diligence materials to Carlile, and participated in telephone calls with Carlile." Carlile and WIC recognize that "[n]either the Texas Supreme Court nor this [c]ourt has ruled on the enforceability of forum-selection clauses by or against non-signatories who participated in the transaction." *See Deep Water,* 234 S.W.3d at 693.

**\*10** Nonsignatories may be subject to forum-selection clauses if they were transaction participants. *See Brock v. Entre Computer Ctrs., Inc.,* 740 F.Supp. 428, 430–31 (E.D.Tex.1990). However, all cases analyzing whether a nonsignatory is a transaction participant apply the issue solely in the context of a nonsignatory defendant attempting to enforce a forum-selection clause against a signatory plaintiff, who did not want the clause enforced. *See CNOOC,* 222 S.W.3d at 898 (collecting cases); *see also Quicksilver Resources, Inc. v. Eagle Drilling, LLC,* 792 F.Supp.2d 948, 953 & n. 5 (S.D.Tex.2011) (declining to enforce choice-of-law provision against nonsignatory officers, directors, and shareholders of signatory corporation by plaintiff signatory and stating defendant nonsignatories not third-party beneficiaries or closely related). Based on the record before us and the paucity of legal authority applying the transaction-participant theory to enforce a forum-selection clause against a nonsignatory in a suit brought by a signatory, we conclude that Carlile and WIC have failed to carry their burden to identify and prove a theory under which the nonsignatories could be bound by the forum-selection clauses.

**3. Summary**

Carlile and WIC could not enforce the forum-selection clauses against nonsignatories Lynch, Meier, and the remaining directors under either direct-benefits estoppel or as transaction participants. The trial court did not err by concluding that the forum-selection clauses could not be enforced against the remaining directors. [11] Therefore, we need not decide whether Carlile and WIC's claims fall within the scope of the forum-selection clauses. *See* Tex.R.App. P. 47.1. We overrule Carlile and WIC's sole issue.

**III. IN PERSONAM JURISDICTION**

We now decide whether the trial court correctly exercised jurisdiction over Lynch and Meier on the basis of minimum contacts. Carlile and WIC do not argue on appeal that the trial court had in personam jurisdiction over the remaining directors on the basis of the long-arm statute and due process: "The only issue here is whether the [remaining directors] consented to jurisdiction pursuant to the forum-selection clause. Under that analysis, the [remaining directors'] contacts with Texas, or lack thereof, are irrelevant." Therefore, we address the presence of in personam jurisdiction only regarding Lynch and Meier. As stated above, Lynch and Meier assert that the trial court lacked in personam jurisdiction over them because the long-arm statute does not apply and because minimum contacts with Texas are absent.

**A. STANDARDS AND SCOPE OF REVIEW**

**1. Appellate Prism**

The standards of review and the burdens of proof applicable to our review of a trial court's ruling on a special appearance are well established. We determine whether a trial court has personal jurisdiction over a defendant under a de novo standard. *BMC Software,* 83 S.W.3d at 794; *Fish v. Tandy Corp.,* 948 S.W.2d 886, 891–92 (Tex.App.-Fort Worth 1997, writ denied). A plaintiff has the initial burden to plead sufficient allegations to bring a nonresident within the provisions of the Texas long-arm statute. *Kelly v. Gen. Interior Constr., Inc.,* 301 S.W.3d 653, 658 (Tex.2010); *Retamco Operating, Inc. v. Republic Drilling Co.,* 278 S.W.3d 333, 337 (Tex.2009). Once a plaintiff sufficiently pleads such jurisdictional allegations,

the burden shifts to the defendant to negate the bases of personal jurisdiction asserted by the plaintiff. *Kelly,* 301 S.W.3d at 658; *Moki Mac,* 221 S.W.3d at 574.

**\*11** In determining whether the nonresident defendant sufficiently negated the pleaded bases for personal jurisdiction, the trial court frequently must resolve questions of fact. *BMC Software,* 83 S.W.3d at 794. While we review de novo the trial court's legal conclusion that personal jurisdiction does not exist, any supporting findings of fact are reviewed for factual and legal sufficiency. *Id.* If the trial court's findings are supported by sufficient evidence, we must decide as a matter of law whether those facts negate all bases for personal jurisdiction. *Id.* In reviewing the factual sufficiency of the evidence to support a fact finding, [12] we may only "unfind" an implied factual finding if we determine that the credible evidence supporting the finding is too weak or that the finding is against the great weight and preponderance of the credible evidence contrary to the finding. [13] *Tex. Nat'l Bank v. Karnes,* 717 S.W.2d 901, 903 (Tex.1986); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965).

### 2. Long–Arm Statute and Due Process

Of course, a special appearance challenges the trial court's personal jurisdiction over a defendant. Texas courts may not exercise personal jurisdiction over a nonresident defendant unless federal due process requirements and the Texas long-arm statute are satisfied. Tex. Civ. Prac. & Rem.Code Ann. §§ 17.041–.042 (West 2008); *Helicopteros Nacionales de Colom., S.A. v. Hall,* 466 U.S. 408, 412–13 & n. 7, 104 S.Ct. 1868, 1871 & n. 7, 80 L.Ed.2d 404 (1984). The Texas long-arm statute and the requirements of due process are coextensive; thus, the long-arm statute is satisfied if the exercise of personal jurisdiction comports with federal due process. *See Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991). As such, we rely on federal and Texas jurisprudence in resolving questions regarding personal jurisdiction. *BMC Software,* 83 S.W.3d at 795. Federal due process is satisfied if (1) the nonresident defendant has "minimum contacts" with Texas and (2) the exercise of personal jurisdiction over the nonresident defendant does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Wash.,*

*Office of Unemp't Comp. & Placement,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

### B. APPLICATION

#### 1. Sufficient Pleading Invoking Long–Arm Statute

**[3]** We first determine whether Carlile and WIC met their initial burden to plead sufficient allegations to bring Lynch and Meier within the provisions of the Texas long-arm statute, without reaching the merits of those allegations. [14] *See Hoffman v. Dandurand,* 143 S.W.3d 555, 559 (Tex.App.-Dallas 2004, no pet.). Under the long-arm statute, personal jurisdiction attaches to a nonresident defendant who "commits a tort in whole or in part in [Texas]" or "contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in [Texas]." Tex. Civ. Prac. & Rem.Code Ann. § 17.042(1)-(2) (West 2008).

**\*12** Here, Carlile and WIC pleaded that Lynch and Meier were Colorado residents but that they committed "torts in whole or in part in Texas," i.e., fraud and negligent misrepresentation. They further asserted that Lynch and Meier "contracted by mail or otherwise with a Texas resident and either party is to perform the contracts in whole or in part in [Texas]." In support of these claims, Carlile and WIC alleged that Lynch and Meier concealed and failed to disclose information in Texas during the merger negotiations. These allegations met Carlile and WIC's initial pleading burden by alleging acts or omissions in Texas by Lynch and Meier, personally or through an agent, and torts arising from such conduct. *See, e.g ., Moncrief Oil Int'l Inc. v. OAO Gazprom,* 414 S.W.3d 142, 149 (Tex.2013); *Baldwin v. Household Int'l, Inc.,* 36 S.W.3d 273, 277 (Tex.App.-Houston [14th Dist.] 2001, no pet.).

Lynch and Meier argue at length that Carlile and WIC failed to meet their burden to plead a jurisdictional basis under the long-arm statute. In these arguments, they delve into the merits of Carlile and WIC's claims by asserting that the alleged acts were not purposefully committed within Texas; any concealment was by omission and occurred in Colorado; no fiduciary relationship between Lynch, Meier, and Carlile was pleaded or proven; no substantially false impression by any concealment was pleaded or proven; Carlile and WIC failed to plead or

prove that J. Bryant was acting within the scope of his authority; and Lynch and Meier could not foresee being hailed to court in Texas. These arguments go to the merits of Carlile and WIC's allegations and are not appropriate considerations in determining whether Carlile and WIC met their initial *pleading* burden under the long-arm statute. *See, e.g., Guardian Royal,* 815 S.W.2d at 227 (holding "[f]oreseeability is ... important consideration in deciding whether the nonresident defendant has purposely established 'minimum contacts' " but not considering foreseeability in context of initial pleading burden); *Leesboro Corp. v. Hendrickson,* 322 S.W.3d 922, 929 (Tex.App.-Austin 2010, no pet.) (considering whether corporate representative's acts could be imputed to corporation in determining minimum contacts, not initial pleading burden).

### 2. Due Process

Because Carlile and WIC sufficiently pleaded allegations to bring Lynch and Meier within the provisions of the Texas long-arm statute, the burden then shifted to Lynch and Meier to negate all pleaded jurisdictional bases and, thereby, establish a violation of their rights to due process. *Retamco,* 278 S.W.3d at 337; *see Schlobohm v. Schapiro,* 784 S.W.2d 355, 356 (Tex.1990) (recognizing jurisdiction over nonresident supportable if long-arm statute authorizes such jurisdiction and it is consistent with due-process guarantees). Lynch and Meier assert that exercising specific jurisdiction over them would violate due process because (1) the evidence is factually insufficient to establish their minimum contacts with Texas and (2) any exercise of jurisdiction would offend traditional notions of fair play and substantial justice.

### a. Minimum contacts

#### (1) purposeful availment

**\*13** **[4]**   When, as here, a plaintiff asserts specific jurisdiction, the minimum-contacts analysis focuses on the relationship between the defendant, the forum, and the litigation.[15] *IRA Res., Inc. v. Griego,* 221 S.W.3d 592, 596 (Tex.2007). Minimum contacts are sufficient when a nonresident defendant "purposefully avails itself of the privilege of conducting activities within the forum State,

thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958). In determining purposeful availment, we consider (1) the defendant's own actions but not the unilateral activity of another party, (2) whether the defendant's actions were purposeful rather than "random, isolated, or fortuitous," and (3) whether the defendant sought "some benefit, advantage, or profit by availing itself of the privilege of doing business in Texas." *Michiana,* 168 S.W.3d at 785. The nonresident defendant's contacts are considered as a whole and not in isolation, focusing on the quality and not the quantity of the contacts. *Retamco,* 278 S.W.3d at 339; *Guardian Royal,* 815 S.W.2d at 230 n. 11. We look to the relationship between the defendant, the forum, and the litigation. *Moki Mac,* 221 S.W.3d at 576.

Here both Meier and Lynch agreed as officers and directors of the Bank and WIC to seek out Carlile in Texas regarding a potential acquisition of WIC and the Bank. Meier and Lynch were directly involved in compiling information for the ensuing due diligence, which they knew would be produced to Carlile in Texas as part of the merger negotiations. Both Meier and Lynch directed emails to Carlile employees in Texas that provided further due-diligence information. Lynch traveled to Texas to meet with Carlile employees about the possible merger and had phone conversations with Cosby.[16]

These contacts were not random and fortuitous but were specifically directed to Carlile in Texas for the purposes of due diligence and the ensuing merger. *See generally Michiana,* 168 S.W.3d at 785 (holding "[s]ellers who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' " are purposeful rather than fortuitous contacts (quoting *Travelers Health Ass'n v. Commonwealth of Va. ex rel. State Corp. Comm'n,* 339 U.S. 643, 647, 70 S.Ct. 927, 929, 94 L.Ed. 1154 (1950))). The merger discussions and exchange of information were not unilateral and showed that Lynch and Meier were availing themselves of the privilege of conducting business —a possible corporate merger—with a Texas corporation. The due-diligence process lasted over a year, resulting in amended agreements and a final merger agreement. Lynch and Meier were involved in this process and sought some benefit or advantage by availing themselves of Texas jurisdiction—a merger with Carlile. Further, Meier and Lynch directed the produced information to

Carlile in Texas. *See Wien Air Alaska v. Brandt,* 195 F.3d 208, 213–15 (5th Cir.1999) (holding German attorney's alleged misrepresentations and omissions directed to Texas, while limited, were sufficient contacts to confer personal jurisdiction over him in a Texas court). Further, Lynch and Meier were experienced businessmen and knew the information they provided would be relied on by Carlile in making the ultimate decision on merging with WIC—a decision that was made in Texas. Lynch and Meier could reasonably foresee being haled into a Texas court based on their purposeful actions directed to Texas. *See Moki Mac,* 221 S.W.3d at 576–79 (finding purposeful availment by nonresident company that made alleged material misrepresentations to resident plaintiffs in Texas, which were relied on by resident plaintiffs to their detriment); *Siskind v. Villa Found. for Educ., Inc.,* 642 S.W.2d 434, 436 (Tex.1982) ("Villa's solicitation of Texas business, consisting of representations made in Texas, is a purposeful act committed in Texas.").

**\*14**  Lynch and Meier assert, however, that any actions they took were at the direction of J. Bryant and that they had no input into what information to produce. But considering the evidence before the trial court, we cannot conclude that the evidence supporting the trial court's implied findings regarding purposeful availment was too weak or that the findings were against the great weight and preponderance of the credible evidence contrary to the implied finding. Indeed, Nichols's affidavit contradicts Meier's and Lynch's averments that they were passive conduits of information at the mercy of J. Bryant. We conclude that the trial court's conclusion that Lynch and Meier purposefully availed themselves of the privilege of conducting business in Texas was supported by factually sufficient evidence. *See, e.g., Parex Res., Inc. v. ERG Res., LLC,* 427 S.W.3d 407, 436–40 (Tex.App.-Houston [14th Dist.] 2014, pets. filed); *Leesboro,* 322 S.W.3d at 929–32; *Glencoe,* 269 S.W.3d at 165–67.

### (2) substantial connection

Purposeful availment alone does not support the exercise of specific jurisdiction unless the defendant's potential liability arises from or relates to the forum contacts. *Guardian Royal,* 815 S.W.2d at 228; *Glencoe,* 269 S.W.3d at 167. In short, there must be a substantial connection between the defendant's contacts with the forum and the operative facts of the litigation. *Moki Mac,* 221 S.W.3d at 584.

Here, Meier and Lynch communicated with and provided information to Carlile in Texas multiple times, which Carlile relied on in deciding to merge with WIC. Lynch even traveled to Texas to discuss the possible merger and reviewed the financial status of the Bank at that time. Carlile alleges that this information was incorrect and resulted in losses to Carlile in Texas, leading to their claims for fraud and misrepresentation. Thus, the contacts showing purposeful availment are the operative facts of the litigation. Lynch's and Meier's liability, if any, will arise from the type and scope of the information they produced to Carlile in Texas. The trial court's conclusion that there was a substantial connection between Lynch's and Meier's qualitative contacts and the facts of the litigation was supported by factually sufficient evidence. *See Glencoe,* 269 S.W.3d at 167.

### 3. Fair Play and Substantial Justice

**[5]**  If minimum contacts are present, whether general or specific, the nonresident defendant then bears the burden to establish that the exercise of personal jurisdiction would offend traditional notions of fair play and substantial justice. *Prof'l Ass'n of Golf Officials v. Phillips Campbell & Phillips, L.L.P.,* No. 02–12–00426–CV, 2013 WL 6869862, at \*5 (Tex.App.-Fort Worth Dec. 27, 2013, pet. denied) (mem.op.) (citing *Knight Corp. v. Knight,* 367 S.W.3d 715, 726 (Tex.App.-Houston [14th Dist.] 2012, orig. proceeding)). When the nonresident defendant has purposefully established minimum contacts with the forum state, it will be rare that the exercise of jurisdiction over the nonresident defendant would not comport with fair play and substantial justice. *Guardian Royal,* 815 S.W.2d at 231.

**\*15**  Lynch and Meier assert that Carlile and WIC failed to show that fair play and substantial justice require Texas jurisdiction. But the burden was on Lynch and Meier, not Carlile and WIC, to "present 'a compelling case that the presence of some consideration would render jurisdiction unreasonable.' " *Id.* (quoting *Burger King,* 471 U.S. at 477, 105 S.Ct. at 2185). The relevant considerations we are to review in determining whether the exercise of jurisdiction comports with fair play and substantial justice are (1) the burden on the defendants, (2) the interest of the

forum state in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980); *Guardian Royal,* 815 S.W.2d at 228. Lynch and Meier focus on the first two considerations.

Lynch's and Meier's affidavits offered in support of their special appearance state no evidence relative to these considerations other than their assertions that they reside in Colorado. In their brief on appeal, they refer to the "expense of hotel and ground travel ... compared to that of the Carlile representative" and "the cost of discovery since most of the witnesses are located in Colorado." However, there is no record evidence of the burdensomeness of litigating in Texas, and indeed, "[d]istance from the forum is generally not sufficient to defeat jurisdiction because the availability of 'modern transportation and communication have made it less burdensome for a party sued in a State where he engages in economic activity.' " *Glencoe,* 269 S.W.3d at 168 (quoting *McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957)).

Additionally, Lynch's and Meier's alleged misrepresentations were purposefully directed into Texas, where it was foreseeable that a Texas resident would rely on them. *See Charles R. Weber Co. v. Back–Haul Bulk Carriers, Inc.,* No. 14–02–00240–CV, 2002 WL 31769418, at *5 (Tex.App.-Houston [14th Dist.] Dec. 12, 2002, no pet.) (not designated for publication). Texas generally has a manifest interest in providing its residents with a convenient forum for redressing injuries inflicted by nonresidents. *See Burger King,* 471 U.S. at 473, 105 S.Ct. at 2182–83. Lynch and Meier have not demonstrated that the interests of Colorado or the shared interests of all the states outweigh Texas's substantial interest in providing relief to its residents. Lynch and Meier have not identified any considerations that would render jurisdiction in Texas unreasonable or that provide them with a vested right not to be sued in Texas. Accordingly, we conclude that Lynch and Meier failed to meet their burden to establish a compelling case that the trial court's exercise of

personal jurisdiction over Lynch and Meier would offend traditional notions of fair play and substantial justice. *See, e.g., Tempest Broad. Corp. v. Imlay,* 150 S.W.3d at 861, 876–77 (Tex.App.-Houston [14th Dist.] 2004, no pet.); *Rowland & Rowland, P.C. v. Tex. Emp'rs Indem. Co.,* 973 S.W.2d 432, 436 (Tex.App.-Austin 1998, no pet.).

### 4. Summary

**\*16** Carlile and WIC pleaded sufficient allegations bringing Lynch and Meier within the provisions of the Texas long-arm statute. Lynch and Meier then failed to establish the violation of their rights to due process because the record supported the trial court's conclusion that Lynch and Meier had minimum contacts with Texas sufficient to establish specific jurisdiction. Lynch and Meier also failed to present a compelling case that that the trial court's exercise of personal jurisdiction over Lynch and Meier would offend traditional notions of fair play and substantial justice. Therefore, we overrule Lynch and Meier's three points.

### IV. CONCLUSION

Because Carlile and WIC could not enforce the forum-selection clauses against nonsignatories Lynch, Meier, and the remaining directors under either direct-benefits estoppel or as transaction participants, the trial court did not err by concluding that the forum-selection clauses were unenforceable. Thus, the trial court correctly sustained the remaining directors' special appearance. Although the forum-selection clauses were unenforceable against Lynch and Meier, the trial court correctly overruled their special appearances because the record supported the trial court's conclusion that in personam jurisdiction over Lynch and Meier was present and did not offend due process or the traditional notions of fair play and substantial justice. We affirm the trial court's interlocutory orders. *See Tex.R.App. P. 43.2(a).*

### All Citations

Not Reported in S.W.3d, 2014 WL 3891658

Footnotes

1    *See* Tex.R.App. P. 47.4.

2    The record does not reflect who signed the nondisclosure agreement on behalf of WIC.

3    Nichols believed that this meeting occurred in May 2011.

4    Lynch denied that this meeting occurred in Texas, and J. Bryant could not recall such a meeting.

5    Between the time of the amended and the second amended agreements, Nichols met with Armstrong at Carlile's offices in Tarrant County, Texas, to discuss the Bank's "financial condition and the need for it to be acquired and/or have a substantial injection of capital." Armstrong affirmed that he traveled to Texas for this meeting.

6    A tail policy provides ongoing insurance coverage for a company's officers and directors for claims made during the tail period that are based on acts or omissions of the officers or directors before closing. *E.g.,* Duncan, SEC Lit. Release No. 22274, 103 SEC Docket 614, 2012 WL 8703002 (Mar. 5, 2012).

7    J. Bryant signed on behalf of WIC, as "Substitute Proxy Holder," and as an individual shareholder. All other signatories signed as individual shareholders.

8    J. Bryant did not appeal the denial of his special appearance.

9    At various points in their briefs, the parties rely on statements the trial court made at a hearing on the special appearances to support their respective arguments regarding what the trial court found or concluded. Such statements are not the equivalent of findings of fact and conclusions of law, and we will not construe them to be so in our review. *See Amend v. Watson,* 333 S.W.3d 625, 628 n. 2 (Tex.App.-Dallas 2009, no pet.).

10   We look to cases applying direct-benefits estoppel in the context of arbitration clauses because arbitration clauses are a type of forum-selection clause. *See St. Clair v. Brooke Franchise Corp.,* No. 2–06–216–CV, 2007 WL 1095554, at *4 (Tex.App.-Fort Worth Apr.12, 2007, no pet.) (mem.op.). *See generally Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,* 515 U.S. 528, 534, 115 S.Ct. 2322, 2326, 132 L.Ed.2d 462 (1995) (recognizing arbitration provisions are a subset of forum-selection clauses).

11   Although the trial court would have erred by overruling Lynch's and Meier's special appearances because the forum-selection clauses constituted their consent to jurisdiction, we may uphold the trial court's ruling on any legal basis finding support in the record, i.e., Lynch's and Meier's minimum contacts with the forum state. Therefore, our conclusion regarding the enforceability of the forum-selection clause against the nonsignatories alone is not fatal to the trial court's ruling. *See Dukatt v. Dukatt,* 355 S.W.3d 231, 237 (Tex.App.-Dallas 2011, pet. denied) (recognizing appellate courts must affirm denial of special appearance on any legal theory supported by the evidence in the absence of findings and conclusions).

12   Lynch and Meier do not challenge the legal sufficiency of the trial court's implied findings.

13   This standard applies because Lynch and Meier had the burden to disprove Carlile and WIC's pleaded jurisdictional facts. *See Gooch v. Am. Sling Co.,* 902 S.W.2d 181, 184 (Tex.App.-Fort Worth 1995, no writ); W. Wendell Hall, *Hall's Standards of Review in Texas,* 42 St. Mary's L.J. 3, 41–42 (2010).

14   Lynch and Meier argue that Carlile and WIC's failure to specifically allege jurisdictional facts in their original and first amended petitions indicates they did not meet this initial burden. But Carlile and WIC's live pleading filed before the special-appearance hearing included jurisdictional allegations and is the pleading we rely on. *See* Tex.R. Civ. P. 65 (providing amended pleading replaces and supersedes previous pleading); *cf. Frank A. Smith Sales, Inc. v. Atl. Aero, Inc.,* 31 S.W.3d 742, 747 (Tex.App.-Corpus Christi 2000, no pet.) ("The meaning of the term 'pleadings' must be limited at least so as to exclude matter not filed prior to the special appearance hearing.").

15   Carlile and WIC concede that the trial court did not have general jurisdiction over Lynch or Meier.

16   For the reasons we stated in *Glencoe,* we are not concluding that phone calls, standing in isolation, are sufficient to establish purposeful availment. *Glencoe Capital Partners II, L .P. v. Gernsbacher,* 269 S.W.3d 157, 165–67 (Tex.App.-Fort Worth 2008, no pet.). However, phone calls combined with other contacts satisfying the three inquiries of purposeful availment can support the exercise of specific jurisdiction. *See also Moncrief Oil,* 414 S.W.3d at 151–53.

---

End of Document                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 6

2010 WL 3835762
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
E.D. Texas,
Tyler Division.

EOLAS TECHNOLOGIES, INC., Plaintiff,
v.
ADOBE SYSTEMS, INC., et al, Defendants.

No. 6:09–CV–446.
|
Sept. 28, 2010.

## MEMORANDUM OPINION AND ORDER

LEONARD DAVIS, District Judge.

 *1 Defendants' Motion to Transfer to the U.S. District
Court for the Northern District of California Pursuant to
28 U.S.C. § 1404(a) (Docket No. 214) is before the Court.
Having considered the parties' written submissions, the
Court **DENIES** the motion.

## BACKGROUND

In its Complaint, Eolas Technologies Incorporated
accuses twenty-three defendants of infringing U.S. Patent
No. 5,838,906, entitled "Distributed hypermedia method
for automatically invoking external application providing
interaction and display of embedded objects within a
hypermedia document," and U.S. Patent No. 7,599,985,
entitled "Distributed hypermedia method and system for
automatically invoking external application providing
interaction and display of embedded objects within a
hypermedia document."

Adobe Systems, Inc., Amazon.com, Inc., Apple Inc.,
Blockbuster Inc., eBay Inc., The Go Daddy Group,
Inc., Google Inc., New Frontier Media, Inc., Playboy
Enterprises International, Inc., Sun Microsystems Inc.,
Yahoo! Inc., and YouTube, LLC. ("Defendants") move
to transfer the case to the Northern District of California.

CDW Corporation, JP Morgan Chase & Co., and
Staples, Inc. join in the motion to transfer. Citigroup,
Inc., Frito–Lay, Inc., J.C. Penney Company, Office
Depot, Inc., Perot Systems Corp., Rent–A–Center, Inc.,
and Texas Instruments, Inc. have not joined in nor
opposed the motion to transfer. Alternatively, if the Court
determines that any defendant is an obstacle to transfer,
Defendants request that those defendants be severed and
the remaining defendants be transferred to the Northern
District of California.

The Regents of the University of California own both
patents in suit and are not a party to this suit. Eolas is an
exclusive licensee to the patents. Eolas conducts research
and development to create technologies in the areas
of interactive embedded and distributed applications,
systems, data analysis, visualization, collaboration and
networking. Eolas is incorporated in Texas, and its
principal place of business is in Tyler, Texas, in the Eastern
District of Texas.

Seven defendants reside in California: Adobe, Apple, Sun,
eBay, Google, Yahoo!, and YouTube. Six defendants
reside in Texas. Texas Instruments and Blockbuster are
headquartered in Dallas, Texas. Perot Systems, Frito–
Lay, J.C. Penney, and Rent–A–Center are headquartered
in Plano, Texas, in the Eastern District of Texas.

Nine other defendants are located throughout the
country. Amazon's headquarters are in Seattle,
Washington. Citigroup's headquarters are in New York
City. CDW is headquartered in Vernon Hills, Illinois.
Go Daddy's principal place of business is in Scottsdale,
Arizona. J.P Morgan is headquatered in New York City.
New Frontier Media's headquarters are in Colorado.
Office Depot's headquarters are in Boca Raton, Florida.
Playboy's headquarters are in Chicago, Illinois. Staples'
headquarters are in Framingham, Massachusetts.

## SEVERANCE

 *2 The Court **DENIES** Defendants' request to sever
any defendants. Severance would not promote judicial
economy. All defendants are accused of infringing
the patents in suit, and adjudicating infringement
will require construing the claims and evaluating the
patents' innovation over the prior art. Thus, determining
defendants' liability will involve substantially overlapping

questions of law and fact. *See MyMail, Ltd. v. Am. Online, Inc.,* 223 F.R.D. 455 (E.D.Tex.2004) (Davis, J.); *see also* FED. R. CIV. P. 42(a) (authorizing courts to consolidate or join for trial actions that involve common questions of law or fact). For multiple courts to simultaneously address these identical issues would be a waste of the courts' and parties' resources and could potentially lead to inconsistent results. Moreover, the record before the Court does not show that the products or methods at issue are so different that determining infringement in one case is less proper or efficient than determining infringement in multiple cases. Nor does the record show that any defendant will be so prejudiced by joinder that severance is necessary to prevent an inequitable process or result. *See* FED. R. CIV. P. 42(b). Accordingly, the Court will not at this time sever any defendant and will consider all defendants in its transfer analysis.

## APPLICABLE TRANSFER LAW

Defendants argue that they are entitled to transfer under 28 U.S.C. § 1404(a). Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The first inquiry when analyzing a case's eligibility for 1404(a) transfer is "whether the judicial district to which transfer is sought would have been a district in which the claim could have been filed." *In re Volkswagen AG,* 371 F.3d 201, 203 (5th Cir.2004) (*"In re Volkswagen I"*).

Once that threshold inquiry is met, courts analyze both public and private factors relating to the convenience of parties and witnesses as well as the interests of particular venues in hearing the case. *See Humble Oil & Ref. Co. v. Bell Marine Serv., Inc.,* 321 F.2d 53, 56 (5th Cir.1963); *In re Nintendo Co., Ltd.,* 589 F.3d 1194, 1198 (Fed.Cir.2009); *In re TS Tech USA Corp.,* 551 F.3d 1315, 1319 (Fed.Cir.2009). The private factors are: 1) the relative ease of access to sources of proof; 2) the availability of compulsory process to secure the attendance of witnesses; 3) the cost of attendance for willing witnesses; and 4) all other practical problems that make trial of a case easy, expeditious, and inexpensive. *In re Volkswagen I,* 371 F.3d at 203; *In re Nintendo,* 589 F.3d at 1198; *In re TS Tech,* 551 F.3d at 1319. The public factors are: 1) the administrative difficulties flowing from court congestion; 2) the local

interest in having localized interests decided at home; 3) the familiarity of the forum with the law that will govern the case; and 4) the avoidance of unnecessary problems of conflict of laws or in the application of foreign law. *In re Volkswagen I,* 371 F.3d at 203; *In re Nintendo,* 589 F.3d at 1198; *In re TS Tech,* 551 F.3d at 1319.

**\*3** The plaintiff's choice of venue is not a factor in this analysis. *In re Volkswagen of Am., Inc.,* 545 F.3d 304, 314–15 (5th Cir.2008) (*"In re Volkswagen II"* ). Rather, the plaintiff's choice of venue contributes to the defendant's burden in proving that the transferee venue is "clearly more convenient" than the transferor venue. *In re Volkswagen II,* 545 F.3d at 315; *In re Nintendo,* 589 F.3d at 1200; *In re TS Tech,* 551 F.3d at 1319. Furthermore, though the private and public factors apply to most transfer cases, "they are not necessarily exhaustive or exclusive," and no single factor is dispositive. *In re Volkswagen II,* 545 F.3d at 314–15.

## ANALYSIS

### *The Relative Ease of Access to Sources of Proof*
Despite technological advances that certainly lighten the relative inconvenience of transporting large amounts of documents across the country, this factor is still a part of the transfer analysis. *In re Volkswagen II,* 545 F.3d at 316. Courts analyze this factor in light of the distance that documents, or other evidence, must be transported from their existing location to the trial venue. *See id.* This factor will turn upon which party, usually the accused infringer, will most probably have the greater volume of documents relevant to the litigation and their presumed location in relation to the transferee and transferor venues. *See, e.g., In re Volkswagen II,* 545 F.3d at 314–15; *In re Nintendo,* 589 F.3d at 1199; *In re Genentech, Inc.,* 566 F.3d 1338, 1345 (Fed.Cir.2009). However, documents that have been moved to a particular venue in anticipation of a venue dispute should not be considered. *In re Hoffman–La Roche Inc.,* 587 F.3d 1333, 1336–37 (Fed.Cir.2009).

Defendants argue that transfer will be more convenient for all defendants, including those that do not reside in the Northern District of California, as evidenced by those defendants' joinder or non-opposition to the motion. Just as the Court will not presume that this venue is convenient for a plaintiff because it filed suit here, but considers the actual location of a plaintiff's witnesses and documents,

the Court will not presume that a proposed transferee venue is convenient for defendants.

Seven defendants are located in California, and it will be substantially more convenient for their party witnesses and documents to try this case in the Northern District of California. Conversely, seven parties are located in Texas, and five of them are within the Eastern District of Texas. For these parties, it will be substantially more convenient for the case to continue in the Eastern District of Texas. Of the remaining nine parties, four reside on the east coast, one on the west coast, one in the mid-west, and two in the west. Thus, the remaining parties are split nearly in half on whether they would benefit from transfer.

Defendants argue that Eolas's location in the Eastern District of Texas should not be given any weight. To be clear, the Court does not give weight to Eolas's choice of venue, as that is already accounted for by Defendants' burden in proving transfer is clearly warranted. However, the Court does consider Eolas's location in determining whether transfer would be more convenient for it, just as the Court considers every other party's location for the same purpose. *In re Volkswagen I,* 71 F.3d at 204 (considering all of the parties and witnesses and claims and controversies in the case in the transfer analysis).

**\*4** Defendants contend that Eolas's location in the Eastern District should be disregarded because it is recent and insubstantial. While Eolas did recently relocate to the Eastern District of Texas, Eolas is conducting its normal business here. Its Chief Legal Officer and his family have relocated here and own a home here. Eolas's only corporate office is located in Tyler, Texas, and board of directors meetings are conducted here. Most of Eolas's tangible and intangible property, including all of the company's electronic and non-electronic files, books, and records, are located in Tyler. Eolas is currently testing its AnatLab product at the University of Texas at Tyler and employs seven people in Tyler to conduct the testing. Defendants contend that Eolas's recent relocation from Illinois to Texas is an attempt to manipulate venue, but Eolas points out that it receives more favorable tax treatment in Texas than in Illinois. Defendants also discount Eolas's employees, saying they are merely part-time college students. Eolas responds that it is conducting its beta testing in the normal course of its business. While Eolas's relocation is recent, it is not ephemeral. *See In re Apple, Inc.,* 374 Fed. Appx. 997, 999 (Fed.Cir. May

12, 2010) (unpublished) (discounting a plaintiff's state of incorporation and presence in Texas as "recent and ephemeral"). Eolas appears to have genuinely relocated its business to Texas and is conducting its business affairs in the normal course of its business in this District. The Court will not create a time-based litmus test for how long a plaintiff must reside in this District before bringing suit here. It would be substantially more convenient for Eolas to continue suit here. The Court will not ignore Eolas's location simply because it is unfavorable to Defendants' transfer argument.

The patents in suit are owned by the Regents of the University of California, located in the Northern District of California. The patented subject matter was invented in the Northern District of California, and the patents were prosecuted in the Northern District of California. Defendants contend that key prior art witnesses are located in the Northern District of California. However Eolas presents evidence that one prior art witness (Mr. Wei) may no longer be in the Northern District of California and another piece of prior art (the Mosiac browser) cited by Defendants was actually developed in Illinois. Additionally, Eolas also identifies prior art witnesses located in Texas.

Finally, Defendants contend that the Texas-based defendants should not defeat transfer and imply that they were only named as defendants to manufacture venue. However, Eolas did not sue small, local businesses such that the cost of bringing suit would overwhelm any monetary or equitable damages that Eolas could hope to recover. Rather, Eolas sued large, billion dollar companies, and the Court will not presume that Eolas only sued them to manipulate venue. Defendants also contend that the Northern California defendants' documents are more important than other defendants' documents because the other defendants use software developed by the Northern California defendants. However, as Eolas points out, while the other defendants may run software developed by the Northern California defendants, the accused systems and functionalities appear to be developed in-house and not by the Northern California defendants.

**\*5** This factor slightly favors transfer to the extent that relevant documents or witnesses related to developing the patented inventions and prosecuting the patents may be in the Northern District of Texas. The parties themselves are

nearly evenly split between being located in California or Texas and California or Texas being more convenient. As for prior art witnesses, both sides have identified witnesses closer to their preferred location.

### *The Availability of Compulsory Process to Secure the Attendance of Witnesses*

This factor will weigh more heavily in favor of transfer when more third-party witnesses reside within the transferee venue. *See In re Volkswagen II,* 545 F.3d at 316. The factor will weigh the heaviest in favor of transfer when a transferee venue is said to have "absolute subpoena power." *Id.* "Absolute subpoena power" is subpoena power for both depositions and trial. *In re Hoffmann–La Roche Inc.,* 587 F.3d at 1338.

As described above, the parties have identified potential third-party prior art witnesses located in California, Texas, and elsewhere in the United States. Neither District would have absolute subpoena power, and this factor is neutral.

### *The Cost of Attendance for Willing Witnesses*

This factor is analyzed giving broad "consideration [to] the parties and witnesses in all claims and controversies properly joined in a proceeding." *In re Volkswagen I,* 371 F.3d at 204. All potential material and relevant witnesses must be taken into account for the transfer analysis, irrespective of their centrality to the issues raised in a case or their likelihood of being called to testify at trial. *See In re Genentech,* 566 F.3d at 1343 ("Requiring a defendant to show that a potential witness has more than relevant and material information at this point in the litigation or risk facing denial of transfer on that basis is unnecessary.").

The Fifth Circuit has adopted a "100 mile rule" to assist with analysis of this factor. *See In re Volkswagen I,* 371 F.3d at 204–205. "When the distance between an existing venue for trial of a matter and a proposed venue under § 1404(a) is more than 100 miles, the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled." *Id.* at 205. When applying the "100 mile rule" the threshold question is whether the transferor and transferee venues are more than 100 miles apart. *See In re Volkswagen II,* 545 F.3d at 317; *In re TS Tech,* 551 F.3d at 1320. If so, then a court determines the respective distances between the residences (or workplaces) of all the identified material and relevant

witnesses and the transferor and transferee venues. *See In re Volkswagen II,* 545 F.3d at 317; *In re TS Tech,* 551 F.3d at 1320. The "100 mile rule" favors transfer (with differing degrees) if the transferee venue is a shorter average distance from witnesses than the transferor venue. *See In re Volkswagen II,* 545 F.3d at 317; *In re TS Tech,* 551 F.3d at 1320. Furthermore, the existence or non-existence of direct flights can impact the analysis of travel time. *See In re Volkswagen I,* 371 F.3d at 204, n. 3. Thus, regardless of the "straight line" distances calculated for the "100 mile rule," if "travel time" distances favor the transferee venue, then this factor will favor transfer. However, the "100 mile rule" should not be rigidly applied. *See In re Genentech,* 566 F.3d at 1344. When a particular witness will be required to travel "a significant distance no matter where they testify," then that witness is discounted for purposes of the "100 mile rule" analysis. *Id.* (discounting European witnesses and documents transported from Washington D.C. in the convenience analysis when reviewing a denial of transfer from Texas to California).

**\*6** In cases where no potential witnesses are residents of the court's state, favoring the court's location as central to all of the witnesses is improper. *Id.* at 1344. Finally, this factor favors transfer when a "substantial number of material witnesses reside in the transferee venue" and no witnesses reside in transferor venue regardless of whether the transferor venue would be more convenient for all of the witnesses. *Id.* at 1344–45.

The parties themselves are nearly evenly split between being located in or closer to California or Texas, and both sides have identified witnesses closer to their preferred location. Accordingly, neither District would be more convenient for the majority of witnesses. In either District, about half of the witnesses would be inconvenienced by the trial's location. This factor weighs against transfer.

### *Other Practical Problems*

Practical problems include those that are rationally based on judicial economy. Particularly, the existence of duplicative suits involving the same or similar issues may create practical difficulties that will weigh heavily in favor or against transfer. *In re Volkswagen of Am., Inc.,* 566 F.3d 1349, 1351 (Fed.Cir.2009) ("*In re Volkswagen II*").

Eolas argues that this factor weighs against transfer because trials in the Northern District of California are typically longer than trials in the Eastern District of Texas,

increasing the expense for both parties and witnesses. Defendants do not dispute this.

This factor does not favor transfer.

### The Administrative Difficulties Flowing from Court Congestion

The speed with which a case can come to trial and be resolved is a factor in the transfer analysis. *In re Genentech, 566 F.3d at 1347.* This factor appears to be the most speculative, and this factor alone should not outweigh other factors. *Id.*

This case is currently set for trial in this District in October 2011. Eolas contends that the earliest trial setting a transferred case could get in the Northern District of California is thirty months from now.

This factor does not favor transfer.

### The Local Interest in Having Localized Interests Decided at Home

The Fifth Circuit has explained that "[j]ury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation." *In re Volkswagen I, 371 F.3d at 206.* This factor analyzes the "factual connection" that a case has with both the transferee and transferor venues. *Id.* Generally, local interests that "could apply virtually to any judicial district or division in the United States" are disregarded in favor of particularized local interests. *In re Volkswagen II, 545 F.3d at 318* (in a products liability suit, disregarding local interest of citizens who used the widely-sold product within the transferor venue); *In re TS Tech, 551 F.3d at 1321.* Thus, when products are sold throughout the United States, citizens of a venue do not have a particularized interest in deciding the dispute simply based on product sales within the venue. *In re Nintendo, 589 F.3d at 1198.*

**\*7** Both Districts have a specific local interest in this case. The Northern District of California is home to several defendants, the Eastern District of Texas is home to Plaintiff and several defendants, and Texas itself is home to several other Defendants. As already discussed and rejected, the Court will not ignore Eolas's location in this District. This factor does not favor transfer.

### The Familiarity of the Forum with the Law that Will Govern the Case and Avoidance of Unnecessary Problems of Conflict of Laws

These factors are inapplicable.

### CONCLUSION

Only the relative ease of access to sources of proof factor slightly favors transfer, and that factor only favors transfer to the extent that relevant documents or witnesses related to developing the patented inventions and prosecuting the patents may be in the Northern District of California. The remaining factors are either neutral or weigh against transfer. Accordingly, Defendants have not shown that transfer is clearly more convenient for the parties and witnesses. *Cf. HTI IP LLC v. DriveOK, Inc., 2010 WL 3075200 (E.D.Tex. Aug.4, 2010)* (Davis, J.) (transferring a patent case where the case's connection to Texas was nominal, but the connection to the transferee district was strong).

Defendants' attempt to move this trial from the Eastern District of Texas to the Northern District of California would merely shift the inconvenience of trial from one set of parties to another. Defendants criticize Eolas's recent relocation to this District as an attempt to manipulate venue. However Defendants' arguments are dubious, at best. Defendants ask the Court to discount Eolas's contacts with the Eastern District because those contacts do not serve Defendants' desire for transfer. Eolas has not clearly set up a sham location in this District to manipulate venue. *See In re Apple, Inc., 374 Fed. Appx. at 999* (discounting a plaintiff's state of incorporation and presence in Texas as "recent and ephemeral" when the plaintiff's Texas office was that of its litigation counsel and plaintiff did not employ anyone in Texas). Rather Eolas appears to have genuinely moved its business to this District and is operating within the normal course of its business within this District. Contrary to what Defendants may believe, many businesses choose to relocate to Texas and to Tyler, Texas each year for reasons that are unrelated to venue. Eolas points out the tax benefits it receives in Texas, and additionally, many people find that Tyler is a wonderful place to live and work. The Court will not ignore Eolas's location merely because it does not suit Defendants.

Similarly, Defendants ask the Court to sever any defendant for whom transfer would be less convenient and imply that Eolas only sued certain defendants in an attempt to manipulate venue. Eolas chose to sue multiple large corporations, some of whom are located in Texas. Defendants contend that if the Court does not discount the existence of the Texas defendants in this case, the Court will encourage a policy of suing Texas defendants in order for a plaintiff to maintain venue in this District. It is not within the Court's proper role to encourage or discourage suit against certain parties. As the plaintiff, Eolas is the master of its suit. Within the rules, Eolas is entitled to decide who it will sue, where and when it will bring suit, and on what causes of actions or patent claims it will sue. The Texas defendants are all large companies, likely with substantial damages exposure. The Court will not ignore or sever them merely because their existence in this case weighs against Defendants' motion for transfer.

**\*8** The Court strongly encourages the parties to work together in a more cooperative manner to resolve their differences. The Court **DENIES** the motion.

**So ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3835762

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 7

1996 WL 296540
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Charles JORDAN, Support Securities Ltd., Denis
E. Chambers, and Michael J.W. Sellers, Plaintiffs,
v.
SEI CORPORATION, and
Alfred P. West, Jr., Defendants.

No. CIV. A. 96–1616.
|
June 4, 1996.

MEMORANDUM AND ORDER

YOHN, J.

**\*1** Plaintiffs Charles Jordan ("Jordan"), Support Securities Limited ("SSL"), Denis E. Chambers ("Chambers") and Michael J.W. Sellers ("Sellers") brought an action for common law fraud and negligent misrepresentation against defendants SEI Corporation ("SEI") and Alfred P. West, Jr. ("West"). Defendants immediately countered by filing a motion to dismiss, claiming that Zurich, Switzerland is the proper forum for this lawsuit. Defendants base their argument on a contractual forum selection clause or, alternatively, the doctrine of *forum non conveniens.* Finding that the forum selection clause is both enforceable and applicable to this case, the court will dismiss plaintiffs' action without prejudice. [1]

*STANDARD: RULE 12(b)(6)*

When considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept as true and view in a light most favorable to the plaintiff all allegations made in the complaint. *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 249 (1989); *Rocks v. City of Philadelphia,* 868 F.2d 644, 645 (3d Cir.1989). A motion to dismiss will only be granted if it is clear that relief cannot be granted to the plaintiff under any set of facts that could be proven consistent with the complaint's allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984).

Generally, in deciding a motion to dismiss, a district court considers only the allegations of the complaint, exhibits attached to the complaint and matters of public record. *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993), *cert. denied,* 114 S.Ct. 687 (1994). However, a district court also may consider "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Id.* A district court may consider such a document without having to convert the motion to one for summary judgment. [2] *Id.* Defendants attached two letter agreements to their motion to dismiss, one between Jordan and SEI Capital AG ("AG") and one between Chambers and Sellers, and AG. These contracts contain the forum selection clauses at issue in defendants' motion. Plaintiffs do not contest the authenticity of these documents. Additionally, the court finds that plaintiffs' claims are based on these agreements because their claims derive primarily from their relationship with AG and its agents, which the agreements governed. Accordingly, the court will consider the letter agreements along with the complaint in deciding defendants' motion to dismiss.

*BACKGROUND:*

1. The Complaint

Plaintiffs' complaint alleges the following facts. [3]

Plaintiffs are all subjects of the United Kingdom ("U.K."). Jordan resides in Scotland. SSL is registered in Scotland and maintains places of business in Edinburgh and London. Chambers and Sellers both reside in Great Britain. Defendant SEI is a Pennsylvania corporation and defendant West, Chairman and Chief Executive Officer of SEI, resides in Pennsylvania. (Compl. at ¶¶ 4–9.)

**\*2** In 1994, SEI created AG, a wholly owned Zurich-based subsidiary. Peter Dahl ("Dahl"), a Swedish subject, was AG's president. SEI conducted business in the U.K. through AG. AG offered investors "entry into a trading partnership that purchase[d] fixed income instruments in the European private placement and trade finance debt markets." The partnership operated as follows. Investors would deposit funds in a Swiss banking institution earning normal short term interest. AG would arrange trades on behalf of these investors, using the deposited capital. The

Jordan v. SEI Corp, Not Reported in F.Supp. (1996)

Case 4:18-cv-04704   Document 9-3   Filed on 01/24/19 in TXSD   Page 76 of 131

trades would generate profits from pricing differentials caused by market inefficiencies. AG then would split the profit earned from each trade with the investors. (Compl. at ¶ 10.)

### A. Jordan and SSL

Jordan first made Dahl's acquaintance on April 12, 1994. In May of 1994, Jordan met with Dahl in Zurich and learned about the trading in which SEI was to engage. Dahl told Jordan that the trading would be riskless. Dahl then asked Jordan to arrange meetings at which Dahl could pitch SEI's investment products to Scottish investors. Jordan agreed to become a marketing representative for SEI in the U.K.. In exchange, Dahl agreed to compensate Jordan with a percentage of the monies invested in SEI as a result of his efforts. (Compl. at ¶¶ 11–12.)

Jordan began to actively solicit interest in SEI among investors in Edinburgh. Echoing Dahl, Jordan told potential investors that investment in SEI would be riskless. On May 23, Jordan wrote to defendant West and told him that he had set up three meetings with potential clients. On June 9, 1994, Dahl and West gave three separate presentations to Scottish investors, in which they stressed that investment with SEI would be riskless. In early August of 1994, Jordan and a prospective client met with Dahl in Zurich and, again, Dahl described SEI's planned trades as riskless. On September 1, 1994, a prospective client recruited by Jordan contacted Dahl with questions about the proposed trading program. On September, 5, 1994, SEI responded to those questions through an individual named Stefan de Bekassy ("de Bekassy"). (Compl. at ¶¶ 13–15, 17.)

Jordan intensified his efforts to secure clients for SEI based on the following misrepresentations:

1. On August 31, 1994, SEI issued a press release stating that it was trading in money market and capital market securities, and would offer other services and products in the near future. (Compl. at ¶ 16.)

2. On September 9, 1994, Harry Georgieff ("Georgieff"), a representative of defendants, informed Jordan that five to seven clients were signed up. (Compl. at ¶ 18.)

3. On November 5, 1994, SEI sent a brochure to Jordan emphasizing the riskless nature of investing through SEI. (Compl. at ¶ 19.)

On November 7, 1994, Jordan entered into a letter of understanding with SEI. Georgieff and Dahl signed the letter on behalf of SEI. The letter agreement confirmed Jordan's authority to represent SEI in the U.K.. Dahl told Jordan that "once an initial client had been signed up through Jordan's efforts, SEI and Jordan would enter into a formal contract." (Compl. at ¶ 20.)

**\*3** Jordan continued his efforts on behalf of SEI in reliance on the following false statements:

1. At a presentation to Mitsubishi Corporation in London on November 17, 1994, Georgieff stated that SEI had $275 million of client monies under management and anticipated receiving much more from the United States. (Compl. at ¶ 21.)

2. On December 13, 1994, Dahl told Daniel Emerson, soon to be a shareholder of SSL, that AG was expecting to receive $800 million from the U.S. limited partnership, of which SEI was the general partner, by the end of February 1995. (Compl. at ¶ 23.)

Jordan formed SSL in January of 1995. Jordan had written to West on November 20, 1994, to inform him that he was forming SSL for the sole purpose of selling and marketing SEI's investments and securing clients for SEI. Relying on the false representations of Dahl and West, outlined above, several individuals, including Jordan, invested in SSL. Additionally, Jordan became the Chairman and Managing Director of SSL. (Compl. at ¶ 22.)

Jordan and SSL maintained their representation of SEI in reliance on the following misrepresentations:

1. On January 17, 1995, Dahl and Georgieff gave a presentation to SSL shareholders in London at which they stated that: (1) SEI had $275 to $300 million under management; (2) all of these funds came from Europe; (3) SEI acquired these funds during the first three weeks of October, 1994; (4) SEI had computer problems but would begin investment and trading in March, 1995; and (5) SEI had to maintain share capital of 500,000 Swiss francs but was otherwise exempt from Swiss banking and investment

Jordan v. SEI Corp, Not Reported in F.Supp. (1996)

Case 4:18-cv-04704　Document 9-3　Filed on 01/24/19 in TXSD　Page 77 of 131

regulations because it was acting in an agency capacity. (Compl. at ¶ 24.)

2. On January 27, 1995, Dahl and Georgieff made the same statements at a presentation to potential investor Smedvig Holdings in London. (Compl. at ¶ 25.)

3. On February 10, 1995, at a follow up meeting with Smedvig Holdings, Georgieff, accompanied by an individual named Wolfgang Haller ("Haller"), again repeated these misrepresentations. (Compl. at ¶ 26.)

4. On March 1, 1995, in response to Jordan and SSL's request for SEI's trading record up to that date, Dahl stated: "I have spoken to our trading desk. They estimate that based on the offers we have received since the beginning of the year, they could have generated an estimated 1% per month, plus the fiduciary deposit of 0.50%." (Compl. at ¶ 27.)

5. On March 30, 1995, SEI mailed SSL shareholders a brochure stating that "[t]he transactions arranged by SEI involve intra-day trades[.]" (Compl. at ¶ 28.)

On May 3, 1995, Kenneth MacKay, an employee of SEI, informed Jordan that: (1) the riskless financial product in which SEI was to have traded did not exist; (2) SEI had no client monies under management, its sole funds consisted of $5 million of SEI's own money; (3) Swiss law required SEI to have a "B" banking license in order to trade in eurobonds, and the company had never obtained or tried to obtain such a license; and (4) SEI could not trade on an intra-day basis. In reliance on the false statements "that defendants had furnished to them" prior to May 3, 1995, Jordan and/or SSL had contacted and/or made presentations to approximately 45 businesses and individuals. (Compl. at ¶¶ 31–32.)

### B. Chambers and Sellers

**\*4** In May of 1994, Dahl and Georgieff met with Chambers and Sellers in Switzerland and explained SEI's proposed trading plan. Dahl and Georgieff stressed that trading would be riskless. Dahl and Georgieff also stated that AG was actively managing at least $275 million of clients' funds and had conducted numerous trades on behalf of those accounts. (Compl. at ¶¶ 34–35.)

On November 15, 1994, Chambers and Sellers executed a letter of understanding with AG. The letter outlined the duties and compensation corresponding to Chambers and Sellers' positions as U.K. representatives of AG. Dahl and Georgieff signed the letter agreement on behalf of AG. Previously, Chambers and Sellers had been acting as agents of AG pursuant to an oral agreement. (Compl. at ¶ 36.)

From June 1994, to May 1995, Chambers and Sellers, relying on SEI's assurance that their investment product was riskless, devoted their full attention to securing potential investors for SEI. Dahl and Georgieff applied constant pressure on Chambers and Sellers to develop new clients. (Compl. at ¶ 37.)

Acting under the letter agreement, Chambers and Sellers arranged for and attended approximately 30 meetings with 50 potential investors in the U.K. and Europe. In addition, Chambers and Sellers arranged several meetings between potential clients and Dahl, Georgieff and West. During these meetings, Dahl, Georgieff and West repeatedly maintained that investment with SEI would be riskless. In March of 1995, SEI issued its annual report for 1994, which emphasized the riskless trading conducted by AG. (Compl. at ¶ 38.)

In April of 1995, Ken MacKay of SEI informed Chambers and Sellers that "there were problems at SEI AG and that Dahl had been transferred to the United States." Chambers and Sellers then learned that: (1) AG had experienced difficulty obtaining financing; (2) SEI did not have the proper license from the Swiss authorities to trade in the securities market; (3) SEI had done very little research on whether a riskless trading product could be marketed; and (4) no one at SEI "had sufficient skill at trading this particular product." In May of 1995, "Chambers and Sellers were told that SEI AG's 'riskless trading' operations were on hold and that they were to stop marketing this product." (Compl. at ¶¶ 39–40.)

### 2. The Letters of Understanding

Jordan, Chambers and Sellers entered into identical letters of understanding with AG ("agreement"). [4] (Defs.' Mem. Ex. C, F.) Dahl and Georgieff signed the agreement on behalf of AG. (Jordan Agmt. at 3.) The agreement established Jordan, Chambers and Sellers as representatives of AG in the U.K.. (Jordan Agmt. at

Jordan v. SEI Corp, Not Reported in F.Supp. (1996)

Case 4:18-cv-04704   Document 9-3   Filed on 01/24/19 in TXSD   Page 78 of 131

¶ 2.) The agreement stated that Jordan, Chambers and Sellers were to "actively sell [AG]'s products in the United Kingdom." (Jordan Agmt. at ¶ 2.) The agreement also contained the following clause:

### 10. Jurisdiction

This letter of understanding shall be governed by Swiss law, place of jurisdiction will be Zurich.

**\*5** (Jordan Agmt. at ¶ 10 (emphasis added).) The instant motion revolves around the forum selection aspect of this clause ("forum selection clause").

*DISCUSSION:*

Defendants contend that the court must dismiss this case because the forum selection clause contained in the agreement specifies Zurich, Switzerland as the appropriate forum. Plaintiffs counter that the clause is both unenforceable and inapplicable. The court will address plaintiffs' arguments in turn.

### 1. Enforceability of the Forum Selection Clause

A district court sitting in diversity must determine the effect to be given a contractual forum selection clause by reference to federal not state law. *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 877 (3d Cir.1995). "Because questions of venue and the enforcement of forum selection clauses are essentially procedural, rather than substantive, in nature, federal law applies in diversity cases irrespective of *Erie Railroad Co. v. Tompkins* [.]" *Id.* Adopting the federal common law standard established by the Supreme Court in *M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1 (1972), the Third Circuit announced that:

> a forum selection clause is presumptively valid and will be enforced by the forum unless the party objecting to its enforcement establishes (1) that it is the result of fraud or overreaching, (2) that enforcement would violate a strong public policy of the forum, or (3) that enforcement would in the particular circumstances of the case result in litigation in a jurisdiction

so seriously inconvenient as to be unreasonable.

*Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.,* 709 F.2d 190, 202 (3d Cir.), *cert. denied,* 464 U.S. 938 (1983). [5] Plaintiffs argue that the court cannot enforce the agreement's forum selection clause because (1) the agreement did not represent the "final" understanding between the parties and (2) discovery will produce evidence showing that the agreement does not bind plaintiffs.

### A. Finality of the Agreement

Plaintiffs argue that the forum selection clause is invalid because the agreement in which it appears did not represent the final understanding of the parties. The court rejects this argument. The complaint fails to mention any subsequent agreements between plaintiffs and AG or defendants. Moreover, plaintiffs do not contend that the parties actually entered into new agreements, merely that they intended to do so. That plaintiffs may be able to produce evidence showing that the parties intended to supplant the agreement with new contracts is irrelevant. As plaintiffs concede that the parties never executed new agreements, the existing agreement controls. [6]

### B. Validity of the Agreement

Plaintiffs next argue that an "escape clause" in the agreement renders it and its forum selection clause impotent. Plaintiffs direct the court's attention to paragraph 9 of the agreement, which reads as follows:

### 9. Minimum Target

Mr. Jordan [, Mr. Chambers and Mr. Sellers] agrees to achieve a minimum target of US$50 million by March 31, 1995. The $50 million will have to be funded and actively trading by this date, Otherwise [AG] would have the right to reconsider the agency agreement for the United Kingdom. Mr. Jordan [, Mr. Chambers and Mr. Sellers] will not be bound by this agreement if [AG] is not able to perform its trading activities. In addition, either party can cancel this agreement for any reason with a 30 day written notice.

**\*6** (Jordan Agmt. at ¶ 9 (emphasis supplied).) Plaintiffs claim that discovery will reveal that AG was not able to perform its trading activities and, therefore, the agreement, with its forum selection clause, has no power over plaintiffs.

Even assuming plaintiffs will be able to offer evidence illustrating that AG was unable to trade, the court rejects this argument. When read in the context of the entire agreement, the words "this agreement" only refer to paragraph 9's minimum target agreement and, thus, have no impact on the forum selection clause, contained in paragraph 10. Paragraph 9 begins by stating: "Mr. Jordan agrees to achieve a minimum target...." (Jordan Agmt. at ¶ 9 (emphasis added).) Logic dictates that the contested term "this agreement," which appears two sentences later in the paragraph, refers to the agreement to achieve a minimum target. In all other paragraphs, the agreement consistently refers to itself as "this letter of understanding," not "this agreement." *See* Jordan Agmt. ¶¶ 3, 5, 10. For example, paragraph 10 reads: "This letter of understanding shall be governed by Swiss law, place of jurisdiction will be Zurich." (Jordan Agmt. ¶ 10 (emphasis supplied).) The term "this agreement" only appears in paragraph 9. Finally, disregarding the forum selection clause because of a dispute over the meaning of a contractual term would be absurd. Under this reasoning, a party could always avoid the enforcement of a forum selection clause by disputing the interpretation of a critical term in the contract or otherwise arguing that evidence to be produced at a later date will invalidate the contract.

The court concludes by noting that plaintiffs' finality and contract interpretation arguments are improper collateral attacks on the validity of the forum selection clause. These arguments do not implicate the concerns embodied in the *Bremen* standard; plaintiffs make no claim that the clause resulted from fraud or overreaching, that enforcement would violate public policy or that enforcement would unreasonably inconvenience them. Accordingly, the court finds that plaintiffs have failed to rebut the presumption of validity surrounding the agreement's forum selection clause and, therefore, the court will enforce the clause.

### 2. Applicability of the Forum Selection Clause

Plaintiffs maintain that the agreement's forum selection clause does not apply to the instant matter because plaintiff SSL and defendants did not sign the agreement. Defendants respond by arguing that their and SSL's status as nonsignatories is of no consequence.

Forum selection clauses bind nonsignatories that are closely related to the contractual relationship or that should have foreseen governance by the clause. *See Hugel v. Corporation of Lloyd's,* 999 F.2d 206, 209–10 (7th Cir.1993) (binding corporations owned and controlled by contracting party); *Manetti–Farrow, Inc. v. Gucci America, Inc.,* 858 F.2d 509, 514 n. 5 (9th Cir.1988) (binding parent companies of contracting party, as well as individual directors); *Coastal Steel Corp.,* 709 F.2d at 202–03 (binding third party beneficiary). The complaint and the agreement reveal an umbilical link between SSL and the Jordan/AG contractual relationship. On November 16, 1994, Jordan and AG entered into the agreement. (Jordan Agmt. at 3.) The agreement designated Jordan as a representative of AG and it charged him with identifying and referring potential clients to AG. (Jordan Agmt. at ¶¶ 1–2.) Shortly after entering into the agreement, Jordan formed SSL and became its chairman and managing director. (Compl. at ¶¶ 20, 22.) According to the complaint, Jordan stated that SSL was "dedicated to sales and marketing for SEI," and that the company's purpose was to "find clients for SEI, and provided that we are sufficiently encouraged by this, this is all it will do." (Compl. at ¶ 22 (internal quotation marks omitted).) As Jordan invested SSL, a company that he managed, with a mission identical to his obligations under the agreement, the court concludes that SSL was closely related to the Jordan/AG contractual relationship and should have foreseen that the agreement's forum selection clause would bind it.

**\*7** The court next considers whether defendants may invoke the forum selection clause. In *Coastal Steel,* the Third Circuit held that the presence of a nonsignatory defendant does not render a forum selection clause inapplicable where (1) that defendant consents to be governed by the clause and (2) the pleadings do not allege that the conduct of that defendant caused a harm separate from that allegedly caused by a signatory. *Coastal Steel Corp.,* 709 F.2d at 203. The instant defendants satisfy this standard. First, defendants "expressly consent to submit to service of process and personal jurisdiction in Switzerland." (Defs.' Mem. at 22.) Second, while the

complaint indicates that defendants had some direct involvement in the alleged fraud, it certainly does not claim that their actions caused any harm distinct from that allegedly caused by AG. [7] On the contrary, the complaint accuses defendants and AG of making the same misrepresentations. For example, plaintiffs assert that, at various times, West, SEI and AG all represented that the proposed investment would be without risk. [8] That the complaint repeatedly refers to AG and its principals as "agents" of or "under the control" of defendants, *e.g.,* Compl. at ¶¶ 11, 17, 18, 23, 24, provides further proof that plaintiffs regard defendants and AG as a collective entity responsible for a collective harm. [9] For these reasons, under *Coastal Steel,* plaintiffs cannot claim that defendants' status as nonsignatories of the agreement renders inapplicable the forum selection clause contained therein. [10]

The court concludes its analysis of nonsignatory defendants' ability to invoke forum selection clauses with a discussion of the Seventh Circuit's recent decision in *Frietsch v. Refco, Inc.,* 56 F.3d 825 (7th Cir.1995), a case factually analogous to the instant matter. In that case, Refco, a U.S. commodities broker, entered into a venture with several German businessmen to establish commodity pools in Germany. The German businessmen owned three German corporations, which promoted and solicited investment in the commodity pools. German trustees managed the pools. Plaintiffs, various citizens and residents of Germany, had invested in the pools pursuant to contracts with the German trustees and promoters. These contracts contained forum selection provisions designating Germany as the place of jurisdiction. When plaintiffs sued Refco for fraud, Refco, a nonparty to the investment contracts, sought to invoke the forum selection clauses contained in those contracts. *Refco, Inc.,* 56 F.3d at 827.

Writing for the majority in *Refco,* Chief Judge Posner invoked the principles articulated in *Hugel, Manetti–Farrow,* and *Coastal Steel,* noting that "courts in this country ... enforce forum selection clauses in favor of non-parties closely related to a signatory." *Id.* Posner then stated that this rule "can be given meaning by reference to the principle of mutuality." *Id.* Posner explained as follows:

**\*8** Suppose the plaintiffs wanted to sue Refco in Germany. Since the basis of their claim is that Refco totally controlled the promoters and trustees who are the nominal signatories of the investment contracts, the plaintiffs could argue as a justification for enforcing the forum selection clause in the investment contracts that the clause binds Refco as the secret principal of the signatories. If so, mutuality requires that Refco be allowed to invoke the clause. Otherwise the plaintiffs would have a choice of venues but Refco would not, and there is no reason for such an asymmetry of procedural choices. All Refco is doing in invoking the forum selection clause to which it is not a party is accepting one of the premises of the plaintiff's [sic] suit—that the promoters and trustees are indeed simply cat's paws of Refco—and pointing out that the implication is that the investment contracts, including the forum selection clause, are really between the plaintiffs and Refco.

*Id.* at 827–28. Based on this analysis, the Seventh Circuit held that Refco was "closely related" to the signatories of the investment contracts and, therefore, could invoke the forum selection clause. *Id.* 826.

As in *Refco,* plaintiffs' claims rest on the theory that defendants, domiciled in the United States, directly controlled the activities of the Swiss subsidiary AG. In their complaint, plaintiffs repeatedly state that AG and its principals were, at all times, acting as "agents of defendants" or were "under the direct supervision and control of defendants[.]" *E.g.,* Compl. at ¶¶ 11, 17, 18, 23, 24. By invoking the forum selection clause, defendants are merely acknowledging plaintiffs' implication that the agreement was between plaintiffs and defendants, not between plaintiffs and AG. [11] Thus, in addition to the

Case 4:18-cv-04704   Document 9-3   Filed on 01/24/19 in TXSD   Page 81 of 131

Jordan v. SEI Corp, Not Reported in F.Supp. (1996)

rule announced by the Third Circuit in *Coastal Steel,* the Seventh Circuit's mutuality analysis in *Refco* compels the court to conclude that defendants may invoke the forum selection clause even though they did not sign the agreement. For these reasons, the court will apply the clause in the instant matter.

*CONCLUSION:*

As explained above, the court finds plaintiffs' arguments regarding the enforceability and applicability of the forum selection clause unpersuasive. The court concludes that the clause governs the instant matter and, therefore, Zurich, Switzerland is the proper forum for this dispute. Accordingly, the court will dismiss plaintiffs' complaint without prejudice pursuant to Rule 12(b)(6). An appropriate order follows. [12]

ORDER

AND NOW, this day of June, 1996, upon consideration of defendants' motion to dismiss the complaint and memoranda of law in support thereof, and plaintiffs' response thereto, IT IS HEREBY ORDERED that:

1. defendants SEI and West have 20 days from the date of this order to execute an affidavit memorializing their consent to personal jurisdiction and service of process in Switzerland; and

**\*9** 2. provided that defendants SEI and West comply with the above condition, the motion is GRANTED and the complaint is DISMISSED WITHOUT PREJUDICE. 1332(a)(2). Rule 12(b)(3) governs dismissal for lack of venue. While courts have granted Rule 12(b)(3) motions to dismiss on the basis of a forum selection clause, *see, e.g., Riley v. Kingsley Underwriting Agencies, Ltd.,* 969 F.2d 953, 956 (10th Cir.), *cert. denied,* 506 U.S. 1021 (1992), it is not clear that this is a correct application of Rule 12(b)(3). Statute, not contract, ordinarily determines venue. Here, venue is proper under 28 U.S.C. § 1391(a)(2), as both defendants reside in the Eastern District of Pennsylvania. Rule 12(b)(3), therefore, may not be a proper means for enforcing the contractual forum selection clause that defendants are attempting to invoke in their motion. Accordingly, the court will decide defendants' motion to dismiss under Rule 12(b)(6). *See Lambert v. Kysar,* 983 F.2d 1110, 1112 n. 1 (1st Cir.1993) (stating that motions for dismissal based upon forum selection clauses are founded on Rule 12(b)(6) not Rule 12(b)(3)).

**All Citations**

Not Reported in F.Supp., 1996 WL 296540

Footnotes

1   Defendants brought their motion to dismiss under Federal Rules of Civil Procedure 12(b)(1), (3) and (6). Rule 12(b)(1) authorizes dismissal for lack of subject matter jurisdiction and, therefore, is not appropriate here. The court has subject matter jurisdiction over this diversity action pursuant to 28 U.S.C. §

2   The Third Circuit explained as follows:
    Our decision will not undermine the rationale underlying Rule 12(b)(6)'s requirement that a motion to dismiss be converted to a summary judgment motion if a court considers matters outside the pleadings. The reason that a court must convert a motion to dismiss to a summary judgment motion if it considers extraneous evidence submitted by the defense is to afford plaintiff an opportunity to respond. When a complaint relies on a document, however, the plaintiff obviously is on notice of the contents of the document, and the need for a chance to refute evidence is greatly diminished.
    *White Consol. Indus., Inc.,* 998 F.2d at 1196–97 (citations omitted).

3   Throughout the complaint, plaintiffs use inconsistent terminology to refer to the various actors, often attributing to SEI acts that appear to have been committed by AG or individual agents of AG. Although confusing at times, the court's recital of the facts remains true to plaintiffs' presentation in the complaint.

4   As the Jordan agreement and the Chambers and Sellers agreement contained identical terms and language, the court will refer to the agreements and their provisions in the singular, e.g., "the agreement," "the forum selection clause," etc.. Additionally, for the sake of uniformity, when referring to the language of the agreements, the court will make citations to the "Jordan Agreement."

Jordan v. SEI Corp, Not Reported in F.Supp. (1996)

Case 4:18-cv-04704   Document 9-3   Filed on 01/24/19 in TXSD   Page 82 of 131

5    In *Scherk v. Alberto–Culver Co.,* 417 U.S. 506 (1974), the Supreme Court clarified the meaning of the term "fraud" as used in the *Bremen* standard. The Court explained that fraud only warrants the invalidation of a forum selection clause "if the *inclusion of that clause in the contract* was the product of fraud or coercion." *Id.* at 281 n. 14.

6    Additionally, as defendants note, under plaintiffs' "finality" argument, contractually bound parties could routinely avoid forum selection clauses by claiming that the agreement containing the clause was not final. Such a result would contravene the strong public policy favoring the enforcement of contracts and, specifically, contractual forum selection clauses.

7    The conduct of AG, of course, includes the actions of Dahl and Georgieff, agents of AG.

8    Plaintiffs argue that discovery will reveal that defendants hosted meetings in Pennsylvania and communicated with plaintiffs via telephone and mail. Regardless, proof of these events will not change the fact that plaintiffs' complaint does not assert that defendants' conduct caused a harm separate from that allegedly caused by AG.

9    At a hearing on May 23, 1996, plaintiffs argued that they will be able to produce evidence showing that defendants directly instructed AG to make the alleged misrepresentations. Even if plaintiffs could establish this as fact, it would only serve to strengthen the nexus between defendants and AG, which, in turn, would lend support to the court's conclusion that plaintiffs do not—because they cannot—distinguish between the harm allegedly caused by defendants and that allegedly caused by AG. If defendants had such puppetlike control over AG, perhaps they "instructed" AG to enter into the agreement with plaintiffs; at the very least, it would not be unreasonable to assume that defendants were aware of the agreement and its ramifications.

10   Although plaintiffs never raised this argument, the court notes that the forum selection clause governs the instant matter even though plaintiffs seek to recover for fraud and negligent misrepresentation. The public policy favoring the enforcement of forum selection clauses "requires that they not be defeated by artful pleading of claims.... [W]here the relationship between the parties is contractual, the pleading of alternate non-contractual theories of liability should not prevent enforcement of such a bargain." *Coastal Steel Corp.,* 709 F.2d at 202. In the instant matter, the agreement embodied the relationship between the parties. Were it not for this contractual relationship, plaintiffs would not have been in a position to allege that defendants' misrepresentations caused them injury. Plaintiffs' claims grew out of the relationship defined by the agreement and, therefore, the agreement's forum selection clause governs plaintiffs' claims.

11   Plaintiffs clearly make this implication in their complaint. Paragraph 20 of the complaint states that Jordan signed the agreement, which "had been prepared by SEI and previously signed by Dahl on behalf of and as agent for SEI." (Compl. at ¶ 20.) The agreement, however, explicitly states that it is between Jordan and AG, not between Jordan and SEI, and that Dahl signed on behalf of AG, not on behalf of SEI. (Jordan Agmt. at 3.)

12   As the court has resolved defendants' motion on the basis of the forum selection clause, it need not address defendants' *forum non conveniens* argument. However, without conducting a full blown analysis, the court notes that the following factors strongly counsel in favor of dismissing the case on *forum non conveniens* grounds: (1) virtually all of the alleged misrepresentations occurred in Switzerland and the U.K.; (2) the forum selection clause specifies Zurich, Switzerland as the place of jurisdiction; (3) plaintiffs are residents of Sweden and the U.K. and, therefore, Zurich would be at least as convenient a forum for them as Pennsylvania; (4) defendants, Pennsylvania residents, prefer Zurich; (5) neither plaintiffs nor defendants have any control over former AG employees Georgieff and Haller, and former AG consultant de Bekassy, three of the four nonparties alleged to have made the misrepresentations at issue; however, these individuals reside in Switzerland and, therefore, would be subject to compulsory process in that country; (6) as former AG president Dahl, the fourth nonparty allegedly responsible for the misrepresentations, resides in Sweden, producing him as a witness would be equally difficult in Switzerland and the United States; and (7) consistent with item (1) above, nearly all of the many individuals to whom Dahl, Georgieff, Haller and de Bekassy allegedly made oral misrepresentations—essential defense witnesses—reside in the U.K. and likely would consent more readily to appear in nearby Switzerland than in distant Pennsylvania.

**End of Document**                                          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 8

2016 WL 3523878
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas, Houston Division.

JPT Group, LLC., Plaintiff,

v.

Steven Madden Retail, Inc., and
Steven Madden, Ltd., Defendants.

CIVIL ACTION H-15-3264
|
Signed 06/28/2016

**Attorneys and Law Firms**

J. Reid Bumgarner, Port & Bumgarner LLP, Bellaire, TX, for Plaintiff.

Scott E. Stevens, Stevens Henry, PLLC, Longview, TX, for Defendants.

### MEMORANDUM OPINION AND ORDER

Gray H. Miller, United States District Judge

 *1 Pending before the court is a motion to transfer venue to the United States District Court for the Eastern District of New York filed by defendants pursuant to 28 U.S.C. § 1404(a). Dkt. 15. After considering the motion, response, reply, and applicable law, the court finds that the motion should be DENIED. [1]

### I. BACKGROUND

This is a patent infringement action brought under 35 U.S.C § 271 et seq. by JPT Group, LLC ("JPT") against Steven Madden Retail, Inc., and Steven Madden, Ltd. (collectively, "Madden"). Dkt. 1 at 2. JPT's principal place of business is located in Bend, Oregon and Madden's principal place of business is in Long Island City, New York. Id. at 2. JPT owns the Bernardo brand ("Bernardo"). Id. at 1. JPT alleges that Madden copied innovative designs of the Bernardo brand and engaged in production and distribution of infringing products through retail and online stores. Id. at 1–2. JPT was duly and legally issued U.S. Patent No. D577,182 (filed

Nov. 16, 2007) (issued Sept. 23, 2008) and U.S. Patent No. D581,149 (filed May 21, 2008) (issued Nov. 25, 2008) (collectively, "Mojo patents"). Id. at 3. The Mojo patents relate to the ornamental designs of the Mojo sandal, which is sold by JPT under its Bernardo brand. Id. The Mojo design was invented by Dennis Comeau, who currently resides in New Mexico. Dkt. 19 at 10. JPT alleges that Madden misappropriated JPT's patented ornamental sandal designs by manufacturing and distributing the accused products, including their Virrtue Thong sandals, throughout the United States, including Texas and New York. Dkt. 1 at 4.

JPT filed this lawsuit on November 5, 2015. Dkt. 1. On February 17, 2016, Madden moved to transfer this action to the Eastern District of New York pursuant to 28 U.S.C. § 1404(a). Dkt. 15. On March 13, 2016, JPT filed a response to the motion (Dkt. 19), to which Madden filed a reply (Dkt. 20).

### II. LEGAL STANDARD

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). "The district court has broad discretion in deciding whether to order a transfer." Caldwell v. Palmetto State Sav. Bank of S.C., 811 F.2d 916, 919 (5th Cir. 1987). The moving party bears the burden of showing why the forum should be changed. Time, Inc. v. Manning, 366 F.2d 690, 698 (5th Cir. 1966). In evaluating a § 1404(a) motion to transfer, the court examines (1) whether the action "might have been brought" in the transferee forum, and (2) whether there is "good cause" for transferring the action. In re Volkswagen of Am. Inc., 545 F.3d 304, 312, 315 (5th Cir. 2008).

 *2 To show good cause, the movant must demonstrate that a transfer is "[f]or the convenience of parties and witnesses, in the interest of justice." Id. In determining whether transfer is appropriate, the court considers private and public interest factors. Id. The public interest factors are: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of

laws or in the application of foreign law. *Id.* "[W]hen the transferee venue is not clearly more convenient than the venue chosen by the plaintiff, the plaintiff's choice should be respected." *Id.* The private interest factors are: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious, and inexpensive. *Id.*

## III. ANALYSIS

Both parties agree that this case could have been brought in the Eastern District of New York. Dkt. 15 at 5; Dkt. 19 at 4. Madden contends that Texas and this court have no meaningful connection to this case and provides arguments for why the private and public factors weigh in favor of transferring the case. *See* Dkt. 15 at 8–16.

### A. Public Factors

Madden admits that three of the four public factors are neutral, and therefore, relies solely on the local interest factor to prove that the public factors weigh in favor of transfer. *See* Dkt. 15 at 13–16. The local interest factor analyzes the "factual connection" that a case has with both the transferee and transferor venues. *In re Volkswagen AG, 371 F.3d 201, 206 (5th Cir. 2004).* Madden asserts that this case has a stronger factual connection with the Eastern District of New York because Madden and JPT have "strong ties" to New York. Dkt. 15 at 14. Madden points out that they maintain their corporate headquarters and several stores in New York. JPT counters that Madden has only eighteen (18) stores located in New York, compared to 123 stores located in other states, including thirteen (13) stores in Texas. Dkt. 19 at 12, 17. Madden asserts that the only connection this case has to Texas is that some of the accused infringing products were sold in Texas. Dkt. 15 at 14–15. However, as Madden points out, these products were sold not only in Texas, but elsewhere throughout the United States, including New York. *Id.*

Madden asserts that the Bernardo Brand, owned by JPT, was founded in New York in 1946 and is headquartered in New York City. *Id.* JPT denies this assertion, claiming that the Bernardo website had previously contained outdated information and has since been amended to reflect that Bernardo's headquarters are no longer located

in New York. Dkt. 19 at 12. In their reply, Madden points out that the Bernardo website still uses a New York showroom and boasts telephone area codes from New York and JPT's Facebook page still claims that "the [Bernardo] headquarters is based in New York." Dkt. 20 at 3–4; Dkt. 20, Exs. 2, 5. Regardless of the true location of its headquarters, Bernardo clearly has significant connections to New York.

Bernardo, however, also has strong ties to Texas. As JPT points out, current and former employees of Bernardo (and its predecessor companies) significantly contributed to the *Mojo* patents. Dkt. 15 at 20. The company that previously owned the *Mojo* patents, Bernardo Footwear, LLC, has been based in either Houston or Stafford, Texas since its inception in 2001. Dkt. 19 at 10. In 2007, when Bernardo Footwear, LLC filed the patent applications for the *Mojo* patents, its employees included: Roy R. Smith III, Cynthia Smith, Tim Hubbard, Pete Bottoni, and Tom Allen, all of whom currently reside within this district. *Id.* Moreover, Gilbreth & Associates, P.C. was the law firm that prosecuted the *Mojo* patents. Dkt. 19 at 10. This firm was based in Houston at the time, and is currently located within this district in Bellaire, Texas. *Id.* In 2011, Bernardo Group, LLC acquired the Bernardo brand and the *Mojo* patents. *Id.* On February 11, 2014, JPT acquired the Bernardo brand and *Mojo* patents. *Id.* at 11. During this aforementioned time period, the officers and employees of the Bernardo Group included: Peter Cooper, Todd Miller, Tim Hubbard, John Moore-Jones, Kerri Woodard, Pete Bottoni, and Tom Allen. *Id.* Each of these individuals resides within this district. *Id.* These non-party witnesses managed and/or administered the sale of the *Mojo* sandals, witnessed Madden's alleged infringement of the *Mojo* sandals, and are knowledgeable about the patented design, marking, prior art, and damages. *Id.*

**\*3** Because both venues have a strong local interest in this lawsuit, this court finds that the local interest factor is neutral. Accordingly, the court finds that none of the public interest factors weighs in favor of transfer.

### B. Private Factors

The private interest factors are: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy,

expeditious, and inexpensive. *In re Volkswagen of Am., Inc.*, 545 F.3d at 315.

### 1. *Relative Ease Of Access to Proof*

" 'In patent infringement cases, the bulk of the relevant evidence usually comes from the accused infringer. Consequently, the place where the defendant's documents are kept weighs in favor of transfer to that location.' " *In re Genentech, Inc.*, 566 F.3d 1338, 1345 (Fed. Cir. 2009) (quoting *Neil Bros. Ltd. v. World Wide Lines, Inc.*, 425 F. Supp. 2d 325, 330 (E.D.N.Y. 2006)).

Madden argues that their corporate headquarters and most, if not all, of Madden's relevant documents concerning the accused products are maintained in New York. Dkt. 15. JPT counters that Madden identifies no specific witnesses who are located in New York, and that any documents located in New York do not outweigh JPT's key witnesses and evidence in this district. Dkt. 19. Although JPT does not identify any specific documents, it appears that most of the documents related to the research and development and patent prosecution of JPT's *Mojo* patents are in Texas. Indeed, Bernardo completed the applications of the *Mojo* patents in Houston and the law firm that filed them is currently located in Bellaire, Texas. *Id.* at 10; Dkt. 19, Ex. 4.

Therefore, the documents relating to the allegedly infringing products are located in New York, whereas the documents relating to the infringed upon products are located in Houston. Under *In re Genentech, Inc.*, for purposes of considering this factor, the location of Madden's documents in New York is of greater importance than JPT's documentary evidence in Texas. 566 F.3d at 1345. Therefore, the court finds that this factor weighs in favor of transfer.

### 2. *The Availability of Compulsory Process to Secure Attendance of Witnesses*

"Pursuant to Rule 45(b)(2)(C) of the Federal Rules of Civil Procedure, a district court may compel attendance through the issuance of a subpoena at any place within the district of the court by which it is issued or at any place within 100 miles of where the deposition, trial, or hearing is being held." *Id.*

Madden contends that this court does not have subpoena power to compel several witnesses to testify including

Madden's employees located in New York and the inventor of the *Mojo* patents, who resides in New Mexico. Dkt. 15 at 7–8. JPT argues that Madden could require their employee witnesses to attend trial even if they are not located within the subpoena power of this court. Dkt. 19 at 16 (citing *Pension Advisory Grp. Ltd. v. Country Life Ins. Co.*, 771 F. Supp. 2d 680, 711 (S.D. Tex. 2011) (finding that a "motion to transfer under 28 U.S.C. § 1404(a) may be denied when the witnesses are employees of the defendant and their presence can be obtained by the party")). Further, JPT points out that some of Madden's employee witnesses reside in Texas. Dkt. 19 at 16. More importantly, a substantial number of third-party witnesses reside in Texas, including: the original owner of the Bernardo brand that developed the *Mojo* patents, the attorneys responsible for the prosecution of the *Mojo* patents, the second and current owner of the *Mojo* patents, and former employees with knowledge about the process of filing and obtaining the *Mojo* patents. *Id.* at 15–16.

**\*4** In sum, Madden has the ability to compel its own employees in New York to attend trial in this court. Neither this court nor the prospective transferee court would be able to secure the attendance of the inventor of the patent by subpoena. However, this court could secure the attendance of the third-party witnesses mentioned above, whereas the prospective transferee court could not. Therefore, the court finds that this factor weighs against transfer.

### 3. *Cost of Attendance for Willing Witnesses*

This factor considers the cost of attendance for those witnesses that are more than 100 miles away from the court. "When the distance between an existing venue for trial of a matter and a proposed venue under § 1404(a) is more than 100 miles, the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled." *In re Volkswagen AG*, 371 F.3d 201, 204–05 (5th Cir. 2004).

In this case, because the existing venue and proposed venue are more than 100 miles apart, the court must compare the relative distances required to travel to each venue. JPT asserts that there are ten individual witnesses that would have to travel 1,428 miles from Texas to New York, if transferred. Dkt. 19 at 17. These witnesses appear to include Bernardo's current and former employees and the attorneys that prosecuted the *Mojo* patents. *Id.* Additionally, there are two key witnesses who reside in

Oregon and New Mexico, both of which are significantly closer to Texas. *See id.* JPT's corporate representative witness in Oregon is 649 miles closer to Texas than New York and the inventor in New Mexico is 1,030 miles closer to Texas. *Id.* at 17; Dkt. 19. Ex. 10. Therefore, because it would be more costly and inconvenient to travel to New York for the majority of the witnesses, the court finds that this factor weighs against transfer.

### 4. *All Other Practical Concerns*

For this factor, courts consider whether transfer would delay already protracted litigation. *In re Radmax, Ltd.*, 720 F.3d 285, 289 (5th Cir. 2013). Additionally, the courts consider the efficiency of the court system in handling several related lawsuits in the same district. *Acad., Ltd. v. A & J Mfg., LLC*, Civ.A. No. H-14-2043, 2014 WL 6679260, at *4 (S.D. Tex. Nov. 25, 2014) (Miller, J.) (granting a motion to transfer venue where there was pending litigation concerning the same patents in the proposed venue, reasoning that "it will be more efficient for the court system if the same court determines" the issue of infringement).

JPT points out that this action is related to the following two cases pending in this district: *JPT v. Express*, 4:15-CV-2873, originally assigned to Judge Rosenthal, later consolidated with *JPT v. Yellow Box Corp.*, 4:15-CV-02757, before Judge Gilmore. Dkt. 19 at 18. There

appears to be a substantial overlap of witnesses and claim construction in all three of these cases. Dkt. 19 at 18. The related pending cases in this district involve the same plaintiff enforcing the same patents, but against different defendants accused of infringing upon the *Mojo* patents. *Id.* Accordingly, this factor weighs against transfer.

In sum, the court finds that none of the public interest factors weigh in favor of transfer, only one private interest factor weighs in favor of transfer, and three of the private interest factors weigh against transfer. Accordingly, Madden has failed to carry its burden to show good cause for a § 1404(a) transfer.

### IV. CONCLUSION

**\*5** Madden's motion to transfer venue to the United States District Court for the Eastern District of New York (Dkt. 15) is DENIED.

It is so ORDERED.

Signed at Houston, Texas on June 28, 2016.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 3523878

---

Footnotes

1    On March 23, 2016, JPT filed a motion for leave to file a sur-reply (Dkt. 22) in response to Madden's reply in support of their motion to transfer venue. However, even without considering JPT's sur-reply, the court finds that Madden cannot demonstrate that transfer of venue is warranted. Therefore, JPT's motion for leave to file a sur-reply is DENIED as moot.

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works. 4

# EXHIBIT 9

Potomac Ins. Co. v. Woods, Not Reported in F.Supp. (1996)

Case 4:18-cv-04704   Document 9-3   Filed on 01/24/19 in TXSD   Page 89 of 131

1996 WL 450687
Only the Westlaw citation is currently available.
United States District Court,
E.D. Texas, Beaumont Division.

POTOMAC INSURANCE CO.
v.
Charlotte Kae WOODS, et al.

No. 1:95–CV–469.
|
July 22, 1996.

*REPORT AND RECOMMENDATION OF
THE UNITED STATES MAGISTRATE
JUDGE RE: PLAINTIFF'S MAY 15, 1996
MOTION FOR SUMMARY JUDGMENT*

HINES, United States Magistrate Judge.

**\*1** Pending is plaintiff's May 15, 1996 motion for summary judgement, to which defendant filed a response on June 6, 1996. This motion was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) by United States District Judge Richard A. Schell for recommendation as to disposition.

I. Declaratory Judgment Action

A. Factual Background
According to the parties' submissions, the following facts are not contested.

Plaintiff insurance company issued a $401,000.00 fire insurance policy insuring Woods Components, Inc., a business located in Orange, Texas. At the time of issuance, Woods Components was owned in equal shares by defendant Charlotte Kae Woods and her then-husband Rick Woods. Under Texas law, the property and all interest in Woods Components, Inc. was community property.

On August 14, 1994, the business was destroyed by fire; the Woods' residence was also destroyed by fire the same evening. Rick Woods was later arrested and indicted on two counts of arson. He pled nolo contendre to both

counts of arson and received probation and deferred adjudication. Defendant Charlotte Kae Woods admits that Rick Woods was responsible for setting the fire which burned the insured business.

Defendant Charlotte Kae Woods on January 20, 1995 filed a proof of loss for the proceeds of the insurance policy in the amount of $401,000.00. The Woods were divorced on June 22, 1995. The divorce decree awarded defendant as her sole and separate property "all right, title, and interest to any fire insurance paid as a result of the fires damaging [Woods Components, Inc.]."

Defendant's insurance claim was thereafter denied. Plaintiff's asserted bases for denying the claim were: involvement by Ms. Woods in the arson, breach of the insurance contract by Ms. Woods (specifically, her failure to produce documents and her material concealments and misrepresentations during investigation of the claim by the insurer), the "Innocent Spouse Doctrine," and the "Corporate Arson Defense."

Plaintiff filed this declaratory judgment action seeking a declaration of nonliability on the $401,000.00 policy. Defendant filed a counterclaim alleging breach of contract, breach of the common law duty of good faith and fair dealing (i.e., the "bad faith" counterclaim), violations of the Texas Deceptive Trade Practices–Consumer Protection Act, and violations of article 21.21 of the Texas Insurance Code.

B. Innocent Spouse Doctrine [1]

1. State Precedents
For many years, Texas law prohibited an innocent individual from recovering insurance proceeds when his or her spouse deliberately destroyed jointly owned property. See, e.g., Jones v. Fidelity & Guar. Ins. Co., 250 S.W.2d 281 (Tex.Civ.App.1952, writ ref'd) (finding persuasive similar holdings by state courts in Massachusetts, Pennsylvania, Wisconsin, and Michigan). The Texas Supreme Court partially abandoned this rule in 1986 in Kulubis v. Texas Farm Bureau Underwriters Ins. Co., 706 S.W.2d 953 (Tex.1986), by holding that an innocent spouse could recover 50% of the insurance proceeds to a mobile home after her husband burned the home without her knowledge. The Kulubis court went out of its way, however, to note that under the facts of the case each spouse had possessed an undivided one-half interest in the

Potomac Ins. Co. v. Woods, Not Reported in F.Supp. (1996)

Case 4:18-cv-04704 Document 9-3 Filed on 01/24/19 in TXSD Page 90 of 131

mobile home because it was a gift from the wife's parents. The court expressly declined to comment on the result that would obtain were the property community property:

> **\*2** Texas courts are faced with an additional problem in this situation because we are a community property state. It is not necessary for us to address that particular problem at this time inasmuch as the mobile home in question was a gift to Betty and John and as such an undivided one-half interest was the separate property of each of them. We are not to be understood as holding that an innocent spouse is barred from recovering under an insurance policy covering community property. We do not have that fact situation before us and therefore do not address the problem of how to compensate the innocent spouse and yet not permit benefit to the wrongdoing spouse. That problem will be addressed when and if it is presented to us.

*Id.* at 955.

One intermediate level state appellate ruling issued subsequent to *Kulubis* has proffered an answer to the question left open by the Texas Supreme Court. *Travelers Cos. v. Wolfe,* 838 S.W.2d 708 (Tex.App.—Amarillo 1992),* involved a husband who filed a proof of loss with an insurer in connection with the fire loss of a business he owned as community property with his wife. The insurer denied the claim based on the husband's criminal act of arson. The couple was subsequently granted a divorce; the decree provided that the wife "shall retain any rights she may have to file an insurance claim for losses incurred as a result of the fire at [the business] and any insurance proceeds she receives from such claim shall be her sole and separate property." *Id.* at 710. The wife brought suit claiming entitlement to an undivided one-half interest in the insurance policy.

The Amarillo Court of Appeals read *Kulubis* as not barring recovery of insurance proceeds by the wife, even though the insured property was community property at the time of loss. The court found that the divorce decree eliminated any concern that allowing recovery by the wife would simultaneously benefit the husband, "for at the time [the wife] established her claim to one-half of the loss, the claim, and her right to receive the proceeds, was her separate property by virtue of the final divorce decree." *Id.* at 712. Obviously, were the court to apply the reasoning of *Wolfe* under the facts present here, defendant would not automatically be barred from recovery as a result of the acts of her former spouse.

2. Fifth Circuit *"Erie* Guesses"

In the course of its analysis in *Wolfe,* the Amarillo Court of Appeals expressly declined to follow two Fifth Circuit decisions handed down following *Kulubis,* rightly suggesting that such decisions are, from the point of view of an intermediate level state appellate court, at most persuasive and not controlling on issues of state law. *Id.* (citing *Woodard v. Texas Dep't of Human Resources,* 573 S.W.2d 596, 598 (Tex.Civ.App.—Amarillo 1978, writ ref'd n.r.e.)). The two Fifth Circuit cases discussed in *Wolfe* would, if applied here, compel the result that defendant is disqualified from receiving insurance proceeds.

**\*3** The first of the two cases was *Norman v. State Farm Fire & Casualty Co.,* 804 F.2d 1365 (5th Cir.1986). Comparable to the facts here, *Norman* involved the destruction by a husband's act of arson of an insured structure classified as community property. The Fifth Circuit discussed the public policy underpinnings of *Kulubis* to determine whether Texas law would countenance application to insured community property of the departure announced in that case from the general rule disqualifying an innocent spouse from recovering insurance proceeds. The Fifth Circuit ascertained that the dominant public policy concern supporting the Innocent Spouse Doctrine was ensuring that a wrongdoer not benefit from his wrongdoing. *Id.* at 1366. The Fifth Circuit concluded that Texas law provided for no exception to the Innocent Spouse Doctrine in the case of insured community property, stating:

> The law should assiduously seek ...
> to avoid holding out any incentive to

Potomac Ins. Co. v. Woods, Not Reported in F.Supp. (1996)

Case 4:18-cv-04704 Document 9-3 Filed on 01/24/19 in TXSD Page 91 of 131

such actions [of arson] and should be diligent to assure that it permits no benefits to be derived from them by their perpetrators. We conclude that it would be a strange rule indeed that guaranteed the would-be arsonist a minimum of one-half of the insured value of his building—paid in cash and as community property—even were he found guilty of the act, so long as he arranged matters so that the insurance company could not prove that he had let his spouse in on his scheme. That would be the apparent result were we to engraft the *Kulubis* separate-property rule on to the community property case presented today, and we therefore decline to do so.

*Id.; see also Ashworth v. State Farm Fire & Casualty Co.,* 738 F.Supp. 1032, 1036 (W.D.La.1990) (construing analogous Louisiana law on the subject, and relying significantly on *Norman* ). The court recognized the harshness of this rule. Nevertheless, the court declined the invitation to announce a (federally) judicially crafted solution [2] to a state law concern. *Id.* [3]

The second Fifth Circuit case, *Webster v. State Farm Fire & Casualty Co.,* 953 F.2d 222 (5th Cir.1992), involved an additional layer of complexity—namely, the effect of a divorce property separation agreement—and is therefore more analogous to the situation presented by the facts here. *Webster* involved a fire at a couple's home; the couple had separated prior to the fire, but all parties agreed that the residence was nevertheless community property. The couple jointly filed a claim for insurance benefits. The husband thereafter filed for divorce. The claim was subsequently denied by the insurance company. Several months later, the couple's divorce became final. The divorce decree awarded each partner a "one-half undivided interest" in the realty where the house had been located "and/or one-half the net insurance proceeds, if any, resulting from the total loss of [the home]." *Id.* at 222–23. About a year after their divorce, the couple sued the insurer for breach of contract. The insurer argued its duties were excused because the husband had committed arson, but the wife insisted on her entitlement to one-half the proceeds, arguing that her former husband's act of arson was irrelevant if she was innocent.

**\*4** The Fifth Circuit noted that it had denied recovery to an innocent co-insured whose community property was destroyed by her husband in *Norman*. The court then considered the effect of the property separation agreement:

> Now that the Websters are divorced, Guy would receive no benefit should State Farm reimburse Etta for her loss. That the Websters' property interests were severed after coverage was denied them, however, is irrelevant to our analysis. At all points of time pertinent to State Farm's decision to deny recovery— the date the policy was issued, the date of the fire, the date the Websters filed their claim, and the date the claim was refused—the property was community.

*Id.* at 223.

The facts of the instant case are analogous to those in *Webster.* The only difference is that here the couple's divorce and property separation agreement were finalized prior to the denial of the claim. Defendant emphasizes this difference in her brief. However, it would be illogical to adopt a rule which makes an insurer's duty to pay proceeds a function of the speed with which it processes the claim. [4] Moreover, defendant's suggested interpretation ignores a well-founded rule of insurance law—namely that a claim for insurance benefits accrues at the time of loss. [5] Since the claim accrued at the time of the fire, when the parties were still married and the property was community, defendant at that moment lost entitlement to insurance proceeds by operation of the Innocent Spouse Doctrine. Any later attempt to sever out as separate property, by means of a property separation agreement, a right to proceeds was an act without consequence, because there was then no property right in insurance proceeds remaining.

Case 4:18-cv-04704 Document 9-3 Filed on 01/24/19 in TXSD Page 92 of 131

Potomac Ins. Co. v. Woods, Not Reported in F.Supp. (1996)

3. Resolution of Conflicting Precedents

The parties' dispute, then, turns on whether the court applies state or federal precedent. It is well established that a federal district court must generally apply an interpretation of law articulated by its circuit court of appeals. As articulated by the Seventh Circuit, "Ours is a hierarchical judiciary, and judges of inferior courts must carry out decisions they believe mistaken. A district judge who thinks that new evidence or better argument 'refutes' [a circuit court] decision[ ] should report his conclusions while applying the existing law of the circuit." *Gacy v. Welborn,* 994 F.2d 305, 309 (7th Cir.), *cert. denied,* 114 S.Ct. 269, 126 L.Ed.2d 220 (1993) (citations omitted).

While *Gacy* involved a district court's departure from circuit court precedent on an issue of federal law, it is similarly well established that a district court sitting in diversity is generally bound by the state law interpretations of its circuit court. *See, e.g., Winter Panel Corp. v. Reichhold Chems., Inc.,* 823 F.Supp. 963, 969 (D.Mass.1993) ("Plaintiff urges that this court not follow the oft-criticized *Roto–Lith [Ltd. v. F.P. Bartlett & Co.,* 297 F.2d 497 (1st Cir.1962) ] case. While the Supreme Judicial Court of Massachusetts has never adopted its tenets, ... this court remains bound by its holdings."); *see also Mygsa, S.A. v. Howard Indus.,* 879 F.Supp. 624, 627 (S.D.Miss.1995) ("When the Mississippi Supreme Court has not spoken on an issue of state law, this Court is bound to follow the Fifth Circuit interpretation of state law."); *Gordon v. American Standard, Inc.,* 858 F.Supp. 621, 624 (S.D.Miss.1994) (district court would be bound by Fifth Circuit interpretation of state law) (dicta).

 **\*5** Adherence by a federal district court to a circuit court's "*Erie* guess" is typically the norm, even when there exist decisions from the state's intermediate level appellate courts that are inconsistent with the circuit court's resolution of the state law issue. [6] In this circuit, circuit court precedents containing *Erie* predictions bind unless "a subsequent state court decision or statutory amendment ... render[s] [the Fifth Circuit's] prior decision clearly wrong." *Batts v. Tow–Motor Forklift Co.,* 66 F.3d 743, 747 (5th Cir.1995), *cert. denied,* 116 S.Ct. 1851 (1996); *see also* Jed I. Bergman, Note, *Putting Precedent in Its Place: Stare Decisis and Federal Predictions of State Law,* 96 COLUM.L.REV. 969, 987 (1996); *cf. Broussard v. Southern Pac. Transp. Co.,* 665 F.2d 1387, 1389 (5th Cir.1982) (explaining a similar rule for subsequent panels

of the court of appeals: "[A] prior panel decision 'should be followed by other panels without regard to any alleged existing confusion in state law, absent a subsequent state court decision or statutory amendment which makes this Court's [prior] decision clearly wrong.' " (quoting *Lee v. Frozen Food Express, Inc.,* 592 F.2d 271, 272 (5th Cir.1979))).

In determining whether subsequent events have rendered a federal circuit court's interpretation of state law clearly wrong, a federal district court must not give undue weight to a single decision of an intermediate state court of appeals. Said one court:

> In the absence of an authoritative pronouncement from the state's highest tribunal, decisions of the lower state appellate courts should be accorded proper regard but not conclusive effect. In determining the proper regard to ascribe to decisions of intermediate state courts, a federal tribunal should be careful to avoid the danger of giving a state court decision a more binding effect than would a court of that state under similar circumstances. This follows from the elemental tenet that a federal court adjudicating matters of state law in a diversity suit is regarded as only another court of that state. Thus, in the words of the Court, "it would be incongruous indeed to hold the federal court bound by a decision which would not be binding on any state court."

*Largoza v. General Elec. Co.,* 538 F.Supp. 1164, 1166 (E.D.Pa.1982) (quoting *King v. United Commercial Travelers,* 333 U.S. 153, 161, 68 S.Ct. 488, 492, 92 L.Ed.2d 608 (1948)) (some quotations and citations omitted). When, however, an interpretation of state law by a federal court of appeals has been "repeatedly rejected by subsequent decisions of state trial and appellate courts," a federal district court sitting in diversity is not bound by that interpretation. *In re Eastern & Southern Dists. Asbestos Litig.,* 772 F.Supp. 1380, 1409 (E. & S.D.N.Y.1991), *aff'd in part & rev'd in part sub nom. In re Brooklyn Navy Yard Asbestos Litig.,* 971 F.2d 831 (2d Cir.1992); *Farnham v. Bristow Helicopters, Inc.,* 776 F.2d 535, 537 (5th Cir.1985). [7]

 **\*6** The weight of the single decision of the Amarillo Court of Appeals in *Wolfe* does not render the outcome arrived at by two separate panels of the Fifth Circuit in *Norman* and *Webster* clearly wrong. First, since its release, the *Wolfe* opinion has not been cited by any reported case applying Texas law concerning the point at issue here.

Second, *Wolfe* is itself merely a prediction of the manner in which the Texas Supreme Court would resolve an issue on which it had expressly reserved comment. Finally, without detracting from the sympathetic attraction of the *Wolfe* court's outcome, it must be acknowledged that there also exist independent countervailing factors counseling the opposite resolution of the issue. *See supra* sec. I.B.2. (discussing the unappealing result of making an insurance company's payment obligations turn on the speed with which it processes claims and discussing how allowing recovery by the innocent spouse would disregard the accrual date of the right to insurance proceeds).

### C. Discussion of Alternate Grounds Pretermitted

As noted, plaintiff elaborated three bases apart from the Innocent Spouse Doctrine for denying the claim: involvement by Ms. Woods in the arson, [8] breach of the insurance contract by Ms. Woods (specifically, failure to produce documents and material concealments and misrepresentations during investigation of the claim by the insurer), [9] and the "Corporate Arson Defense." [10] Because the undersigned concludes that recovery by defendant under the policy is precluded by the Innocent Spouse Doctrine, discussion of these alternate bases is unnecessary here.

### II. Breach of Contract, Bad Faith, DTPA, and Insurance Code Counterclaims

#### A. Breach of Contract Counterclaim

Because the undersigned concludes that plaintiff's motion for summary judgment on its declaratory judgment action should be granted, plaintiff's motion for summary judgment on defendant's breach of counterclaim is perforce meritorious as well.

#### B. Bad Faith Counterclaim

Defendant's "Original Answer and Counter-claim" contains only the most barebones of allegations to support her bad faith counterclaim. The pleading premises the bad faith claim on the allegation that defendant was "wrongfully denied coverage without [the insurer's] having a reasonable basis to believe [she] ... committed arson or any other breach of the policy under an exclusions portion of the policy." Defendant's Original Answer and Counter-claim, at 3–4.

The Texas Supreme Court has announced that "[a]s a general rule there can be no claim for bad faith when an insurer has promptly denied a claim that is in fact not covered." *Republic Ins. Co. v. Stoker,* 903 S.W.2d 338, 341 (Tex.1995); *Liberty Nat'l Fire Ins. Co. v. Akin,* No. 95–1283, 1996 WL 378330, at *2 (Tex. July 8, 1996). In dicta the court left open the theoretical possibility that in a case in which the insurer has no liability under the policy there could be a bad faith claim; however, the court made clear that only the most extreme acts could subject an insurer to bad faith liability. *Stoker,* 903 S.W.2d at 341. The court hinted that wholesale failure to investigate might be the type of act that could expose an insurer to a meritorious bad faith claim. *Id.; see also Snydergeneral Corp. v. Central Indem. Co.,* 907 F.Supp. 991, 1006 (N.D.Tex.1995).

*7 Both defendant's responsive pleading and her responses to requests for admission concede as fact that Rick Woods was responsible for the fire which destroyed the insured property. Once this fact is established (and the basic marital relationship between the parties is established), plaintiff is armed with an absolute policy defense—namely the legal defense of the Innocent Spouse Doctrine. As such, a detailed factual investigation by the insurer was not required to properly deny the claim; therefore, it is apparent that this case does not fall within the exception for "extreme" conduct by an insurer which would support a finding of bad faith without an obligation on the underlying insurance contract, and plaintiff's motion for summary judgment as to defendant's bad faith counterclaim should be granted.

#### C. DTPA and Insurance Code Counterclaims

The basis of defendant's DTPA counterclaim is that plaintiff "engaged in a deceptive trade practice by improperly denying and handling [her] claim for policy limits." Defendant's Original Answer and Counter-claim, at 9. The basis for the alleged violation of article 21.21 of the Insurance Code is that plaintiff "wrongfully den[ied] [defendant's] claim for policy proceeds pursuant to the provisions contained within the policy of insurance issued." *Id.* Defendant's pleading contains no independent factual elaboration as to these causes of action. The causes of action follow in the counterclaim immediately after the allegation that defendant's claim for insurance proceeds was denied "without reasonable basis." It is clear that the bad faith, DTPA, and Insurance Code counterclaims are all interwoven and all rely on the allegation that

Potomac Ins. Co. v. Woods, Not Reported in F.Supp. (1996)

Case 4:18-cv-04704   Document 9-3   Filed on 01/24/19 in TXSD   Page 94 of 131

policy benefits were denied without a reasonable basis. When statutory causes of action under the DTPA and the Insurance Code are joined with a cause of action sounding in breach of the duty of good faith and fair dealing, and when all three causes of action are based on an alleged denial of policy benefits without a reasonable basis, then the DTPA and Insurance Code claims must fail if the bad faith claim fails. *State Farm Fire & Casualty Co. v. Woods,* 925 F.Supp. 1174, 1180 (E.D.Tex.1996); *Emmert v. Progressive County Mut. Ins. Co.,* 882 S.W.2d 32, 36 (Tex.App.—Tyler 1994, writ denied); *State Farm Lloyds, Inc. v. Polasek,* 847 S.W.2d 279, 282 n. 2 (Tex.App.—San Antonio 1992). For this reason, plaintiff's motion for summary judgment should be granted as to defendant's DTPA and Insurance Code claims.

### III. Recommendation

Summary judgment should be entered in favor of plaintiff on its declaratory judgment action. Summary judgment should be entered in plaintiff's favor on each of defendant's counterclaims as well.

The court is aware that the result in this case might seem harsh. Nevertheless, the result is compelled by the combined operation of several factors: the fact that under the Fifth Circuit's interpretation of Texas law, which has not been demonstrated to be clearly wrong, an innocent individual may not recover when community property is deliberately destroyed by his or her spouse; the fact that the right to insurance proceeds attaches at the time of loss; and the absence of any provision of Texas law, fashioned by the appropriate manufacturers of such law, which effects automatic severance of an innocent individual's interests in community property upon destruction of that property by a spouse.

### IV. Objections

**\*8** Objections must be (1) specific, (2) in writing, and (3) served and filed within ten days after being served with a copy of this report. 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(b), and 72(b).

A party's failure to object bars that party from (1) entitlement to *de novo* review by a district judge of proposed findings and recommendations, *Rodriguez v. Bowen,* 857 F.2d 275, 276–77 (5th Cir.1988), and (2) appellate review, except on grounds of plain error, of unobjected-to factual findings and legal conclusions accepted by the district court, *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415 (5th Cir.1996) (en banc).

### All Citations

Not Reported in F.Supp., 1996 WL 450687

### Footnotes

1   "Innocent Spouse Doctrine" is not a term which appears in the caselaw relevant to this dispute; rather, it is a shorthand the parties have used throughout their motion papers. In fact, the term appears to the court to be a misnomer when attached to the doctrine espoused by plaintiff. Nevertheless, for convenience of the parties and for lack of a ready substitute, it is the term the court will use in the remainder of this report.

2   Such as announcing a rule that the deliberate destruction of community property by one spouse effects an automatic partition of the innocent spouse's interests.

3   In dicta, the court also recognized that post-destruction events such as divorce and property allocation could result in a change of circumstances such that the wrongdoer would not stand to benefit from a disbursement of insurance proceeds; however, the court reserved further comment, as the issue was not before the court. *Id.*

4   Such a rule, if adopted, could encourage mischief by an insurer: in cases in which the insurer had an initial suspicion of arson as well as reason to believe a divorce was imminent, the insurer might speed up the processing of the claim so that the "Innocent Spouse Doctrine" would preclude recovery by either spouse, encouraging hasty claims processing in such instances and compromising the integrity of the arson determination in the first instance. *See Norman,* 804 F.2d at 1365 n. 1.

5   Cf. *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 143 (Tex.1994) (withdrawn); *Seneca Resources Corp. v. Marsh & McLennan, Inc.,* 911 S.W.2d 144, 145 (Tex.App—Houston [1st Dist.] 1995); *Highlands Ins. Co. v. City of Galveston,* 721 S.W.2d 469, 471 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.). The rule is more clearly articulated elsewhere. *See, e.g., Corbin v. Aetna Life & Casualty Co.,* 447 F.Supp. 646, 650 (N.D.Ga.1978); *Oklahoma Morris Plan Co. v.*

Case 4:18-cv-04704   Document 9-3   Filed on 01/24/19 in TXSD   Page 95 of 131

**Potomac Ins. Co. v. Woods, Not Reported in F.Supp. (1996)**

*Security Mut. Casualty Co.,* 323 F.Supp. 1057, 1059–60 (E.D.Mo.1970), *aff'd,* 455 F.2d 1209 (8th Cir.1972); *National Surety Corp. v. Michigan Fire & Marine Ins. Co.,* 59 F.Supp. 493, 498 (D.Minn.1944), *aff'd,* 156 F.2d 329 (8th Cir.1946); *Fireman's Fund Mortgage Corp. v. Allstate Ins. Co.,* 838 P.2d 790, 794 (Alaska 1992); *Atlas Assurance Co. v. Mistic,* 822 P.2d 897, 902 (Alaska 1992).

6   *See, e.g., Hultz v. Federated Mut. Ins. Co.,* 817 F.Supp. 59, 61–62 (C.D.Ill.1993). *Accord City of Clayton v. Grumman Emergency Prods., Inc.,* 576 F.Supp. 1122, 1125 (E.D.Mo.1983). *See generally* Nikiforos Mathews, Note, *Circuit Court Erie Errors and the District Court's Dilemma: From Roto–Lith and the Mirror Image Rule to Octagon Gas and Asset Securitization,* 17 CARDOZO L.REV. 739, 742 n. 23 (1996) (collecting cases).

7   *But see Christian v. Scor Reins. Co.,* No. 3:92–CV–1209D, 1993 WL 625532 (N.D.Tex. Oct. 12, 1993) (district court considers itself bound by intermediate state appellate decision (for which the Texas Supreme Court had granted a writ of error) that was contrary to earlier Fifth Circuit state law interpretation).

8   If proved, such a defense to the policy would clearly be meritorious. *See, e.g., Jones,* 250 S.W.2d at 281–82.

9   Such willful misrepresentation defenses are typically disallowed due to the operation of Article 21.19 of the Texas Insurance Code.  TEX.INS.CODE ANN. art. 21.19 (Vernon's 1981); *Fireman's Fund Ins. Co. v. Reynolds,* 85 S.W.2d 826 (Tex.Civ.App.—Waco 1935, writ ref'd); *Vernon v. Aetna Ins. Co.,* 301 F.2d 86 (5th Cir.), *cert. denied,* 371 U.S. 819, 83 S.Ct. 33, 9 L.Ed.2d 59 (1962); *United States Fire Ins. Co. v. Skatell,* 596 S.W.2d 166 (Tex.Civ.App.—Texarkana 1980, writ ref'd n.r.e.); *Aetna Casualty & Surety Co. v. Guynes,* 713 F.2d 1187 (5th Cir.1983).

10   Several jurisdictions disallow, under various formulations of the corporate arson defense, recovery by a corporation when a principal shareholder has caused the destruction of property which forms the basis of the insurance claim. *See, e.g., Vicksburg Furniture Mfg., Ltd. v. Aetna Casualty & Surety Co.,* 625 F.2d 1167 (5th Cir. Unit A 1980); *Cora Pub, Inc. v. Continental Casualty Co.,* 619 F.2d 482 (5th Cir.1980); *Erlin–Lawler Enters., Inc. v. Fire Ins. Exch.,* 73 Cal.Rptr. 182 (Cal.Ct.App.1968); *Iemma v. Adventure RV Rentals, Inc.,* 632 N.E.2d 1178 (Ind.Ct.App.1994); *United Gratiot Furniture Mart, Inc. v. Michigan Basic Property Ins. Ass'n,* 406 N.W.2d 239 (Mich.Ct.App.1987); *Continental Ins. Co. v. Gustav's Stable Club, Inc.,* 317 N.W.2d 734 (Neb.1982); *Miller & Dobrin Furniture Co. v. Camden Fire Ins. Co. Ass'n,* 150 A.2d 276 (N.J.Super.Ct. Law Div.1959).

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

---

# EXHIBIT 10

2007 WL 4054473
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

Stephen F. SEIDENSTICKER, Plaintiff,
v.
The GASPARILLA INN, INC., a Delaware
corporation, William S. Farish, Sarah
S. Farish, Laura F. Chadwick, and
William R. Gotwals, Defendants.

Civil Action No. 2555-CC.
|
Date Submitted: Nov. 8, 2007.
|
Decided: Nov. 8, 2007.

**Attorneys and Law Firms**

Andre G. Bouchard, Joel Friedlander, and Dominick T. Gattuso, of Bouchard, Margules & Friedlander, P.A., Wilmington, Delaware, Attorneys for Plaintiff.

Lewis H. Lazarus, of Morris James LLP, Wilmington, Delaware, Attorney for Defendants.

### *MEMORANDUM OPINION*

CHANDLER, Chancellor.

**\*1** Under Delaware law, courts interpret contracts to mean what they objectively say. This approach is longstanding and is motivated by grave concerns of fairness and efficiency.[1] Before me is plaintiffs motion for partial summary judgment seeking an order declaring the meaning of several disputed provisions of a Stock Purchase Agreement. Because there is only one reasonable interpretation of these unambiguous provisions, plaintiffs motion is granted.

### FACTS AND BACKGROUND

Before the Court is Seidensticker's second motion for partial summary judgment. In June, the Court granted his earlier motion for partial summary judgment.[2] After that decision, the parties endeavored to settle their remaining issues, and stipulated that they would submit by letter to the Court any irresolvable differences. They have now done so.

Seidensticker was a longtime employee of The Gasparilla Inn who rose through the ranks to become its CEO in 1995.[3] The next year, Bayard Sharp, the sole shareholder of the Inn, transferred to Seidensticker 132 shares as a performance incentive. Because the Inn was a closely held corporation, the marketability and transferability of these shares were sharply restricted by the Stock Purchase Agreement ("SPA"). Specifically, the SPA limited the scope and means of both voluntary and involuntary transfers. An involuntary transfer was triggered under the SPA when (a few days after Sharp's death), Seidensticker's employment was terminated. Under section VI of the SPA, Seidensticker's termination triggered an involuntary transfer event that constituted a "deemed offer" by Seidensticker to sell his shares first to the Inn and then to Sharp. In its June 19, 2007 opinion, the Court held that the Inn and Sharp's estate failed to exercise their options to purchase the shares within the time period set out in the SPA.

The parties are now attempting to negotiate the terms of a final order and judgment. The Inn insists that a legend be placed on the stock certificate noting that the restrictions contained in section V continue to apply. Although both parties agree that these restrictions still have some effect, the Inn contends that the triggering events defined by solely Seidensticker's name and actions are also applicable to any of his transferees.

Section V of the SPA reads, "Upon the occurrence of any of the following events, Seidensticker, or his or her [sic] personal representative or successor (the 'Deemed Offeror') shall be deemed to have made an offer to sell [the shares]." It then goes on to list a series of seven events (the disputed provisions are underlined):

1. Commencement of federal or state bankruptcy, liquidation, or insolvency proceedings by or against the Deemed Offeror;

2. Attachment or garnishment of, or levy or seizure upon, or execution of a judgment against the Common Stock of the Deemed Offeror;

3. Any court order transferring an interest in the Common Stock of the Deemed Offeror to a third party, including a former spouse

**\*2** 4. Any attempt to Transfer any Common Stock of the Deemed Offeror in violation of any term of this Agreement;

5. Termination of employment with Sharp for any reason;

6. *Disability for a continuous period of three (3) years;* or

7. *Seidensticker's death.*

Subsection B of section V defines the date the offer is deemed to be made, and says that with respect to Seidensticker's death or disability, Common Stock is limited to the shares owned by Seidensticker. At issue now is whether paragraphs 6 and 7 of section V.A apply to Seidensticker's successors or transferees. [4]

## ARGUMENTS

Seidensticker contends that paragraphs 6 and 7 need not be noted on the stock certificate legend going forward because they would have no applicability to transferred shares. Defendants, however, say that the purpose of the SPA was to allow the Sharp family to keep the Inn a closely held, family business. If Seidensticker's interpretation is correct, defendants contend, that purpose would be thwarted.

In support of his argument, Seidensticker relies heavily on section V.B, which he says limits the scope of the shares "deemed to be offered" under triggering events 6 and 7. The relevant text reads, "In connection with Seidensticker's death and disability, the phrase 'all of those shares of Common Stock of the Deemed Offeror subject to the event' shall mean all shares of Common Stock owned by Seidensticker." This provision, Seidensticker argues, renders events 6 and 7 inapplicable to any shares he transfers and, therefore, it is unnecessary to include these events in the legend on any transferred shares.

Defendants offer two chief reasons supporting their interpretation. First, they cite section III of the SPA, which states that "[a]ll shares of the Common Stock which may now or hereafter be owned by Seidensticker shall be subject to the restriction on Transfer imposed by this Agreement." Defendants contend that this language is universal and applies to any mention of common stock throughout the contract, regardless of whether or not Seidensticker still owns the stock. Second, defendants argue that the purpose of this agreement was to ensure the Inn's ownership did not become diverse. They suggest that the "plain intent" of the drafters militates against Seidensticker's interpretation.

## ANALYSIS

Summary judgment is appropriate only when the record shows no genuine issue of any material fact and the court can rule as a matter of law. [5] While considering a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party. [6] Where the dispute centers on the proper interpretation of an unambiguous contract, summary judgment is appropriate because such interpretation is a question of law. [7]

Delaware law adheres to an objective theory of contracts, under which a court does not resort to extrinsic evidence "to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity" when the contract terms are unambiguous. [8] Contract terms are not ambiguous merely because the parties to the contract disagree; [9] rather, the court "stand[s] in the shoes of an objectively reasonable third-party observer," and ascertains whether the contract language is unmistakably clear. [10]

**\*3** The Supreme Court's recent decision in *Appriva Shareholder Litigation Co. v. EV3, Inc.* [11] does not set forth a new or different standard. There, the Supreme Court held that a trial court may not, on a Rule 12(b)(6) motion to dismiss, "choose between two differing reasonable interpretations of ambiguous provisions." [12] Where a contract term is objectively clear and there is only one "reasonable interpretation," it is well within the province of this Court to rule as a matter of law. The

Supreme Court may have quoted language suggesting a subjective theory of contracts from *Klair v. Reese,* [13] but *Appriva* does not rely on a subjective theory to reach its holding. Because of this, and because the Supreme Court has-in an earlier opinion neither distinguished nor cited in *Appriva*-expressly "disapproved" of the "overbroad" language of Klair, I cannot determine that Appriva alters Delaware's stalwart and longstanding adherence to an objective theory of contracts. [14]

Here, section V unambiguously defines certain "triggering events," upon the occurrence of which Seidensticker, *or* his personal representative, or his successor shall be deemed to have made an offer to sell the shares back to the Inn. The contact language anticipates *three* different individuals who might be deemed to have made an offer (Seidensticker, his personal representative, or his successor). The contract provision then collectively defines the class of all three as the "Deemed Offeror." That definitional term would be entirely superfluous if any one of the three individuals could, on its own, stand for all three. When interpreting contracts, this Court gives meaning to every word in the agreement and avoids interpretations that would result in "superfluous verbiage." [15] The "Deemed Offeror" term would be rendered superfluous verbiage if this Court followed defendants' interpretation. Section V.B explicitly states that triggering events 6 and 7 implicate only those shares owned by Seidensticker. Seidensticker is only one of three individuals contemplated by section V; if "Common stock owned by Seidensticker" were to mean "Common Stock owned by Seidensticker, his personal representative, or his successor," the drafters would have used "Deemed Offeror." By saying only Seidensticker, the drafters excluded the other individuals contemplated by section V, because *expressio unius est exclusio alterius.* [16]

Defendants' interpretation makes rational sense (in that it is rational to think that the drafters may not have wanted to allow these shares to get away from the Sharp family), but its interpretation is not *reasonable* in light of the indisputably clear language of the contract. Defendants' attempt to cabin the last sentence of section V.B by suggesting that it means all shares "ever" owned by Seidensticker necessarily fails: the contract does not use the word "ever." Moreover, defendants' contention that the language in section III applies throughout the entire agreement is refuted by the familiar interpretive rule that specific provisions prevail over general provisions. [17] Defendants offer no persuasive reason that the contract means anything other than what it says, and "Common Stock" in connection with Seidensticker's death or disability means only common stock held by Seidensticker.

## CONCLUSION

**\*4** Under the plain language of the SPA, no deemed offering of shares occurs upon Seidensticker's death or disability with respect to shares held by Seidensticker's transferees. Because this is the only reasonable interpretation of the SPA's language, I grant plaintiff's motion for partial summary judgment.

Counsel shall confer on the terms of a final order and judgment implementing this decision and the earlier ruling. In the event counsel are unable to resolve all disagreements as to the form of final order, each side shall submit a proposed form of order for the Court's consideration.

**All Citations**

Not Reported in A.2d, 2007 WL 4054473

Footnotes

1    *See Joseph M. Perillo, The Origins of the Objective Theory of Contract Formation and Interpretation,* 69 FORDHAM L.REV. 427, 477 (2000) (concluding that a judicial attempt to uncover the subjective meaning of contracts would incentivize perjury and needlessly complicate litigation).

2    *Seidensticker v. The Gasparilla Inn,* C.A. No. 2555-CC, 2007 WL 1930428 (Del. Ch. June 19, 2007).

3    These facts are undisputed and are taken from the parties' submissions.

4    Both sides agree that because Seidensticker has already been terminated, paragraph 5 is irrelevant.

5    Ct. Ch. R. 56(c); *Twin Bridges Ltd P'ship v. Draper,* C.A. No. 2351-VCP, 2007 WL 2744609, at \*8 (Del. Ch. Sept. 14, 2007).

6    *HIFN, Inc. v. Intel Corp.,* C.A. No. 1835-VCS, 2007 WL 1309376, at \*9 (Del. Ch. May 2, 2007).

7      *Id.*

8      *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232-33 (Del.1997).

9      *Id.*

10     *Dittrick v. Chalfant,* C.A. No. 2156-VCL, 2007 WL 1039548, at *4 (Del. Ch. Apr. 4, 2007).

11     Nos. 470, 2006, 623, 2006, 2007 WL 3208783 (Del. Nov. 1, 2007).

12     *Appriva,* slip op. at 30, 2007 WL 3208783, at *10 (quoting *VLIW Tech., LLC v. Hewlett-Packard Co.,* 840 A.2d 606, 615 (Del.2003)).

13     531 A.2d 219, 223 (Del.1987) ("The primary search is for the common meaning of the parties, not a meaning imposed on them by law.").

14     *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.,* 702 A.2d 1228, 1232 n. 7. (Del.1997) ("Unfortunately, certain language in the Court's opinion [in *Klair v. Reese* ] is overbroad on the issue of when extrinsic evidence should be considered. To the extent that such language may be read to be broader than, or at variance with, the principles set forth in this opinion, it is disapproved. The *Klair* opinion should be construed narrowly to conform with this opinion." (citations omitted)).

15     *NAMA Holdings, LLC v. World Market Center Venture, LLC,* C.A. No. 2756-VCL, 2007 WL 2088851, at *6 (Del. Ch. July 20, 2007).

16     *Priest v. State,* 879 A.2d 575, 584 (Del.2005).

17     *Cf. Shellburne Civic Ass'n, Inc. v. Brandywine School Dist.,* C.A. No. 2273-N, 2006 WL 2588959, at *4 (Del. Ch. Sept. 1, 2006).

---

**End of Document**                                  © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 11

Case 4:18-cv-04704 Document 9-3 Filed on 01/24/19 in TXSD Page 102 of 131

Sgic Strategic Global Investment Capital, Inc. v. Burger..., Not Reported in...

2015 WL 12731761
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas, Dallas Division.

SGIC STRATEGIC GLOBAL INVESTMENT
CAPITAL, INC., et al., Plaintiffs,
v.
BURGER KING EUROPE GMBH, Defendant.

CIVIL ACTION NO. 3:14-CV-3300-B
|
Signed 08/26/2015

**Attorneys and Law Firms**

James H. Billingsley, Caitlin Jemilha Morgan, Daniel D.
McGuire, Leane K. Capps, Polsinelli PC, Katherine Kelly
Valent, MacDonald Devin PC, Dallas, TX, Amy D. Fitts,
Polsinelli PC, Kansas City, KS, for Plaintiffs.

Deborah S. Coldwell, Jamee Michele Cotton, Haynes
& Boone LLP, Dallas, TX, Michael D. Joblove, Nina
Greene, Genovese Joblove & Battista PA, Miami, FL, for
Defendant.

<u>**MEMORANDUM OPINION AND ORDER**</u>

JANE J. BOYLE, UNITED STATES DISTRICT
JUDGE

 **\*1** Before the Court is Defendant Burger King Europe
GmbH's Motion to Dismiss based on lack of personal
jurisdiction and *forum non conveniens* (doc. 11), filed on
January 5, 2015. For the reasons stated below, the Court
**DENIES** the Motion to Dismiss based on lack of personal
jurisdiction and **GRANTS** the Motion to Dismiss based
on *forum non conveniens.*

**I.**

**BACKGROUND**

*A. Factual Background* [1]
This case concerns disputes between entities with interests
in restaurants operating as Burger King franchisees in

Germany. Plaintiffs SGIC Strategic Global Investment
Capital, Inc. ("SGIC") and GRIL German Restaurant
Investment & Lending, Inc. ("GRIL") are Delaware
corporations with their principal place of business in
Dallas, Texas. Doc. 1, Compl. 1. Plaintiff SGIC is the
sole shareholder of Plaintiff GRIL. *Id.* Plaintiff Christian
Groenke, a United States citizen and a resident of Texas, is
the sole shareholder and president of SGIC. *Id.* Defendant
Burger King Europe GmbH ("Defendant" or "BKE"),
a Swiss corporation with its principal place of business
in Zug, Switzerland, is a franchisor of Burger King
restaurants in Germany and other European countries. *Id.*
at 2; doc. 11, Def.'s Mot. to Dismiss 2.

Beginning in 1997, Plaintiff Groenke became involved
in owning and operating Burger King franchises in
Germany through a company that subsequently became
known as HEGO System-Gastronomie GmbH & Co.
KG ("HEGO"), which in turn later became a wholly
owned subsidiary of another German company, SAVE
Vermogensverwaltungs GmbH & Co., Holding KG
("SAVE"). Compl. 4. HEGO owned certain Burger King
franchises, and it also owned and controlled a number
of separate German subsidiaries that owned individual
Burger King restaurants. *Id.* HEGO and the subsidiaries
were parties to franchise agreements with Defendant;
these franchise agreements contained a forum selection
clause providing for the litigation of any disputes in
Munich, Germany. *Id.*; doc. 47, Pls.' Br. in Resp. to Mot.
to Dismiss 10. The franchise agreements required the
franchisees to pay certain franchise fees to Defendant.
Compl. 4. Originally, the franchise fee payments for some
of the franchises were backed by a letter of credit with a
German bank, but Plaintiff Groenke later substituted his
personal guarantee for the letter of credit. *Id.* at 4–5.

In addition to being a franchisor, Defendant BKE
also operated certain restaurants it owned in Germany
through subsidiaries, including Burger King GmbH Berlin
("BK Berlin"), whose parent company was Burger King
Beteiligungs GmbH ("BKB"). *Id.* at 4. According to
Plaintiffs, in 2010, Defendant induced Plaintiff Groenke
to agree that SAVE would purchase all the shares of
BK Berlin, which at the time owned nonperforming
Burger King restaurants in Berlin. *Id.* at 5. In exchange,
HEGO would receive a development agreement and the
opportunity to purchase 91 Burger King restaurants in
Germany. *Id.* After SAVE purchased the shares of BK
Berlin, SAVE was renamed BK HEGO-SAGRO Holding

Case 4:18-cv-04704 Document 9-3 Filed on 01/24/19 in TXSD Page 103 of 131

Sgic Strategic Global Investment Capital, Inc. v. Burger..., Not Reported in...

GmbH & Co. BK ("SAGRO"). *Id.* at 6. Through a series of mergers and restructurings, American Restaurant Holding, LP ("ARH") became the successor in interest to SAGRO. *Id.* ARH is owned by Plaintiff GRIL, which, in turn, is owned by Plaintiff SGIC. *Id.* Plaintiff Groenke is the sole shareholder of SGIC. *Id.*

**\*2** Plaintiffs allege that, contrary to the terms of the sale negotiated in 2010, Defendant sold the 91 restaurants without giving HEGO an opportunity to purchase them, terminated the development agreement with HEGO before its initial five-year term had expired, and engaged in a course of conduct designed to devalue Plaintiff Groenke's performing restaurants. *Id.* at 6–8. Meanwhile, the BK Berlin restaurants continued to suffer losses, and in 2012, BK Berlin was forced to file for bankruptcy protection under German law. *Id.* at 7.

Because of the deteriorating German Burger King market, Plaintiff Groenke decided to exit the market and thus tried to sell Plaintiff SGIC's interest in Plaintiff GRIL. *Id.* at 8. Plaintiff SGIC allegedly disclosed this to Defendant, although it maintains that it had no legal or contractual obligation to do so. *Id.* Plaintiffs assert that they entered into a share purchase agreement on April 23, 2014 (the "Share Purchase Agreement"). *Id.* at 10. This Share Purchase Agreement provided that Plaintiff SGIC would sell its interest in Plaintiff GRIL to a potential buyer, SHOKOIP Limited ("SHOKOIP"). *Id.* However, Defendant opposed this sale. *Id.* at 11. Accordingly, it sent a letter to GRIL on March 19, 2014 claiming that it had not received any specific information regarding the proposed sale of SGIC's equity interest in GRIL. *Id.* Defendant also claimed that, under the franchise agreements held by HEGO and its affiliates, any sale of SGIC's equity interest in GRIL required Defendant's prior consent. *Id.* Defendant then allegedly threatened to terminate the franchise agreements if SGIC proceeded with the sale of its equity interest in GRIL. *Id.* As a result, on May 20, 2014, Yi-Ko, on behalf of the potential buyer SHOKOIP, sent a written notice to SGIC that it would not proceed with the acquisition of GRIL. *Id.* at 14. According to Plaintiffs, SHOKOIP "made it clear that [Defendant] had threatened it with the loss of its franchise agreements and development agreements if it moved forward with the acquisition." *Id.*

Plaintiffs object to Defendant's interpretation of the franchise agreements and maintain that they complied

with the agreements' provisions in their attempted sale of GRIL. *Id.* at 11–12. Based on their reading of the franchise agreements and the alleged conduct described above, Plaintiffs SGIC, GRIL, and Groenke filed this lawsuit against Defendant BKE on September 12, 2014, alleging tortious interference with the Share Purchase Agreement related to SGIC's attempt to sell its interest in GRIL to a third party. *Id.* at 15. Plaintiffs further seek a declaration of the parties' respective rights under the relevant franchise agreements. *Id.* at 15–17.

In addition, the Court notes the existence of another lawsuit involving some of the parties to the present matter. On April 17, 2014, prior to Plaintiffs' filing of this lawsuit, Defendant BKE, as a plaintiff, filed an action for franchise fees against Groenke, as a defendant, based on Groenke's personal guarantee for the payment of certain franchise fees. *See Burger King Europe GmbH v. Groenke*, 3:14-CV-1417-G-BN (N.D. Tex. filed Apr. 17, 2014) (the "Guarantee Lawsuit").

### *B. Procedural Background*

On January 5, 2015, Defendant filed the Motion to Dismiss for Lack of Personal Jurisdiction and *Forum Non Conveniens* (doc. 11) now before the Court. On January 22, 2015, Plaintiffs filed a Motion for Leave to Conduct Jurisdictional Discovery (doc. 19), which the Court referred to United States Magistrate Judge David L. Horan. Doc. 22. On May 4, 2015, the Magistrate Judge entered his Findings, Conclusions, and Recommendation, in which he recommended that Plaintiffs' Motion for Leave to Conduct Jurisdictional Discovery be denied. *See* doc. 36, Findings, Conclusions, and Recommendation. The Court overruled Plaintiffs' subsequent objections and accepted these Findings, Conclusions, and Recommendation in an Order dated July 9, 2015. *See* docs. 37, 40, 41, 42.

**\*3** After the decision on Plaintiffs' Motion for Leave to Conduct Jurisdictional Discovery, the Court ordered Plaintiffs to submit their Response to Defendant's Motion to Dismiss by July 24, 2015, which they timely filed. [2] Doc. 46. After seeking an additional extension of time, Defendant submitted its Reply (doc. 60) on August 12, 2015. As such, this Motion is now ripe for the Court's review.

Case 4:18-cv-04704  Document 9-3  Filed on 01/24/19 in TXSD  Page 104 of 131

Sgic Strategic Global Investment Capital, Inc. v. Burger..., Not Reported in...

## II.

### LEGAL STANDARD

*A. Rule 12(b)(2) Motion to Dismiss*

A plaintiff bears the burden of establishing a trial court's jurisdiction over each defendant. *Stuart v. Spademan,* 772 F.2d 1185, 1192 (5th Cir. 1985). A plaintiff need only establish a prima facie case of jurisdiction; proof by a preponderance of the evidence is not required. *Wien Air Alaska, Inc. v. Brandt,* 195 F.3d 208, 211 (5th Cir. 1999); *Jones v. Petty-Ray Geophysical, Geosource, Inc.,* 954 F.2d 1061, 1067 (5th Cir. 1992). In deciding whether the plaintiff has made a prima facie case, non-conclusory factual allegations in the Complaint must be taken as true. *Gardemal v. Westin Hotel Co.,* 186 F.3d 588, 592 (5th Cir. 1999). The Court may also consider "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Spademan,* 772 F.2d at 1192. All conflicts between the facts contained in the parties' affidavits and other documentation must be resolved in the plaintiff's favor. *Cent. Freight Lines, Inc. v. APATransp. Corp.,* 322 F.3d 376, 380 (5th Cir. 2003). The Court is not, however, required to credit conclusory factual or jurisdictional allegations, even if uncontroverted. *Panda Brandywine Corp. v. Potomac Elec. Power Co.,* 253 F.3d 865, 869 (5th Cir. 2001) (finding no personal jurisdiction where plaintiffs' sole evidence of contacts was their allegation "on information and belief" that defendant knew they were Texas residents and that its actions would intentionally cause harm in Texas).

"A federal court sitting in diversity may exercise jurisdiction over a nonresident defendant to the same extent as a forum state court." *Wilson v. Belin,* 20 F.3d 644 (5th Cir. 1994). A Texas state court may exercise jurisdiction over a non-resident if two preconditions are met: (1) the nonresident must be amenable to service of process under Texas's long-arm statute; and (2) the assertion of jurisdiction over the nonresident must comport with the Due Process Clause of the Constitution. *Jones,* 954 F.2d at 1067. Because Texas's long-arm statute has been held to extend to the limits of due process, the Court need only determine whether jurisdiction over the defendant is constitutionally permissible. *Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex. 1990). To meet the federal constitutional test of due process, two

elements must be satisfied: (1) the defendant must have purposefully availed itself of the benefits and protections of the forum state by establishing "minimum contacts" with that state such that it should reasonably anticipate being haled into court there; and (2) the exercise of jurisdiction over the defendant must not offend traditional notions of fair play and substantial justice. *Jones,* 954 F.2d at 1068.

**\*4** The "minimum contacts" test can be met by contacts giving rise to either specific or general jurisdiction. *Gundle Lining Constr. Corp. v. Adams County Asphalt, Inc.,* 85 F.3d 201, 205 (5th Cir. 1996). Specific jurisdiction exists when the nonresident defendant's contacts with the forum state arise from, or are directly related to, the cause of action. *Id.* (citation omitted). To demonstrate specific jurisdiction, the plaintiff must establish that the defendant in question undertook some activity in, or purposefully directed some act at Texas, *and* that the plaintiff's claims arise out of or result from those activities. *Felch v. Transportes Lar-Mex SA de CV,* 92 F.3d 320, 325 (5th Cir. 1996) (emphasis added).

"General personal jurisdiction is found when the nonresident defendant's contacts with the forum state, even if unrelated to the cause of action, are continuous, systematic, and substantial." *Marathon Oil Co. v. Ruhrgas,* 182 F.3d 291, 295 (5th Cir. 1999) (citation omitted). A plaintiff's own activity, without more, cannot be the basis for the exercise of jurisdiction over a nonresident. *Worldwide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 298 (1980). "Such unilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction." *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 417 (1984). The analysis ultimately reduces to whether the nonresident defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thereby invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253 (1958).

*B. Motion to Dismiss Based on Forum Non Conveniens*

In a diversity action, a federal court in the Fifth Circuit may employ the doctrine of *forum non conveniens* to decline to exercise jurisdiction over a suit, even though jurisdiction is authorized. *See McLennan v. Am. Eurocopter Corp., Inc.,* 245 F.3d 403, 423 (5th Cir. 2001).

Case 4:18-cv-04704 Document 9-3 Filed on 01/24/19 in TXSD Page 105 of 131

Sgic Strategic Global Investment Capital, Inc. v. Burger..., Not Reported in...

*Forum non conveniens* contemplates a scenario where at least two forums are available in which the defendants are amenable to process and provides the district court with the criteria to choose the best forum. *Id.* at 424.

A defendant seeking dismissal on grounds of *forum non conveniens* must first establish that there is an alternate forum that is available and adequate. *Id.* A foreign forum is available when all of the parties can come under the jurisdiction of that forum. *See Delta Brands, Inc. v. Danieli Corp.*, No. 3:02-CV-0081-N, 2002 WL 31875560, at *6 (N.D. Tex. Dec. 20, 2002) (citing *McLennan*, 245 F.3d at 423). Additionally, if a defendant submits to the authority of the foreign forum, then the forum will be presumed available. *See In re Ford Motor Co.*, 591 F.3d 406, 413 (5th Cir. 2009). A defendant must also show that the available foreign forum is adequate. *Id.* To establish an adequate forum, a defendant must show that "the parties will not be deprived of all remedies or be treated unfairly, even though they may not enjoy the same benefits as they might receive in an American court." *Delta Brands*, 2002 WL 31875560, at *6.

1. Forum Selection Clause

In *Atlantic Marine*, the Supreme Court concluded that the appropriate legal mechanism by which a defendant may enforce a forum selection clause is through the doctrine of *forum non conveniens*, which, "for the subset of cases in which the transferee forum is within the federal court system," is codified under 28 U.S.C. § 1404(a). 134 S. Ct. 568, 579–80 (2013). A typical § 1404(a) analysis that does not involve a forum selection clause requires a district court to "weigh the relevant factors and decide whether, on balance, a transfer would serve 'the convenience of parties and witnesses' and otherwise promote the interest of justice." *Id.* at 581 (quoting § 1404(a)). These relevant factors consider both the private interests of the litigants and those of the public. *Id.* The private interest factors are: "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious and inexpensive." *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) (internal citations and quotations omitted). The public interest factors are: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will

govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *Id.*; *see also Atl. Marine*, 134 S. Ct. at 581 n.6 (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981) and *Norwood v. Kirkpatrick*, 349 U.S. 29, 32 (1955)). These lists are neither exhaustive nor exclusive, and none of the factors is "of dispositive weight." *In re Volkswagen*, 545 F.3d at 315 (citing *Action Indus., Inc. v. U.S. Fid. & Guar. Corp.*, 358 F.3d 337, 340 (5th Cir. 2004)). Moreover, courts typically show deference in their venue transfer calculus to the plaintiff's choice of forum and allocate a burden of "good cause" to the moving party to demonstrate to the court that the transferee venue is more convenient. *Id.*

**5** In *Atlantic Marine*, however, the Supreme Court held that where "the parties have agreed to a valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause." 134 S. Ct. at 581. Only "extraordinary circumstances unrelated to the convenience of the parties" should warrant the denial of a § 1404(a) motion. *Id.* As such, *Atlantic Marine* directs district courts to modify their usual *forum non conveniens* analysis in three ways when a valid forum selection clause is present. *Id.* First, a "plaintiff's choice of forum merits no weight" and is therefore irrelevant to a district court's analysis. *Id.* at 581–82. This shifts the burden from the defendant to the plaintiff to demonstrate "why the court should not transfer the case to the forum to which the parties agreed." *Id.* at 582. Second, a district court should disregard "arguments about the parties' private interests" and "must deem private-interest factors to weigh entirely in favor of the preselected forum." *Id.* District courts "may consider arguments about public-interest factors only." *Id.* Third, where a party has disregarded the forum selection clause and filed suit in a different forum, "a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules" which may, in some circumstances, affect a district court's evaluation of the public interest factors. *Id.* In practice, then, these modifications require the party acting in violation of the forum selection clause to "bear the burden of showing that public-interest factors overwhelmingly disfavor a transfer." *Id.* at 583. As a final guiding principle, the *Atlantic Marine* court advised district courts to refrain from unnecessarily disrupting the parties' contractual expectations of venue in their litigation. *Id.*

Case 4:18-cv-04704   Document 9-3   Filed on 01/24/19 in TXSD   Page 106 of 131

Sgic Strategic Global Investment Capital, Inc. v. Burger..., Not Reported in...

### III.

### ANALYSIS

In moving to dismiss this lawsuit, Defendant maintains that this Court cannot assert personal jurisdiction over it and that the existence of an enforceable forum selection clause providing for the litigation of disputes in Germany warrants dismissal based on *forum non conveniens.* The Court examines the parties' respective arguments on these issues, in turn, below, and concludes that while it can assert specific personal jurisdiction over Defendant, the forum selection clause counsels toward the dismissal of this case based on *forum non conveniens.*

*A. Motion to Dismiss for Lack of Personal Jurisdiction*
Defendant moves to dismiss this lawsuit under Rule 12(b)(2), arguing that the Court can assert neither general nor specific personal jurisdiction over it. Doc. 11, Def.'s Mot. to Dismiss ("Def.'s Mot.") 8–13. In their Response to Defendant's Motion, Plaintiffs appear to concede that the Court cannot assert general jurisdiction over Defendant. Doc. 47, Pls.' Br. in Resp. to Mot. to Dismiss ("Pls.' Resp.") 4–10. However, Plaintiffs insist that specific jurisdiction exists because (1) Defendant purposefully directed its communications towards the Plaintiffs in Texas; and (2) Defendant purposefully availed itself of this Court's jurisdiction by filing the Guaranty Lawsuit against Groenke in this Court prior to the initiation of the present action. *Id.* at 5–9. Plaintiffs further claim that the assertion of personal jurisdiction over Defendant is consistent with traditional notions of fair play and substantial justice. *Id.* at 9–10. Because the Court concludes that specific personal jurisdiction exists based on Defendant's communications to Plaintiffs in Texas and that the assertion of such jurisdiction comports with traditional notions of fair play and substantial justice, the Court does not consider Plaintiffs' argument that Defendant purposefully availed itself of this Court's jurisdiction by filing the Guaranty Lawsuit.

1. Defendant's Communications to Plaintiffs in Texas
Plaintiffs first argue that Defendant purposefully directed its communications and correspondence to them in Texas, and they contend that these communications gave rise to the claims in this case. *Id.* at 5–6. Specifically, Plaintiffs

assert that the following communications were directed at them in Texas and are the foundation for their claims that Defendant interfered with the Share Purchase Agreement, made improper demands that SGIC not sell its shares in GRIL, and incorrectly asserted that it must consent to the sale of SGIC's shares:

- an August 14, 2013 letter from BKB (the parent company of BK Berlin, one of the subsidiaries through which Defendant operates Burger King restaurants in Germany). Doc. 53-4, Pls.' Ex. E-10, App. 542–46. The letter is addressed to GRIL and Groenke, as GRIL's president, in Irving, Texas, discusses HEGO shareholders' intent to sell certain restaurants, and offers to arrange contacts with potential buyers. *Id.*;

**\*6**  • a March 19, 2014 letter from Defendant addressed to GRIL and Groenke, as GRIL's president, in Irving, Texas, stating that Defendant has been informed of "a potential buyer ... in advanced stages of negotiations ... regarding a possible acquisition of the Burger King(R) restaurants in Berlin operated by HEGO." Doc. 54-1, Pls.' Ex. E-14, App. 573. The letter further indicates that any transfer of a Burger King restaurant to a third party would require Defendant's approval "in accordance with §§ 15, 17 of the existing franchise agreements." *Id.* Lastly, the letter warns GRIL and Groenke that any failure to obtain Defendant's approval on the transfer of a restaurant would be a breach of the franchise agreements, which could "result in the immediate termination of ... franchise agreements." *Id.*; and

- a May 21, 2014 letter from Defendant addressed to SGIC and Groenke, as SGIC's president, in Irving, Texas, expressing disapproval that SGIC and GRIL continue to pursue the sale of certain restaurants and have signed a share purchase agreement even after Defendant advised them not to proceed with the sale. Doc. 54-4, Pls.' Ex. E-17, App. 577–78. Again, Defendant's letter admonishes SGIC, through Groenke, that "consummation of the transaction without [Defendant's] approval would constitute a violation of all HEGO franchise agreements" and would lead to the termination of the franchise agreements. *Id.* at App. 578.

*See* Pls.' Resp. 6. Based on these communications, Plaintiffs argue that, when Defendant became aware that

SGIC intended to sell its shares in GRIL, Defendant purposefully directed its threats to Texas residents in an effort to stop the transaction. *Id.* at 7.

Plaintiffs direct the Court to *Linton v. Whitman*, in which plaintiff John Linton, a Texas resident and managing director of plaintiff Clearview Partners, LLC, contacted the defendant Richard Whitman, a California resident and general manager of a company named Alena, regarding the purchase of Alena. No. 5:08-CV-00548-XR, 2008 WL 4560558, at *1 (W.D. Tex. Oct. 8, 2008). From Texas, the individual plaintiff exchanged several emails and engaged in multiple telephone conversations with the defendant while negotiating revisions to the letter agreement for the sale of Alena. *Id.* Following the execution of the letter agreement, the individual plaintiff was actively involved with the defendant in contacting investors who might be interested in the acquisition of Alena. *Id.* Subsequently, the plaintiffs filed suit against the defendant in Texas for fraud and negligent misrepresentation in connection with the defendant's sale of Alena. *Id.* at *1–2. The court determined that the plaintiffs had established a prima facie case of specific jurisdiction because the defendant had allegedly committed intentional torts aimed at a Texas resident and because the plaintiffs' claims were based on the communications the defendant directed at them in Texas. *Id.* at *2–3.

Defendant does not substantively engage with Plaintiffs' argument as to this basis for specific jurisdiction, instead briefly asserting that any communications and actions directed at Plaintiffs in Texas are insufficient and that "Plaintiffs' principal place of business in Texas is a mere fortuity." Def.'s Mot. 4–5. Moreover, Defendant objects to Plaintiffs' reliance on this particular theory of specific jurisdiction, as it was not raised in the Complaint. *Id.* at 1, 3.

First, Plaintiffs' neglect to raise this basis for specific jurisdiction in their Complaint does not require the Court to overlook this ground for jurisdiction. As previously explained, Plaintiffs need only establish a prima facie case of jurisdiction. *Wien Air Alaska, Inc.*, 195 F.3d at 211; *Jones*, 954 F.2d at 1067. Such prima facie case can be supported by non-conclusory factual allegations in the Complaint, as well as "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Gardemal*, 186 F.3d

at 592; *Spademan*, 772 F.2d at 1192. Here, Plaintiffs' Complaint does not assert that specific jurisdiction over Defendant is premised on Defendant's communications to Plaintiffs, which resulted in the alleged tortious conduct. Compl. 2–3. However, the Complaint does assert detailed grounds attempting to establish the existence of specific jurisdiction based on Defendant's filing of the Guarantee Lawsuit as well as general jurisdiction based on Defendant's continuous contacts with Texas. *Id.* In addition, the remainder of the Complaint discusses the allegedly tortious actions that Plaintiffs now explain qualify as "minimum contacts" with Texas. *See generally* Compl. Defendant has not presented authority indicating that Plaintiffs' failure to plead a specific theory of personal jurisdiction—when two others have been well articulated in the Complaint—precludes Plaintiffs from asserting that basis for jurisdiction by relying on the actual letters evincing Defendant's communications with Texas residents. [3]

**\*7** Here, Plaintiffs have made a prima facie showing that specific jurisdiction exists. As the Fifth Circuit has made clear, "[w]hen an alleged tort-feasor's intentional actions are expressly aimed at the forum state, and the tort-feasor knows that the brunt of the injury will be felt by a particular resident in the forum, the tort-feasor must reasonably anticipate being haled into court there to answer for its tortious actions." *Southmark Corp. v. Life Investors, Inc.*, 851 F.2d 763, 772 (5th Cir. 1988). Similar to the defendant in *Linton*, Defendant BKE purposefully directed its allegedly tortious conduct to Texas residents. Such conduct is evidenced by letters addressed to Plaintiffs in Irving, Texas regarding the sale of GRIL and the signing of the Share Purchase Agreement, in which Defendant expressed its disapproval of Plaintiffs' actions and threatened to take measures in response. *See* letters directed at SGIC, GRIL, and Groenke in Irving Texas, Pls.' Exs. E-10, App. 542–46; E-14, App. 573; E-17, App. 577–78. As Plaintiffs aver, Defendant's communications "gave rise to the claims in this case"—tortious interference with a share purchase agreement, claims relating to Defendant's demand that SGIC not sell GRIL, and Defendant's position that it must consent to any sale of GRIL. Therefore, Defendant's allegedly tortious actions and communications were directed at Plaintiffs in Texas and concerned the exact issues that are now the basis for this litigation.

Sgic Strategic Global Investment Capital, Inc. v. Burger..., Not Reported in...

Case 4:18-cv-04704   Document 9-3   Filed on 01/24/19 in TXSD   Page 108 of 131

Because the Court concludes that it can assert specific jurisdiction over Defendant based on the communications and conduct it directed at Plaintiffs in Texas, the Court need not address the parties' arguments as to Defendant's remaining grounds for challenging this Court's jurisdiction.

2. Traditional Notions of Fair Play and Substantial Justice

Next, the Court considers whether exercising personal jurisdiction over Defendant will offend traditional notions of fair play and substantial justice. *Asahi Metal Indus. Co. v. Superior Ct.*, 480 U.S. 102, 114 (1987); *see also Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.*, 9 F.3d 415, 421 (5th Cir. 1993). The court must consider five factors in determining whether exercising personal jurisdiction over a particular defendant offends fair play and substantial justice: (1) defendant's burden; (2) the forum state's interests; (3) plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the shared interest of several states in furthering fundamental social policies. *McFadin v. Gerber*, 587 F.3d 753, 759–60 (5th Cir. 2009).

With respect to the first factor—the defendant's burden—the question is not whether it would be inconvenient for a defendant to litigate in a plaintiff's chosen forum, but instead whether it would be unreasonable. *Id.* Here, Defendant BKE is a sophisticated international corporation fully capable of engaging in overseas travel. *See Glencoe Capital Partners II, L.P. v. Gernsbacher*, 269 S.W. 3d 157, 168 (Tex. App.—Fort Worth 2008, no pet.) (citing *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)). Additionally, as Plaintiffs indicate, the Burger King legal department and many of Defendant's records are located in the United States. Pls.' Resp. 10. Thus, requiring Defendant to travel to Texas to litigate this matter is not unreasonable, especially in light of the fact that it recently filed and litigated the related Guarantee Lawsuit in this Court.

The second factor is the forum state's interests. *Ruston Gas Turbines*, 9 F.3d at 421. Texas has a strong interest in protecting its residents from tortious activity. Plaintiff Groenke is a Texas resident, and Plaintiffs SGIC and GRIL have their principal places of business in Texas; as such, Texas has a strong interest in protecting its

citizens from the type of tortious activity alleged against Defendant. *Id.*; *see* Pls.' Resp. 10.

The third factor is the plaintiff's interest in convenient and effective relief. *Id.* This case involves individuals and entities from different countries, indicating that significant costs will likely be incurred for travel and document transfer. Plaintiffs have chosen their home forum, which is expected to secure the greatest level of convenience in pursuing relief. Strictly confined to the analysis of "traditional notions of fair play and substantial justice," requiring Plaintiffs to travel to a foreign forum would merely shift travel burdens from Defendant to Plaintiffs.

**\*8**  The fourth and fifth factors relate to the overall interest of the judicial system in effectively adjudicating controversies, as well as furthering fundamental social policies. *Ruston Gas Turbines*, 9 F.3d at 421. While Texas certainly has an interest in these areas, the alternate German forum would likewise have such interests. Accordingly, the Court concludes that the fourth and fifth factors are not determinative on the question of fairness. Instead, the Court relies on the first three factors, which weigh in favor of Plaintiffs. Based on these factors, the Court determines that exercising personal jurisdiction would not offend traditional notions of fair play and substantial justice.

Because Defendant has sufficient minimum contacts with Texas and the exercise of personal jurisdiction would not be unreasonable or unfair, this Court concludes that personal jurisdiction exists as to Defendant BKE. Accordingly, Defendant's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) is **DENIED**.

B. *Motion to Dismiss Based on Forum Non Conveniens*
The Court next considers whether this lawsuit should be dismissed based on *forum non conveniens.* Because Defendant urges that the forum selection clause in the franchise agreements at issue in this case mandates that this matter be litigated in Munich, Germany, the Court follows the modified *forum non conveniens* analysis, as set forth by the Supreme Court in *Atlantic Marine.*

Plaintiffs explain, and Defendant does not dispute, that the following forum selection clause appears in the franchise agreements:

Jurisdiction/Applicable Law

Case 4:18-cv-04704 Document 9-3 Filed on 01/24/19 in TXSD Page 109 of 131

Sgic Strategic Global Investment Capital, Inc. v. Burger..., Not Reported in...

The exclusive venue for any disputes arising out of this Agreement, its application or its termination shall be Munich.

This Agreement shall become effective upon acceptance and signature by BKE.

This Agreement and its interpretation are governed by the laws of the Federal Republic of Germany.

Pls.' Resp. 10; Def.'s Reply 5.

The parties do not contest the mandatory nature of this clause, and the Court likewise determines that its language indicates that it is mandatory and thus subject to the framework set forth in *Atlantic Marine. See UNC Lear Servs., Inc. v. Kingdom of Saudi Arabia*, 581 F.3d 210, 219 (5th Cir. 2009) (quoting *City of New Orleans v. Mun. Admin. Servs., Inc.*, 376 F.3d 501, 504 (5th Cir. 2004)) (explaining that a clause is mandatory when its language "go [es] beyond establishing that a particular forum will have jurisdiction and must clearly demonstrate the parties' intent to make that jurisdiction exclusive."). Additionally, the parties do not challenge the general enforceability,[4] validity, or reasonableness of the forum selection clause, nor do they suggest that the clause does not govern the dispute. Indeed, the clause is "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *Braspetro Oil Servs. Co. v. Modec ( USA ), Inc.*, 240 Fed.Appx. 612, 615 (5th Cir. 2007) (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972)). No such arguments have been made, and the Court similarly discerns no questions as to the validity or enforceability of the clause.

Instead, the parties' disagreement lies in whether (1) Defendant waived the right to enforce the forum selection clause when it filed the Guarantee Lawsuit; and (2) whether the forum selection clause can be enforced against all Plaintiffs, even though only Plaintiff Groenke signed the franchise agreement containing the clause. The Court addresses these issues, in turn, below.

### 1. Waiver of the Right to Enforce the Forum Selection Clause

**\*9** Plaintiffs argue that Defendant waived the right to enforce the forum selection clause in the franchise

agreements by filing the related Guaranty Lawsuit in this Court prior to Plaintiffs' initiation of the present case. Pls.' Resp. 11.

Although a party can waive its right to enforce a forum selection clause, "such waiver cannot be found lightly." *Kettler Int'l, Inc. v. Starbucks Corp.*, 55 F. Supp. 3d 839, 849 (E.D. Va. 2014). In assessing whether a party had waived its right to enforce a forum selection clause by seeking to recover similar damages in an alternative forum, the Fifth Circuit applied Texas law and outlined the following elements of waiver: "(1) an existing right, benefit, or advantage; (2) actual or constructive knowledge of its existence; (3) actual intent to relinquish that right." *GP Plastics Corp. v. Interboro Corp.*, 108 Fed.Appx. 832, 836 (5th Cir. 2004) (citing *Two Thirty Joint Venture v. Joe*, 60 S.W.3d 896, 904 (Tex. App. — Dallas 2001), *rev'd*, 145 S.W.3d 150 (Tex. 2004)); *see also Bancroft Life & Cas. ICC, Ltd. v. Davnic Ventures, L.P.*, No. H-12-2015, 2013 WL 1222112, at \*3 (S.D. Tex. Mar. 25, 2013) (quoting *N. Am. Specialty Ins. Co. v. Debris Fin. Servs., Inc.*, 513 F.3d 466, 470 (5th Cir. 2007) ("For waiver to occur, there must be an existing right, knowledge of its existence, and either an actual intention to relinquish that right or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished."). Thus, "[i]n order to establish a waiver of rights under a contract, there must be proof of an intent to relinquish a known right." *Johnson v. Structured Asset Servs., LLC*, 148 S.W.3d 711, 712 (Tex. App.—Dallas 2004, no pet.).

Plaintiffs contend that the franchise agreements providing for the franchise fees that were the subject of the Guarantee Lawsuit contain the same forum selection clause as the franchise agreements at issue in this case. Pls.' Resp. 11. Accordingly, Plaintiffs maintain that by filing the Guarantee Lawsuit in this Court, Defendant ignored the applicable forum selection clause and thus cannot invoke the clause in the present case. *Id.* Defendants disagree and explain that they did not waive their right to enforce the forum selection clause by filing the Guarantee Lawsuit, because the two lawsuits are based on different contracts. Def.'s Reply 6. While the Guarantee Lawsuit consists of a single claim against Groenke for breach of the guarantee contract (which does not contain a forum selection clause), the present action is based on whether Defendant had the right under the franchise agreements

Case 4:18-cv-04704  Document 9-3  Filed on 01/24/19 in TXSD  Page 110 of 131

Sgic Strategic Global Investment Capital, Inc. v. Burger..., Not Reported in...

to consent to the transfer of Plaintiffs' interests in certain Burger King restaurants. *Id.*

After reviewing the parties' arguments, the Court concludes that there is no indication that Defendant intended to waive its contractual right to enforce the forum selection clause included in the franchise agreements. Plaintiffs do not dispute that the guarantee contract at issue in the Guarantee Lawsuit does not contain a forum selection clause similar to that included in the franchise agreements that are the subject of this case. *See* Pls.' Resp. 10–11. Thus, although the Guarantee Lawsuit concerned certain fees owed under the franchise agreements, Defendant filed the suit specifically seeking to enforce its rights under the guarantee contract with Groenke, not under the franchise agreements. By asserting its rights under a distinct agreement that did not contain a forum selection clause, Defendant cannot be held to have intended to waive a right under the franchise agreements.

### 2. Direct Benefits Estoppel

**\*10**  The parties further disagree over whether all three of the Plaintiffs are bound by the forum selection clause. Although Plaintiffs do not dispute that Groenke personally signed the franchise agreements and is thus bound by the forum selection clause included in these agreements, they assert that the clause is not enforceable against the remaining plaintiffs—SGIC and GRIL— because they did not sign the franchise agreements containing the clause. Pls.' Resp. 11; *see also* Def.'s Mot. 18. In contrast, Defendant insists that Plaintiffs SGIC and GRIL are subject to the forum selection clause under the direct benefits estoppel theory. Def.'s Mot. 18–19.

The Fifth Circuit has applied the direct benefit estoppel theory to enforce a forum selection clause against a non-signatory when the non-signatory accepts the benefits of a contract containing a forum selection clause and brings claims " 'against a signatory premised in part upon the agreement.' " *Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, 517–18 (5th Cir. 2006) (quoting *Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 353 (5th Cir. 2003)). Thus, non-signatories to a contract can be bound by the forum selection clause included in such contract when they " 'have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the [forum selection] clause in the contract.' " *Id.* (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269

F.3d 187, 200 (3d Cir. 2001)). " 'A non-signatory can 'embrace' a contract containing an arbitration clause in two ways: (1) by knowingly seeking and obtaining 'direct benefits' from that contract; or (2) by seeking to enforce the terms of that contract or asserting claims that must be determined by reference to that contract. " *Lonrho PLC v. Starlight Invs., LLC*, No. H-11-02939, 2012 WL 256421, at \*3 (S.D. Tex. Jan. 27, 2012) (quoting *Noble Drilling Servs., Inc. v. Certex USA, Inc.*, 620 F.3d 469, 473 (5th Cir. 2010)).

Defendant points the Court to *Hellenic*, where the plaintiff purchased a vessel in reliance on the defendant's issuance of a certificate. 464 F.3d at 516. The defendant, a classification society, conducted the certification inspection under its certification contract with the vessel's previous owner. *Id.* at 515–16. The plaintiff subsequently sued the classification society for fraudulent misrepresentation, and the defendant moved to dismiss the lawsuit based on the forum selection clause included in the certification contract between the certification society and the vessel's previous owner. *Id.* at 516–17. The plaintiff claimed that, because it was not a signatory to the certification contract, it was not bound by the rules applicable to the contract. *Id.* The Fifth Circuit disagreed, holding that the plaintiff was bound by the contract's forum selection clause because the plaintiff directly benefitted from the defendant's performance of the contract with the previous owner. *Id.* at 519; *see also CMH Mfg. Inc. v. Hensel Phelps Constr. Co.*, No. SA-12-CV-1223-XR, 2014 WL 897341, at \*4 (W.D. Tex. Mar. 5, 2014) (where non-signatory directly benefitted from contract containing arbitration clause, direct benefit estoppel prevented non-signatory from avoiding its obligation to arbitrate).

Defendant argues that, like the plaintiff in *Hellenic*, Plaintiffs SGIC and GRIL are estopped from challenging the forum selection clause because they benefitted from the franchise agreements and are now asking the Court to interpret these agreements and declare what rights they confer upon the parties. Def.'s Mot. 19. Plaintiffs object to the application of the direct benefits estoppel theory, arguing that there is no evidence that Plaintiffs GRIL and SGIC are seeking a direct benefit under the franchise agreements. Pls.' Resp. 13. They note that SGIC is merely trying to sell its interest in GRIL, and that SGIC and GRIL cannot be held to receive direct benefits simply because one of their subsidiaries entered into a contract with Defendant that contains a forum selection clause. *Id.*

Case 4:18-cv-04704 Document 9-3 Filed on 01/24/19 in TXSD Page 111 of 131

Sgic Strategic Global Investment Capital, Inc. v. Burger..., Not Reported in...

**\*11** Despite Plaintiffs' argument that there is no evidence to support the direct benefits estoppel theory, their own allegations and version of events reveal the contrary. SGIC and GRIL cannot circumvent the forum selection clause included in the franchise agreements because they "embraced" these agreements by: (1) obtaining direct benefits from these contracts; and (2) asserting claims that must be determined by reference to these contracts. *See Lonrho PLC*, 2012 WL 256421, at *3 (quoting *Noble Drilling Servs., Inc.*, 620 F.3d at 473). First, Plaintiffs SGIC and GRIL directly benefitted from Defendant's performance under the franchise agreements. Although Plaintiffs' pleadings indicate that GRIL "did not directly own or operate any Burger King restaurants and is not a Burger King franchisee," their subsequent allegations provide a more nuanced description of the parties' relationships. Compl. 3. The Complaint goes on to explain that "[w]hen SGIC sought to sell its shares in GRIL, ... [Defendant] threatened the buyer, effectively stopping the sale when [Defendant] had no contractual or legal right to do so. This conduct significantly harmed SGIC, GRIL, and Groenke." *Id.* Plaintiffs' pleadings further characterize SGIC's efforts to sell its interest in GRIL as the pursuit of the "sale of the equity interests in an upstream parent of the franchisee." *Id.* at 12. Therefore, Plaintiffs' own version of events indicates that, although GRIL did not directly own Burger King franchisees, both SGIC and GRIL had a stake in the franchisees and thus obtained a direct benefit from the franchise agreements that enabled these franchise relationships. Additionally, as Defendant observes, "[w]ithout [its] performance under the Franchise Agreements, there would be no interests in the Restaurants for Plaintiffs to sell." Def.'s Mot. 19.

Second, Plaintiffs' claims that Defendant interfered with SGIC's attempted sale of GRIL embrace the franchise agreements—and thus subject SGIC and GRIL to the forum selection clause—because the claims "must be determined by reference to th[ese] contract[s].' " *Lonrho PLC*, 2012 WL 256421, at *3 (quoting *Noble Drilling Servs., Inc.*, 620 F.3d at 473). Plaintiffs' pleadings describe the controversy between the parties as one based on "the interpretation of the franchise agreements governing the restaurants owned by HEGO and its affiliates." Compl. 16. Plaintiffs collectively assert that "the franchise agreements governing the restaurants owned by HEGO and its affiliates do not require or permit [Defendant's] consent to a sale by SGIC of its interest in GRIL."

*Id.* Plaintiffs' own statement of the dispute demonstrates that the claims are based on whether the franchise agreements required Defendant to consent to the transfer of Plaintiffs' interests in the restaurants. Accordingly, the claims can only be determined by reference to these franchise agreements, and Plaintiffs SGIC and GRIL are precluded from selectively relying on certain portions of these agreements while disregarding the agreements' forum selection clause. In sum, the Court determines that it is appropriate to enforce the forum selection clause against the non-signatory Plaintiffs, SGIC and GRIL.

Plaintiffs raise no other arguments to challenge the validity, enforceability, or applicability of the forum selection clause to the present dispute, nor can the Court discern any such issues. Accordingly, the Court concludes that the forum selection clause in the franchise agreements providing for the litigation of disputes in Munich, Germany is valid, enforceable, and governs Plaintiffs' claims. [5]

### 3. Public Interest Factors

**\*12** As stated above, in considering a motion to dismiss based on *forum non conveniens* involving a valid forum selection clause, the Court must deem the private interest factors to weigh entirely in favor of the preselected forum and grant the motion unless the party opposing transfer shows that the "public-interest factors overwhelmingly disfavor a transfer." *Atl. Marine*, 134 S. Ct. at 581–82. The public interest factors that a district court must consider are: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *In re Volkswagen of Am., Inc.*, 545 F.3d at 315. This is not necessarily an "exhaustive or exclusive" list of factors, and none of these factors is of dispositive weight. *Id.* (citing *Action Indus.*, 358 F.3d at 340).

Plaintiffs' sole contention in support of the convenience of the present forum is that Defendant brought the Guarantee Lawsuit in this Court under German law to enforce the guarantee contract. Pls.' Resp. 14. Plaintiffs thus argue that Defendant is precluded from claiming that "this forum is inconvenient or not equipped to handle the

Case 4:18-cv-04704 Document 9-3 Filed on 01/24/19 in TXSD Page 112 of 131

Sgic Strategic Global Investment Capital, Inc. v. Burger..., Not Reported in...

interpretation of the same German law agreement and transactions" that were previously tried in this Court. *Id.*

Defendant clarifies that the guarantee contract that was the subject of the related Guarantee Lawsuit in this Court did not have a forum selection clause, and that the initiation of the Guarantee Lawsuit does not constitute a waiver of its right to enforce the forum selection clause included in the franchise agreements at issue in this case. Def.'s Reply 9. In addition, Defendant argues that "inasmuch as all of the alleged acts giving rise to Plaintiffs' claims occurred in Germany, the causes of action accrued in Germany, and there is no local interest in having this German dispute tried in Texas." *Id.*

As previously explained, the filing of the Guarantee Lawsuit did not waive Defendant's right to enforce the forum selection clause in the franchise agreements. Similarly, Defendant is not precluded from asserting that the public interest factors weigh against the present forum. Indeed, considerations such as the German court's interest in resolving local disputes and this Court's avoidance of unnecessary problems of conflict of laws or in the application of foreign law weigh against the convenience of this forum. As such, the Court finds that the public interest factors counsel toward dismissing this case.

In sum, the Court concludes that the forum selection clause is valid and enforceable against all parties in this case, and that it mandates that this dispute be resolved in Munich, Germany. In light of this clause and the public interest factors, which weigh in favor of dismissing this case, the Court **GRANTS** Defendant's Motion to Dismiss based on *forum non conveniens.*

## IV.

## CONCLUSION

For the reasons stated above, the Court **GRANTS in part** and **DENIES in part** Defendant Burger King Europe GmbH's Motion to Dismiss based on lack of personal jurisdiction and *forum non conveniens.* Doc. 11.

Specifically, the Court concludes that it can assert personal jurisdiction over Defendant and it therefore **DENIES** Defendant's Motion to Dismiss under Rule 12(b)(2). However, the Court also concludes that this dispute is governed by a forum selection clause that is enforceable against all Plaintiffs and that the public interest factors weigh in favor of dismissing the case from this forum. Accordingly, the Court **GRANTS** Defendant's Motion to Dismiss Based on *Forum Non Conveniens* and dismisses this lawsuit.

**SO ORDERED.**

**SIGNED: August 26, 2015.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 12731761

Footnotes

1   The Court incorporates in large part the factual background outlined in its Order Overruling Plaintiffs' Objections and Adopting the Findings and Recommendation of the United States Magistrate Judge on Plaintiffs' Motion for Leave to Conduct Jurisdictional Discovery. *See* doc. 42.

2   Along with their Response to Defendant's Motion to Dismiss, Plaintiffs also submitted their Objections to Defendant's Evidence in Support of its Motion to Dismiss. Doc. 55. In this filing, Plaintiffs object to the Declaration of Frank Doll and the franchise agreement and translated excerpts of the franchise agreement, which accompany Defendant's Motion to Dismiss. Doc. 55, Objections 1. However, the Court did not rely on these evidentiary submissions in deciding the present Motion to Dismiss, as it instead relied on Plaintiffs' allegations and the evidence they submitted, as well as any concessions they made to Defendants' assertions. Accordingly, the Court need not address Plaintiffs' objections to Defendant's evidentiary submissions.

3   Defendant relies on a case from the Southern District of New York to support its claim that Plaintiffs' newly raised arguments in favor of specific jurisdiction should not be considered. Def.'s Mot. 3 (citing *Cenage Learning Inc. v. Buckeye Books,* 531 F. Supp. 2d 596, 598–99 (S.D.N.Y. 2008)). However, this case does not advance Defendant's argument, as it merely states that, when there has been no discovery in connection with a motion to dismiss for lack of jurisdiction, "the plaintiff defeats the motion simply by pleading in good faith legally sufficient allegations of jurisdiction—i.e., by making

Case 4:18-cv-04704 Document 9-3 Filed on 01/24/19 in TXSD Page 113 of 131

Sgic Strategic Global Investment Capital, Inc. v. Burger..., Not Reported in...

a prima facie showing that jurisdiction exists." *Cenage Learning Inc.*, 531 F. Supp. 2d at 598–99. While the court notes that the plaintiff must present a "legally sufficient allegation of jurisdiction" in the complaint, the court did not hold that any such allegations could not be supplemented with arguments or documents outside the complaint. *Id.* at 599.

4   Plaintiffs do challenge the enforceability of the clause as to Plaintiffs SGIC and GRIL—a matter the Court discusses below.

5   Plaintiffs further point to *In re Rolls Royce*, insisting that, when a party attempts to enforce a forum selection clause against a party that did not sign the contract containing such clause, the Court must consider the private interest factors as they relate to the non-signatories. 775 F.3d 671 (5th Cir. 2014); Pls.' Resp. 11–12. In *Rolls Royce*, the Fifth Circuit held that, in determining whether to sever and transfer the claims affecting signatories to a forum selection clause from those related to the non-signatories, courts must balance the following three factors: (1) "the private factors of the parties who have signed a forum agreement [that], as a matter of law, cut in favor of severance and transfer to the contracted forum;" (2) "the private factors of the parties who have *not* signed a forum selection agreement;" and (3) "the judicial economy consideration of having all claims determined in a single lawsuit." 775 F.3d at 681. The scenario in *Rolls Royce* differs from the present case, and thus renders the above analysis inapplicable, because the Court has determined that the forum selection clause can bind the non-signatory plaintiffs SGIC and GRIL under the direct benefits estoppel theory. Thus, the Court need not engage in the "severance-and-transfer inquiry" outlined in *Rolls Royce*. However, even if the Court were to consider the private interest factors as they relate to Plaintiffs SGIC and GRIL, they would not tilt the balance in favor of denying Defendant's motion to dismiss based on *forum non conveniens*; Plaintiffs' only comment regarding the private interest factors is that "many of the key witnesses are located in the U.S. and Canada." Pls.' Resp. 12. At most, such a statement alludes to the convenience of litigating the matter in these two countries, but it fails to establish the convenience of the present forum.

---

**End of Document**                                   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 12

328 So.2d 448
District Court of Appeal of Florida, First District.

UNIJAX, INC., a Florida Corporation, Appellant,
v.
FACTORY INSURANCE
ASSOCIATION, etc., et al., Appellees.

No. X-122.
|
March 1, 1976.
|
Rehearing Denied April 1, 1976.

**Synopsis**

Parent corporation brought action to recover on business interruption policy for fire loss to paper mill owned by subsidiaries. The Circuit Court, Duval County, Marion W. Gooding, J., entered final summary judgment for insurer and for agent engaged to procure business interruption policy for plaintiff and plaintiff appealed. The District Court of Appeal, Boyer, C.J., held that the parent and its two subsidiaries being separate entities, and each separately insured under the same policy, each corporation was required to maintain its own action to recover for its own loss; that parent corporation was not doing business through its subsidiaries which were not the 'mere instrumentality' of parent; that parent corporation was not the real party in interest; that insurer's agreement for prelitigation payment would not support parent's claim of estoppel in view of specific provision in the agreement against waiver or modification of any conditions or requirements of policy or coverage thereof; and that as parent suffered no loss as a result of interruption of its business it suffered no loss as a result of any failure or fault on part of agent to procure adequate business interruption policy.

Affirmed.

West Headnotes (10)

**[1]    Judgment**
    Nature of summary judgment

Summary judgment may not be used as a substitute for trial.

Cases that cite this headnote

**[2]    Judgment**
    Necessity that right to judgment be free from doubt

If pleadings, depositions, answers to interrogatories, admissions, affidavits and other evidence in the file raise the slightest doubt upon any issue of material fact then a summary judgment may not be entered.

10 Cases that cite this headnote

**[3]    Insurance**
    Parties

Inasmuch as parent corporation and its two subsidiaries which owned property damaged by fire were separate entities and each was separately insured, though under the same business interruption policy, each corporation was required to maintain its own action to recover for its own loss and, absent a transfer of rights by subsidiaries to parent, parent was required to establish its own entitlement to recover on the policy.

8 Cases that cite this headnote

**[4]    Corporations and Business Organizations**
    Contracts in general

Where subsidiary corporations which owned Louisiana property damaged by fire were not the "mere instrumentality" of parent corporation, parent could not recover on business interruption policy covering parent and subsidiaries on theory that parent was doing business through its subsidiaries.

14 Cases that cite this headnote

**[5]    Corporations and Business Organizations**
    Parent and subsidiary corporations in general

**Corporations and Business Organizations**
    Identity of directors, officers, or shareholders

Neither ownership of all of the stock of a subsidiary, nor common officers and directors, nor both combined, are sufficient per se to justify piercing the corporate veil.

6 Cases that cite this headnote

**[6]**    **Insurance**
👉 Parties

Parent corporation of subsidiaries which owned property damaged by fire could not recover on business interruption policy covering parent and subsidiaries on theory that parent was the real party in interest.

8 Cases that cite this headnote

**[7]**    **Insurance**
👉 Matters as to which assertable

Matters of coverage are not subject to doctrines of waiver and estoppel.

3 Cases that cite this headnote

**[8]**    **Insurance**
👉 Payment of loss

Agreement between insurer on business interruption policy and parent of subsidiary corporations which owned property damaged by fire for prelitigation payment to parent did not estop insurer from asserting that parent corporation did not sustain an insured loss where the agreement specifically provided that it did not waive or modify any conditions or requirements of the policy or the coverage thereof.

9 Cases that cite this headnote

**[9]**    **Insurance**
👉 Business Interruption;Lost Profits

Diminution in value of parent corporation's stock in its subsidiaries as result of fire damage to subsidiaries' property in Louisiana did not come within coverage of policy insuring against loss resulting from the necessary interruption of business conducted on the described premises in Louisiana.

3 Cases that cite this headnote

**[10]**    **Insurance**
👉 Failure to procure coverage

Inasmuch as any loss to parent corporation as result of fire damage to property of its subsidiaries was not the result of interruption of parent's business, parent suffered no loss as result of any failure or fault on part of agent engaged by parent to procure business interruption policy.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*449**  John B. Chandler, Jr. and G. Kenneth Norrie, of Rogers, Towers, Bailey, Jones & Gay, Jacksonville, for appellant.

Delbridge L. Gibbs, of Marks, Gray, Conroy & Gibbs, Jacksonville, John W. Morrison, of Clausen, Miller, Gorman, Caffrey & Witous, Chicago, Ill., to appellees.

**Opinion**

BOYER, Chief Judge.

This is an appeal from a Final Summary Judgment, and a subsequent order denying a motion for consideration, entered by the Circuit Court of Duval County. The real issue, though not so framed by any party hereto, is whether appellant (as distinguished from its subsidiaries) sustained an insured loss under a certain policy of insurance issued by appellee, Factory Insurance Association.

**[1]**   **[2]**   It is axiomatic that summary judgment may not be used as a substitute for trial and that if the pleadings, depositions, answers to interrogatories, admissions, affidavits and other evidence in the file raise the slightest doubt upon any issue of material fact then a summary judgment may not be entered. (Connell v. Sledge, Fla.App.1st 1975, 306 So.2d 194) We must, therefore, in order to resolve the issues presented by this appeal, examine the uncontroverted evidence in the light of those principles of law.

The litigation giving rise to this appeal was commenced, ant at all times has been maintained, by appellant (Unijax) on its own behalf, to recover under a business interruption policy issued by appellee (FIA) for a loss Unijax claims to have sustained. In each count of its six count Complaint directed against FIA, (Count VII was later amended as to defendant, Womble, only), appellant alleged an August, 1969, fire loss to a paper mill in Elizabeth, Louisiana, and that it (Unijax) did 'own and operate said paper mill through its subsidiaries'. Appellant alleged further that 'as a direct result of said fire loss, Unijax sustained a business interruption loss of $4,447,361.00'. The amount claimed to be due from FIA to Unijax, after credit for a prelitigation payment of $3,494,874.00, is $952,487.00.

FIA asserted defenses to each count of the Complaint alleging inter alia, that:

1. Unijax sustained no loss insured against under the policy sued upon; and alternatively,

2. By reason of a coinsurance clause in the policy, FIA's liability is limited to, and cannot exceed, that amount paid under its policy prior to the commencement of suit.

The Circuit Court entered its summary judgment based upon its finding that Unijax **\*450** has not sustained an insured loss; i.e. that Unijax's business had not been interrupted by the Louisiana fire.

It is important that we emphasize that the issues raised by the parties, and therefore herein resolved, Do not relate to whether the subject policy afforded coverage (except as to the dispute relative to the coinsurance clause) for the fire loss, nor as to whether appellant's subsidiaries have a viable claim. Since those issues are not raised, we do not address them.

The insurance contract, which forms the basis for this litigation, identifies the insureds as:
'Jacksonville Paper Company and all subsidiary and affiliated companies as normally constituted whether owned or leased, Elizabeth, Louisiana'.

The coverage afforded by the policy, (i.e. the subject of the insurance), is delineated throughout the contract as follows:

'Subject to all its provisions this Policy insures against loss resulting only from the necessary interruption of business conducted by the Insured on premises situated: within the area located on both side of Main Street and westerly of Highway Route No. 112 in Elizabeth, Allen County, Louisiana.'

It is readily apparent from the foregoing provisions of the policy that in order for Unijax (successor to Jacksonville Paper Company) to have a claim under the policy It (Unijax) must have suffered a loss resulting from interruption of Its business conducted on the described premises in Louisiana. This is necessarily so because the subsidiaries of Unijax (as well as its affiliated companies) are also insureds and they (not Unijax) are entitled to a claim for Their losses, if any, within the coverage of the policy.

The designated insureds under the policy sued upon, their relationship Inter se and to the property described in appellee's policy, are as follows:

Unijax, Inc., a Florida corporation, appellant herein, is the successor to the corporation heretofore known as Jacksonville Paper Company, a Florida corporation. (There is no contention that Unijax does not enjoy the same protection under the policy as that afforded its predecessor.) Unijax is a wholly-owned subsidiary of IU International Corporation and is the parent of Calcasieu Paper Company and Southern Maid Paper Company. (Neither Unijax, nor its predecessor, were ever authorized to do business in Louisiana; the location of the fire which has given rise to this litigation.) Calcasieu Paper Company (Calcasieu) is a Louisiana corporation not admitted to do business in Florida. It is a subsidiary of Unijax, and was, together with Southern Maid Paper Company, the owner of the property affected by the subject fire. Southern Maid Paper Company (Southern Maid) is a Florida corporation, admitted and doing business in Louisiana. IU International Corp. (IU), formerly International Utilities Corporation, is a Maryland corporation, which, at times relevant, had its offices in Philadelphia, Pennsylvania, its principal place of business being in Wilmington, Delaware. IU

has literally hundreds of other subsidiaries. One of those subsidiaries is an operations controlling company, which is known as International Utilities Management and Services Corporation, (Management & Services Company), located in Philadelphia, Pennsylvania. The function of the Management and Services Company was inter alia, to provide consulting assistance and 'to see that the subsidiaries were well-run and profitable'.

In 1968, IU acquired Jacksonville Paper Company and all its subsidiaries, including Calcasieu and Southern Maid. Thereafter, IU caused the name of Jacksonville Paper to be changed to Unijax. From December of 1968, up through and including the date of the fire, Management & Services Company, on behalf of the parent IU, had the power to exercise complete control over **451** Unijax (Jacksonville Paper), Calcasieu and Southern Maid.

In military terms, the 'chain of command' between the above-named companies from top to bottom was: IU had the 'power' of control over Management & Services Company, which had the power of control over Unijax, which had the power of control over its subsidiaries Calcasieu and Southern Maid, which had the power of control and owned the property damaged by the fire, which was located in Elizabeth, Louisiana. It was that fire which resulted in the business interruption losses, which are the subject of this action by Unijax.

The amount of the policy in force on the date of loss, and at all times prior thereto, was determined by Reports of Values (business interruption work sheets) filed on behalf of Calcasieu and Southern Maid only. No reports of business interruption values were filed prior, or subsequent to, the loss for Unijax or Jacksonville Paper.

Following the fire in August of 1969, at the insured premises in Louisiana, interruption of business losses were incurred. When the parties attempted to adjust the losses a disagreement arose as to the application of a coinsurance provision in the policy. FIA acknowledged, however, notwithstanding the coinsurance penalties, that it did incur obligations on account of the fire. To the end of satisfying its obligations, FIA sought agreement as to the amounts of the losses sustained on the Calcasieu and Southern Maid properties. Upon agreement as to the extent of the business interruption losses sustained as a result of the fire, the parties agreed that the maximum amount recoverable under the policy was $4,447,361.00. It was then determined that if, as FIA contended, the

coinsurance provision was applicable, the recovery would in the aggregate, be reduced by $952,487.00. The sum of the uncompensated loss was arrived at by reducing the recoverable loss of Calcasieu by $695,609.00 and of Southern Maid by $256,878.00. FIA, thereupon, paid $3,494,874.00. The difference between the amount paid ($3,494,874.00) and the maximum agreed to be recoverable ($4,447,361.00) is the amount claimed by appellant in this lawsuit.

As of the date of the post-loss agreement, August 20, 1970, it was understood by all concerned that the loss and penalty calculations were predicted upon and limited to business interruption losses of Calcasieu and Southern Maid. The source of all dollar amounts referred to in the agreement came from information furnished as to the business interruption losses of Calcasieu and Southern Maid. Unijax never did business in Louisiana, and it owned no property in Louisiana affected by the fire.

The agreement for payment, which was between FIA and Unijax, hereinabove referred to concluded with the following paragraph:

> '4. Except as specifically provided herein, nothing contained in this Agreement is intended to waive or modify the conditions and requirements of the policy or in any manner to change or modify the coverage afforded by the policy, nor shall this Agreement constitute or be construed to constitute a waiver or relinquishment of any of the rights of Factory and its member companies or Unijax under the policy.'

Subject to the payment by FIA pursuant to said agreement of $3,494,874.00, the suit giving rise to this appeal was commenced; followed by motions directed to the pleadings and extensive discovery, which was, among other things, directed to an attempt to determine the intertwining corporate relationships between the super-parent, IU, its intermediaries, its out of state subsidiaries, including Unijax and the Unijax subsidiaries in Louisiana.

On November 12, 1973, an official of IU, one Keber, was deposed in Philadelphia. His deposition was not corrected and filed until December 31, 1973. Within **452** 60 days, thereafter, FIA filed its Amended Answer alleging that Unijax had not sustained an insured loss as a result of the fire in Elizabeth, Louisiana. Consistent with its original pleadings, appellant (Unijax) maintained it had sustained a business interruption loss. At no time prior to the motion for summary judgment did appellant allege or otherwise contend that anyone other than it (Unijax) sustained a business interruption loss as a result of the subject fire.

In each count of its Complaint, appellant bottoms the theory of its recovery upon the insurance contract, the occurrence of the August, 1969 fire, and its allegation that it, Unijax, 'owned and operated a paper mill in Elizabeth, Louisiana . . . through its subsidiaries, Calcasieu Paper Company, Inc. and Southern Maid Paper Company.' As already observed, the policy afforded coverage to multiple insureds: Unijax (Jacksonville Paper), Calcasieu and Southern Maid, all being separate insureds under the policy. The latter two corporations together with other entities, including IU, fall within the category description 'subsidiary and affiliated companies'.

[3] Unijax, Calcasieu and Southern Maid being separate entities, and each separately insured, (though under the same policy) the rights of one under the policy are separate and independent of the rights of the others. In Gordon Chemical Co. v. Aetna C. & S. Co., 358 Mass. 632, 266 N.E.2d 653 (1971), the defendant-insurer issued a business interruption policy naming three corporations as insureds. As a result of fire, one of the insureds (Gordon Chemical) was unable to carry on its manufacturing operations. The business of the three insureds was interrelated and the management functions of Gordon Chemical and that of another corporate insured (Hammond Plastics) were performed by the same persons. In rejecting the contention that the three corporations should be treated as one for insurance purposes, the Court, in language especially applicable to the case at bar, stated:

'The defendant further argues that the three corporations in question should be treated as one single corporation for the purposes of the insurance policy. If this is done, no loss was sustained. The defendant argues that since Hammond, Gordon, and Gordon Realty are owned and controlled by the same persons, operating branches of one business, each of which was interdependent with the other, and insured for one amount under one policy with the defendant, they are one single insured and that their

interests appear and are in fact the same. The short answer is while their interests may appear to be, they are not in fact the same. * * *

'Although the corporations had common management, the employees of Gordon otherwise were different persons from the employees of Hammond. Separate books of account for each company were kept by different individuals. Gordon lost net profits after the fire. Hammond had an increase in profits after the fire.

"Ownership of all the stock in several corporations by one person does not create a single unit or justify a disregard of separate corporations. * * * Different corporations usually are distinct entities in law. It is only where the corporation is a sham, or is used to perpetrate deception to defeat a public policy, that it can be disregarded.' New England Theatres, Inc. v. Olympia Theatres, Inc., 287 Mass. 485, 493, 192 N.E. 93, 97. 'The ownership of all the stock and the absolute control of the affairs of a corporation do not make that corporation and the individual owner identical, in the absence of a fraudulent purpose in the organization of the corporation.' M. McDonough Corp. v. Connolly, 313 Mass. 62, 66, 46 N.E.2d 576, 579. **453** Galdi v. Caribbean Sugar Co., 327 Mass. 402, 407-408, 99 N.E.2d 69. My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 233 N.E.2d 748. There is no justification here for disregarding the separate existence of each of the corporations named in the policy. They were as a matter of law separate and distinct legal entities when the policy was entered into, when the fire occurred and thereafter.' 266 N.E.2d 653, 657. (Emphasis supplied)

The holding of the court in Gordon Chemical, supra, that claims of various entities, even though interrelated, must be treated separately, and that the rights of each must be maintained in separate actions, is in accord with Florida law. (Kassner v. Travelers Ind. Co., Fla.App.3rd 1973, 285 So.2d 686) In the latter case, our sister court said:

'The fact that separate independent causes of action under an insurance contract may have arisen and accrued to two different parties or entities from a single wrong or under one contract, does not preclude, But on the contrary requires their bringing separate actions thereon. Atlanta & St. A.B. Ry. Co. v. Thomas, 60 Fla. 412, 53 So. 510.' 285 So.2d 686, 687. (Emphasis supplied)

There being three separate and distinct corporate entities, Unijax, Calcasieu and Southern Maid, each of which must maintain its own action to recover for its own loss, it is manifest, as determined by the trial court, that absent establishment of a transfer of rights by Calcasieu and Southern Maid to Unijax, Unijax must establish, in its own right, its own entitlement under the contract sued upon. In derogation of this precept, appellant seeks to recover in its own name on behalf of corporations which did business in Louisiana and from whom it has not received, nor does it claim to assert, any derivative rights. The Court below found, based upon the admissions of appellant appearing in responses to Requests to Admit and in depositions, that Unijax (Jacksonville Paper) did not own property in Elizabeth, Louisiana, on the date of the loss and that it was never authorized to do business in Louisiana. It is thus apparent that the business of Unijax was not 'conducted . . . on premises situated . . . in Elizabeth, Allen County, Louisiana.' Unijax could not, therefore, have sustained a 'loss resulting . . . from . . . the necessary interruption of its business' by the fire, which occurred in Elizabeth, Louisiana, in August of 1969.

The record establishes that the only connection between Unijax on the one hand, and Calcasieu and Southern Maid and the fire damaged property on the other, is appellant's ownership of stock in Calcasieu and Southern Maid. The only manner, therefore, in which appellant was affected by the fire was a 'possible' diminution in the value of its stock in its subsidiaries. Nowhere in FIA's policy is coverage found for a paper loss due to the diminution of an insured's stock holdings in a subsidiary, or any other corporations.

**[4]**    Appellant's argument that it was doing business in Louisiana 'through its subsidiaries, Calcasieu Paper Company and Southern Maid Paper Company' must also be rejected on the basis of other well settled legal precepts: The relationship of parent and subsidiary is not of itself sufficient to constitute doing business by the parent in the state where the subsidiary functions. Consolidated Textile Co. v. Gregory, 289 U.S. 85, 53 S.Ct. 529, 77 L.Ed. 1047 (1933); Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925); Edwin Raphael Co. v. Maharam Fabric Corp., 283 F.2d 310 (7th Cir. 1960); Berkman v. Ann Lewis Shops, 246 F.2d 44 (2nd Cir. 1957); Harris v. Deere & Co., 223 F.2d 161 (4th Cir. 1955).

Consistent with the foregoing, courts have uniformly held that a parent company is not liable for the torts of its subsidiaries, **\*454** unless the subsidiary is operated as a 'mere instrumentality' of the parent. Taylor v. Standard Gas and Elec. Co., 96 F.2d 693 (10th Cir. 1938) reversed on other grounds, 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939). The 'mere instrumentality' rule is rarely applied and only under special circumstances, for it runs contrary to established principles of corporate identity.

'The instrumentality rule should only be invoked after mature consideration and caution. Indiscriminate application would destroy the purpose of the corporate law.' Brown v. Margrande Compania Naviera, 281 F.Supp. 1004, 1006 (E.D.Va.1968). (Emphasis supplied)

The tests to be applied for the instrumentality rule were set out in Steven v. Roscoe Turner Aeronautical Corp., 324 F.2d 157, 160 (7th Cir. 1963):

'In order to establish that a subsidiary is the mere instrumentality of its parent, three elements must be proved: control by the parent to such a degree that the subsidiary has become its mere instrumentality; fraud or wrong by the parent through its subsidiary, e.g., torts, violation of a statute or stripping the subsidiary of its assets; and unjust loss or injury to the claimant, such as insolvency of the subsidiary.' 324 F.2d 157, 160.

**[5]**    None of the three elements above referred to have been alleged, much less established, by appellant sub judice. The facts established by the record, even when viewed in the light most favorable to appellant, conclusively show that Calcasieu and Southern Maid are not the 'mere instrumentality' of Unijax, as that concept has been defined by law. Neither ownership of all of the stock of a subsidiary, nor common officers and directors, nor both combined, are sufficient per se to justify 'Piercing the corporate veil'. (See St. Petersburg Sheraton Corp. v. Stuart, Fla.App.2d 1970, 242 So.2d 185)

Additional facts, which must be present to invoke the Instrumentality Rule, have been variously described 'as direct intervention' in the subsidiary's affairs (Kingston Dry Dock Co. v. Lake Champlain Transportation Co., 31 F.2d 265, 267 (2nd Cir. 1929)); the 'act of operation' of the subsidiary's business (Berkey v. Third Avenue Ry. Co., 244 N.Y. 84, 155 N.E. 58, 61 (1926)); or 'the exercise of control, not the opportunity to exercise control'. (Brown

v. Margrande Compania Naviera, supra, at 1006) Nothing of the kind is present in this case.

Appellant's next argument is founded upon its claim that it is the real party in interest. Clearly, the argument of real party in interest, in the context of this case, has as its necessary predicate the right of a parent corporation to absorb the rights of its subsidiaries with the resulting divestiture in the subsidiaries of any cause of their cause of action. To sustain such a theory, this Court must ignore the separate identities of the corporations and the judicial mandate that their respective rights under appellant's policy 'requires their bringing separate actions thereon'. (Kassner v. Travelers Ind. Co., supra)

[6]    Further, even acceptance of appellant's theory of the law requires rejection of Unijax as the real party in interest: Unijax argues in its brief that it is the real party in interest, as it is the party 'ultimately' entitled to the benefits of the insurance; i.e. that the party ultimately entitled to the insurance proceeds is the real party in interest. If Unijax, as parent of Calcasieu and Southern Maid, is a beneficiary of any monies which might be due to its subsidiaries, then it is clear that the parent of Unijax, IU, and 'affiliated' company is the 'ultimate' beneficiary, and IU, not Unijax, is the real party in interest.

[7]    Appellant's third argument, that appellee is estopped from asserting that Unijax **455 did not sustain an insured loss, is necessarily founded upon the proposition that matters of coverage (as distinct from contentions of forfeiture) are subject to the doctrines of waiver and estoppel. This is an erroneous view of the law, which has been rejected by Florida courts. Six L's Pack. Co., Inc. v. Florida Farm Bur. Mut. Ins. Co., Sup.Ct.Fla.1973, 276 So.2d 37 affirming Fla.App.4th 1972, 268 So.2d 560; Hayston v. Allstate Ins. Co., Fla.App.3rd 1974, 290 So.2d 67; Kaminer v. Franklin Life Ins. Co., 472 F.2d 1073 (5th Cir. 1973); Johnson v. Dawson, Fla.App.3rd 1972, 257 So.2d 282; and see cases collected in 1 A.L.R.3d 1139 and Supplement.

In Six L's Pack. Co., Inc., supra, the Florida Supreme Court, in considering a value reporting form policy, found for the insurer, and in so doing, adopted as its ruling, the decision of the District Court of Appeal. One of the issues before the courts on review was the same question confronting this Court, to wit: whether the doctrines of waiver or estoppel are applicable to matters of coverage.

The Court of Appeal answered this question in the negative stating:

'The general rule is well established that the doctrine of waiver and estoppel based upon the conduct or action of the insurer (or his agent) is Not applicable to matters of Coverage as distinguished from grounds for Forfeiture. 18 Fla.Jur. Insurance s 677, and 43 Am.Jur.2d Insurance s 1184. State Liquor Stores, #1 v. United States Fire Ins. Co., Fla.App.1971, 243 So.2d 228; Johnson v. Dawson, Fla.App.1972, 257 So.2d 282. See also Alaska Foods, Inc. v. American Mfr's Mut. Ins. Co., Alaska 1971, 482 P.2d 842; Commonwealth Ins. Co. of New York v. O. Henry Tent & Awn. Co., 7 Cir. 1961, 287 F.2d 316. In other words, while an insurer may be estopped by its conduct from seeking a Forfeiture of a policy, the insurer's Coverage or restrictions on the Coverage cannot be extended by the doctrine of waiver and estoppel.' 268 So.2d 560, 563 (1972). (Court's emphasis)

To the same effect in Hayston v. Allstate Ins. Co., supra, where the plaintiff claimed that the defendant's failure to participate in an arbitration proceeding estopped the insurer from asserting lack of coverage as a defense.

The rationale for the rule that waiver and estoppel are not applicable to matters of coverage has been succinctly explained as follows:

'While waiver and estoppel have been held applicable to nearly every area in which an insurer may deny liability, the courts of most jurisdictions agree that these concepts are not available to broaden the coverage of a policy so as to protect the insured against risks not included therein or expressly excluded therefrom. The theory underlying this rule seems to be that the company should not be required by waiver and estoppel to pay a loss for which it charged no premium, and the principle has been announced in scores of cases involving almost every conceivable type of policy or coverage provision thereof.' 1 A.L.R.3d 1139, 1144.

[8]    We further note that the agreement for prelitigation payment, which is the touch stone for Unijax's waiver and estoppel argument, provides in paragraphs 3 and 4 as follows:

'3. Factory agrees to pay and Unijax agrees to accept $3,494,874, provided, however, that Such payment and acceptance shall not be regarded as a final settlement of the rights of the parties and Shall be deemed to be without prejudice to the right of Unijax to contest the

applicability to the loss of the 80% Co-insurance clause and to the payment of any amount less than $4,447,361, and Without prejudice to the rights of Factory to defend against such claim. Unijax may enforce its said rights by an action  **\*456**  at law in a court of competent jurisdiction or otherwise As may be advisable, and it is agreed that the time to institute any such action or proceedings be and the same hereby is extended to January 18, 1971.

'4. Except as specifically provided Herein, nothing contained in this Agreement is intended to waive or modify the conditions and requirements of the policy or in any manner To change or modify the coverage afforded by the policy, nor shall this Agreement constitute or be construed to constitute a waiver or relinquishment of any of the rights of Factory and its Member companies or Unijax under the policy.' (Emphasis supplied)

Upon considering the foregoing provisions of the agreement the learned trial judge concluded as a matter of law:

> 'The language of the Agreement does not sustain plaintiff's claim of estoppel, but rather Para. 4 thereof specifically provides that it does not waive or modify any conditions or requirement of the policy or the coverage thereof. Based on the depositions, admissions on file and the admissions of plaintiff's counsel during argument of the motion, all figures in the Agreement relate to losses and expenses sustained by Calcasieu and Southern Maid and do not represent any loss or expense of Unijax.'

In summary, inasmuch as it appears that the subject policy of insurance insures multiple parties and that the interruption of business losses were sustained not by appellant but by separate corporate entities, Calcasieu and Southern Maid, it is clear that appellant Unijax, did not sustain an insured loss as a result of the fire on the properties of its subsidiaries in Louisiana.

**[9]**    Appellant further argues that its stock in its subsidiaries, Calcasieu and Southern Maid, was diminished in value and that therefore appellant sustained the loss. Assuming, without deciding, that such assertion by appellant is accurate, it nevertheless clearly appears that appellees' policy of insurance does not cover stock losses. As already repeatedly observed, that policy 'insures against loss resulting only from the necessary interruption of business conducted' on the described premises in Louisiana. It is therefore abundantly clear that the learned trial judge did not err in entering the summary final judgment in favor of FIA and against Unijax.

**[10]**    We next consider appellant's attack upon the summary judgment in favor of appellee Womble. Count Seven of appellant's complaint, as amended, alleges that appellee Womble was engaged by Unijax as its agent to procure a business interruption insurance policy to adequately protect Unijax and perform certain other functions such as providing expert counsel and advice concerning the business interruption policy. In entering the summary final judgment, the trial judge found that Womble was entitled to summary judgment on the same ground advanced by FIA, viz: that Unijax suffered no insured loss under the policy. Appellant argues in its brief that 'Womble is charged in the complaint as amended with having negligently failed to procure and maintain adequate business interruption insurance for Unijax. If Womble procured a policy upon which Unijax could not recover in the event of a loss, such as one in which Unijax had no insurable interest as the trial court found was here the case, the coverage obtained by Womble was hardly 'adequate'. In so arguing, appellant has missed the point of the controversy. By appellants own argument, as above quoted, Womble was allegedly charged with the responsibility of procuring and maintaining on behalf of Unijax adequate Business interruption insurance. Inasmuch as any loss sustained by Unijax was a result of diminution of the value of its stock in its subsidiaries and not as a result of any interruption of the business of Unijax then it necessarily follows  **\*457**  that since Unijax suffered no loss as a result of interruption of its business it suffered no loss as a result of any failure or fault on the part of Womble. The learned trial judge was imminently correct when he entered summary judgment for Womble also.

Affirmed.

RAWLS and SMITH, JJ., concur.

**All Citations**

328 So.2d 448

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 13

2009 WL 1351808
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

William WEYGANDT and
Williams Aviation, Inc., Plaintiffs,
v.
WECO, LLC a/k/a Weco, Inc.
and Does 1-20, Defendants.
Gulfstream Aerospace Corp., GDAS-
Lincoln, Inc., and Weco, LLC,
Counterclaim and Third-Party Plaintiffs,
v.
William Weygandt, Williams Aviation,
Inc., and Weygandt and Associates,
Counterclaim and Third-Party Defendants.

C.A. No. 4056-VCS.
|
Submitted: April 7, 2009.
|
Decided: May 14, 2009.

**Attorneys and Law Firms**

Richard L. Horwitz, Esquire, Brian C. Ralston, Esquire,
Patrick C. Gallagher, Esquire, Potter Anderson &
Corroon LLP, Wilmington, Delaware; Matthew J.
Thomas, Esquire, Sean P. Tarantino, Esquire, Rodney L.
Lewis, Esquire, Jenner & Block LLP, Chicago, Illinois,
Attorneys for Third-Party Plaintiffs.

Thomas P. Leff, Esquire, Casarino, Christman, Shalk,
Ransom & Doss, P.A., Wilmington, Delaware; Craig
S. Denney, Esquire, Downey Brand LLP, Sacramento,
California; Mark Dombroff, Esquire, Dombroff Gilmore
Jaques & French, P.C., McLean, Virginia, Attorneys for
Third-Party Defendant Weygandt & Associates.

MEMORANDUM OPINION

STRINE, Vice Chancellor.

**\*1** The counterclaim and third-party plaintiffs in this
case seek, among other relief, the rescission of two
agreements-an agreement to purchase a business, and
a related lease on the facilities where the business was
operated-based on alleged misrepresentations about the
health of the business. In this opinion, I address the
motion brought by the third-party defendant lessor to
dismiss the counterclaims and third-party claims against
it for lack of personal jurisdiction. I hold that the lessor is
bound to the forum selection clause in favor of Delaware
contained in the agreement concerning the sale of the
business, which the lessor did not execute but which, like
the lease, was negotiated by the lessor's controller. The two
agreements were closely related because the lease was only
needed by the buyer if the sale of the business closed, the
lease was specifically referenced as one of the transaction
documents in the sale agreement, and it was foreseeable
that the lessor would have to litigate issues that related
to both agreements, such as this fraudulent inducement
claim, in Delaware. The reason for that is obvious: the
buyer only entered the lease on the assumption that the
business it was to operate on the leased premises was
in the condition represented by the seller, and if there
were grounds for rescission of the business sale, the lessor
should have reasonably expected to face a rescission suit,
too. As a result, the lessor is bound by equitable estoppel
to appear in Delaware.

### I. *Background*

Before 2007, Weco, Inc. ("Weco-California")[1] owned
and operated an FAA-certified aviation repair and
overhaul business located in Lincoln, California (the
"Repair Business"). The sole shareholder of Weco-
California is William Weygandt.[2] Weygandt also
controls Weygandt and Associates ("W & A"), which
owns the building where the headquarters and main repair
facilities for the Repair Business are located (the "Lincoln
Facility").

#### A. *The Sale Of The Repair Business*
*And Lease Of The Lincoln Facility*

In late 2006, Weygandt negotiated a sale of the
Repair Business to Gulfstream Aerospace Corporation.
On January 22, 2007, Weygandt and Weco-California

executed an "Asset Purchase Agreement" with Weco, LLC ("Weco-Delaware"), a wholly owned subsidiary of Gulfstream Aerospace. The Asset Purchase Agreement contained a consent to jurisdiction clause (the "Consent Provision"): "Each party to this Agreement consents to submit to the exclusive personal jurisdiction of any state or federal court sitting in the State of Delaware in any action or proceeding arising out of or relating to this Agreement...." [3]

As a condition of closing, the Asset Purchase Agreement also required that several related agreements be executed. One of these agreements was for Weco-Delaware to lease the Lincoln Facility from W & A (the "Lease Agreement"). Accordingly, W & A and Weco-Delaware executed the Lease Agreement, the form of which was an exhibit to the Asset Purchase Agreement, as part of the Asset Purchase Agreement closing on March 2, 2007. The Lease Agreement did not contain a consent to jurisdiction clause.

**\*2** The interdependence of the Asset Purchase Agreement and the Lease Agreement is evident from several provisions in the two documents. First, in § 6.6 of the Asset Purchase Agreement, Weco-California and Weygandt covenanted that they would "cause ... [W & A] to enter into the ... Lease Agreement." [4] In other words, Weco-California and Weygandt covenanted that they had the ability to cause W & A to enter into a contract that was a necessary component of the Repair Business sale. Relatedly, as noted above, a condition of closing under the Asset Purchase Agreement was that Weygandt and Weco-California deliver an executed copy of the Lease Agreement. [5]

And, § 12.7 of the Asset Purchase Agreement stated that "[t]his Agreement, the Disclosure Schedules, *the Transaction Documents* and the other documents referred to herein collectively constitute the entire agreement among the parties...." [6] The Lease Agreement was one of the defined "Transaction Documents," and thus "constitute[d]" part of the "entire agreement" between Weco-California, Weygandt, and Weco-Delaware.

Finally, § 12 of the Lease Agreement referred back to the Asset Purchase Agreement, acknowledging that Weco-Delaware had acquired certain improvements under the Asset Purchase Agreement and preserving W & A's ability

to use the improvements that were an integral part of the building.

It is clear from these provisions that the sale of the Repair Business and the lease of the Lincoln Facility were mutually dependent aspects of the bargain Weygandt negotiated with Gulfstream. There was no reason for Gulfstream to lease the Lincoln Facility if it did not also purchase the Repair Business. As a result, if the Repair Business was not in the condition warranted, suffered a material adverse effect, or otherwise failed to meet a closing condition and Gulfstream therefore had grounds not to purchase the Repair Business, Gulfstream would have had no use for a lease on the Lincoln Facility. In essence, Gulfstream and Weygandt struck a bargain for Gulfstream to pay for its acquisition of the Repair Business in two ways-the up-front purchase price paid to Weco-California and the ongoing stream of lease of payments paid to W & A-and then divided the terms of those payments across two, interrelated agreements.

B. *The Federal Investigation And Ensuing Litigation*

A year after the sale of the Repair Business closed, in February 2008, FBI agents served a Grand Jury subpoena for certain records of the Repair Business. Weco-Delaware learned that the Department of Justice was investigating the Repair Business for pre- and post-sale violations of FAA regulations, including failure to perform mandated tests and procedures and use of unapproved parts and materials in repairs.

When Weco-California learned of the investigation, and of Weco-California's potential liability for the alleged pre-sale violations, it demanded that Weco-Delaware provide copies of certain books and records in order for Weco-California to prepare its defense. After Weco-Delaware refused, Weco-California and Weygandt brought suit in this court against Weco-Delaware asserting, among other things, breach of certain clauses of the Asset Purchase Agreement requiring cooperation in defending against legal actions.

**\*3** Weco-Delaware, along with Gulfstream Aerospace and another one of its subsidiaries (collectively, "Gulfstream"), then brought a counterclaim and third-party complaint (the "Counterclaim") against Weygandt, Weco-California, and W & A alleging, among other

things, fraudulent inducement, equitable fraud, and civil conspiracy based on alleged misrepresentations in the Asset Purchase Agreement. W & A now seeks to dismiss the Counterclaim against it on the basis that this court lacks personal jurisdiction over W & A.

## II. *Analysis*

On a Rule 12(b)(2) motion to dismiss, "the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the nonresident defendant." [7] All allegations of fact are presumed true unless contradicted by affidavit, and the court may look to pleadings, briefs, and affidavits to determine whether the plaintiff has met its burden of making a prima facie case establishing jurisdiction. [8]

Gulfstream's sole basis for asserting jurisdiction over W & A is the Consent Provision in the Asset Purchase Agreement. Gulfstream essentially raises two arguments as to why W & A is bound by that Provision even though W & A was not a party to Asset Purchase Agreement: 1) the Asset Purchase Agreement and the Lease Agreement, which W & A did sign, were part of a single agreement, so W & A is bound by the terms of the Asset Purchase Agreement; and 2) W & A embraced the benefits of the Asset Purchase Agreement, so it is equitably estopped from denying the obligations imposed by the agreement. I address each of these arguments in turn.

### A. *Single Agreement*

Gulfstream first argues that the Asset Purchase Agreement and the Lease Agreement are part of the same transaction, so W & A is bound to the Consent Provision under the general rule that agreements that are part of the same transaction are construed together. [9] But, Gulfstream has not demonstrated that under this rule of contract interpretation, a party can be bound to terms that are not in any of the agreements the party itself signed.

As a general rule, "only the formal parties to a contract are bound by its terms." [10] In some cases where the same parties have executed multiple, related agreements, the court will read all of the agreements together in order to determine the rights and obligations of the

parties. For example, in *Simon v. Navellier Series Fund,* [11] this court held that a trustee was required to bring his indemnification claim in the venue the parties selected in an Indemnification Agreement even though the trustee's claim purported to be based entirely on a related Declaration of Trust, which did not contain a venue provision. But, in *Simon* the trustee had consented to the venue provision for at least some purposes by executing the Indemnification Agreement; the issue was the scope of that consent. Here, W & A did not execute any agreement containing a consent to jurisdiction in Delaware.

**\*4** None of the cases cited by Gulfstream support the proposition that, under the single agreement theory, a party can be bound to terms not contained in any document the party executed. [12] And, doing so would be in conflict with Delaware's general policy of not extending the rights and obligations of contracts to parties that did not execute them, absent special circumstances. One of those special circumstances-equitable estoppel-may exist here, as discussed below. But, Gulfstream must press its claim through that doctrine, not through the single agreement theory.

### B. *Equitable Estoppel*

Gulfstream's second argument is that W & A is bound by the Consent Provision because W & A received a direct benefit from the Asset Purchase Agreement. For this argument, Gulfstream relies primarily on *Capital Group Cos. v. Armour,* [13] which held that a non-signatory was bound by a forum selection clause after applying a three-step analysis adopted from the United States District Court for the District of Delaware's opinion in *Hadley v. Shaffer* [14]: "First, is the forum selection clause valid? Second, are the defendants third-party beneficiaries, or closely related to, the contract? Third, does the claim arise from their standing relating to the merger agreement?" [15]

Here, W & A does not dispute that the first and third elements of the *Capital Group* test are met, [16] so the operative question is whether W & A was "closely related" to the Asset Purchase Agreement. The holding in *Capital Group* is based on a body of law developed in the federal courts concerning the enforceability of forum selection clauses. [17] The rationale in these cases is based on the

principle that a third-party beneficiary cannot enjoy the benefits of an agreement without accepting its obligations. The cases expand this principle to include not only third-party beneficiaries, but also parties who are "closely related" to the agreement at issue. For example, in *Capital Group,* the court found that a defendant was bound to an agreement that she did not sign and that expressly disclaimed any third-party beneficiaries because she was "closely related" to that agreement.

The cases suggest two ways a party can be closely related to an agreement: 1) she receives a direct benefit from the agreement; [18] or 2) it was foreseeable that she would be bound by the agreement. [19] Both ways are applicable here.

### 1. *Direct Benefit*

In *Capital Group,* the direct benefit was that a closely held company allowed one of its employees to transfer his individually titled stock to a joint trust for himself and his wife on the condition that the trust execute a Stock Restriction Agreement. This transfer benefited the wife because it gave her a direct, beneficial interest in the stock, and the court held that she was therefore bound by the forum selection clause in the Stock Restriction Agreement when the company brought suit against her in her individual capacity. [20] In *American Bureau of Shipping v. Tencara Shipyard S.P.A,* [21] the direct benefit was that a certification of seaworthiness allowed a ship purchaser to obtain lower insurance rates and permission to sail the ship under the French flag. The court therefore held that the purchaser was bound to the forum selection clause in the agreement to certify the ship executed between the ship's builder and the certification organization when the purchaser tried to sue the certification organization for improperly certifying the ship. [22]

**\*5** Here, Gulfstream claims that W & A received a direct benefit under the Asset Purchase Agreement because Gulfstream would not have entered the Lease Agreement if it was not buying the Repair Business in accordance with the Asset Purchase Agreement. The Lease Agreement is a direct benefit to W & A because it provides a lucrative tenant for W & A. Under the Lease Agreement, Gulfstream must pay W & A an annual base rent that increases over each of the five years of the lease term, starting at $277,500 and ending at $324,480, for a total of

over $1.5 million paid over the life of the lease (Gulfstream paid $19.3 million for the Repair Business). [23] In addition to this base rent, Gulfstream must pay W & A a pro rata share of W & A's "Operating Expenses" based on the percentage of rentable area occupied by Gulfstream, which was 62.12% at the time of the Lease Agreement. [24] Thus, under the Lease Agreement, W & A is able to shift a major portion of its costs of operating the Lincoln facility to Gulfstream, which is a direct benefit to W & A and is a benefit that Gulfstream only agreed to provide because the Asset Purchase Agreement required Gulfstream to lease the Lincoln Facility from W & A.

### 2. *Foreseeability*

A close relationship based on foreseeability also exists here. Several cases suggest that when a control person agrees to a forum, it is foreseeable that the entities controlled by that person which are involved in the deal will also be bound to that forum. [25] The rationale for binding such entities rests on the public policy that forum selection clauses "promote stable and dependable trade relations," and it would be inconsistent with that policy to allow the entities through which one of the parties chooses to act to escape the forum selection clause. [26]

Here, Weygandt negotiated the entire Repair Business transaction, including the sale of the Business and the lease of the Lincoln Facility. Weygandt agreed, on behalf of both himself and Weco-California, to a forum for resolving disputes arising from the sale of the Repair Business. Both Weygandt and Gulfstream expected that if there was a dispute regarding the Asset Purchase Agreement, it would be resolved in Delaware-indeed, Weygandt and Weco-California initiated this very suit in this court. Likewise, it should have been apparent to Weygandt, and therefore his controlled company, W & A, that W & A might become involved in a dispute under the Asset Purchase Agreement.

W & A obtained the Lease Agreement only because Weygandt negotiated for it as part of the sale of Repair Business memorialized in the Asset Purchase Agreement. It was foreseeable that if Gulfstream sought rescission of the Asset Purchase Agreement because it was fraudulently induced, as it is doing here, Gulfstream would also seek rescission of the Lease Agreement because

the key inducement for both Agreements-Weygandt's representations about health of the Repair Business-was the same. Put bluntly, if Gulfstream was excused from buying the Repair Business because of fraud or the falsity of the contractual representations and warranties, it would have had no business reason or legal obligation to enter the Lease Agreement, a Lease Agreement which was only needed if Gulfstream was to operate the Repair Business. And, it was foreseeable that such a dispute involving both the Asset Purchase and Lease Agreements would have to be brought, at least in part, in Delaware because of the Consent Provision in the Asset Purchase Agreement.

**\*6** Because W & A's controller negotiated this arrangement, wherein a dispute foreseeably involving W & A and the Lease Agreement had to be brought in Delaware, W & A is bound to appear in Delaware. Otherwise, W & A would have the power to cause duplicative and inefficient litigation in multiple forums and undermine the benefit of predictability that W & A's controller, Weygandt, provided to Gulfstream by agreeing to the Consent Provision in the Asset Purchase Agreement.

Thus, W & A is equitably estopped from asserting that this court lacks jurisdiction over it.

### III. *Conclusion*

For the foregoing reasons, I find that this court has personal jurisdiction over third-party defendant Weygandt & Associates and therefore deny the motion to dismiss for lack of personal jurisdiction. IT IS SO ORDERED.

**All Citations**

Not Reported in A.2d, 2009 WL 1351808

**Footnotes**

1 Weco-California has since changed its name to Williams Aviation, Inc.

2 Counterclaim ¶ 10.

3 Asset Purchase Agreement § 12.13.

4 Asset Purchase Agreement § 6.6(b).

5 Asset Purchase Agreement § 8.6(d).

6 Asset Purchase Agreement § 12.7 (emphasis added).

7 *Werner v. Miller Tech. Mgmt., L.P.,* 831 A.2d 318, 326 (Del. Ch.2003).

8 *Crescent/Mach I Partners, L.P. v. Turner,* 846 A.2d 963, 974 (Del. Ch.2000). The court may also exercise its discretion to otherwise craft an efficient procedure for determining the defendant's amenability to suit. *Hart Holding Co. v. Drexel Burnham Lambert Inc.,* 593 A.2d 535, 539 (Del. Ch.1991).

9 *See Simon v. Navellier Series Fund,* 2000 WL 1597890, at *7 (Del. Ch. Oct. 19, 2000) (noting that an "important principle of construction" is that contemporaneously executed documents executed by the same parties and dealing with related matters should be construed together); *Crown Books Corp. v. Bookstop, Inc.,* 1990 WL 26166, at *1 (Del. Ch. Feb. 28, 1990) ("[I]n construing the legal obligations created by [a] document, it is appropriate for the court to consider not only the language of that document but also the language of contracts among the same parties executed or amended as of the same date that deal with related matters ...."); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 202(2) (1981) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.").

10 *Alliance Data Sys. Corp. v. Blackstone Capital Partners V L.P.,* 963 A.2d 746, 760 (Del. Ch.2009).

11 2000 WL 1597890 (Del. Ch. Oct. 19, 2000).

12 Gulfstream claims this is what happened in *Res. Ventures, Inc. v. Res. Mgmt. Int'l, Inc.,* 42 F.Supp.2d 423 (D.Del.1999). But, in that case the court held that a signatory to an amendment was bound by the terms of the original agreement where the amendment expressly stated the original agreement remained in full force and effect. *Id. at 432-33.* Thus, the terms of the original agreement were expressly incorporated into the document the party signed, unlike here, where the Lease Agreement does not expressly incorporate the terms of the Asset Purchase Agreement.

13 2004 WL 2521295 (Del. Ch. Oct. 29, 2004). This court also recognized the applicability of equitable estoppel in the forum selection clause context in *Ishimaru v. Fung,* 2005 WL 2899680 (Del. Ch. Oct. 26, 2005). In that case, the plaintiff was attempting to reap the benefits of an agreement without submitting to its obligations. The *Ishimaru* plaintiff sued the

subsidiary of a company with which the plaintiff had a contract. The plaintiff argued that the non-signatory subsidiary was so indistinct from its signatory parent that the subsidiary could be treated as a party to the agreement and be held liable itself for breaches of the agreement. But, the plaintiff argued, the non-signatory subsidiary was distinct enough from its parent that it could not enforce the agreement's arbitration clause against the plaintiff. *Id.* at * 18. The factual situation here is not so stark, and here the question is of requiring a non-signatory defendant to appear in a forum chosen in an agreement executed by an affiliate rather than of allowing a non-signatory defendant to enforce a forum selection clause against a signatory plaintiff, but *Ishimaru* supports the basic principle of *Capital Group* that this court will use principles of equitable estoppel to determine when parties are bound to a forum.

14   2003 WL 21960406, at *4 (D.Del. Aug. 12, 2003).

15   *Capital Group,* 2004 WL 2521295, at *5. The *Hadley* court phrased the third prong of this test as both "whether the present claim arises from [the Hadleys'] standing relating to the Merger Agreement" and "do the claims against the Hadleys arise from their status relating to the Merger Agreement?" *Hadley,* 2003 WL 21960406, at *4, *6. The *Hadley* court explained that the legal requirement underlying this prong was that "[i]n order for the Hadleys to be bound by the terms of the forum selection clause [in the Merger Agreement], the claims asserted must arise from the Merger Agreement at issue." *Id.* at *6. Similarly, the *Capital Group* court stated "[i]n order for Ritter to be bound by the terms of the forum selection clause [in the SRA], the claims asserted must arise from the SRA." 2004 WL 2521295, at *7.

Thus, as applied, the meaning of the third prong of the *Capital Group* test is that the agreement containing the forum selection clause must also be the agreement that gives rise to the substantive claims brought by or against a non-signatory in order for the forum selection clause to be enforceable against the non-signatory. This appears to be a way of cabining the number of forum selection clauses a party needs to worry about in a complex transaction by preventing a litigant from binding a non-signatory to an agreement that was part of the transaction at issue, but that was so unrelated to the non-signatory that no substantive claim against the non-signatory could arise from it.

16   W & A has expressly said that the Consent Provision is valid. Rep. Br. at unnumbered 3. And W & A has not argued that the third element is not met. Nor would that be a persuasive argument. The core of Gulfstream's complaint is that the defendants failed to correct misrepresentations in the Asset Purchase Agreement, so the agreement that the claim arises under is the same agreement that contains the forum selection clause.

17   *See Am. Bureau of Shipping v. Tencara Shipyard S.P.A.,* 170 F.3d 349 (2d Cir.1999); *Hugel v. Corp. of Lloyd's,* 999 F.2d 206 (7th Cir.1993); *Coastal Steel Corp. v. Tilghman Wheelabrator, Ltd.,* 709 F.2d 190 (3d Cir.1983); *Hadley,* 2003 WL 21960406; *Jordan v. SEI Corp.,* 1996 WL 296540 (E.D. Pa. June 4, 1996).

18   *See Capital Group,* 2004 WL 2521295, at *6 ("In general, a non-signatory is estopped from refusing to comply with a forum selection clause when she received a 'direct benefit' from a contract containing a forum selection clause." (citing *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH,* 206 F.3d 411, 418 (4th Cir.2000); *Tencara Shipyard,* 170 F.3d at 353)).

19   *See Hugel,* 999 F.2d at 209 ("In order to bind a non-party to a forum selection clause, the party must be 'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound ." (quoting *Manetti-Farrow, Inc. v. Gucci Am., Inc.,* 858 F.2d 509, 514 n. 5 (9th Cir.1988); *Coastal Steel,* 709 F.2d at 203)); *Jordan,* 1996 WL 296540, at *6 ("Forum selection clauses bind nonsignatories that are closely related to the contractual relationship or that should have foreseen governance by the clause.").

20   2004 WL 2521295, at *7.

21   170 F.3d 349 (2d Cir.1999).

22   *Id.* at 353.

23   Lease Agreement Ex. C.

24   Lease Agreement § 4.2. As defined in the Lease Agreement, W & A's Operating Expenses include taxes, amortized capital repairs or replacements, insurance, permits and inspections, regulatory costs, utilities in common areas, and management fees for common areas.

25   I find the statements of the foreseeability rule to be somewhat circular-a party is bound when she should know she will be bound. But, the cases applying it tend to focus on whether the same people were involved in all of the agreements, even if they were acting on behalf of different entities. *See, e.g., Hugel,* 999 F .2d at 210 (upholding district court's finding that "the corporations owned and controlled by Hugel are so closely related to the dispute that they are equally bound by the forum selection clause and must sue in the same court in which Hugel agreed to sue"); *Jordan,* 1996 WL 296540, at *6 (holding that a company formed by a signatory to a marketing agreement for the purpose of fulfilling the signatory's obligations under the marketing agreement was bound to the forum selection clause in the marketing agreement even though the company was a non-signatory).

26    *Coastal Steel,* 709 F.2d at 203; *see also Clinton v. Janger,* 583 F.Supp. 284, 290 (N.D.Ill.1984) ("[T]he cases hold that a range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses. This is especially true where the nonparty is a third party beneficiary of the disputed contract and it is foreseeable that dispute resolution would occur in a foreign jurisdiction." (citations omitted)); *Manetti-Farrow,* 858 F.2d at 514 n. 5 ("However, 'a range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses.' We agree with the district court that the alleged conduct of the non-parties is so closely related to the contractual relationship that the forum selection clause applies to all defendants." (quoting *Janger,* 583 F.Supp. at 290)).

---

**End of Document**                                          © 2019 Thomson Reuters. No claim to original U.S. Government Works.